*Jeanne Ann Burton*

vs

*Hagh Law*

Deposition of

**PHILLIP YOUNG**

*April 21, 2022*



**HARPETH**
COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                    NASHVILLE DIVISION

 3

   IN RE:                          ) Case No:
 4                                 ) 3:19-bk-07235
        CUMMINGS MANOOKIAN, PLLC,  ) Chapter 7
 5                                 )
            Debtor,                ) Honorable Charles
 6   _____) M. Walker
                                   )
 7   Jeanne Ann Burton, in her     )
     capacity as Chapter 7         )
 8   Trustee,                      )
                                   )
 9            Plaintiff,           )
                                   )
10   v.                            ) Adv. No:
                                   ) 3:20-ap-90002
11   Hagh Law, PLLC, Afsoon Hagh,  )
     Manookian PLLC,               )
12                                 )
            Defendants.            )
13   _____)

14

15

16                    Deposition of

17                    PHILLIP YOUNG

18         Taken on behalf of the Defendants

19            Commencing at 10:14 a.m.

20                  April 21, 2022

21

22

23                    Reported by:

24            Harpeth Court Reporters
                 Franklin, Tennessee
25       Sabrina L. Schneider, LCR No. 455
```

```
1    APPEARANCES:

2    For the Witness:

3         JUSTIN CAMPBELL, ESQ.
          Thompson Burton, PLLC
4         One Franklin Park
          6100 Tower Circle, Suite 200
5         Franklin, Tennessee 37067
          (615) 465-6008
6         justin@thompsonburton.com

7    For the Defendant HAGH LAW, PLLC, and AFSOON HAGH:

8         CRAIG V. GABBERT, JR., ESQ.
          Bass Berry & Sims
9         150 Third Avenue South, Suite 2800
          Nashville, Tennessee 37201
10        (615) 742-6277
          cgabbert@bassberry.com

11
     For the Defendant MANOOKIAN, PLLC:
12
          JOHN SPRAGENS, ESQ.
13        Spragens Law, PLC
          311 22nd Avenue North
14        Nashville, Tennessee 37203
          (615) 983-8900
15        john@spragenslaw.com

16   Also Present:

17        Jeanne Ann Burton, Trustee
          Brian Manookian
18

19

20

21

22

23

24

25
```

Case 3:20-ap-90002    Doc 174-1    Filed 05/27/22    Entered 05/27/22 16:54:47    Desc
Exhibit Full Deposition Transcript    Page 3 of 68

1                         I N D E X

2                  INDEX OF EXAMINATIONS
                                              Page
3      By Mr. Spragens..................................5

4

5                    INDEX OF EXHIBITS

6      None were marked

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        The deposition of PHILLIP YOUNG, was taken

2  on behalf of the Defendants on the 21st day of April,

3  2022, in the offices of the U.S. Customs House, 701

4  Broadway, Nashville, Tennessee, for all purposes under

5  the Federal Rules of Civil Procedure.

6        The formalities as to notice, caption,

7  certificate, et cetera, are waived.  All objections,

8  except as to the form of the questions, are reserved

9  to the hearing.

10        It is agreed that Sabrina L. Schneider, being

11  a Notary Public and Court Reporter for the State of

12  Tennessee, may swear the witness, and that the reading

13  and signing of the completed deposition by the witness

14  are reserved.

15

16

17

18

19

20                        * * *

21

22

23

24

25

```
1                    PHILLIP YOUNG
2    was called as a witness, and after having been first
3    duly sworn, testified as follows:
4                  E X A M I N A T I O N
5    BY MR. SPRAGENS:
6    Q.      Mr. Young, my name's John Spragens.  I assume
7    that you know the rules of a deposition; is that fair?
8    A.      I do.
9    Q.      You're represented by counsel, Mr. Thompson?
10   Sorry.
11   A.      Mr. Campbell.
12   Q.      Mr. Campbell of Thompson Burton?
13   A.      Yes.
14   Q.      Can you give me a little bit of background
15   about yourself in terms of law licensure and the
16   history of your career?
17   A.      Yeah.  Licensed in 2000.  Practiced at Bass,
18   Berry & Sims from 2000 to August 2008.  Was on my
19   own from August 2008 through January 2010.  Formed
20   Garfinkle, McLemore & Young in 2010, practiced there
21   until March of 2014, and have been with Thompson
22   Burton since that time.
23   Q.      Let's see.  So you went to Bass, Berry & Sims
24   straight after law school?
25   A.      Yeah.
```

(615) 933-6786
www.harpethcourtreporters.com
5

Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 6 of 68

1    Q.      And then you left there in 2008?

2    A.      Right.

3    Q.      With respect to your separation from Bass,

4  Berry & Sims, was that your decision or the firm's

5  decision or a mutual decision?

6    A.      My decision.

7    Q.      And were there any ethical issues raised in

8  terms of your integrity or your ethical practice of

9  law at that time?

10   A.      None.

11   Q.      Then you were in solo practice for two or

12  three years; is that right?

13   A.      About a year and a half, I think.

14   Q.      And then you were at the Garfinkle firm from

15  '10 to '14?

16   A.      Correct.

17   Q.      Was it your decision to separate from the

18  Garfinkle firm or was it the firm's decision?

19   A.      My decision.

20   Q.      Were you a partner at that firm?

21   A.      Yes.

22   Q.      And you had a membership interest in the firm?

23   A.      I did.

24   Q.      With respect to -- okay.  At Bass, I'm

25  assuming you were not a partner; is that right?

1    A.       I had not yet been a partner.  They told me I

2    was making partner.

3    Q.       So you were expecting to make partner at the

4    time you left Bass?

5    A.       Correct.

6    Q.       Any reason why you didn't stick around and

7    make partner?

8    A.       Sure.  Because I was working too much, had

9    small children.

10   Q.       What was the corporate form of your solo

11   practice?

12   A.       Just an LLC -- or PLLC.

13   Q.       PLLC?

14   A.       Yeah.

15   Q.       What, if you recall, was the Garfinkle firm's

16   corporate entity status?

17   A.       It was either a PLC or PLLC.  I don't

18   remember.

19   Q.       And you said it was your decision to leave the

20   Garfinkle firm.

21   A.       Correct.

22   Q.       And then you went to Thompson Burton.

23   A.       Right.

24   Q.       What's the corporate form of Thompson Burton?

25   A.       PLLC.

Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 8 of 68

1  Q.      And I assume that at all times that you were

2  whether solo at Garfinkle or at Thompson Burton,

3  there's been a licensed attorney who's a member -- at

4  least one licensed attorney who's a member of each of

5  those firms?

6  A.      I assume so at Bass Berry.  Since I wasn't a

7  member there, I can't speak to that directly, but I

8  assume so.  But I can speak directly to the others.

9  Yes.

10  Q.      Your client identified you as having personal

11  knowledge about some of the allegations in the

12  complaint in this case; is that correct?

13  A.      Yes.

14  Q.      And that was in her sworn interrogatory

15  responses to Ms. Hagh's interrogatories; is that

16  right?

17  A.      Correct.

18  Q.      What is the subject matter or the -- what are

19  the topics about which you have personal knowledge in

20  this case?

21  A.      Things that happened -- any of the allegations

22  in the complaint that related to the receivership,

23  because there was a separate receivership section, and

24  then certain of the facts under the heading of the

25  Fitzgerald case to the extent that those things

1  happened prior to the bankruptcy, so, for example,

2  discussions about movement of the money and things

3  like that.

4  Q.     The bankruptcy was filed in -- is it November

5  or December of 2019?

6  A.     November.

7  Q.     November 2019.  So with respect to the

8  Fitzgerald case, before that date would be what you

9  have personal knowledge about?

10  A.     Correct.

11  Q.     And the receivership allegations, those

12  would be the ones that appear under the heading the

13  Receivership, and that starts on Page 5 and goes

14  through Page 6 of the complaint.  Does that sound

15  right to you?

16  A.     I guess.  It's under a heading that says

17  Receivership.  And obviously some of those things are

18  taken directly from pleadings.  But you'll see in

19  there that the receiver made demand or the receiver

20  asked or things like that.  Those are the things that

21  I would have personal knowledge of.

22  Q.     And with respect to the Fitzgerald case

23  allegations, that's the next section of the complaint,

24  and those are the ones that your knowledge -- your

25  personal knowledge continues through the time of the

(615) 933-6786
www.harpethcourtreporters.com
9

Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 10 of 68

1  filing of the bankruptcy?

2  A.      Right.  I think that -- I think my involvement

3  in the Fitzgerald matter really ended in -- well, I

4  guess -- yeah, I guess that's right, because there

5  were continuing to be hearings up through the time of

6  the bankruptcy, so -- about the money that was

7  deposited with the state court, so...

8  Q.      That's right.  And some of those hearings

9  would have occurred after the bankruptcy was filed

10  and, though, at the time you were still functioning as

11  the receiver in the state court case; is that right?

12  A.      Yes.  This was not a typical receivership.

13  I was not receiver of Cummings Manookian.  This was

14  a receivership that was just to collect choses in

15  action.  So it was a receivership just to collect A/R,

16  but to the extent A/R was still outstanding up until

17  the time of the bankruptcy.  Once the bankruptcy was

18  filed, I no longer had authority to collect the A/R.

19  Q.      But you were still involved in the -- as the

20  receiver after the bankruptcy was filed but before the

21  adversary proceeding was filed, correct?

22  A.      In name.  There was just nothing to do.

23  Q.      Didn't we both attend a hearing together in

24  December of 2019?  And my understanding, and correct

25  me if I'm wrong, was that you were there as the

1    receiver.

2    A.    That's right.  Yeah, that's right.

3    Q.    And that was in Lawrenceburg in front of Judge

4    Allen.

5    A.    Allen.

6    Q.    You were appointed receiver on June 20th,

7    2019; is that right?

8    A.    That sounds right.  I thought it was early

9    July, but it may have been late June.

10   Q.    I'll just -- rather than trying to show

11   you a bunch of documents today, out of respect for

12   everyone's time, I'll represent to you that Paragraph

13   22 of the complaint says, "On June 20th, 2019,

14   the Williamson County Circuit Court granted the

15   receivership and entered an order appointing Phillip

16   G. Young as receiver for purposes of collecting the

17   Cummings Manookian and Hammervold, PLC, choses in

18   action."

19   A.    That would be more accurate than my memory

20   today, so yes.

21   Q.    With respect to your knowledge or the

22   materials in the complaint that you have personal

23   knowledge about, is there anything in the complaint

24   that you now believe is inaccurate?

25   A.    That I have personal knowledge of?  No.

1  Q.      Was an order ever entered terminating the

2  receivership in the state court case?

3  A.      No, I don't think so.

4  Q.      So as of today you are still the receiver by

5  that court appointment?

6  A.      I suppose in name, but there's nothing to do,

7  because, like I said, there's no choses in action.

8  Those all belong to the bankruptcy estate.

9  Q.      But whether or not there's anything to do, you

10 were appointed receiver and the Court has not

11 terminated that appointment?

12 A.      To my knowledge, they haven't terminated.

13 Q.      What was your first awareness of a dispute

14 between Mr. Manookian or his then law firm and the

15 Chase parties?  Essentially, how did you get involved

16 as receiver in that case?

17 A.      I received a call from Dan Puryear a month or

18 two, maybe, before my appointment to ask if I was

19 willing to serve as a receiver in a case.

20 Q.      And had you known him previously?

21 A.      Dan Puryear?  I'd worked with him in other

22 cases.

23 Q.      Had you ever served as a receiver in a case in

24 which he was representing a party?

25 A.      I don't think so.

1   Q.      Had you ever served as a receiver before in

2   other state court cases?

3   A.      Yes.

4   Q.      So I'll represent to you that the complaint

5   says that they filed the receivership motion on April

6   25th of 2019.  Does that sound right to you?

7   A.      That sounds right.

8   Q.      Do you believe that you were contacted by

9   Mr. Puryear before that motion was filed?

10  A.      I think so, but I'm not certain.  I think so.

11  Q.      Do you recall whether that motion asked the

12  Court to appoint you specifically as receiver or just

13  a receiver?

14  A.      I don't recall.

15  Q.      Do you recall reviewing that motion before it

16  was filed?

17  A.      No.  I recall reviewing an order before an

18  order was submitted, but I don't recall reviewing a

19  motion.

20  Q.      And when Mr. Puryear contacted you, what in

21  sum or substance did he say?

22  A.      That he was representing a party that had a

23  large judgment against a default -- a defunct law firm

24  or against a law firm that was being wound down or

25  something and that he needed somebody to collect the

(615) 933-6786
www.harpethcourtreporters.com
Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 14 of 68

13

1  accounts receivables.

2  Q.      So at the time that he first contacted you, he

3  told you that Cummings Manookian was being wound down?

4  A.      Let me think of when that was.  Yes, I think

5  he did.

6  Q.      And what did you say to him?  I assume you had

7  to run a conflicts check and go through the usual

8  process?

9  A.      I did.

10  Q.      Did you say -- what's your recollection of how

11  you responded to his --

12  A.      Well, obviously I said yes at some point.  I

13  don't remember -- I don't remember whether I -- you

14  know, whether that took two weeks or two days.  I

15  don't remember.

16  Q.      Had you had any previous dealings with

17  Cummings Manookian or Mr. Manookian as of the time

18  Mr. Puryear called you?

19  A.      No.  I'd never heard of either of them.

20  Q.      And so, essentially, at that time you agreed

21  that you would serve as receiver if the Court

22  appointed you, and attempt to collect that

23  approximately $750,000; is that right?

24  A.      That's right.

25  Q.      And that $750,000 was a sanctions award that

1  Judge Binkley had entered in Williamson County court

2  against Mr. Manookian; is that right?

3  A.     I think it was against Mr. Manookian, Cummings

4  Manookian, Mark Hammervold, and Mark Hammervold's law

5  firm.

6  Q.     Did you attend the hearing on that motion?

7  A.     Yes.

8  Q.     So presumably that motion probably named you;

9  is that right?

10  A.     Certainly by the time -- by the time it was

11  being heard, I was proposed.  I don't remember whether

12  the motion named me or whether that was later.  I just

13  don't recall.  But certainly I knew by the time that

14  there was a hearing that I was being proposed.

15  Q.     What did you do -- what was your first act as

16  receiver after you got that appointment?

17  A.     What I recall is that I attempted to contact

18  Mr. Manookian, Mr. Hammervold, and maybe Mr. Cummings

19  -- definitely Mr. Cummings at some point, I don't know

20  whether that was later, but to get a list of cases

21  that were still active for Cummings Manookian,

22  Hammervold, either of those two firms.

23  Q.     And that would have been in the summer of

24  2019?

25  A.     That's right.

1  Q.      Did you get that list from any or all of them?

2  A.      I think I got lists from all of them.  They

3  were all slightly different, as I recall, but I

4  believe I got lists from all of them.

5  Q.      And then what did you do after you got that

6  list or those lists?

7  A.      Filed attorneys liens in those cases.

8  Q.      And you listed those cases in the complaint on

9  Page 6, the list that we talked about yesterday with

10 Ms. Burton; is that right?

11 A.      That's correct.

12 Q.      And then at some point did you begin

13 attempting to collect fees in those cases on behalf of

14 the Chase parties?

15 A.      Yes.  Well, on behalf of the Court.  The Court

16 would ultimately decide what happened to the funds,

17 but on behalf of the Court.

18 Q.      Sure.  Do you remember -- do you recall which

19 cases you successfully were collecting fees in during

20 that time period?

21 A.      I don't.  I know there were a couple, and I

22 think they're listed in the complaint, actually, but I

23 don't remember which of those cases we actually

24 collected funds from.

25 Q.      And then at some point Mr. Cummings continued

1  to make some payments to you as cases continued to

2  settle; is that right?

3  A.     Yes.

4  Q.     Was that all in 2019 or did that bleed into

5  2020 after the bankruptcy?

6  A.     That would be a question for the trustee,

7  but I -- I believe the trustee collected some fees

8  from Mr. Cummings, as well, post bankruptcy.  I know I

9  did as receiver pre bankruptcy in maybe two or three

10  cases.

11  Q.     When did you get copies of any engagement

12  letters?  When, if ever, did you get copies of any

13  engagement letters between Cummings Manookian and its

14  clients?

15  A.     As receiver, I got copies of engagement

16  letters in -- from Mr. Manookian in, I believe it was,

17  September 2019.

18  Q.     How did you get those?  Were they emailed to

19  you or did you meet in person?  What were the

20  circumstances of getting those?

21  A.     I met at 45 Music Square West, met

22  Mr. Manookian there, and he gave me copies there.

23  Q.     Was anybody else at that building, as far as

24  you knew, during that meeting?

25  A.     I didn't see anyone else.

1    Q.       So Ms. Hagh certainly wasn't there?

2    A.       Not that I know of.

3    Q.       And is it fair to say that in your time as

4    receiver, you did not ever see Ms. Hagh at 45 Music

5    Square West?

6    A.       I've never met Ms. Hagh, so no.

7    Q.       Is that the only time that you've been to

8    45 Music Square West, that September 2019 meeting?

9    A.       Yes.

10   Q.       Tell me what happened during that meeting.

11   A.       It was pretty uneventful.  I showed up and

12   rang the doorbell.  It took -- I remember it took a

13   while for somebody to come to the door because I was

14   thinking, you know, "Am I at the wrong place?"  But

15   Mr. Manookian came to the door.

16            We went upstairs to a conference room, sat

17   down.  He had the letters laid out and some other

18   things.  Like, I know there were some notices about

19   his temporary suspension that he gave me at that

20   meeting and there were some -- maybe some case

21   invoices related to the Fitzgerald case that he gave

22   me.  It was mostly engagement letters for the various

23   matters I'd asked for.

24   Q.       At that meeting, did you receive a copy of the

25   December 2018 withdrawal letter that we looked at

1  yesterday with Ms. Burton?

2  A.      I did.

3  Q.      Any other withdrawal letters that you received

4  during that meeting?

5  A.      No.

6  Q.      When you were at 45 Music Square West, did you

7  see anyone -- did you see any indicia of law practice

8  going on while you were there?

9  A.      I didn't see anyone there, if that's what

10 you're asking.

11 Q.      When you were up on the second floor, you were

12 in just a nondescript conference room; is that right?

13 A.      Yeah, was just in a conference room.

14 Q.      Was anybody using any of the other offices on

15 that floor?

16 A.      I don't remember seeing any other offices.

17 What I recall is that we went straight into a

18 conference room.  I wasn't looking, though.  I wasn't

19 looking for people.

20 Q.      At some point, did you learn that Ms. Hagh had

21 formed Hagh Law in March of 2019?

22 A.      Yes.

23 Q.      And do you recall how you learned that?

24 A.      I think that the way I recall that is that in

25 the process of attempting to secure the Fitzgerald

1  fees, Mr. Manookian represented -- well, first, I

2  found out from Mr. Meisner, who was the defense lawyer

3  in that case, that he was instructed to remit those

4  fees to Afsoon Hagh at Hagh Law.  I think that may

5  have been the first time I'd heard about Hagh Law at

6  that point.  And I think maybe I went to the secretary

7  of state's office, you know, to the website, to pull

8  it up at that point.

9  Q.      What, if anything else, did Mr. Meisner tell

10 you other than that he was instructed to remit the

11 fees to Hagh Law?

12 A.      That that's what the settlement agreement said

13 and that that's what he intended to do.

14 Q.      Did he suggest to you that there was anything

15 untoward or unusual about sending those fees to Hagh

16 Law?

17 A.      No.

18 Q.      Did you develop an impression at that time

19 that there was something untoward or improper about

20 those fees being submitted to Hagh Law?

21 A.      I don't know if it was at that time or later,

22 but I certainly, at some point during that time prior

23 to the bankruptcy, knew that the complaint had been

24 filed by Cummings Manookian and that even after the

25 December 2018 letter from Mr. Manookian that purported

1 to terminate the relationship, that Ms. Hagh continued

2 filing pleadings in the Fitzgerald case on behalf of

3 Cummings Manookian.

4 Q.      And how did you learn that, that she had

5 continued to file pleadings, as you say, on behalf of

6 Cummings Manookian?

7 A.      From the court file.

8 Q.      So you went and looked at the docket to try to

9 figure out everything that's been going on in the

10 Fitzgerald case at that time?

11 A.      I don't remember if that was -- it was

12 somewhere in August or September of 2019.

13 Q.      You are aware that when an attorney or a law

14 firm seeks to withdraw from a case, they have to make

15 some efforts to ensure that the client is continued to

16 be represented in that case; is that right?

17 A.      Yes, unless the Court excuses them from that

18 and allows the client to proceed pro se, yes.

19 Q.      So there's nothing unusual about seeing a

20 motion to withdraw that assures the Court that the

21 client will continue to be represented by another

22 attorney, is there?

23 A.      No.  I thought it was unusual that there was

24 no order allowing the withdrawal, but -- what was

25 unusual about that, though, is it was -- it was not

1  Cummings Manookian's withdrawal, it was Brian

2  Manookian's withdrawal, and then it said Afsoon Hagh

3  will continue representing the client.

4  Q.      And what was the significance, in your mind,

5  of not seeing an order regarding the withdrawal?

6  A.      I've just never -- I mean, it's a hanging

7  motion that's not resolved if there's no order that

8  grants the motion or denies the motion.

9  Q.      And that's really as a result of the Court's

10 action, not the litigant's action, right?

11 A.      I mean, if you don't submit a proposed order,

12 there's not going to be one granted.

13            MR. GABBERT:  Unless you've lost your

14 license and you can't submit a proposed order.

15            MR. MANOOKIAN:  Unless the Tennessee

16 Supreme Court has already submitted it on your behalf.

17 BY MR. SPRAGENS:

18 Q.      You're aware that Mr. Manookian became

19 suspended from the practice of law at some point in

20 2018, right?

21 A.      Yes.

22 Q.      And was it your understanding that that action

23 was taken by the Tennessee Supreme Court and the Board

24 of Professional Responsibility?

25 A.      As far as I know.

1  Q.      And there's nothing that any trial court has

2  to do to effectuate suspension of a law license, is

3  there?

4  A.      Not that I know of.

5  Q.      Do you have a view on whether Cummings

6  Manookian could have filed a notice of withdrawal as

7  opposed to a motion to withdraw in the Fitzgerald

8  case?

9  A.      I don't know.

10  Q.      If they had filed a notice of withdrawal,

11  how would that impact your view of whether Cummings

12  Manookian continued to represent the Fitzgerald

13  family?

14  A.      If Cummings Manookian had filed a notice or if

15  Brian Manookian had filed a notice?

16  Q.      Let's start with Cummings Manookian.

17  A.      If Cummings Manookian had filed a notice, then

18  presumably there would be a substitution of counsel

19  right behind it for the reasons that you've just

20  expressed, that the Court doesn't want them

21  unrepresented, and then -- so that would be

22  understandable.

23  Q.      What if Brian Manookian, who you knew to be --

24  let me ask you this.  Did you know at that time that

25  Brian Manookian was the sole member of Cummings

1    Manookian?

2    A.      No.

3    Q.      When did you learn that he was the sole member

4    of Cummings Manookian?

5    A.      Sometime after the bankruptcy was filed.

6    Q.      At what point did you first have dealings with

7    Brian Cummings?

8    A.      Within a few weeks after the receivership,

9    like I said, I reached out to him to try to get a list

10   of cases he was aware of that Cummings Manookian or

11   Hammervold Law was involved in.

12   Q.      And as of that time, you knew that he had been

13   a named partner at Cummings Manookian?

14   A.      Yes.

15   Q.      And a member for purposes of the PLLC?

16   A.      Yes.

17   Q.      Did you seek to get a copy of the operating

18   agreement at that time?

19   A.      No.

20   Q.      At what point did you seek to get a copy of

21   the Cummings Manookian operating agreement?

22   A.      I never did.  The trustee did.

23   Q.      So that would have been after the bankruptcy

24   was filed?

25   A.      Correct.

1  Q.      Is that how you came to learn that as of

2  December 2018 and early 2019, that Mr. Manookian was

3  the sole member of Cummings Manookian?

4  A.      No.  I think I discovered that after the

5  bankruptcy, but I think it was a combination of things

6  between what the trustee told me about the meeting of

7  creditors and then looking up secretary of state

8  information on Cummings Manookian.

9  Q.      In 2019, before the bankruptcy was filed, did

10  you have any view on who else was or may have been a

11  member of Cummings Manookian?

12  A.      I didn't know whether Afsoon Hagh was a

13  member.

14  Q.      Did you ask Mr. Manookian that question?

15  A.      I did not.

16  Q.      Did you ask Ms. Hagh that question via email

17  or telephone or any other way?

18  A.      I did not.

19  Q.      Did you take any steps in 2019 to determine

20  who all the members of Cummings Manookian were?

21  A.      No.

22  Q.      And is there any reason that you didn't do

23  that?

24  A.      It wasn't relevant at that time.

25  Q.      In your role as receiver, did you have any

1  view on whether a PLLC that did not have a member with

2  an active law license could continue to represent

3  clients?

4  A.     No.

5  Q.     Do you have any view on that now?

6  A.     Yes.

7  Q.     Are you prepared to share that view?

8  A.     Sure.  Mr. Manookian had a suspended license.

9  He still had a license, he was not disbarred, and so I

10 believe he could still own a PLC.  In fact, he formed

11 Manookian, PLLC, while he was suspended.

12 Q.     So it's your view that if a lawyer has

13 a suspended license, they can form and operate a

14 professional LLC engaged in the practice of law, they

15 just can't personally practice law?

16 A.     Right.

17 Q.     You are aware that the terms of his

18 suspension, which he reviewed, prohibited

19 Mr. Manookian from being in the same building as

20 anyone practicing law?

21 A.     I was aware of that.

22 Q.     And that doesn't change your view about

23 whether a PLLC with a suspended sole member can

24 continue to practice law?

25 A.     It doesn't.  I mean, you can have associates.

1  Q.      Is it your view that Mr. Manookian could hire

2  associates today and run a law firm where they are

3  engaged in the practice of law?

4  A.      I don't know.  You'd have to ask the BPR that.

5  Q.      And have you taken any steps to ask the BPR

6  that?

7  A.      No.

8  Q.      Have you taken any steps to consult with an

9  expert on legal ethics about whether that's

10  permissible or not?

11  A.      No.

12  Q.      And have you taken any steps to consult with

13  an expert on corporate formation and entities such as

14  a PLLC about whether that is allowable under the PLLC

15  statute?

16  A.      No.  I mean, I've looked at the PLLC statute.

17  Have I consulted with an expert?  No.

18  Q.      That's your view of the statute, though?

19  A.      Yes.  That's what you asked me, was my view.

20  Q.      At what point -- well, let me ask you this.

21  Did you at some point develop the view that Ms. Hagh

22  was continuing to practice law on behalf of Cummings

23  Manookian after December 2018?

24  A.      Yes.

25  Q.      How did you develop that view?

1   A.      I'm sorry.  Ask me the question again.

2   Q.      I think that you had just said that you did

3   develop the view at some point that Ms. Hagh was

4   continuing to practice law on behalf of Cummings

5   Manookian after December 2018.  And my question is:

6   How did you come to develop that view?

7   A.      Okay.  From looking at the pleadings in the

8   Fitzgerald case where she continued filing pleadings

9   on behalf of Cummings Manookian.

10  Q.      And you developed that view in the summer or

11  fall of 2019?

12  A.      It would have been -- it would have been the

13  fall of 2019.

14  Q.      And when did Ms. Hagh, in your view as

15  receiver, stop practicing law on behalf of Cummings

16  Manookian?

17  A.      I don't know that I formed an opinion, as

18  receiver, of that.

19  Q.      In your role as receiver, did you share

20  Ms. Burton's view that when Ms. Hagh filed pleadings

21  that stated Cummings Manookian, she was working on

22  behalf of Cummings Manookian, and when she filed

23  pleadings that stated Hagh Law, she was working on

24  behalf of Hagh Law?

25              MR. CAMPBELL:  Object to the form.

1           THE WITNESS:  I don't know that I formed

2     an opinion either way about that.

3     BY MR. SPRAGENS:

4     Q.      As receiver, did you form an opinion that

5     Ms. Hagh was -- that all of Ms. Hagh's work in the

6     Fitzgerald case in 2019 was performed on behalf of

7     Cummings Manookian?

8     A.      Again, I don't know that I formed an opinion

9     about that.  What I was tasked to do by the Court was

10    to collect $750,000, and I knew that I had a very good

11    argument, based on the engagement letter, that the

12    firm was entitled to at least that much, and that was

13    sort of the end of it.

14    Q.      Well, let's talk about the engagement letter

15    for a minute.  You're aware that the engagement letter

16    entitles Cummings Manookian to collect a reasonable

17    attorney's fee in the event it's discharged by its

18    client, right?

19    A.      That's what it says, right.

20    Q.      And in the next paragraph, it talks about if

21    the firm withdraws from the representation, and it

22    says, "Cummings Manookian is entitled to collect its

23    advanced costs," correct?

24    A.      That's what it says, right.

25    Q.      And it does not say anything in that paragraph

1    about collecting any fees from the client; is that

2    correct?

3    A.      It does not.

4    Q.      You would agree that the Fitzgeralds never

5    discharged Cummings Manookian as their counsel,

6    correct?

7    A.      Not to my knowledge.

8    Q.      And you've seen the December 2018 letter in

9    which Cummings Manookian tells the Fitzgeralds that it

10   is withdrawing from the case, correct?

11   A.      Yes.  And then there's subsequent pleadings

12   that were continued to be filed on behalf of Cummings

13   Manookian.

14   Q.      But you have seen that letter that we looked

15   at yesterday with Ms. Burton?

16   A.      Yes.

17   Q.      And when you withdraw from a representation,

18   is it unusual, in your view, that there might be a

19   transition period in which a couple of additional

20   pleadings are filed?

21   A.      Yes, that would be unusual in my opinion.

22   Q.      Your reading of the engagement letter between

23   Cummings Manookian and the Fitzgeralds is that it is

24   silent on the question of whether Cummings Manookian

25   is entitled to attorney's fees in the event that it

(615) 933-6786
www.harpethcourtreporters.com
30

Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 31 of 68

1  withdraws?

2  A.      Are you asking me as receiver or counsel for

3  the trustee?

4  Q.      I'm asking you as receiver when you got that

5  letter.

6  A.      As receiver, I had no opinion about that.

7  Q.      Well, you just told me that you thought that

8  you had a good argument as receiver that Cummings

9  Manookian was entitled to that money in the Fitzgerald

10 case.  So what's the basis of that good argument?

11 A.      Because there was a signed engagement letter

12 with Cummings Manookian, and I was unaware of any

13 other signed engagement letters.

14 Q.      But you were aware, as of summer 2019, that

15 this December 2018 withdrawal letter existed, right?

16 A.      Yes.

17 Q.      How did that impact your good argument?

18 A.      It didn't.

19 Q.      And why is that?

20 A.      Because I think that's an attempted withdrawal

21 that was never followed through.  I think it was a

22 notice to the client that there was an attempt to

23 withdraw and then there was never a withdrawal.

24 Q.      So it's your view -- or it was your view as

25 receiver that notwithstanding the suspension of the

1  law license and the statement to the client that "I

2  am required to withdraw as counsel in this matter,

3  Cummings Manookian is additionally required to

4  withdraw as Brian Cummings has recently left the

5  firm and I am in the process of winding up its

6  affairs" -- notwithstanding that language, you do

7  not believe that there was an effective withdrawal

8  by Cummings Manookian in the Fitzgerald matter?

9  A.      That's correct.

10 Q.      And the statement in the December 2018 letter,

11 "I am in the process of winding up its affairs,"

12 that's consistent with what Mr. Puryear told you when

13 he called you about serving as receiver, correct?

14 A.      I think it is, yeah.

15 Q.      Cummings Manookian was winding down because

16 Manookian had been suspended from the practice of law

17 and so he couldn't continue anymore?

18 A.      I don't know if he said that, but I do think

19 he said they were winding down.  I do believe that.

20 Q.      And so this letter that was signed by Brian

21 Manookian in December of 2018 is entirely consistent

22 with what Mr. Puryear told you when you got involved

23 in the case?

24 A.      With regard to the winding down, yes.

25 Q.      So how would Cummings Manookian continue to

1  represent the Fitzgeralds after sending this letter

2  and filing a motion for withdrawal in the Fitzgerald

3  case?

4  A.    Well, Cummings Manookian didn't file a motion

5  to withdraw.  It was Brian Manookian's motion to

6  withdraw.  So Afsoon Hagh could continue representing

7  Cummings Manookian in that case.

8  Q.    And it was your view as receiver she could do

9  that, notwithstanding the fact that the principal of

10  Cummings Manookian sent a letter telling the client

11  that the firm would no longer represent the client or

12  even be engaged in the business of practicing law?

13  A.    Yes.

14          MR. CAMPBELL:  Mr. Spragens, are you

15  going to make that an exhibit to his depo?

16          MR. SPRAGENS:  I wasn't planning to,

17  because we did it yesterday.

18          MR. CAMPBELL:  If it's in the record from

19  yesterday, that's fine.

20          MR. SPRAGENS:  It is the December 7th,

21  2018, letter.

22          THE WITNESS:  I know what letter you're

23  talking about.

24  BY MR. SPRAGENS:

25  Q.    In your view, were Marty and Melissa

1  Fitzgerald entitled to rely on the representation

2  from Mr. Manookian in December 2018 that the firm was

3  withdrawing and, in fact, winding up its affairs?

4  A.      I don't even know if they received that

5  letter, so I can't answer that question.

6  Q.      If they did receive that letter, would they be

7  entitled to rely on that representation?

8              MR. CAMPBELL:  Object to the form.

9              THE WITNESS:  I don't know.

10  BY MR. SPRAGENS:

11  Q.      You didn't have a view on that as receiver?

12  A.      No.

13  Q.      At the time that Mr. Manookian gave you a copy

14  of this letter in 2019, did you doubt that it had been

15  sent to the client?

16  A.      Yes.

17  Q.      And what was the basis of that?

18  A.      Because Mr. Manookian couldn't produce -- or

19  Cummings Manookian couldn't produce the green card,

20  because he says it was sent certified.

21  Q.      Any other reason you doubted the authenticity

22  of this letter?

23  A.      That's it.

24  Q.      If Mr. Fitzgerald testifies that he received

25  this letter, would that be sufficient, in your mind,

1 | to demonstrate that he did receive this letter?

2 | A.     As receiver, it doesn't matter to me anymore.

3 | So...

4 | Q.     And when you were receiver, did you contact

5 | Mr. Fitzgerald to ask if he received this letter?

6 | A.     No.

7 | Q.     Did you develop your suspicion about its

8 | authenticity immediately upon receiving it?  In other

9 | words -- let me ask you this:  When did you ask for

10 | the green card?

11 | A.     Before the bankruptcy.  It was while I was

12 | serving as receiver, but I don't remember when.

13 | Q.     Was it during that meeting at 45 Music Square

14 | West?

15 | A.     It could have been, or it could have been

16 | after that.  I don't remember.

17 | Q.     Do you have any correspondence where you asked

18 | for the green card?

19 | A.     I don't know.

20 | Q.     Do you recall if you did it orally or in

21 | writing?

22 | A.     I don't.

23 | Q.     Is that material that you could search through

24 | and obtain in this case if we asked you to?

25 | A.     I could if it's relevant, yes.

1  Q.      Is there any chance that you didn't ask for

2  the green card?

3  A.      No.  I asked for the green card.

4  Q.      You just don't remember when or how?

5  A.      I don't remember how or when.  I remember

6  being told that the file that that was kept in had

7  been corrupted, the computer file, that it had been

8  scanned in and been corrupted.

9  Q.      Do you recall hearing anything about a server

10 that was no longer able to be accessed?

11 A.      No.

12 Q.      You don't recall Mr. Manookian ever telling

13 you about that?

14 A.      No.

15 Q.      And when you say you heard about a file that

16 had been corrupted, when did you hear about that?

17 A.      It would have been the same time I asked for

18 the green card.

19 Q.      That was a conversation between you and

20 Mr. Manookian?

21 A.      Yes.  I don't remember whether it was by email

22 or orally.  I don't remember.

23 Q.      But you two were the only parties to that

24 conversation?

25 A.      As far as I remember, yes.

1  Q.      And whatever conversation you-all had in

2  person at 45 Music Square West, you-all were the only

3  parties to that conversation as well?

4  A.      Yes.  It was a brief conversation.  It was

5  really, "Here are the documents."

6  Q.      And to the best of your recollection, at that

7  meeting you did not ask for the green card?

8  A.      I don't remember.  I don't remember if it was

9  that meeting or later.

10  Q.      Is there something that led you to believe you

11  needed to see the green card in order to understand

12  that this letter got sent?

13  A.      I don't remember.  I don't remember why I

14  asked for the green card.

15  Q.      Because my point is, you know, a lot of times

16  letters say via U.S. mail, via email, but you don't go

17  ask every time you get a letter to see the proof that

18  it was sent, correct?

19  A.      Right.

20  Q.      So what was it about this letter that made you

21  need to see the green card?

22  A.      I think just the fact that then there were

23  filings that Afsoon Hagh later had on behalf of

24  Cummings Manookian.

25  Q.      Well, that was your legal view as the

1 receiver, correct?

2 A.      Right.

3 Q.      That was a conclusion you drew?

4 A.      Right.

5 Q.      So isn't it possible that you drew a

6 conclusion that was just not supported by the record

7 of what actually happened in the case?

8 A.      Yeah.  Of course that's possible.

9 Q.      Do you have any information about what the

10 Fitzgeralds did after receiving this letter, if, in

11 fact, they received this letter?

12 A.      No.

13 Q.      Do you know if they attempted to interview any

14 other attorneys to represent them?

15 A.      I don't.

16 Q.      And you didn't contact them to ask about

17 that --

18 A.      No.

19 Q.      -- when you were serving as receiver?

20 A.      I did not.

21 Q.      Upon your appointment as receiver, at some

22 point you filed motions that were adverse to Cummings

23 Manookian; is that correct?  And by "adverse" I mean

24 seeking to collect funds from Cummings Manookian.

25 A.      No, I don't think so.  I don't think I was

1    ever seeking -- I was seeking to recover the funds

2    that belonged to Cummings Manookian.

3    Q.      Did you ever file a motion seeking contempt

4    against Cummings Manookian?

5    A.      In the receivership?

6    Q.      When you were serving as receiver.

7    A.      I may have, but I don't remember.

8    Q.      Did you file a motion seeking sanctions

9    against Cummings Manookian as receiver?

10   A.      I may have.  I don't remember.

11   Q.      Do you recall that the substance of the

12   December 2019 hearing involved allegations by you as

13   receiver that Ms. Hagh had moved money improperly in

14   bank accounts?

15   A.      Yes.

16   Q.      And those allegations are actually

17   memorialized in the complaint that Ms. Burton filed,

18   correct?

19   A.      That's correct.

20   Q.      Do you recall seeking monetary sanctions

21   against Ms. Hagh or Hagh Law?

22   A.      I don't, but I could have.  I just don't

23   remember.

24   Q.      Do you recall seeking monetary sanctions

25   against Cummings Manookian?

1  A.      I don't, but I could have.  I mean, the

2  pleadings would be the best evidence of that.  I just

3  don't remember.

4  Q.      So whatever the pleadings say, you stand by

5  those pleadings?

6  A.      That's right.

7  Q.      Do you agree with me that if you filed a

8  motion seeking sanctions and -- monetary sanctions

9  and/or contempt against Cummings Manookian, that that

10  would make you adverse to Cummings Manookian?

11          MR. CAMPBELL:  Object to the form.

12          THE WITNESS:  I don't know.  I don't

13  remember the context of that, so I can't answer that

14  question.

15  BY MR. SPRAGENS:

16  Q.      Do you understand what I mean when I talk

17  about adversity in a legal sense?

18  A.      Yeah.  Sure.

19  Q.      So if you alleged improper conduct by Cummings

20  Manookian or its principals, do you agree with me that

21  that would make you adverse to Cummings Manookian?

22  A.      Or its principals, yes.

23  Q.      You don't disagree with me that seeking

24  monetary sanctions against a party makes you adverse

25  to that party?

1    A.      I'd say that's generally right, yeah.

2    Q.      You have paid yourself, with court

3    authorization, from funds that you collected as

4    receiver from Cummings Manookian, correct?

5    A.      From Cummings Manookian and Hammervold

6    receivables, yeah, that's right.

7    Q.      And do you know as of the time the adversary

8    proceeding was filed -- do you know how much you had

9    paid yourself, at that time, from those funds?

10   A.      I don't, but the receivership reports would

11   show that.

12   Q.      Do you have any time or fees in the

13   receivership action that have not been paid as of this

14   date?

15   A.      I think so, yes.

16   Q.      And what's the date range of that work?

17   A.      I don't recall.

18   Q.      Do you have any -- do you recall what work you

19   haven't been paid for in the receivership?

20   A.      I think it was all pre-petition time, if

21   that's what you're asking.

22   Q.      So your recollection is that work you haven't

23   been paid for in the receivership predates the filing

24   of the bankruptcy?

25   A.      That's my recollection, but the receivership

Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 42 of 68

1 reports would show that.

2 Q.    Have you been paid for your work in December

3 of 2019 in which you filed motions for a temporary

4 restraining order seeking some sort of collection of

5 funds from Hagh Law in front of Judge Allen?

6 A.    I don't know.

7 Q.    So you're not sure if you've been paid for the

8 December 2019 work you did?

9 A.    I don't know.

10 Q.    That would be after the filing of the

11 bankruptcy?

12 A.    That's right.

13 Q.    Is Cummings Manookian obligated to pay your

14 unpaid fees in the receivership?

15 A.    No.

16 Q.    And why not?

17 A.    I think there's a court order that directs

18 that any unpaid receiverships be paid by the

19 petitioning party, which would be the Chases.

20 Q.    And that's because the $750,000 that you were

21 seeking to collect as receiver has been vacated as of

22 this date; that order has been vacated by the

23 Tennessee Court of Appeals?

24 A.    I'm not sure that that's why, but what you

25 said is accurate, that that order has been vacated.

1 It was well after my involvement in the state court

2 action.

3 Q.      At this point in the receivership, there is

4 not a chose in action that needs to be collected?

5 A.      That's correct.

6 Q.      Fair to say?

7 A.      Yes.

8 Q.      I'm talking to you about things you know

9 better than I do, which is always the challenge being

10 a lawyer.

11          MR. SPRAGENS:  Let's take a little break.

12 We don't have a whole lot more.

13          (Recess observed.)

14 BY MR. SPRAGENS:

15 Q.      Mr. Young, have you ever spoken with Judge

16 Walker in person or on the phone, outside the presence

17 of opposing counsel, about any party or issue in this

18 case?

19 A.      No.

20 Q.      You heard Judge Walker say that an attorney

21 had called him expressing concerns about being in the

22 same room with Mr. Manookian.  Did you hear him say

23 that at the hearing?

24 A.      I heard him say that, that somebody had

25 called --

Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 44 of 68

1    MR. CAMPBELL: Objection. Relevance.

2    THE WITNESS: I heard him say that

3  somebody called chambers.

4  BY MR. SPRAGENS:

5  Q.    And do you know anything about an attorney

6  calling chambers about Mr. Manookian?

7  A.    The only thing that I know about it is the

8  very, very first hearing we had in this case, I called

9  his courtroom deputy to alert her to the fact that a

10 creditor's lawyer had an order of protection. And I

11 didn't know how that was going to work logistically

12 when you have a lawyer who's representing a creditor

13 in the bankruptcy and the debtor's representatives

14 and there was an order of protection down. And so I

15 called to alert them to that so they would know how to

16 handle that. But I don't know if anybody else called.

17 Q.    And which creditor are you referring to?

18 A.    Chase.

19 Q.    And who's the lawyer?

20 A.    Dan Puryear.

21 Q.    And do you know if Mr. Puryear contacted

22 chambers too about that?

23 A.    I don't know.

24 Q.    But you contacted chambers to let them know

25 that the Chase parties and Mr. Manookian couldn't be

1 | in the same space; is that correct?

2 | A.     I just told them that I knew there was an

3 | order of protection, so logistically I thought that

4 | was a potential problem.

5 |          MR. CAMPBELL:  Objection.  Relevance.

6 | BY MR. SPRAGENS:

7 | Q.     And did you make any comments about

8 | Mr. Manookian posing a risk to any person in the

9 | courthouse?

10 | A.     No.

11 | Q.     Do you know who in the chambers you talked to?

12 | A.     It would have been his courtroom deputy.  I

13 | think it was the person before Lauren.  Lauren is the

14 | current courtroom deputy, but I think it was the

15 | person before her.

16 | Q.     Did you consider filing a motion to point out

17 | whatever that concern was rather than calling chambers

18 | ex parte?

19 | A.     No.

20 | Q.     And why not?

21 | A.     Because it was just a logistical issue and we

22 | always handle that through the courtroom deputies.

23 | Q.     Well, it was a logistical issue that

24 | implicated bodily safety; is that fair?

25 |          MR. CAMPBELL:  Objection.  Relevance.

1          THE WITNESS:  No, I don't think that's

2    fair.

3    BY MR. SPRAGENS:

4    Q.      Did you say anything about Mr. Manookian

5    posing a risk to any person?

6    A.      No.

7    Q.      Do you know who was operating Cummings

8    Manookian during the period December 2018 through

9    March 2019?

10   A.      No.

11   Q.      You know it wasn't Mr. Cummings, though,

12   correct?

13   A.      I wasn't involved in the case during that

14   time, so I don't know.  I assume it wasn't, because he

15   had withdrawn.

16   Q.      And started his own firm?

17   A.      Correct.

18   Q.      And you learned all that as receiver?

19   A.      Right.

20   Q.      So as receiver, did you develop any view on

21   who was operating Cummings Manookian during that time

22   period between December 2018 and March 2019?

23   A.      No.

24   Q.      But I guess you testified earlier that you

25   thought that -- at that time you thought that Ms. Hagh

1    might be a partner operating a firm?

2    A.        I didn't know what she was.  I just know she

3    was signing pleadings on behalf of Cummings Manookian.

4    Q.        And you know she's a licensed attorney just

5    like you and I are, correct?

6    A.        Right.

7    Q.        And she's had other law firm jobs other than

8    Hagh Law.  Are you aware of that?

9    A.        No.

10   Q.        You're aware that she's -- are you aware that

11   she has litigated and tried cases in court?

12   A.        I think somebody has mentioned that, but I'm

13   not personally aware of where that was or anything.

14   Q.        I guess I'm just trying to understand why you

15   developed the assumption that she was not, you know,

16   able to start her own law firm and represent clients

17   in her own capacity at Hagh Law.

18   A.        Is that a question?

19   Q.        Yeah.  Can you shed any light on that?

20   A.        I don't think I developed the theory that she

21   wasn't able to.  I think I developed the theory that

22   she didn't because she continued filing things on

23   behalf of Cummings Manookian.

24   Q.        As of March 2019, when she formed Hagh Law, do

25   you contend that Cummings Manookian still represented

1 | the Fitzgeralds starting in March 2019?

2 | A.      I don't think I had an opinion on that as

3 | receiver.

4 | Q.      As receiver, did you develop an opinion on the

5 | last action that Ms. Hagh took on behalf of Cummings

6 | Manookian in the Fitzgerald case?

7 | A.      I didn't have an opinion about that.

8 | Q.      As receiver, do you hold the opinion that

9 | Cummings Manookian was entitled to 100 percent of the

10 | fee in the Fitzgerald case?

11 | A.      I never fully developed that opinion, so the

12 | answer to that is no, I didn't have an opinion on

13 | that.  I felt confident that Cummings Manookian was

14 | entitled to at least the 760 that was in court.

15 | Q.      And you're aware now that your client's view

16 | is that Cummings Manookian is entitled to 100 percent

17 | of the fee in the Fitzgerald case?

18 | A.      Yes.

19 | Q.      But that is not a view that you had formed as

20 | receiver?

21 | A.      Not at that time.

22 | Q.      I'm not going to mark the complaint as an

23 | exhibit, but I'm going to hand you a copy of the

24 | adversary proceeding complaint.  And my question is:

25 | Looking through Paragraphs 10 through 41, which are

1    all the factual materials in the case, those were all

2    facts that were developed within your knowledge as

3    receiver; is that fair to say?

4    A.      (Reviewing document.)  No.

5    Q.      Okay.  Which facts were not within your

6    personal knowledge as receiver?

7    A.      I don't think I knew the date or the year in

8    which Cummings Manookian was formed.

9    Q.      So that would be a fact in Paragraph 10?

10   A.      Uh-huh.  Yes.

11   Q.      And just for the record, you're reviewing

12   these paragraphs in the complaint, and you'll let me

13   know if you see facts that were not developed in your

14   role as receiver.

15   A.      Yes.  And so in Paragraph 13, for example,

16   I mean, these were things I knew as receiver, but

17   actually, the actual pleadings are the best evidence

18   of that.

19   Q.      Fair enough.

20   A.      Paragraph 13.

21   Q.      But you had personal knowledge as receiver of

22   the facts in Paragraph 13, even though the pleadings

23   may be the best evidence of what was in those

24   pleadings?

25   A.      Right.  I knew of those pleadings and I knew

1  that they represented what it says in Paragraph 13.

2  Same on Paragraph 14, and same on Paragraph 15.  I

3  mean, obviously the secretary of state's website is

4  where that information came from.

5  Q.      That's right.  But you --

6  A.      But I knew of that information, yes.

7  Q.      I think you testified earlier that you went

8  and looked that up on the secretary of state's website

9  when you were receiver.

10  A.      I think I did.

11          And the same thing on 16.  That comes from

12  pleadings, but I knew.

13          Now, 17 I did not have personal knowledge of

14  as receiver.

15  Q.      You heard Ms. Burton testify that the basis

16  for the allegation in 17 that appears in some other

17  places in the complaint is the use of 45 Music Square

18  West by Ms. Hagh on pleadings; is that right?

19  A.      That's right.

20  Q.      And you did have personal knowledge of that at

21  the time?

22  A.      That's right.

23  Q.      And you're not aware of any other facts that

24  support Paragraph 17 that were developed in your time

25  as receiver, are you?

1   A.      No.  18, again, it was from the secretary

2   of state's office.  I'm actually not sure that as

3   receiver I knew the date that Manookian, PLLC, was

4   formed.

5   Q.      So you don't have a recollection, when you

6   were serving as receiver, looking up Manookian, PLLC?

7   A.      I don't.  And the same response to Number 19.

8   I'm not sure that I looked into Manookian, PLLC, as

9   receiver.

10  Q.      Any reason why Manookian, PLLC, was not

11  important to you when you were serving as receiver?

12  A.      Because it wasn't holding any funds.  It

13  wasn't making claims to any funds.  And, again, I was

14  just trying to collect a receivable, and it wasn't

15  making a claim to a receivable.  And same answer to

16  20.

17  Q.      Okay.  So those paragraphs with respect to

18  Manookian, PLLC, are not information that you learned

19  or developed as receiver?

20  A.      That's right.

21  Q.      And then I think we've talked about the next

22  section, which is Paragraphs 21 through 24.

23  A.      Yes.  That would all be -- I would have had --

24  again, some of these, I mean, are just reciting things

25  that are in the record, but I would have had knowledge

1 of all this that was in the record, being 21 through

2 24.

3 Q.      And you were participating in the hearings in

4 that case during that time period?

5 A.      That's right.

6 Q.      Paragraph 25 through 41 is about the

7 Fitzgerald case.  We talked about it a little bit

8 earlier, but is it fair to say that these are facts

9 that you developed or came to learn of in your time as

10 receiver?

11 A.      Let me look through them again.

12 Q.      Sure.

13 A.      It's been a while since I've seen this.  I

14 mean, we looked at it yesterday, but I was not looking

15 at it through this lens.

16          And, again, just to be clear, a lot of these

17 things I learned from documents, from pleadings, from

18 the engagement letter, things like that.  But I knew

19 about those things, if that's the question.  And then,

20 obviously, like Paragraph 28 is actual -- I had

21 personal knowledge of that.

22 Q.      Right.  And, for example, the things you

23 learned about from documents in this section, which

24 could be, you know, Paragraph 27, Paragraph --

25 A.      26.

1  Q.      -- 26, Paragraph 29, those are things you

2  learned from documents in the course and scope of your

3  duties as receiver?

4  A.      That's correct.

5  Q.      Okay.  Otherwise, you'd probably tell me this

6  was work product and you couldn't tell me how you know

7  about this.

8  A.      That's right.  Yeah, that's right.

9          But yes, I had personal knowledge of all those

10 facts.

11 Q.      So that gets us through Paragraph 41.

12 A.      Right.

13 Q.      And then the remainder of the complaint are

14 the claims for relief, correct --

15 A.      Right.

16 Q.      -- and the prayers for relief?

17         You can set that aside.  Thank you.

18         Have you submitted all of your bills for your

19 work as receiver, or are there some invoices that you

20 haven't submitted?

21 A.      I don't know.  I'm not sure.  I think I've

22 submitted them all.

23 Q.      So you think that you've submitted invoices

24 that haven't been paid?

25 A.      I think so.

1  Q.      And when you submit those, do you send those

2  to the court?

3  A.      I file them with the court.

4  Q.      And that's filed in the Williamson County

5  court, circuit court; is that correct?

6  A.      Williamson County Circuit Court.

7  Q.      I get confused because Judge Allen got

8  involved, so I don't know where you file things in

9  that case.

10  A.      You file at the Williamson County Circuit

11  Court.

12  Q.      So as best you know as you sit here today,

13  you've filed all of your invoices for your work as

14  receiver?

15  A.      As best I know, yes.

16  Q.      But you don't think you've been paid on all of

17  those invoices?

18  A.      I think that's right.

19  Q.      At some point, did the Chase parties become

20  responsible for payment of your outstanding fees in

21  the receivership?

22  A.      My understanding is that the Court put down an

23  order that made them responsible.

24  Q.      And did you have any discussions with them

25  about that before the Court put down that order?

1    A.      No.

2    Q.      Is it your understanding that the Chase

3    parties agreed to pay your outstanding fees in the

4    receivership?

5    A.      I saw it for the first time in a motion where

6    they said that they would, and that had something to

7    do with Mark Hammervold, I think.

8    Q.      And no one acting on behalf of the Chase

9    parties had contacted you before that motion was

10   filed?

11   A.      They did not.  That was the first time I

12   learned about it, when I saw it in the motion.

13   Q.      It's rare that you get to receive a copy of

14   the motion and learn that you're going to get paid.

15   A.      I was not surprised by it because that's what

16   Tennessee law says is that the petitioning party is

17   responsible for a receiver's fees to the extent the

18   estate is insufficient.  So it didn't surprise me, but

19   no, I had not had a conversation.

20   Q.      But that was not pursuant to any agreement or

21   negotiation --

22   A.      It was not.

23   Q.      -- as far as you're aware?

24   A.      It was not.

25   Q.      You testified earlier about the meeting

1  between you and Mr. Manookian at 45 Music Square West.

2  Do you recall that?

3  A.      Yes.

4  Q.      Is it fair to say that that meeting lasted

5  over an hour?

6  A.      I don't remember it being that long.

7  Q.      Would you agree with me that during that

8  meeting, you and Mr. Manookian discussed Cummings

9  Manookian cases?

10  A.      I do think that's right.

11  Q.      Do you recall that he told you, with respect

12  to each Cummings Manookian case, what he expected the

13  attorney's fee would be in that case?

14  A.      I don't know if we went over every case, but

15  we certainly went over some.

16  Q.      So it is fair to say it was a substantive

17  conversation about the pending cases that Cummings

18  Manookian had and the amount that could be expected to

19  be recovered in each case?

20  A.      Again, I'm not sure if we talked about each

21  case, but we had discussions about what he expected

22  out of some of the cases for sure.

23  Q.      And the topic of that discussion was Cummings

24  Manookian's entitlement to fees in those cases which

25  are the same cases that are listed in the adversary

1   complaint, correct?

2   A.      Yeah.   He expressed his opinion about that,

3   right.

4               MR. SPRAGENS:   I think I'm going to see

5   if Mr. Gabbert has any questions.

6               MR. GABBERT:   No questions.

7               FURTHER DEPONENT SAITH NOT.

8               (Proceedings concluded at 11:31 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:20-ap-90002   Doc 174-1   Filed 05/27/22   Entered 05/27/22 16:54:47   Desc
Exhibit Full Deposition Transcript   Page 58 of 68

1          REPORTER'S CERTIFICATE

2

3          I, Sabrina L. Schneider, Notary Public and

4    Licensed Court Reporter, do hereby certify that I

5    recorded to the best of my skill and ability by

6    machine shorthand all the proceedings in the foregoing

7    transcript, and that said transcript is a true,

8    accurate, and complete transcript to the best of my

9    ability.

10          I further certify that I am not an attorney

11   or counsel of any of the parties, nor a relative or

12   employee of any attorney or counsel connected with the

13   action, nor financially interested in the action.

14

15          SIGNED this 4th day of May, 2022

16

17

18          *Sabrina Schneider*
             Sabrina L. Schneider, LCR

19           Notary Public, State of Tennessee
             My Commission Expires: 5/9/2022

20
     Tennessee LCR No. 455

21   Expires: 6/30/2020

22

23

24

25

1          E R R A T A

2

     I, PHILLIP YOUNG, having read the foregoing
3   deposition, Pages 1 through 57, taken April 21, 2022,
    do hereby certify said testimony is a true and
4   accurate transcript, with the following changes (if
    any):

5

    PAGE LINE      SHOULD HAVE BEEN
6
    _____ _____    _____
7
    _____ _____    _____
8
    _____ _____    _____
9
    _____ _____    _____
10
    _____ _____    _____
11
    _____ _____    _____
12
    _____ _____    _____
13
    _____ _____    _____
14
    _____ _____    _____
15
    _____ _____    _____
16
    _____ _____    _____
17
    _____ _____    _____
18

19
                   _____
20                 PHILLIP YOUNG

21

22

23

24  _____
    Notary Public
25  My Commission Expires:_____

**$**

**$750,000** 14:23,
25 29:10 42:20

**1**

**10** 6:15 48:25
49:9
**100** 48:9,16
**11:31** 57:8
**13** 49:15,20,22
50:1
**14** 6:15 50:2
**15** 50:2
**16** 50:11
**17** 50:13,16,24
**18** 51:1
**19** 51:7

**2**

**20** 51:16
**2000** 5:17,18
**2008** 5:18,19 6:1
**2010** 5:19,20
**2014** 5:21
**2018** 18:25 20:25
22:20 25:2 27:23
28:5 30:8 31:15
32:10,21 33:21
34:2 46:8,22
**2019** 9:5,7 10:24
11:7,13 13:6
15:24 17:4,17
18:8 19:21 21:12
25:2,9,19 28:11,
13 29:6 31:14
34:14 39:12 42:3,
8 46:9,22 47:24
48:1
**2020** 17:5

**20th** 11:6,13
**21** 51:22 52:1
**22** 11:13
**24** 51:22 52:2
**25** 52:6
**25th** 13:6
**26** 52:25 53:1
**27** 52:24
**28** 52:20
**29** 53:1

**4**

**41** 48:25 52:6
53:11
**45** 17:21 18:4,8
19:6 35:13 37:2
50:17 56:1

**5**

**5** 9:13

**6**

**6** 9:14 16:9

**7**

**760** 48:14
**7th** 33:20

**A**

**a.m.** 57:8
**A/r** 10:15,16,18
**accessed** 36:10
**accounts** 14:1
39:14
**accurate** 11:19
42:25
**act** 15:15

**acting** 55:8
**action** 10:15
11:18 12:7 22:10,
22 41:13 43:2,4
48:5
**active** 15:21 26:2
**actual** 49:17
52:20
**additional** 30:19
**additionally**
32:3
**advanced** 29:23
**adversary** 10:21
41:7 48:24 56:25
**adverse** 38:22,
23 40:10,21,24
**adversity** 40:17
**affairs** 32:6,11
34:3
**Afsoon** 20:4 22:2
25:12 33:6 37:23
**agree** 30:4 40:7,
20 56:7
**agreed** 14:20
55:3
**agreement**
20:12 24:18,21
55:20
**alert** 44:9,15
**allegation** 50:16
**allegations** 8:11,
21 9:11,23 39:12,
16
**alleged** 40:19
**Allen** 11:4,5 42:5
54:7
**allowable** 27:14
**allowing** 21:24
**amount** 56:18
**and/or** 40:9
**anymore** 32:17
35:2

**Appeals** 42:23
**appears** 50:16
**appoint** 13:12
**appointed** 11:6
12:10 14:22
**appointing**
11:15
**appointment**
12:5,11,18 15:16
38:21
**approximately**
14:23
**April** 13:5
**argument** 29:11
31:8,10,17
**associates**
26:25 27:2
**assume** 5:6 8:1,
6,8 14:6 46:14
**assuming** 6:25
**assumption**
47:15
**assures** 21:20
**attempt** 14:22
31:22
**attempted** 15:17
31:20 38:13
**attempting**
16:13 19:25
**attend** 10:23
15:6
**attorney** 8:3,4
21:13,22 43:20
44:5 47:4
**attorney's** 29:17
30:25 56:13
**attorneys** 16:7
38:14
**August** 5:18,19
21:12
**authenticity**
34:21 35:8

**authority** 10:18
**authorization**
41:3
**award** 14:25
**aware** 21:13
22:18 24:10
26:17,21 29:15
31:14 47:8,10,13
48:15 50:23
55:23
**awareness**
12:13

**B**

**background**
5:14
**bank** 39:14
**bankruptcy** 9:1,
4 10:1,6,9,17,20
12:8 17:5,8,9
20:23 24:5,23
25:5,9 35:11
41:24 42:11
44:13
**based** 29:11
**basis** 31:10
34:17 50:15
**Bass** 5:17,23 6:3,
24 7:4 8:6
**begin** 16:12
**behalf** 16:13,15,
17 21:2,5 22:16
27:22 28:4,9,15,
22,24 29:6 30:12
37:23 47:3,23
48:5 55:8
**belong** 12:8
**belonged** 39:2
**Berry** 5:18,23 6:4
8:6
**bills** 53:18
**Binkley** 15:1
**bit** 5:14 52:7

**bleed** 17:4

**Board** 22:23

**bodily** 45:24

**BPR** 27:4,5

**break** 43:11

**Brian** 22:1 23:15, 23,25 24:7 32:4, 20 33:5

**building** 17:23 26:19

**bunch** 11:11

**Burton** 5:12,22 7:22,24 8:2 16:10 19:1 30:15 39:17 50:15

**Burton's** 28:20

**business** 33:12

**C**

**call** 12:17

**called** 5:2 14:18 32:13 43:21,25 44:3,8,15,16

**calling** 44:6 45:17

**Campbell** 5:11, 12 28:25 33:14, 18 34:8 40:11 44:1 45:5,25

**capacity** 47:17

**card** 34:19 35:10, 18 36:2,3,18 37:7,11,14,21

**career** 5:16

**case** 8:12,20,25 9:8,22 10:11 12:2,16,19,23 18:20,21 20:3 21:2,10,14,16 23:8 28:8 29:6 30:10 31:10 32:33 33:3,7 35:24 38:7 43:18 44:8 46:13 48:6,

10,17 49:1 52:4,7 54:9 56:12,13,14, 19,21

**cases** 12:22 13:2 15:20 16:7,8,13, 19,23 17:1,10 24:10 47:11 56:9, 17,22,24,25

**certified** 34:20

**challenge** 43:9

**chambers** 44:3, 6,22,24 45:11,17

**chance** 36:1

**change** 26:22

**Chase** 12:15 16:14,16,18,25 54:19 55:2,8

**Chases** 42:19

**check** 14:7

**children** 7:9

**chose** 43:4

**choses** 10:14 11:17 12:7

**circuit** 11:14 54:5,6,10

**circumstances** 17:20

**claim** 51:15

**claims** 51:13 53:14

**clear** 52:16

**client** 8:10 21:15, 18,21 22:3 29:18 30:1 31:22 32:1 33:10,11 34:15

**client's** 48:15

**clients** 17:14 26:3 47:16

**collect** 10:14,15, 18 13:25 14:22 16:13 29:10,16, 22 38:24 42:21 51:14

**collected** 16:24 17:7 41:3 43:4

**collecting** 11:16 16:19 30:1

**collection** 42:4

**combination** 25:5

**comments** 45:7

**complaint** 8:12, 22 9:14,23 11:13, 22,23 13:4 16:8, 22 20:23 39:17 48:22,24 49:12 50:17 53:13 57:1

**computer** 36:7

**concern** 45:17

**concerns** 43:21

**concluded** 57:8

**conclusion** 38:3,6

**conduct** 40:19

**conference** 18:16 19:12,13, 18

**confident** 48:13

**conflicts** 14:7

**confused** 54:7

**consistent** 32:12,21

**consult** 27:8,12

**consulted** 27:17

**contact** 15:17 35:4 38:16

**contacted** 13:8, 20 14:2 44:21,24 55:9

**contempt** 39:3 40:9

**contend** 47:25

**context** 40:13

**continue** 21:21 22:3 26:2,24

32:17,25 33:6

**continued** 16:25 17:1 21:1,5,15 23:12 28:8 30:12 47:22

**continues** 9:25

**continuing** 10:5 27:22 28:4

**conversation** 36:19,24 37:1,3,4 55:19 56:17

**copies** 17:11,12, 15,22

**copy** 18:24 24:17,20 34:13 48:23 55:13

**corporate** 7:10, 16,24 27:13

**correct** 6:16 7:5, 21 8:12,17 9:10 10:21,24 16:11 24:25 29:23 30:2, 6,10 32:9,13 37:18 38:1,23 39:18,19 41:4 43:5 45:1 46:12, 17 47:5 53:4,14 54:5 57:1

**correspondenc e** 35:17

**corrupted** 36:7, 8,16

**costs** 29:23

**counsel** 5:9 23:18 30:5 31:2 32:2 43:17

**County** 11:14 15:1 54:4,6,10

**couple** 16:21 30:19

**court** 10:7,11 11:14 12:2,5,10 13:2,12 14:21 15:1 16:15,17 21:7,17,20 22:16, 23 23:1,20 29:9 41:2 42:17,23

43:1 47:11 48:14 54:2,3,5,6,11,22, 25

**Court's** 22:9

**courthouse** 45:9

**courtroom** 44:9 45:12,14,22

**creditor** 44:12,17

**creditor's** 44:10

**creditors** 25:7

**Cummings** 10:13 11:17 14:3, 17 15:3,18,19,21 16:25 17:8,13 20:24 21:3,6 22:1 23:5,11,14,16,17, 25 24:4,7,10,13, 21 25:3,8,11,20 27:22 28:4,9,15, 21,22 29:7,16,22 30:5,9,12,23,24 31:8,12 32:3,4,8, 15,25 33:4,7,10 34:19 37:24 38:22,24 39:2,4, 9,25 40:9,10,19, 21 41:4,5 42:13 46:7,11,21 47:3, 23,25 48:5,9,13, 16 49:8 56:8,12, 17,23

**current** 45:14

**D**

**Dan** 12:17,21 44:20

**date** 9:8 41:14,16 42:22 49:7 51:3

**days** 14:14

**dealings** 14:16 24:6

**debtor's** 44:13

**December** 9:5 10:24 18:25 20:25 25:2 27:23 28:5 30:8 31:15

32:10,21 33:20
34:2 39:12 42:2,8
46:8,22

**decide** 16:16

**decision** 6:4,5,6,
17,18,19 7:19

**default** 13:23

**defense** 20:2

**defunct** 13:23

**demand** 9:19

**demonstrate**
35:1

**denies** 22:8

**depo** 33:15

**DEPONENT**
57:7

**deposited** 10:7

**deposition** 5:7

**deputies** 45:22

**deputy** 44:9
45:12,14

**determine** 25:19

**develop** 20:18
27:21,25 28:3,6
35:7 46:20 48:4

**developed** 28:10
47:15,20,21
48:11 49:2,13
50:24 51:19 52:9

**directly** 8:7,8
9:18

**directs** 42:17

**disagree** 40:23

**disbarred** 26:9

**discharged**
29:17 30:5

**discovered** 25:4

**discussed** 56:8

**discussion**
56:23

**discussions** 9:2
54:24 56:21

**dispute** 12:13

**docket** 21:8

**document** 49:4

**documents**
11:11 37:5 52:17,
23 53:2

**door** 18:13,15

**doorbell** 18:12

**doubt** 34:14

**doubted** 34:21

**drew** 38:3,5

**duly** 5:3

**duties** 53:3

───────

**E**

**earlier** 46:24
50:7 52:8 55:25

**early** 11:8 25:2

**effective** 32:7

**effectuate** 23:2

**efforts** 21:15

**email** 25:16
36:21 37:16

**emailed** 17:18

**end** 29:13

**ended** 10:3

**engaged** 26:14
27:3 33:12

**engagement**
17:11,13,15
18:22 29:11,14,
15 30:22 31:11,
13 52:18

**ensure** 21:15

**entered** 11:15
12:1 15:1

**entities** 27:13

**entitled** 29:12,22
30:25 31:9 34:1,7
48:9,14,16

**entitlement**
56:24

**entitles** 29:16

**entity** 7:16

**essentially**
12:15 14:20

**estate** 12:8 55:18

**ethical** 6:7,8

**ethics** 27:9

**event** 29:17
30:25

**everyone's**
11:12

**evidence** 40:2
49:17,23

**excuses** 21:17

**exhibit** 33:15
48:23

**existed** 31:15

**expected** 56:12,
18,21

**expecting** 7:3

**expert** 27:9,13,
17

**expressed** 23:20
57:2

**expressing**
43:21

**extent** 8:25 10:16
55:17

───────

**F**

**fact** 26:10 33:9
34:3 37:22 38:11
44:9 49:9

**facts** 8:24 49:2,5,
13,22 50:23 52:8
53:10

**factual** 49:1

**fair** 5:7 18:3 43:6
45:24 46:2 49:3,
19 52:8 56:4,16

**fall** 28:11,13

**family** 23:13

**fee** 29:17 48:10,
17 56:13

**fees** 16:13,19
17:7 20:1,4,11,
15,20 30:1,25
41:12 42:14
54:20 55:3,17
56:24

**felt** 48:13

**figure** 21:9

**file** 21:5,7 33:4
36:6,7,15 39:3,8
54:3,8,10

**filed** 9:4 10:9,18,
20,21 13:5,9,16
16:7 20:24 23:6,
10,14,15,17 24:5,
24 25:9 28:20,22
30:12,20 38:22
39:17 40:7 41:8
42:3 54:4,13
55:10

**filing** 10:1 21:2
28:8 33:2 41:23
42:10 45:16
47:22

**filings** 37:23

**fine** 33:19

**firm** 6:14,18,20,
22 7:20 12:14
13:23,24 15:5
21:14 27:2 29:12,
21 32:5 33:11
34:2 46:16 47:1,
7,16

**firm's** 6:4,18 7:15

**firms** 8:5 15:22

**Fitzgerald** 8:25
9:8,22 10:3 18:21
19:25 21:2,10

23:7,12 28:8 29:6
31:9 32:8 33:2
34:1,24 35:5
48:6,10,17 52:7

**Fitzgeralds**
30:4,9,23 33:1
38:10 48:1

**floor** 19:11,15

**form** 7:10,24
26:13 28:25 29:4
34:8 40:11

**formation** 27:13

**formed** 5:19
19:21 26:10
28:17 29:1,8
47:24 48:19 49:8
51:4

**found** 20:2

**front** 11:3 42:5

**fully** 48:11

**functioning**
10:10

**funds** 16:16,24
38:24 39:1 41:3,9
42:5 51:12,13

───────

**G**

**Gabbert** 22:13
57:5,6

**Garfinkle** 5:20
6:14,18 7:15,20
8:2

**gave** 17:22
18:19,21 34:13

**generally** 41:1

**give** 5:14

**good** 29:10 31:8,
10,17

**granted** 11:14
22:12

**grants** 22:8

**green** 34:19
35:10,18 36:2,3,

18 37:7,11,14,21

**guess** 9:16 10:4
46:24 47:14

---

**H**

---

**Hagh** 18:1,4,6
19:20,21 20:4,5,
11,15,20 21:1
22:2 25:12,16
27:21 28:3,14,20,
23,24 29:5 33:6
37:23 39:13,21
42:5 46:25 47:8,
17,24 48:5 50:18

**Hagh's** 8:15 29:5

**half** 6:13

**Hammervold**
11:17 15:4,18,22
24:11 41:5 55:7

**Hammervold's**
15:4

**hand** 48:23

**handle** 44:16
45:22

**hanging** 22:6

**happened** 8:21
9:1 16:16 18:10
38:7

**heading** 8:24
9:12,16

**hear** 36:16 43:22

**heard** 14:19
15:11 20:5 36:15
43:20,24 44:2
50:15

**hearing** 10:23
15:6,14 36:9
39:12 43:23 44:8

**hearings** 10:5,8
52:3

**hire** 27:1

**history** 5:16

**hold** 48:8

**holding** 51:12

**hour** 56:5

---

**I**

---

**identified** 8:10

**immediately**
35:8

**impact** 23:11
31:17

**implicated** 45:24

**important** 51:11

**impression**
20:18

**improper** 20:19
40:19

**improperly**
39:13

**inaccurate**
11:24

**indicia** 19:7

**information**
25:8 38:9 50:4,6
51:18

**instructed** 20:3,
10

**insufficient**
55:18

**integrity** 6:8

**intended** 20:13

**interest** 6:22

**interrogatories**
8:15

**interrogatory**
8:14

**interview** 38:13

**invoices** 18:21
53:19,23 54:13,
17

**involved** 10:19
12:15 24:11
32:22 39:12
46:13 54:8

**involvement**
10:2 43:1

**issue** 43:17
45:21,23

**issues** 6:7

---

**J**

---

**January** 5:19

**jobs** 47:7

**John** 5:6

**Judge** 11:3 15:1
42:5 43:15,20
54:7

**judgment** 13:23

**July** 11:9

**June** 11:6,9,13

---

**K**

---

**knew** 15:13
17:24 20:23
23:23 24:12
29:10 45:2 49:7,
16,25 50:6,12
51:3 52:18

**knowledge** 8:11,
19 9:9,21,24,25
11:21,23,25
12:12 30:7 49:2,
6,21 50:13,20
51:25 52:21 53:9

---

**L**

---

**laid** 18:17

**language** 32:6

**large** 13:23

**lasted** 56:4

**late** 11:9

**Lauren** 45:13

**law** 5:15,24 6:9
12:14 13:23,24
15:4 19:7,21

20:4,5,11,16,20
21:13 22:19 23:2
24:11 26:2,14,15,
20,24 27:2,3,22
28:4,15,23,24
32:1,16 33:12
39:21 42:5 47:7,
8,16,17,24 55:16

**Lawrenceburg**
11:3

**lawyer** 20:2
26:12 43:10
44:10,12,19

**learn** 19:20 21:4
24:3 25:1 52:9
55:14

**learned** 19:23
46:18 51:18
52:17,23 53:2
55:12

**leave** 7:19

**led** 37:10

**left** 6:1 7:4 32:4

**legal** 27:9 37:25
40:17

**lens** 52:15

**letter** 18:25 20:25
29:11,14,15 30:8,
14,22 31:5,11,15
32:10,20 33:1,10,
21,22 34:5,6,14,
22,25 35:1,5
37:12,17,20
38:10,11 52:18

**letters** 17:12,13,
16 18:17,22 19:3
31:13 37:16

**license** 22:14
23:2 26:2,8,9,13
32:1

**licensed** 5:17
8:3,4 47:4

**licensure** 5:15

**liens** 16:7

**light** 47:19

**list** 15:20 16:1,6,9
24:9

**listed** 16:8,22
56:25

**lists** 16:2,4,6

**litigant's** 22:10

**litigated** 47:11

**LLC** 7:12 26:14

**logistical** 45:21,
23

**logistically**
44:11 45:3

**long** 56:6

**longer** 10:18
33:11 36:10

**looked** 18:25
21:8 27:16 30:14
50:8 51:8 52:14

**lost** 22:13

**lot** 37:15 43:12
52:16

---

**M**

---

**made** 9:19 37:20
54:23

**mail** 37:16

**make** 7:3,7 17:1
21:14 33:15
40:10,21 45:7

**makes** 40:24

**making** 7:2
51:13,15

**Manookian**
10:13 11:17
12:14 14:3,17
15:2,3,4,18,21
17:13,16,22
18:15 20:1,24,25
21:3,6 22:15,18
23:6,12,14,15,16,
17,23,25 24:1,4,
10,13,21 25:2,3,
8,11,14,20 26:8,
11,19 27:1,23

---

28:5,9,16,21,22
29:7,16,22 30:5,
9,13,23,24 31:9,
12 32:3,8,15,16,
21,25 33:4,7,10
34:2,13,18,19
36:12,20 37:24
38:23,24 39:2,4,
9,25 40:9,10,20,
21 41:4,5 42:13
43:22 44:6,25
45:8 46:4,8,21
47:3,23,25 48:6,
9,13,16 49:8
51:3,6,8,10,18
56:1,8,9,12,18

**Manookian's**
22:1,2 33:5 56:24

**March** 5:21 19:21
46:9,22 47:24
48:1

**mark** 15:4 48:22
55:7

**Marty** 33:25

**material** 35:23

**materials** 11:22
49:1

**matter** 8:18 10:3
32:2,8 35:2

**matters** 18:23

**Mclemore** 5:20

**meet** 17:19

**meeting** 17:24
18:8,10,20,24
19:4 25:6 35:13
37:7,9 55:25
56:4,8

**Meisner** 20:2,9

**Melissa** 33:25

**member** 8:3,4,7
23:25 24:3,15
25:3,11,13 26:1,
23

**members** 25:20

**membership**
6:22

**memorialized**
39:17

**memory** 11:19

**mentioned**
47:12

**met** 17:21 18:6

**mind** 22:4 34:25

**minute** 29:15

**monetary** 39:20,
24 40:8,24

**money** 9:2 10:6
31:9 39:13

**month** 12:17

**motion** 13:5,9,
11,15,19 15:6,8,
12 21:20 22:7,8
23:7 33:2,4,5
39:3,8 40:8 45:16
55:5,9,12,14

**motions** 38:22
42:3

**moved** 39:13

**movement** 9:2

**Music** 17:21
18:4,8 19:6 35:13
37:2 50:17 56:1

**mutual** 6:5

___

## N

**name's** 5:6

**named** 15:8,12
24:13

**needed** 13:25
37:11

**negotiation**
55:21

**nondescript**
19:12

**notice** 23:6,10,
14,15,17 31:22

**notices** 18:18

**notwithstanding**
31:25 32:6 33:9

**November** 9:4,6,
7

**Number** 51:7

___

## O

**Object** 28:25
34:8 40:11

**Objection** 44:1
45:5,25

**obligated** 42:13

**observed** 43:13

**obtain** 35:24

**occurred** 10:9

**office** 20:7 51:2

**offices** 19:14,16

**operate** 26:13

**operating** 24:17,
21 46:7,21 47:1

**opinion** 28:17
29:2,4,8 30:21
31:6 48:2,4,7,8,
11,12 57:2

**opposed** 23:7

**opposing** 43:17

**orally** 35:20
36:22

**order** 11:15 12:1
13:17,18 21:24
22:5,7,11,14
37:11 42:4,17,22,
25 44:10,14 45:3
54:23,25

**outstanding**
10:16 54:20 55:3

___

## P

**paid** 41:2,9,13,
19,23 42:2,7,18
53:24 54:16
55:14

**paragraph** 11:12
29:20,25 49:9,15,
10,22 50:1,2,24
52:6,20,24 53:1,
11

**paragraphs**
48:25 49:12
51:17,22

**parte** 45:18

**participating**
52:3

**parties** 12:15
16:14 36:23 37:3
44:25 54:19 55:3,
9

**partner** 6:20,25
7:1,2,3,7 24:13
47:1

**party** 12:24 13:22
40:24,25 42:19
43:17 55:16

**pay** 42:13 55:3

**payment** 54:20

**payments** 17:1

**pending** 56:17

**people** 19:19

**percent** 48:9,16

**performed** 29:6

**period** 16:20
30:19 46:8,22
52:4

**permissible**
27:10

**person** 17:19
37:2 43:16 45:8,
13,15 46:5

**personal** 8:10,19
9:9,21,25 11:22,
25 49:6,21 50:13,
20 52:21 53:9

**personally**
26:15 47:13

**petitioning**
42:19 55:16

**Phillip** 5:1 11:15

**phone** 43:16

**place** 18:14

**places** 50:17

**planning** 33:16

**PLC** 7:17 11:17
26:10

**pleadings** 9:18
21:2,5 28:7,8,20,
23 30:11,20 40:2,
4,5 47:3 49:17,
22,24,25 50:12,
18 52:17

**PLLC** 7:12,13,17,
25 24:15 26:1,11,
23 27:14,16 51:3,
6,8,10,18

**point** 14:12 15:19
16:12,25 19:20
20:6,8,22 22:19
24:6,20 27:20,21
28:3 37:15 38:22
43:3 45:16 54:19

**posing** 45:8 46:5

**post** 17:8

**potential** 45:4

**practice** 6:8,11
7:11 19:7 22:19
26:14,15,24 27:3,
22 28:4 32:16

**practiced** 5:17,
20

**practicing** 26:20
28:15 33:12

**prayers** 53:16

**pre** 17:9

**pre-petition**
41:20

**predates** 41:23

**prepared** 26:7

**presence** 43:16

**pretty** 18:11

**previous** 14:16

**previously** 12:20

**principal** 33:9

**principals** 40:20, 22

**prior** 9:1 20:22

**pro** 21:18

**problem** 45:4

**proceed** 21:18

**proceeding** 10:21 41:8 48:24

**proceedings** 57:8

**process** 14:8 19:25 32:5,11

**produce** 34:18, 19

**product** 53:6

**professional** 22:24 26:14

**prohibited** 26:18

**proof** 37:17

**proposed** 15:11, 14 22:11,14

**protection** 44:10,14 45:3

**pull** 20:7

**purported** 20:25

**purposes** 11:16 24:15

**pursuant** 55:20

**Puryear** 12:17,21 13:9,20 14:18 32:12,22 44:20, 21

**put** 54:22,25

**— Q —**

**question** 17:6 25:14,16 28:1,5 30:24 34:5 40:14

47:18 48:24 52:19

**questions** 57:5,6

**— R —**

**raised** 6:7

**rang** 18:12

**range** 41:16

**rare** 55:13

**reached** 24:9

**reading** 30:22

**reason** 7:6 25:22 34:21 51:10

**reasonable** 29:16

**reasons** 23:19

**recall** 7:15 13:11, 14,15,17,18 15:13,17 16:3,18 19:17,23,24 35:20 36:9,12 39:11,20,24 41:17,18 56:2,11

**receivable** 51:14,15

**receivables** 14:1 41:6

**receive** 18:24 34:6 35:1 55:13

**received** 12:17 19:3 34:4,24 35:5 38:11

**receiver** 9:19 10:11,13,20 11:1, 6,16 12:4,10,16, 19,23 13:1,12,13 14:21 15:16 17:9, 15 18:4 25:25 28:15,18,19 29:4 31:2,4,6,8,25 32:13 33:8 34:11 35:2,4,12 38:1, 19,21 39:6,9,13 41:4 42:21 46:18, 20 48:3,4,8,20

49:3,6,14,16,21 50:9,14,25 51:3, 6,9,11,19 52:10 53:3,19 54:14

**receiver's** 55:17

**receivership** 8:22,23 9:11,13, 17 10:12,14,15 11:15 12:2 13:5 24:8 39:5 41:10, 13,19,23,25 42:14 43:3 54:21 55:4

**receiverships** 42:18

**receiving** 35:8 38:10

**recently** 32:4

**recess** 43:13

**reciting** 51:24

**recollection** 14:10 37:6 41:22, 25 51:5

**record** 33:18 38:6 49:11 51:25 52:1

**recover** 39:1

**recovered** 56:19

**referring** 44:17

**regard** 32:24

**related** 8:22 18:21

**relationship** 21:1

**Relevance** 44:1 45:5,25

**relevant** 25:24 35:25

**relief** 53:14,16

**rely** 34:1,7

**remainder** 53:13

**remember** 7:18 14:13,15 15:11 16:18,23 18:12

19:16 21:11 35:12,16 36:4,5, 21,22,25 37:8,13 39:7,10,23 40:3, 13 56:6

**remit** 20:3,10

**reports** 41:10 42:1

**represent** 11:12 13:4 23:12 26:2 33:1,11 38:14 47:16

**representation** 29:21 30:17 34:1, 7

**representatives** 44:13

**represented** 5:9 20:1 21:16,21 47:25 50:1

**representing** 12:24 13:22 22:3 33:6 44:12

**required** 32:2,3

**resolved** 22:7

**respect** 6:3,24 9:7,22 11:11,21 51:17 56:11

**responded** 14:11

**response** 51:7

**responses** 8:15

**Responsibility** 22:24

**responsible** 54:20,23 55:17

**restraining** 42:4

**result** 22:9

**reviewed** 26:18

**reviewing** 13:15, 17,18 49:4,11

**risk** 45:8 46:5

**role** 25:25 28:19 49:14

**room** 18:16 19:12,13,18 43:22

**rules** 5:7

**run** 14:7 27:2

**— S —**

**safety** 45:24

**SAITH** 57:7

**sanctions** 14:25 39:8,20,24 40:8, 24

**sat** 18:16

**scanned** 36:8

**school** 5:24

**scope** 53:2

**search** 35:23

**secretary** 20:6 25:7 50:3,8 51:1

**section** 8:23 9:23 51:22 52:23

**secure** 19:25

**seek** 24:17,20

**seeking** 38:24 39:1,3,8,20,24 40:8,23 42:4,21

**seeks** 21:14

**send** 54:1

**sending** 20:15 33:1

**sense** 40:17

**separate** 6:17 8:23

**separation** 6:3

**September** 17:17 18:8 21:12

**serve** 12:19 14:21

**served** 12:23 13:1

(615) 933-6786
www.harpethcourtreporters.com

**server** 36:9
57:4

**serving** 32:13
35:12 38:19 39:6
51:6,11

**set** 53:17

**settle** 17:2

**settlement**
20:12

**share** 26:7 28:19

**shed** 47:19

**show** 11:10
41:11 42:1

**showed** 18:11

**signed** 31:11,13
32:20

**significance**
22:4

**signing** 47:3

**silent** 30:24

**Sims** 5:18,23 6:4

**sit** 54:12

**slightly** 16:3

**small** 7:9

**sole** 23:25 24:3
25:3 26:23

**solo** 6:11 7:10
8:2

**sort** 29:13 42:4

**sound** 9:14 13:6

**sounds** 11:8
13:7

**space** 45:1

**speak** 8:7,8

**specifically**
13:12

**spoken** 43:15

**Spragens** 5:5,6
22:17 29:3 33:14,
16,20,24 34:10
40:15 43:11,14
44:4 45:6 46:3

**Square** 17:21
18:5,8 19:6 35:13
37:2 50:17 56:1

**stand** 40:4

**start** 23:16 47:16

**started** 46:16

**starting** 48:1

**starts** 9:13

**state** 10:7,11
12:2 13:2 25:7
43:1

**state's** 20:7 50:3,
8 51:2

**stated** 28:21,23

**statement** 32:1,
10

**status** 7:16

**statute** 27:15,16,
18

**steps** 25:19 27:5,
8,12

**stick** 7:6

**stop** 28:15

**straight** 5:24
19:17

**subject** 8:18

**submit** 22:11,14
54:1

**submitted** 13:18
20:20 22:16
53:18,20,22,23

**subsequent**
30:11

**substance** 13:21
39:11

**substantive**
56:16

**substitution**
23:18

**successfully**
16:19

**sufficient** 34:25

**suggest** 20:14

**sum** 13:21

**summer** 15:23
28:10 31:14

**support** 50:24

**supported** 38:6

**suppose** 12:6

**Supreme** 22:16,
23

**surprise** 55:18

**surprised** 55:15

**suspended**
22:19 26:8,11,13,
23 32:16

**suspension**
18:19 23:2 26:18
31:25

**suspicion** 35:7

**sworn** 5:3 8:14

_____

**T**

**talk** 29:14 40:16

**talked** 16:9 45:11
51:21 52:7 56:20

**talking** 33:23
43:8

**talks** 29:20

**tasked** 29:9

**telephone** 25:17

**telling** 33:10
36:12

**tells** 30:9

**temporary** 18:19
42:3

**Tennessee**
22:15,23 42:23
55:16

**terminate** 21:1

**terminated**

12:11,12

**terminating** 12:1

**terms** 5:15 6:8
26:17

**testified** 5:3
46:24 50:7 55:25

**testifies** 34:24

**testify** 50:15

**theory** 47:20,21

**thing** 44:7 50:11

**things** 8:21,25
9:2,17,20 18:18
25:5 43:8 47:22
49:16 51:24
52:17,18,19,22
53:1 54:8

**thinking** 18:14

**Thompson** 5:9,
12,21 7:22,24 8:2

**thought** 11:8
21:23 31:7 45:3
46:25

**time** 5:22 6:9 7:4
9:25 10:5,10,17
11:12 14:2,17,20
15:10,13 16:20
18:3,7 20:5,18,
21,22 21:10
23:24 24:12,18
25:24 34:13
36:17 37:17 41:7,
9,12,20 46:14,21,
25 48:21 50:21,
24 52:4,9 55:5,11

**times** 8:1 37:15

**today** 11:11,20
12:4 27:2 54:12

**told** 7:1 14:3 25:6
31:7 32:12,22
36:6 45:2 56:11

**topic** 56:23

**topics** 8:19

**transition** 30:19

**trial** 23:1

**trustee** 17:6,7
24:22 25:6 31:3

**typical** 10:12

_____

**U**

**U.S.** 37:16

**Uh-huh** 49:10

**ultimately** 16:16

**unaware** 31:12

**understand**
37:11 40:16
47:14

**understandable**
23:22

**understanding**
10:24 22:22
54:22 55:2

**uneventful**
18:11

**unpaid** 42:14,18

**unrepresented**
23:21

**untoward** 20:15,
19

**unusual** 20:15
21:19,23,25
30:18,21

**upstairs** 18:16

**usual** 14:7

_____

**V**

**vacated** 42:21,
22,25

**view** 23:5,11
25:10 26:1,5,7,
12,22 27:1,18,19,
21,25 28:3,6,10,
14,20 30:18
31:24 33:8,25
34:11 37:25
46:20 48:15,19

## W

**Walker** 43:16,20

**website** 20:7
50:3,8

**weeks** 14:14
24:8

**West** 17:21 18:5,
8 19:6 35:14 37:2
50:18 56:1

**Williamson**
11:14 15:1 54:4,
6,10

**winding** 32:5,11,
15,19,24 34:3

**withdraw** 21:14,
20 23:7 30:17
31:23 32:2,4
33:5,6

**withdrawal**
18:25 19:3 21:24
22:1,2,5 23:6,10
31:15,20,23 32:7
33:2

**withdrawing**
30:10 34:3

**withdrawn** 46:15

**withdraws** 29:21
31:1

**words** 35:9

**work** 29:5 41:16,
18,22 42:2,8
44:11 53:6,19
54:13

**worked** 12:21

**working** 7:8
28:21,23

**wound** 13:24
14:3

**writing** 35:21

**wrong** 10:25
18:14

## Y

**year** 6:13 49:7

**years** 6:12

**yesterday** 16:9
19:1 30:15 33:17,
19 52:14

**you-all** 37:1,2

**Young** 5:1,6,20
11:16 43:15