1           IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF TENNESSEE
2                       AT NASHVILLE

3    ---------------------------------------------------

4    CUMMINGS MANOOKIAN, PLLC,          )
                                        )
5              Debtor                   )
                                        )
6    JEANNE ANN BURTON, TRUSTEE         )
                                        )
7              Plaintiff,               )
                                        )
8    VS.                                )    No. 3:19-BK-07235
                                        )    Chapter 7
9    HAGH LAW, PLLC; AFSOON HAGH;       )    Judge Walker
     MANOOKIAN, PLLC; and FIRST         )
10   CITIZENS BANK & TRUST COMPANY,     )
                                        )
11             Defendant.               )

12   ---------------------------------------------------

13

14

15

16            DEPOSITION OF BRIAN CUMMINGS

17                 Taken on June 9, 2022

18

19

20
     ---------------------------------------------------
21
     PREPARED BY:
22
     CRISTI G. WATSON, LCR
23   Anne S. Wilson & Associates
     P.O. Box 150651
24   Nashville, Tennessee  37215
     Cristicr@bellsouth.net
25

1                   A P P E A R A N C E S

2

   FOR THE PLAINTIFF:
3
   Phillip Young, Jr., Esq.
4  One Franklin Park
   6100 Tower Circle, Suite 200
5  Franklin, Tennessee 37067
   Phillip@thompsonburton.com
6
   FOR DEFENDANT MANOOKIAN:
7
   John Spragens, Esq.
8  Spragens Law, PLC
   311 22nd Avenue N.
9  Nashville, Tennessee  37203
   john@spragenslaw.com
10
   FOR DEFENDANT HAGH:
11
   Craig Gabbert, Jr., Esq.
12 Bass, Berry & Sims
   150 3rd Avenue South
13 Nashville, Tennessee  37201
   cgabbert@bassberry.com
14
   FOR MR. CUMMINGS:
15
   James Price, Esq.
16 Price Hill & Kolarich
   201 4th Avenue North, Suite 1800
17 Nashville, Tennessee  37219
   jprice@pricehillkolarich.com
18

19

20

21

22

23

24

25

1                         I N D E X

2    Examination by Mr. Young                        5
     Examination by Mr. Spragens                    85
3    Further Examination by Mr. Young              129

4                       E X H I B I T S

5    No. 1 - Secretary of State filing             11
     No. 2 - Amended and Restated Amended Operating
6              Agreement                           14
     No. 3 - Property tax document                 26
7    No. 4 - Attorney-Client Agreement             54
     No. 5 - Complaint                             58
8    No. 6 - Lease Agreement                      104
     No. 7 - Invoice                             104
9    No. 8 - 2016 and 2017 tax returns and
              payment to JL Design                104

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    S T I P U L A T I O N S

2

3        The deposition of BRIAN CUMMINGS was taken on

4    the 9th day of June, 2022, on behalf of the plaintiff,

5    via Zoom, beginning at approximately 1:00 p.m. for all

6    purposes allowed under the Federal rules of Civil

7    Procedure.

8        It is agreed that Cristi G. Watson, LCR, may

9    swear the witness, take the deposition by stenographic

10   means and afterwards reduce same to typewritten form.

11       All formalities as to notice, caption,

12   certificate, and signing, et cetera, of the deposition

13   are waived.  All objections, except as to the form of

14   the questions, are reserved to the hearing of said

15   matter.

16

17

18   (Unless previously provided, all proper names are

19   spelled phonetically to the best of the court

20   reporter's ability.)

21

22

23

24

25

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 4 of 134

1              BRIAN CUMMINGS,

2    having been duly sworn, testified as follows:

3                  EXAMINATION

4    BY MR. YOUNG:

5         Q.      Mr. Cummings, good afternoon.  My name is

6    Phillip Young.  I represent Jeanne Burton, who is the

7    court appointed trustee for Cummings Manookian, PLLC,

8    in this case.  Just for the record, I will note that

9    Ms. Burton is in the room with me today so everyone

10   knows.  Mr. Cummings, please state your name for the

11   record.

12        A.      Kirk Brian Cummings.

13        Q.      Mr. Cummings, I know you have taken

14   plenty of depositions, but have you ever given a

15   deposition before?

16        A.      I have.

17        Q.      In what case?

18        A.      I think there were four different times.

19   One was a malpractice case where there was a -- from

20   the other side a claim that there was a discovery rule

21   issue about a statute of limitations argument.  I was

22   deposed in that.  One was a real estate lawsuit where I

23   was a plaintiff.  I was deposed in that.  I was deposed

24   in a litigation matter filed in Texas against my old

25   firm and probably named individually as well.  The

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 5 of 134

1  fourth one I can think of was a board matter where I

2  was one of the -- I don't know if they are called

3  defendants or respondents, but I was one of those

4  people.

5        Q.    Let me ask you about the litigation

6  matter in Texas.  Was Cummings Manookian a defendant in

7  that matter?

8        A.    I believe so.

9        Q.    Tell me about that matter.  What was the

10 nature of that litigation?

11       A.    Our firm handled some consumer fraud

12 cases or claims involving diamonds, overgrading of

13 diamonds.  One of the offenders of that overgrading

14 claimed that we as a firm -- I don't know if they used

15 the word extortion or that's the way I remembered it,

16 the fact we were pursuing fraud claims against them or

17 putting the word out there that they were committing

18 fraud, that we were doing something wrong, and they

19 filed a lawsuit kind of under that umbrella.

20       Q.    What was the outcome of that matter?

21       A.    It settled.  I think the terms are

22 confidential.  I think they have been disclosed since.

23 That was a matter where the people who sued us ended up

24 paying us.

25       Q.    Have you ever given a deposition via Zoom

1  before?

2        A.      No.

3        Q.      So a lot of this is probably going to be

4  old hat for you, but I will go through it anyway,

5  especially since we're on Zoom and there are some

6  idiosyncracies here I want to make sure we go over.

7  Obviously, please, answer my questions audibly with a

8  yes or no, not with a head shake or uh-huh or uh-uh.  I

9  will ask that you answer all questions that I pose even

10 if another attorney objects unless the attorney

11 specifically tells you not to answer.  If that happens

12 we will resolve the dispute before we move on.  If we

13 need to take a break at any time, let me know.  As long

14 as we're not in the middle of a question, I will be

15 happy to accommodate that.  Where are you physically

16 located today?

17       A.      In my office in Green Hills.

18       Q.      Is anyone else in the room with you?

19       A.      No.

20       Q.      I know just for the record Mr. Price is

21 on the Zoom representing you, but he is in a different

22 location, correct?

23       A.      Correct.  He is not where I am.

24       Q.      How many screens are powered on in the

25 room you are sitting in?

1        A.    I have three monitors, all of which have

2    power if that's what you are asking.

3        Q.    It is.  What is pulled up on those three

4    monitors?

5        A.    You or the video is in the middle.  On

6    the left is you sent some exhibits this morning and one

7    of them was large enough I didn't want to print it, so

8    that's pulled up.  The other actually is what I was

9    working on.  It has nothing to do with this matter.  I

10   am going to close it, so that is now one of those blue

11   screens with your icons on it.

12       Q.    Other than the things you just described

13   that were pulled up on the screen, do you have any

14   paper in front of you?

15       A.    I do.

16       Q.    What is that?

17       A.    I have the exhibits that you sent that I

18   did print.  I have some things that -- matters of my

19   own, but within reach it's your exhibits.

20       Q.    Those other things are not related to

21   this deposition?

22       A.    No, not at all.  They are out because

23   it's my office.

24       Q.    On any of those screens do you have any

25   communication apps open like texting or instant

1  messaging?

2          A.      No.   So you know, my phone is in front of

3  me and the screen is dark.

4          Q.      Mr. Cummings, what is your current

5  occupation?  Are you a practicing lawyer?

6          A.      Yes, sir.

7          Q.      What states are you currently licensed to

8  practice law in?

9          A.      Tennessee, Hawaii, California, Georgia

10  and Florida.

11          Q.      Where did you attend law school?

12          A.      Vanderbilt.

13          Q.      What year did you graduate?

14          A.      1998.

15          Q.      When you finished at Vanderbilt in '98,

16  did you go to work for a law firm?

17          A.      No.

18          Q.      What job did you first have after

19  graduating Vanderbilt Law School?

20          A.      I was a law clerk for a state trial court

21  judge here in Nashville.

22          Q.      How long did you do that?

23          A.      It was a little longer than a year

24  because he needed me to start early.

25          Q.      After you finished that clerkship where

1    did you go?

2         A.     I started at the firm -- the name at the

3    time was Gideon & Wiseman.

4         Q.     How long were you at Gideon & Wiseman?

5         A.     I am going to estimate 12 years.  I don't

6    think it's any shorter than that.  I might be wrong

7    that it's a little longer.

8         Q.     After you left Gideon & Wiseman where did

9    you go?

10        A.     I went to the law firm of Levine, Orr and

11   Geracioti.

12        Q.     How long were you there?

13        A.     About three years.

14        Q.     After you left Levine Orr where did you

15   go?

16        A.     I co-founded a firm named Cummings

17   Manookian.

18        Q.     How long were you with Cummings

19   Manookian?

20        A.     I think a little over three-and-a-half

21   years, less than four years.

22        Q.     When you left Cummings Manookian, where

23   did you go practice?

24        A.     I founded my current law firm of Cummings

25   Law.

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 10 of 134

1       Q.      Is that Cummings Law, PLC or PLLC?

2       A.      It probably is, and I just don't know

3   offhand which it is.

4       Q.      It is incorporated in some form or

5   fashion?

6       A.      Yes, it's registered with the Tennessee

7   Secretary of State.

8       Q.      Where is Cummings Law located?

9       A.      4235 Hillsboro Pike.  Mailing suite

10  number is 300, Nashville, Tennessee 37215.

11      Q.      What kind of work does Cummings Law do?

12      A.      Plaintiff's medical malpractice and

13  personal injury.

14      Q.      Approximately when did you found Cummings

15  Law, PLC, or PLLC, whatever it is?

16      A.      Around September 1st of 2018.

17      Q.      You mentioned earlier that you were a

18  member of Cummings Manookian, PLC; is that correct?

19      A.      I was a member, yes.

20      Q.      When was Cummings Manookian, PLC, formed?

21      A.      About January 1st of 2015.

22                      (Exhibit No. 1 was marked.)

23  BY MR. YOUNG:

24      Q.      I am going to ask you to take a look at

25  what's been previously marked Exhibit 1 just so we can

1  get this on the record.  You will see that this is the

2  secretary of state's filing information for Cummings

3  Manookian, PLC.  Do you have that in front of you?

4       A.    I do.

5       Q.    It says the date formed is January 1,

6  2015; is that right?

7       A.    Correct.

8       Q.    Who were the original members of Cummings

9  Manookian?

10      A.    Me and Brian Manookian.

11      Q.    What percentage did you each own?

12      A.    I think it was 50/50 unless for a brief

13  period of time it was 51/49.

14      Q.    Do you know who had the 51 percent?

15      A.    No, but it might be in the Amended

16  Operating Agreement that you made an exhibit.

17      Q.    Did the membership of Cummings Manookian

18  change at any time while you were a member of the firm?

19      A.    No, not the membership.

20      Q.    Tell me how you knew Brian Manookian

21  prior to January 1, 2015.

22      A.    We had worked together at that first law

23  firm I mentioned, Gideon & Wiseman, as attorneys for

24  several years.  That was how I knew him.

25      Q.    Tell me about the conversations that led

1  to you forming Cummings Manookian with Brian Manookian.

2  A.  I can tell you generally.  Maybe you know

3  this.  I don't remember one specific conversation.  We

4  both like litigation.  I think we both like the concept

5  of shifting from what we were doing, which was almost

6  all defense work, to plaintiff's work.  Some of those

7  -- I mentioned the diamond consumer claims -- were on

8  the plaintiffs's side.  We enjoyed doing that and I

9  think just realized we had like or similar perspectives

10 on it and decided to do what we did.

11  Q.  When you formed Cummings Manookian in

12 January 2015, did you form it with the intent of it

13 being a plaintiff's firm?

14  A.  I would say yes.  I don't know that we

15 ever said that out loud.  I just think we knew it,

16 yeah, was to do plaintiff's work.

17  Q.  Was there a particular type of work that

18 you anticipated doing like med mal, accident cases,

19 slip and falls?  Was there a particular type of case

20 that you intended to do?

21  A.  I could best answer that by what we did

22 do.  We did medical malpractice.  There were a few car

23 accident cases.  I think we still had some consumer

24 fraud cases then, so that is what we did.  There might

25 have been occasional defense thing.  I think I did some

1  subrogation work for a carrier, but the heart of what

2  we did is what I put in the first part of that answer.

3       Q.     Did Cummings Manookian have an operating

4  agreement when it first formed?

5       A.     I know we had one very early.  I don't

6  know if it was January 1st, 2015, or not.  I would have

7  to look at the document.

8       Q.     You think that you had an operating

9  agreement from early on in the existence of Cummings

10 Manookian?

11      A.     Sure, and it might have been from day

12 one.  I don't want to misstate that when I don't know.

13 It could have been January 2nd.  I didn't want to

14 misstate that.

15      Q.     I am going to ask you to look at the

16 document that I have premarked as Exhibit 2, which is

17 entitled Amended and Restated Amended Operating

18 Agreement of Cummings Manookian, PLLC.  Do you have

19 that document in front of you?

20      A.     I do.

21      Q.     Have you seen this document before?

22      A.     I have.

23                    (Exhibit No. 2 was marked.)

24 BY MR. YOUNG:

25      Q.     Just for the record flip over to page 17

1  for me.

2           A.      I am there.

3           Q.      Can you confirm that's your signature?

4           A.      That is my signature.

5           Q.      First question is who drafted this

6  document?

7           A.      It was drafted by an attorney who wasn't

8  us, because he would have drafted the original.  We may

9  have made the amendments, we being me and/or Brian

10  Manookian, but the heavy core of this was drafted by --

11  it will come to me.

12           Q.      It's fair to say it was somebody Cummings

13  Manookian hired for the purpose of drafting it?

14           A.      Yeah, that part is right.  I am trying to

15  remember the name.  It's not coming to mind, but it

16  will.

17           Q.      You said you or Mr. Manookian may have

18  actually made the amendments; is that right?

19           A.      Correct, because I think it was very

20  limited what the amendment would have been, so I doubt

21  we farmed that out.  I don't think we had to.

22           Q.      The title of this document is Amended and

23  Restated Amended Operating Agreement.  That leads me to

24  believe -- correct me if I am wrong -- that there was a

25  prior amended operating agreement before this; is that

1  right?

2      A.     I follow your logic.  That's the best way

3  I can answer it.

4      Q.     You don't recall?

5      A.     I don't recall, but I follow your logic

6  why it doesn't just say amended operating agreement.

7      Q.     That was the question.

8      A.     Yeah.

9      Q.     Do you recall why Cummings Manookian

10  needed an amended operating agreement in January 2017?

11      A.     I think I do, but I am not positive.

12      Q.     What's the reason you think you amended

13  this operating agreement?

14      A.     I think my personal IRA loaned money to

15  the firm, and there is some IRA or tax or other

16  regulation where the entity that was the beneficiary of

17  that loan could not be one in which I was a 50 percent

18  or more member, something along those lines.

19      Q.     So you needed to make an amendment to the

20  membership interest in order to appropriately account

21  for that IRA loan?

22      A.     That's my memory, that the loan couldn't

23  occur if I was 50 percent member and, therefore, the

24  change.  I might be wrong, but that's my best thought

25  on it.

1      Q.      Where did Cummings Manookian physically
2 operate during your time as a member?

3      A.      When it started we had an office over on
4 Woodmont Boulevard.  That's 37215.  I think the
5 building address is 102 or 104.  I don't remember the
6 unit number.  It might be on -- I thought it might be
7 on Exhibit 1.  It might be on something but not
8 something I have in front of me.  Then we moved to 45
9 Music Square West also in Nashville.

10     Q.      When did the firm move to 45 Music Square
11 West?

12     A.      I think it was by 2016.  I don't know if
13 it was in 2015 or not.

14     Q.      Why did the firm move its offices to 45
15 Music Square West?

16     A.      To have a better office space.  That
17 original Woodmont office was a one-room office in a
18 larger building.  The Music Square West property was
19 bigger, more rooms.  It was a better setup.

20     Q.      You eventually withdrew as a member of
21 Cummings Manookian, correct?

22     A.      Correct.

23     Q.      When was that?

24     A.      It was August or September of 2018.

25     Q.      Why did you choose to withdraw from

1  Cummings Manookian?

2          A.      To start my own firm.

3          Q.      Where there any other factors?

4          A.      I don't know how to answer that.

5          Q.      Were you aware at the time you withdrew

6  Mr. Manookian was going to be suspended from the

7  practice of law?

8          A.      I don't remember.  I don't know how those

9  time lines overlap.  I don't think that necessarily

10 would have been the reason even if your timeline

11 matches your question.

12         Q.      I am going to ask you to look back at

13 Exhibit 2 to this deposition.  It's Amended and

14 Restated Amended Operating Agreement.  Specifically I

15 want you to turn all the way back to Exhibit B of this

16 document, which starts on page 19.  Let me know when

17 you are there.

18         A.      I am there.

19         Q.      My questions here I am going to relate to

20 paragraph 2 of this document.

21         A.      Okay.

22         Q.      With the other party will be entitled.

23 You see that paragraph?

24         A.      I do.

25         Q.      Take a moment to review that paragraph

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1   and explain to me what you believe that paragraph

2   provides.

3        A.    I will reread it and then answer.  That

4   paragraph reads to me as a way to proactively address

5   how to split up attorney's fees on a matter that was a

6   Cummings Manookian matter.  One of the two of us

7   withdrew from the firm and after that withdrawal both

8   of us then continue to work on it.

9        Q.    Let me see if I understand the way this

10  is supposed to work in practice or at least your

11  understanding.  If Cummings Manookian opened a matter

12  and the lawyers at Cummings Manookian worked on that

13  matter for 10 months and then you withdrew from

14  Cummings Manookian and took the matter with you and you

15  worked on the matter for another 10 months, do I

16  understand this section to provide that Cummings

17  Manookian would be entitled to 50 percent of the fee

18  and you would be entitled to 50 percent of the fee

19  under that scenario?

20       A.    I would have to reread it again about

21  your math, but I think this is the formula under your

22  scenario and question how it would get divided.

23       Q.    When you withdrew from Cummings Manookian

24  August or September 2018, did you take some firm

25  clients with you?

1      A.     Yes.

2      Q.     When those matters were ultimately

3 resolved, did you use the formula in Exhibit 2 to

4 determine what fees you kept and what fees you paid to

5 Cummings Manookian?

6      A.     Yes.

7      Q.     From paragraph 2 we just looked at?

8      A.     Yes.  I knew what you meant, but, yes.

9      Q.     Did you use that formula with each case

10 that you took with you from Cummings Manookian?

11      A.     I did.

12      Q.     Going back to the property at 45 Music

13 Square West, did Cummings Manookian own the real estate

14 located at that address?

15      A.     The land and building, no.  I figure

16 that's what you mean.  I didn't hear what you said.

17 Did you say real estate or real property?

18      Q.     I said real estate, but I mean real

19 property.

20      A.     That's my fault.  Somebody drove by

21 louder than you.

22      Q.     I am asking whether Cummings Manookian

23 owned the building and land at 45 Music Square?

24      A.     No, they did not.

25      Q.     Who owned the building and land at that

1  address?

2     A.  A different entity whose name I know and

3  can't remember.  It's probably on a register of deeds.

4  If you said it I might -- it was some kind of trust

5  separate from Cummings Manookian.

6     Q.  I will ask you to confirm the way I

7  understand it.  Was that property owned by a general

8  partnership made up of two trusts?

9     A.  The entity that owned the building was

10  comprised of two trusts.  It's your general partnership

11  thing.  I don't know enough to know if that's true or

12  not.  It's just something law-wise I don't know how

13  that term fits.

14     Q.  Did you and Mr. Manookian control the two

15  trusts that owned the building?

16     A.  I don't know about his, and I believe the

17  trust that I was a part of of those two I am pretty

18  sure was my wife and I.

19     Q.  But the building was owned by two trusts

20  that were somehow associated with you and Mr.

21  Manookian?

22     A.  No.  The building was owned -- there is

23  something in the -- it got recorded wrong.  It was

24  either 45 -- it was supposed to be MSW Partnership, and

25  I think somewhere letters got transfixed, so it might

1  be documented as 45 MWS.  That was the entity that

2  owned it.  The trust comprised that entity.  I don't

3  want to answer and make it sound like the trust owned

4  the building because that's not my understanding.

5        Q.    I understand.  That was a bad question.

6  I think you are right.  My understanding is the

7  building was owned by a partnership.  The two partners

8  of the partnership were two trusts.  My understanding

9  -- correct me if I am wrong -- was that one of those

10  trusts was affiliated with you in some way and one of

11  those trusts was associated with Mr. Manookian in some

12  way.  Is that fair?

13        A.    Yes.

14        Q.    Did Cummings Manookian have a lease for

15  the property at 45 Music Square West?

16        A.    Yes.

17        Q.    When did it enter into that lease?

18        A.    In 2016.

19        Q.    Was that a written lease?

20        A.    Yes.

21        Q.    Do you have a copy of that lease?

22        A.    Yes.

23        Q.    Do you know if Mr. Manookian kept a copy?

24        A.    I would have no way of knowing if he kept

25  a copy.

1      Q.    Did Cummings Manookian pay rent for the

2 use of the property at 45 Music Square West?

3      A.    Yes.

4      Q.    How much did it pay?

5      A.    It may have gone up incrementally each

6 year.  I want to say about $9200 a month.

7      Q.    When Cummings Manookian made its lease

8 payments, did it pay the partnership?  Did it pay a

9 bank?  Where were the lease payments actually made?

10     A.    It was one of two things.  It either paid

11 45 Music Square West or it paid InsBank that then used

12 the funds to pay the note.  I don't know if that was

13 one step to get there or two.

14     Q.    Is it fair to say the rent was based upon

15 what the payment due InsBank was?

16     A.    I think that's fair to say.  I think that

17 might have been how it was determined.  The answer is

18 yes.

19     Q.    When did Cummings Manookian stop paying

20 the rent for 45 Music Square West?

21     A.    I don't know that.

22     Q.    Do you know if it paid rent through the

23 entire time you were partner?

24     A.    I do and it did.

25     Q.    Do you know if it stopped paying rent

1   shortly after you withdrew?

2   　　　A.　　I don't know that.

3   　　　Q.　　Did Cummings Manookian, PLC, ever own any

4   real property, any real estate?

5   　　　A.　　The firm did not own any real estate.

6   　　　Q.　　Other than 45 Music Square West and the

7   office that you mentioned on Woodmont, prior to that

8   did Cummings Manookian ever lease any other real

9   estate?

10   　　　A.　　Yes.

11   　　　Q.　　Where was that?

12   　　　A.　　For a brief period of time Cummings

13   Manookian had an office in Honolulu.

14   　　　Q.　　Did you practice from that office?

15   　　　A.　　I am smiling.  I was there a few days out

16   of the year.  If that means I practiced from there,

17   then, yes.  If it means I didn't practice from there,

18   then no.

19   　　　Q.　　Did anybody else use that space other

20   than you?

21   　　　A.　　No.

22   　　　Q.　　Did Cummings Manookian own any personal

23   property?

24   　　　A.　　Tell me what you mean by personal

25   property so I can answer.

1    Q.    Sure.  I will give you a few categories

2    that perhaps it owned.  When I say personal property, I

3    am referring, at least for this question, to things

4    like desks, computers, copiers, conference room tables,

5    chairs, things of that nature.

6    A.    Furniture, yes.  Furniture I know is a

7    yes.  The others I don't know one way or another

8    despite I get the logic.

9    Q.    Tell me what furniture you know of that

10   Cummings Manookian owned.

11   A.    We bought furniture from a few companies

12   that we used to help furnish the office.  That's what I

13   am thinking of.

14   Q.    Was that purchased by Cummings Manookian?

15   A.    What I am thinking of, yes.  I had some

16   of my own things.  I would suspect Brian Manookian may

17   have as well, but the firm purchased some of the

18   furniture under that roof.

19   Q.    Do you believe the firm purchased most of

20   the furniture or just a few items?

21        MR. SPRAGENS:  Object to the form of

22   these questions.

23        THE WITNESS:  I don't know about most.  I

24   know it was into the tens of thousands of dollars

25   because I have seen that documented on tax documents.

1             (Exhibit No. 3 was marked.)

2   BY MR. YOUNG:

3        Q.     So I am going to ask you to go ahead and

4   look at Exhibit 3, which is a property tax payment

5   document for the year -- it shows 2020.  It's for

6   personalty.  Do you have that document in front of you?

7        A.     I do.

8        Q.     Have you ever seen this document before

9   getting it today?

10        A.     Not that I remember.  You might know

11   this.  Well, let me leave it at that, that it's 2020.

12   I was going to say you might know the year is the year

13   I wasn't there anymore.

14        Q.     Do you recall ever seeing a document like

15   this for the years where you remember?

16        A.     I may have, but I don't remember.  The

17   tax document I was thinking about is I think called a

18   franchise and excise return we had prepared that list

19   those things, and if they weren't listed there, I

20   wouldn't remember those.

21        Q.     Who prepared the franchise and excise

22   return for you for Cummings Manookian?

23        A.     The one or two I am thinking about is an

24   accounting company called Mahan, and I think it's

25   called Mahan and associates.

1      Q.    Is that M-A-H-A-N?

2      A.    Yes, sir.

3      Q.    Do you have a copy of that F & E return?

4      A.    I have a copy of at least one, I think

5 two at the most, because I know I have seen them

6 recently.

7      Q.    If you look at what's been marked as

8 Exhibit 3, you will see a total value of personal

9 property of 73,806.  Do you see that number?

10     A.    Yeah, I do.

11     Q.    Do you know where that number came from?

12     A.    Absolutely not.  If this year is right,

13 then, no, I have no way of knowing.  I can read the

14 number you see and just read to me.

15     Q.    Does that number seem accurate to you

16 based on what you knew Cummings Manookian to own?

17     A.    I don't know, especially to say it under

18 oath.

19     Q.    That's fair.  I understand.

20     A.    Okay.

21     Q.    Who was responsible for filing the

22 personal property tax returns for Cummings Manookian

23 when you were a part of it?

24     A.    I think Mahan and Associates.  We hired

25 them and paid them to do it.  I think that's the

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 27 of 134

1  answer.

2      Q.    You talked to the -- you knew Cummings

3  Manookian owned furniture, correct?

4      A.    Correct.

5      Q.    And you believe Cummings Manookian spent

6  tens of thousands of dollars on furniture; is that

7  accurate?

8      A.    Correct, but again that ballpark number

9  is coming from tax returns. If I hadn't seen that, I

10 wouldn't even have that estimate.

11     Q.    What about computers? Do you know if

12 Cummings Manookian owned any computers?

13     A.    I do not know that.

14     Q.    What about servers, computer servers?

15     A.    I don't know that either.

16     Q.    What about photocopiers?

17     A.    If you look you will see I am smiling. I

18 don't think we had a photocopier, so that's -- I don't

19 think we possessed one to own it. If we did I don't

20 know either way.

21     Q.    When you were a member of Cummings

22 Manookian, did it have computers at 45 Music Square

23 West?

24     A.    We did have computers, yes.

25     Q.    Do you know who purchased those

1  computers?

2      A.    No.   That's why I don't know who owned

3  them.

4      Q.    Do you know who paid to maintain the

5  computers in case of any maintenance issues?

6      A.    Cummings Manookian would have.

7      Q.    So you mentioned that you knew that

8  Cummings Manookian owned some furniture.  What happened

9  to those items of furniture when you left Cummings

10  Manookian?

11      A.    I did not take them, but I do not know

12  what happened to them.

13      Q.    You don't know where that furniture is

14  today?

15      A.    No, sir.

16      Q.    When you were a member of Cummings

17  Manookian, PLLC, did the firm maintain bank accounts?

18      A.    It did.

19      Q.    How many bank accounts did Cummings

20  Manookian have when you were a member?

21      A.    I think we had two at InsBank, and at one

22  time we had at least one account at Avenue Bank.  That

23  might be it.  I am trying to make sure I don't confuse

24  my current firm with that firm.  That's the list I

25  have.

1  Q.  Let's talk about the accounts at InsBank

2  first.  What were the purpose of those two accounts at

3  InsBank?

4  A.  The two I am thinking of one would have

5  been the IOLTA account and one would have been what I

6  will call the operating account.  If each partner had

7  individual accounts there, which makes sense, maybe

8  that falls under your earlier question, but I was

9  thinking more about the firm when I said two.

10  Q.  That's fair.  I am asking about the firm.

11  I am not asking individual accounts.  I am asking about

12  Cummings Manookian, PLLC, accounts.  What about the one

13  account at Avenue; what was its purpose?

14  A.  I think it would have been an operating

15  account, which might mean we had an IOLTA account

16  there, too, but I don't remember that.  I more remember

17  the InsBank aspect.

18  Q.  When you left Cummings Manookian, did you

19  only have accounts at InsBank in August of 2018?

20  A.  I think so because that's all that I

21  remember.

22  MR. SPRAGENS:  Did you ask the question

23  did Cummings Manookian have those accounts, not Mr.

24  Cummings?

25  MR. YOUNG:  Correct, right.

1      Q.      Just to clarify, I am asking whether

2    Cummings Manookian had only accounts at InsBank when

3    you left the firm in August of 2018?

4      A.      Yes, as far as I remember.

5      Q.      Who had signatory authority on the two

6    InsBank accounts?

7      A.      I would think Brian Manookian and I.  I

8    don't know if anybody else did beyond us.

9      Q.      Do you know if Afsoon Hagh ever had

10   signatory authority?

11     A.      That's what I was struggling -- I don't

12   know one way or another.

13     Q.      What kind of balances did the firm

14   typically maintain in its operating account?  By that I

15   mean did it empty it at the end of every month?  Did it

16   carry over a balance?  What was the firm's policy on

17   that?

18     A.      It definitely did not have a policy

19   because it would vary, including being a plaintiff's

20   firm sometimes some nice size deposits would come in

21   that would, what I will call, raise the daily average,

22   but we wouldn't leave the money sitting there.  We

23   would distribute it or transfer it to us or between us.

24     Q.      Did Cummings Manookian normally maintain

25   large balances month over month?

1      A.      No, not the way I think of the word

2  large, no.

3      Q.      When you were a member of Cummings

4  Manookian, did it use any credit cards in its

5  operations?

6      A.      Yes.

7      Q.      What kind of credit card did it have?

8      A.      I remember the firm had American Express

9  card.  If at one time we had another, I call it,

10  corporate or firm credit card, I don't remember it

11  right now.

12      Q.      In whose name was that account held?  Was

13  it Cummings Manookian or one of you individually?

14      A.      I think it was Cummings Manookian, but I

15  can't picture the card in my mind right now.  I bet

16  each card had our names on it, but I think it was a

17  firm card or firm account.

18      Q.      Who was given credit cards on that firm

19  account?

20      A.      I know myself and Brian Manookian.  I

21  don't know that anyone else was.

22      Q.      Did the firm get monthly bills on that

23  credit card?

24      A.      Yes.

25      Q.      Who paid the monthly bills for the credit

1 card?

2     A.    They came out of the firm account.

3     Q.    Who had access to the AmEx statements?

4     A.    I know I did. I don't know if anyone

5 else did.

6     Q.    Were you the one responsible for

7 reviewing the charges?

8     A.    I know I did review them, yeah. I don't

9 think it was in an operating agreement that it was

10 somebody's responsibility versus others.

11     Q.    When you were a member of Cummings

12 Manookian, what kind of charges were made to the firm

13 credit card?

14     A.    Can you specify what you want me to talk

15 about?

16     Q.    I will ask you a few categories and ask

17 you whether these are the kinds of things you would

18 normally charge to a firm credit card. For example,

19 court costs?

20     A.    I think like filing fees, yes, would have

21 gotten on there.

22     Q.    What about payments to court reporters,

23 for example?

24     A.    Yes.

25     Q.    What about personal expenses?

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 33 of 134

1      A.      Yes.

2      Q.      How would that be accounted for if you

3 had personal expenses billed to the corporate card?

4      A.      It would just show up on the card as a

5 transaction that wasn't one of the other categories.

6      Q.      Would that be treated as a distribution

7 to the partner?

8      A.      I don't know how to answer that.  We

9 didn't have a policy about it.  I don't know.  I don't

10 know how to answer that.

11      Q.      Did Cummings Manookian use telephone

12 numbers in the operation of its business when you were

13 a member there?

14      A.      Yes.

15      Q.      Do you remember what telephone numbers

16 Cummings Manookian used?

17      A.      I will look at one of your exhibits to

18 try to remember.

19      Q.      Let me ask you a few questions and see if

20 this triggers memory.  Was (615)266-3333 Cummings

21 Manookian's primary office telephone number?

22      A.      I think so, yes.

23      Q.      Was (615) 266-0250 its primary fax

24 number?

25      A.      Correct.

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 34 of 134

1    Q.    Did Cummings Manookian use other

2  telephone numbers in the operation of its business?

3    A.    When there was that brief time of having

4  a Hawaii office, the answer is yes, but it was not a

5  Nashville number.  It was an 808 area code number.

6    Q.    Did the lawyers at Cummings Manookian

7  have direct dial numbers?

8    A.    I bet we did.  I don't remember.  It

9  makes sense because we didn't have a switchboard.

10    Q.    Who initially established the Cummings

11  Manookian telephone numbers?  Who set those up?

12    A.    Let me go back.  I am actually not sure

13  we had direct numbers.  I am still thinking about the

14  question.  I don't remember that.  I said I thought we

15  did.  I don't remember.  I am sorry, can you repeat the

16  most recent question?

17    Q.    Sure.  Who established the Cummings

18  Manookian telephone numbers?  Who set up those

19  telephone numbers?

20    A.    I don't know.

21    Q.    Was it someone other than you or you

22  don't recall?

23    A.    I don't know.  It might have been me.  I

24  just don't remember.

25    Q.    In whose name was the telephone bill

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 35 of 134

1  issued every month?

2      A.    I don't know.

3      Q.    Who paid the monthly telephone bill while

4  you were at Cummings Manookian?

5      A.    I think the firm did, but I don't recall.

6  I can't picture a document right now, picture a bill

7  that covers that.

8      Q.    When you resigned your membership from

9  the firm in August or September 2018 did you take any

10  of Cummings Manookian's telephone numbers with you?

11      A.    No.

12      Q.    Did you ever use (615)256-3333 or

13  (615)266-0250 in your new firm?

14      A.    No.

15      Q.    Do you know who was using those two

16  telephone numbers as of December 2018?

17      A.    No.  I just know I wasn't.

18      Q.    Do you know if anyone is using those

19  numbers today?

20      A.    No, I do not.

21      Q.    When you were a member at Cummings

22  Manookian, did it have a website?

23      A.    We did.

24      Q.    What was the domain, the address?

25      A.    I think it was cmtriallawyers.com.

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 36 of 134

1      Q.     When did cmtriallawyers.com first become

2   operational?  Was it at the very beginning of the firm?

3      A.     I don't know.  I believe it was in the

4   first year, so that would have been in 2015.

5      Q.     Was cmtriallawyers.com still operational

6   as of your exit from the firm?

7      A.     Yes.

8      Q.     Do you know when it ceased operating?

9      A.     No.

10      Q.     Did someone maintain that website for

11   you, or did you do it in-house?

12      A.     I know I did not.  We got help from

13   someone who was not a lawyer, and I think Brian

14   Manookian may have helped some, but I am not sure

15   whether he helped on the site or not.

16      Q.     When you say someone who was not a

17   lawyer, was that an employee?

18      A.     It was Jim Pepe with Helix SEO.  We paid

19   him monthly.  I don't know if he was an employee.  He

20   did work for other companies and other people besides

21   ours.

22      Q.     Was his only job, at least for Cummings

23   Manookian, to maintain the website, or did he have

24   other responsibilities as well?

25      A.     I don't think the website was Jim Pepe's

1   only responsibility in our regard, but I can't tell you

2   what else he did do.

3        Q.    Were there annual billings to continue

4   the use of that domain cmtriallawyers.com?

5        A.    My experience is there is an annual

6   renewal for a domain name, so that's why I am going to

7   say yes.

8        Q.    Do you know who paid that annual renewal?

9        A.    Either me personally or the firm.

10       Q.    Do you know who owns the right to that

11   domain --

12       A.    I'm sorry, or Mr. Manookian.  Mr.

13   Manookian may have been the one who -- whoever first

14   purchased it I believe then got hit with the annual

15   renewal.

16       Q.    Do you know who owns the right to that

17   domain today?

18       A.    No.

19       Q.    When you were a member at Cummings

20   Manookian, did its attorneys have e-mail addresses?

21       A.    Yes.

22       Q.    You had an e-mail address?

23       A.    Yes.

24       Q.    What was that e-mail address?

25       A.    Bcummings@cmtriallawyers.com.

1    Q.    Did Brian Manookian have an e-mail
2 address?

3    A.    He did.

4    Q.    What was that address?

5    A.    Bmanookian@cmtriallawyers.com.

6    Q.    Did Afsoon Hagh have a
7 cmtriallawyers.com e-mail address?

8    A.    I think so.  I am not as certain of that
9 as I am about Mr. Manookian and myself.

10    Q.    Who paid to maintain those e-mail
11 accounts when you were a member of the firm?

12    A.    I don't know how to answer that, because
13 I don't know if that is even an expense.

14    Q.    So you are not sure if there was any cost
15 to maintain it?  Is that what you are saying?

16    A.    Yeah, that's what I am saying.  I just
17 might not understand your question, but I don't know.
18 I don't know what that cost would be is my direct way
19 to put it.

20    Q.    Do you know if any of those
21 cmtriallawyers.com e-mail addresses are active today?

22    A.    No, I don't.

23    Q.    When you were a member of Cummings
24 Manookian, did the firm maintain time records for its
25 contingency cases?

1     A.    No, not routinely or per policy.

2     Q.    Do you know if any individual attorneys

3 working for Cummings Manookian had a policy of keeping

4 time records on their contingency cases?

5     A.    Without making you repeat that question,

6 I am going to carefully word my answer.  Yes, to the

7 extent it was somebody like an outside attorney we had

8 help and they were going to get paid at an hourly rate.

9 That would still be a contingency case, but we would

10 have had them keep up with their time so they could get

11 paid for that time, but as far as the in-house Cummings

12 Manookian attorneys, I don't know of such a practice.

13     Q.    Did Cummings Manookian employ any

14 nonlawyer staff during your time as a member?

15     A.    Yes.

16     Q.    How many?

17     A.    One I am certain of, which is Doug Rice.

18 If Jim Pepe was an employee, he would be the second.

19 As I said before, I am not certain he was an employee

20 despite the fact we paid him regularly.

21     Q.    Any others you can think of other than

22 Doug Rice or Jim Pepe?

23     A.    Was your question about nonlawyer people

24 we employed?

25     Q.    Yes.

1    A.    I don't have anybody else to add to that.

2    Q.    You explained to me what Jim Pepe did

3 generally speaking.  What was Doug Rice's role at

4 Cummings Manookian?

5    A.    He was a paralegal.

6    Q.    Was Doug Rice still working for Cummings

7 Manookian at the time you resigned your membership?

8    A.    Yes.

9    Q.    What about Jim Pepe?  Was he still

10 performing services for the firm when you resigned?

11    A.    I think so, but I am not as clear on Jim

12 as I am about Doug Rice.

13    Q.    Did Cummings Manookian ever employ any

14 attorneys other than you and Mr. Manookian during your

15 time at Cummings Manookian?

16    A.    Afsoon Hagh was an attorney at the firm.

17 It's the term employee.  Just like the thing with Pepe,

18 I don't know if I can put it in that category.

19    Q.    Other than Afsoon Hagh, were there any

20 other lawyers -- other than Afsoon Hagh, you, and Mr.

21 Manookian, were there any other lawyers who did work

22 for Cummings Manookian while you were a member there?

23    A.    Yeah, and I am not trying to confuse you.

24 Mr. Hammervold did depending on your question.  He was

25 an outside lawyer, but he did work on some of our

1   cases.

2        Q.    Did you pay Mr. Hammervold on an hourly

3   basis?

4        A.    The firm did.  I think on some cases Mr.

5   Hammervold may have gotten a percentage division just

6   like we were used to, but I think on other things it

7   was more project based for Mr. Hammervold.

8        Q.    Was it fair to say Mr. Hammervold was not

9   a Cummings Manookian attorney?  He was an outsourced

10  attorney?

11       A.    Correct.

12       Q.    Was Afsoon Hagh ever a member of Cummings

13  Manookian, PLC?

14       A.    Not while I was there.

15       Q.    Was Afsoon Hagh ever paid by Cummings

16  Manookian, PLC, in any kind of capacity while you were

17  there?

18       A.    I don't think so unless health insurance

19  is considered compensation, but I don't think that's

20  what you meant.

21       Q.    Was she on Cummings Manookian's health

22  insurance plan?

23       A.    I don't know that the firm had a plan.  I

24  know the firm was charged for a health insurance plan

25  that I was not on, which was my choice, and I think

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 42 of 134

covered Mr. Manookian and Ms. Hagh.

Q. I think I understand your prior comment about not sure whether Afsoon Hagh would be considered an employee of Cummings Manookian. Let me ask you this question. What did you consider Ms. Hagh's role at Cummings Manookian to be while you were a member?

A. She was a lawyer who worked on some firm cases.

Q. Did she ever have a title at Cummings Manookian that you knew of?

A. No.

Q. Did you ever introduce her to clients with any particular title?

A. Right now I don't remember. I know I do remember one time I was with her with a client. I don't think I introduced her. I think they already knew each other.

Q. Did you ever refer to her as senior counsel or senior attorney to anyone?

A. No, not that I remember.

Q. Did you ever hear her --

A. Let me add to that. I also wouldn't have called her junior counsel either. I don't think I would have said any such thing.

Q. Did you ever hear Mr. Manookian refer to

1 her by any title?

2     A.    Not that I remember, no. That's not the

3 way we spoke or at least not the way I remember things.

4     Q.    Did you ever hear her refer to herself by

5 any title?

6     A.    No. I am trying to picture e-mails I

7 received from her how people have signature blocks. I

8 don't remember if she had anything on hers or not. I

9 don't remember her saying that to me.

10     Q.    Do you know if Afsoon Hagh was carried on

11 Cummings Manookian's firm malpractice insurance policy?

12     A.    She was from a certain point forward,

13 yes. I don't think she was initially.

14     Q.    Do you know when she was added to the

15 firm's malpractice insurance policy?

16     A.    I think it was late 2016. It was 2016 or

17 2017. That much I know.

18     Q.    Was she still on the firm's malpractice

19 insurance policy when you resigned Cummings Manookian?

20     A.    Yes.

21     Q.    Did Afsoon Hagh have an office at

22 Cummings Manookian offices at 45 Music Square West?

23     A.    I would say yes to that.

24     Q.    Do you know when she last used that

25 office?

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 44 of 134

1        A.     No.   I have no idea.

2        Q.     Do you recall whether she was using that

3    office when you left the firm in August or September

4    2018?

5        A.     I am going to answer this way.   I can

6    picture the office.   I am thinking of the space in that

7    building she used.   I can't tell you when I last saw

8    her there even when I was there or when I last saw Mr.

9    Manookian.   I just don't have a memory.   I can picture

10   the space I am thinking of, but I can't picture her in

11   it one time versus another.   I am sorry if that sounds

12   flippant.   I just can't.

13       Q.     Thank you for that clarification.   Do you

14   know if Ms. Hagh was getting mail at 45 Music Square

15   West when you left the firm September 2018?

16       A.     She was.

17       Q.     Do you know if she was using her Cummings

18   Manookian e-mail at that time?

19       A.     I don't know.   She used e-mail.   I don't

20   know what the e-mail address was.   It could be figured

21   out.   Spontaneously I don't know.

22       Q.     Do you know if Ms. Hagh was using the

23   (615) 256-3333 as her telephone number as of the date

24   that you left the firm?

25       A.     I think you mean 266 for your question.

1    Q.    Yes, sorry.

2    A.    I think all of us were at the time I

3  left.  By all of us I mean Manookian, Hagh, Cummings.

4    Q.    Do you know when Ms. Hagh ceased using 45

5  Music Square as her mailing address?

6    A.    I don't, no.

7    Q.    For clarification, the reason I am asking

8  this you did work on cases with Ms. Hagh after you

9  resigned from Cummings Manookian, correct?

10    A.    I know I worked on one case with her.  If

11  it's more than that, it's just me not remembering it,

12  not trying to slight anybody.

13    Q.    Do you remember if you needed to mail

14  something to her like a notice, would you use 45 Music

15  Square West on that case?

16    A.    I would have e-mailed it.  I don't think

17  I would have sent her traditional mail to anywhere.

18    Q.    What e-mail address would you have used

19  to send it to Ms. Hagh?

20    A.    I would have just started typing in her

21  name and the rest would auto populate.  I'm sorry, I

22  know it would have started with her name and then it

23  would complete itself, so I don't know.

24    Q.    Do you know when she ceased using her

25  Cummings Manookian e-mail address?

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 46 of 134

1      A.      No, I don't.

2      Q.      Do you know when she ceased using the

3  266-3333 telephone number?

4      A.      I do not.

5      Q.      When you resigned from Cummings

6  Manookian, do you know if the firm notified clients of

7  your departure?

8      A.      The clients got notified.  I don't know

9  who did that, if it was me individually, the firm

10 through a human being, or Mr. Manookian, or some

11 combination of that.  Ms. Hagh may have done it, but

12 they learned of it.

13     Q.      When would they have learned of it?

14     A.      Soon around the time I started my new

15 firm at the latest so they would have all that contact

16 information.

17     Q.      Do you recall if they were notified by

18 telephone or in writing of your departure?

19     A.      I don't remember.  I can tell you what I

20 think the practice was just from knowing me.  I will

21 let you tell me if you want to know that.

22     Q.      Sure.  What was your practice?

23     A.      One of us would have sent an e-mail so if

24 somebody later complained you could prove it went out

25 or to a more formal extent a letter, but it would not

1 have just been a phone call. That's not how I -- that

2 would not have been effective for us of how we do

3 things.

4 Q. You are now aware that Brian Manookian

5 was suspended from the practice of law in December

6 2018, correct?

7 A. I know he has been suspended. Tell me

8 the date again.

9 Q. December 2018.

10 A. I don't know that your date is right, but

11 I won't fuss at you.

12 Q. You knew he was suspended sometime

13 shortly after you resigned your membership?

14 A. Yes.

15 Q. I think you mentioned having at least one

16 client in common with Ms. Hagh. Was that the Shoemaker

17 matter?

18 A. It was. It was Brett Keefer.

19 Q. Do you know if Mr. Manookian ever

20 notified Mr. Keefer of his suspension?

21 A. I didn't see it, but I didn't see

22 anything he sent out. I don't know. You are asking me

23 if I know. The way I use words, no, I don't know. Do

24 I believe he did? Yes, I believe he did.

25 Q. Did you ever see a copy of a letter?

1        A.        I don't remember one way or another.  I

2   may have.  Brian Manookian may have mailed me a copy.

3   I don't know.  I don't remember.  It wasn't a concern

4   of mine because I believed he did it.

5        Q.        Did you ever have any discussions with

6   Mr. Keefer about Mr. Manookian's suspension?

7        A.        I probably did to help him understand.

8   Again, it's like why I think we mailed clients about

9   what was going on.  Just knowing me, I would have

10  wanted him to understand not to panic when he is being

11  told somebody got suspended.

12       Q.        Do you know whether Mr. Keefer was ever

13  informed Cummings Manookian could no longer represent

14  him?

15       A.        I am going to need you to rephrase that.

16  Before you do I am going to grab a bottle of water five

17  steps away from me.  Remember the question.  Repeat the

18  last one.

19       Q.        Do you know whether Mr. Keefer was ever

20  informed that Cummings Manookian could no longer

21  represent him?

22       A.        No, I don't know that.

23       Q.        Do you know whether Mr. Keefer was ever

24  told that he needed to interview new counsel?

25       A.        No.   Politely I don't really understand

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 49 of 134

1  the question.   Maybe I don't need to.   I mean he hired
2  us.

3          Q.      I guess the question is this.   Upon Mr.
4  Manookian's suspension, do you know if Mr. Keefer was
5  told he needed to get new counsel because Cummings
6  Manookian couldn't represent him anymore?

7          A.      No.   Are you going to be upset if I
8  elaborate?

9          Q.      No.

10          A.      When Mr. Keefer signed -- maybe I am
11  wrong.   When Mr. Keefer signed an attorney-client
12  agreement, he knew that it wasn't just one attorney
13  that was going to be representing him, so that's the
14  part I am struggling with.   Maybe it happened, but I
15  don't see a hypothetical, and maybe it's an ethical
16  rule I am unaware of unfortunately, where Mr. Manookian
17  as one attorney being suspended and other existing
18  attorney or attorneys being -- that would have
19  triggered a conversation that he could or should
20  interview other attorneys.   That's why I am not -- one,
21  I am not aware of it, but I am talking too much.   I
22  wouldn't have expected that either.

23          Q.      Is it fair to say, at least in your view,
24  Mr. Manookian's suspension didn't change the way the
25  case was being handled?

1          MR. SPRAGENS:   Object to the form.

2          THE WITNESS:   Correct.  I mean we lost

3    Mr. Manookian's ability to work on the case during that

4    time, but we kept moving the case forward.

5          MR. YOUNG:   Let's take about a five

6    minute break at this point.  Come back at 2:18.

7          (A break was taken.)

8    BY MR. YOUNG:

9          Q.     Mr. Cummings, during the break you

10   mentioned that you needed to make a correction to a

11   prior statement?

12         A.     Yeah, I need to fix a year I think I told

13   you.  You asked me about Afsoon Hagh being on or added

14   to the Cummings Manookian malpractice coverage.  I

15   thing I told you 2016 or 2017.  I looked up an e-mail I

16   had with that company, and it looks like it was 2017.

17   So if I had 2016 I was wrong.

18         Q.     Thank you for that clarification.

19   Earlier you were explaining that some lawyers did some

20   work on Cummings Manookian cases that were paid on an

21   hourly basis.  Do you remember that?

22         A.     Yeah.

23         Q.     You used Mark Hammervold as an example?

24         A.     Correct.

25         Q.     Was Ms. Hagh ever paid on an hourly basis

1  like an outside attorney?

2         MR. SPRAGENS:  Object to the form.

3         THE WITNESS:  Not by Cummings Manookian

4  while I was there.

5  BY MR. YOUNG:

6         Q.    Did you consider her to be I think you

7  used the word in-house attorney when referring to the

8  people who routinely worked on Cummings Manookian

9  matters?  Did you consider Ms. Hagh to be an in-house

10 attorney with Cummings Manookian?

11        A.    Yes, which is why we added her to our

12 malpractice coverage.

13        Q.    I am going to shift a bit and ask

14 questions about a few specific cases.  The first one is

15 Fitzgerald versus Osborn.  Were you ever involved in

16 that case?

17        A.    Not that I remember, no.

18        Q.    You have no personal knowledge about that

19 case?

20        A.    Correct.  That's easy.  I have no

21 personal knowledge about that case.

22        Q.    I think you testified earlier that when

23 you left Cummings Manookian you did take some cases

24 with you.  Do you recall which cases you took with you

25 when you left Cummings Manookian?

1    A.    I was afraid you were going to ask that.

2 First of all, let me put it this way.  I am going to

3 try to list -- do you have a list of any of these cases

4 where I can say yes or no?

5    Q.    I don't.  I guess I am asking which ones

6 you recall taking with you.

7    A.    I will change my answer from how you

8 phrased it.  Matters I worked on after I left Cummings

9 Manookian that were initially signed by the Cummings

10 Manookian firm are the Shoemaker case, a case called

11 Marcum.  There are others, and this is how I know this,

12 and you might know this, too, that paragraph you had me

13 look at with how to break out splitting attorney -- I

14 used that formula to send Ms. Burton checks on more

15 than one case after I left.  It would have been

16 something I continued to have a role on that I ended up

17 doing that accounting, but initially it had been a

18 Cummings Manookian matter.  I just don't have that list

19 in that part of my brain to tell you.

20    Q.    Let me ask this question.  Other than

21 Shoemaker -- put that one to the side -- other than

22 Shoemaker, for any case that originated with Cummings

23 Manookian, that is signing an engagement letter first

24 with Cummings Manookian, but on which you worked after

25 you left Cummings Manookian, did you use that formula

1 to divide fees among yourself and Cummings Manookian?

2      A.     Yes.

3      Q.     Why did you split the fees?

4      A.     I am sorry, the first word didn't come

5 through.

6      Q.     Why did you split the fees?  Why didn't

7 you keep it all to yourself?

8      A.     Because it had initially been a Cummings

9 Manookian matter.  That paragraph, paragraph 2 on

10 Exhibit 2, page 19, I think respectfully you or Ms.

11 Burton may have reminded me I needed to do that.

12      Q.     You believe you were required to do so by

13 the operating agreement?

14          MR. SPRAGENS:  Object to the form.

15          THE WITNESS:  I do.

16                (Exhibit No. 4 was marked.)

17 BY MR. YOUNG:

18      Q.     I am going to ask you to look at what's

19 been premarked Exhibit 4.  Just to be sure we're all

20 looking at the same document, it's a document entitled

21 Attorney-client Agreement on Cummings Manookian

22 letterhead dated April 19, 2017, addressed to Edward

23 Goodwin and Brett Keefer.  Do you see that?

24      A.     Yes.  I have it in front of me.

25      Q.     Have you ever seen this document before?

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 54 of 134

1       A.    Yes.

2       Q.    Is it, in fact, an attorney-client

3 agreement with Mr. Goodwin and Mr. Keefer?

4       A.    Yes, with them and Cummings Manookian,

5 yes.

6       Q.    Is this related to the case that we've

7 sometimes referred to as the Shoemaker case?

8       A.    Yes.

9       Q.    I want you to turn to page 3 of this

10 document and tell me if that's your signature at the

11 bottom of this letter.

12       A.    It is.

13       Q.    Are you the one that initially had

14 conversations with Mr. Keefer?

15       A.    I think so.  I think I was the first one

16 to speak to him, but that's not really the way I

17 remember things.  My mind doesn't categorize things

18 that way.  I think so because this was pretty soon

19 after the event.  It says on page 1 April 14 and this

20 document is going out April 19.  I think I spoke with

21 him, got this to Mr. Goodwin, because that's his e-mail

22 address, and there would be a page where they would

23 have signed it.  Mine only has three pages.

24       Q.    Do you think they ultimately signed this

25 document?  That could have been cut off.

1  A.  I think they did and there might have

2 been a later very similar agreement that only Mr.

3 Keefer signed when we realize Mr. Goodwin was not the

4 surviving spouse of the decedent.

5  Q.  Was a complaint ultimately filed against

6 Vanderbilt on behalf of Mr. Keefer?

7  A.  Yes.

8  Q.  Do you know when that happened?

9  A.  Can I cheat and look at the exhibit you

10 sent me?

11  Q.  Sure.  Go ahead.  We will look at that in

12 a minute.

13  A.  I know it has a stamp filed date on it.

14 February 11, 2019.

15  Q.  Do you know if any time between April 19,

16 2017, and February 11, 2019, when the case was filed,

17 do you know if at any time during that time Cummings

18 Manookian sent Mr. Keefer a letter informing him it was

19 withdrawing from his representation?

20  A.  Can you repeat that.

21  Q.  Do you know if Cummings Manookian ever

22 sent Mr. Keefer a letter before February 11, 2019,

23 informing him that it was withdrawing from his

24 representation?

25  A.  No.

1      Q.      In fact, when you filed this complaint

2   February 2019, did you believe this attorney-client

3   agreement was still in full force and effect?

4      A.      An agreement between Mr. Keefer and

5   Cummings Manookian was still in full force and effect,

6   yes.  Might not have been the one in front of me,

7   because I think Mr. Keefer may have signed a

8   supplemental one that was just him.

9      Q.      You think the terms were substantially

10  similar?

11     A.      Yes.

12     Q.      Prior to the filing of the complaint,

13  were there any settlement discussions with Vanderbilt?

14     A.      Yes.

15     Q.      Was there ever an offer made?

16     A.      Yes.

17     Q.      Do you recall how much that offer was?

18     A.      It was at a mediation.  I remember what

19  Vanderbilt's last comment was, but I will get Mr.

20  Price's help, my attorney here, on what I am allowed to

21  say in the deposition so I don't violate a rule about

22  that.

23          MR. PRICE:  I need to hear that question

24  again.  The settlement agreement I understand is

25  confidential.  I don't know that the mediation was.  I

1  am worried that this may be a confidential

2  communication between Mr. Keefer and his attorneys in

3  this case, so I am worried about the amounts right now.

4  BY MR. YOUNG:

5      Q.    I understand that.  Let me explain why I

6  am asking this.  The defendants in this case have

7  alleged that there was a very low offer made prior to

8  the filing of the complaint and the defendants allege

9  that that is somehow significant in determining

10  division of the fees later.  That's the only reason I

11  am asking.  Maybe you can answer this or not answer

12  this.  The offer that was made prior to the filing of

13  the claim -- would you have considered that a very low

14  offer?

15          MR. SPRAGENS:  Object to the form.

16          THE WITNESS:  Yes, and that's why it was

17  not accepted.

18  BY MR. YOUNG:

19      Q.    That's ultimately why a complaint was

20  filed?

21      A.    Right.

22              (Exhibit No. 5 was marked.)

23  BY MR. YOUNG:

24      Q.    Let's go ahead and look at a copy of the

25  Complaint premarked as Exhibit 5.  I'll ask have you

1  ever seen this document?

2      A.    Yes.

3      Q.    Is this the document that initiated --

4  this is a complaint that initiated the matter between

5  Mr. Keefer and Vanderbilt?

6      A.    This is the complaint that was filed that

7  started the lawsuit.

8      Q.    This shows it was filed February 11,

9  2019, like you testified earlier, correct?

10      A.    Right.  I see that.

11      Q.    Again, like I did in the deposition of

12  Mr. Manookian, I will plead a little ignorance not

13  being a personal injury lawyer and ask you why it took

14  from April 19, 2017, until February 11, 2019, to file

15  this complaint?

16      A.    Sure.  The bulk of that time between

17  death and this February 2019 filing date was at least

18  one if not multiple tolling agreements with Vanderbilt

19  where they said they wanted a tolling agreement meaning

20  a freeze on the running of the statute of limitations

21  and statute of repose to see if it would settle

22  presuit.  They wanted to try that through the presuit

23  mediation you asked me about or I was thinking of.

24  That didn't result in settlement and then filed the

25  lawsuit before the tolling agreement ran out.  The

1  tolling agreement allowed more time than normal, which

2  might be the best way to answer your question.

3      Q.    That does at least partially answer the

4  question.  What did Cummings Manookian do to ready this

5  file for a complaint between April 19, 2017, and

6  February 11, 2019?

7          MR. SPRAGENS:  Object to the form.

8          THE WITNESS:  I can tell you what I did.

9  Is that okay?

10  BY MR. YOUNG:

11      Q.    Sure.  Explain what you did.

12      A.    Met with the client, obtained and

13  reviewed medical records, reviewed information on line

14  about the medical issues, whether it's, quote, unquote,

15  medical literature or things you could read to better

16  understand the issues, conferred with a pre-suit

17  expert, went to that pre-suit mediation you asked

18  about, prepared this document, the complaint.  Those

19  are the things that come to mind as to what was done

20  between first contact to filing of the complaint.

21      Q.    Do you know if any other attorney at

22  Cummings Manookian worked on this matter before the

23  filing of the complaint?

24          MR. SPRAGENS:  Object to the form.

25          THE WITNESS:  I am hesitating, because

1  this came up earlier.  I don't remember the suspension

2  dates.  I don't know.  I know what I did.  I don't know

3  what other people -- I don't know of anybody else doing

4  anything through the point you asked me.

5  BY MR. YOUNG:

6       Q.     You don't recall anyone else doing

7  anything prior to the filing of this complaint?  Is

8  that fair?

9       A.     I don't remember it, but I would have

10 spoken -- if he was not suspended at the time, spoken

11 with Mr. Manookian about this.  We would have been

12 looking at things in the record together, talked about

13 things, talked about whether to include Dr. Gretchen

14 Edwards, but I don't remember those things, and I can't

15 think of a work product to prove it.

16      Q.     Do you recall having any conversations

17 with Afsoon Hagh before this complaint was filed?

18      A.     Not about this matter, no.

19      Q.     I think you mentioned earlier that you

20 drafted this complaint?

21      A.     Yes.

22      Q.     If we look at page 69 of Exhibit 5, is

23 that your signature on this complaint?

24      A.     Yes, it is.

25      Q.     Do you know whether you circulated this

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1   complaint to Brian Manookian for his review before it

2   was filed?

3        A.   I don't know.

4        Q.   Do you know if you circulated this

5   complaint to Afsoon Hagh for her review before it was

6   filed?

7        A.   I do not know that either.  Are you on

8   page 69 of this exhibit?

9        Q.   Sure.

10       A.   You were asking about Ms. Hagh's e-mail

11  address and I told you I didn't remember.  There is one

12  e-mail address.

13       Q.   That's Afsoon@cummingsmanookian.com?

14       A.   Right.  I am reading it from the page.  I

15  obviously didn't remember that.

16       Q.   Would you have sent a copy of this

17  complaint to her for her review before filing?

18            MR. SPRAGENS:  Object to the form.

19            THE WITNESS:  I don't know that I did.

20  BY MR. YOUNG:

21       Q.   While we're on page 69, you see that Ms.

22  Hagh's signature block says Cummings Manookian, PLC,

23  correct?

24       A.   I see that.

25       Q.   It has a telephone number of 266-3333?

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 62 of 134

1      A.      Right.

2      Q.      And a fax number of 266-0250?

3      A.      Correct.

4      Q.      Like you pointed out before, it shows her

5      e-mail address is Afsoon@cummingsmanookian.com?

6      A.      Yeah.  I have to tell you I might have

7      been wrong when I told you what Mr. Manookian's and my

8      e-mail addresses were.  Cmtriallawyers.com might have

9      been the domain name, but our e-mail addresses were the

10     firm name.  Kind of matching my clear indication to you

11     I was not real clear on my memory about that.

12     Q.      That's fair.  It's been a few years.  I

13     understand.  Looking at the signature block on page 69,

14     why did you include her Cummings Manookian, PLC, firm

15     name and e-mail address and these telephone numbers in

16     the signature block?

17     A.      Because she was co-counsel when we were

18     filing it.

19     Q.      Did you understand this to be her contact

20     information as of February 2019?

21     A.      I certainly wouldn't misrepresent that in

22     a filing, so I guess the answer is yes.  I can't tell

23     you I remember one way or the other.

24     Q.      This is what you believed at least as of

25     February 2019?

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 63 of 134

1      A.      Right.

2      Q.      Did Ms. Hagh ask you to change this?

3      A.      No.

4      Q.      Did she ever tell you not to use Cummings

5  Manookian signature block?

6      A.      Not that I remember.  Not about this.

7      Q.      Do you remember at any time her telling

8  you not to use her Cummings Manookian signature?

9      A.      I don't remember that, but it may have

10 occurred at some point later when there was a change of

11 address or change of firm.  I just -- I don't remember

12 that occurring either.

13     Q.      You explained to me earlier the work you

14 did on the Shoemaker case up to the point of filing

15 this complaint.  Can you explain to me what work you

16 did on the Shoemaker case after this complaint was

17 filed?

18     A.      Sure.  I want to be as clear as the

19 question was.  When I was answering earlier because of

20 the way -- I was answering through the filing of the

21 complaint.  When you saw page 69 when this complaint

22 was filed I already left the firm.  Making sure you saw

23 that.

24     Q.      I understand.

25     A.      Fair enough.  Now I forgot the question.

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1   Were you asking what happened later?

2       Q.     What work did you do on the Shoemaker

3   case after the filing?

4       A.     Helped the client answer written

5   discovery, prepared written discovery that was

6   propounded to the defendant, retained experts, both

7   medical experts and one economist expert, attended

8   and/or took depositions before the expert witness

9   depositions. Some I attended and did not take. Some I

10   took the only one there. It was a variety. I attended

11   a second mediation with Afsoon Hagh. This one was

12   during the litigation.

13       Well, obviously, you asked from the

14   complaint forward. There would have been motion

15   hearings I went to. I may have even argued part of it.

16   That part I am not as sharp on memory-wise. I don't

17   want to get -- I'll answer the question. When we would

18   get things, I prepared summaries of it, whether it was

19   Vanderbilt responses to discovery, key points from

20   deposition transcripts. Once I would get the expert's

21   opinion orally prepare the expert disclosures. Rule 26

22   disclosures is the name of that.

23       As part of that maybe prepare summaries

24   to send to those experts, summaries of records,

25   summaries of depositions, summaries of Vanderbilt's

1  discovery responses, speak with them to learn their

2  opinions to prepare the corresponding Rule 26

3  disclosures.  I might be leaving something out.  Off

4  the top of my head, those are the categories I would

5  use.

6      Q.    Just for the record, I am not asking sort

7  of a blow by blow.

8      A.    Then you could have cut me off.

9      Q.    That's good because you did what I asked,

10 which is I wanted explanation of generally what kind of

11 work you did on this matter after the filing of the

12 complaint.  In the same vein I want to ask you

13 generally what work did Brian Manookian do on the

14 Shoemaker case after the filing of this complaint?

15     A.    I can answer that.  Easily through the

16 time of -- I can answer that.  What I am trying to

17 figure out is he took and/or attended a bunch of

18 depositions.  He argued a good number of the motions I

19 was thinking of, a lot of discovery disputes, debates

20 about people and service issues, whether they were --

21 he likely wrote the majority of those discovery related

22 motions, whether we were the motion filer or response

23 filer.  So depositions, motion practice.  He would have

24 prepared written discovery that was propounded on

25 Vanderbilt.  That's my list right now for that answer.

1  Q.    I will ask the same question.  After the
2  filing of this complaint, what work did Afsoon Hagh do
3  on this?

4  A.    She attended that second mediation, first
5  one during the litigation.  I think she prepared that
6  mediation statement.  I don't remember, but I don't
7  think I did, so she would have done that.  I can't
8  picture her or remember her attending or taking any of
9  the depositions Mr. Manookian and I were at.  If I am
10  forgetting one or something, hopefully the transcript
11  shows who was there in the appearance section.  Until I
12  withdrew from the case she would have argued some
13  motions.  She would have argued some of those discovery
14  motions.  She would have attended a case management
15  conference like I would have.  Maybe at times it was
16  one of us without the other or both of us.  Then once I
17  withdrew from the case, that's where I don't know one
18  way or another.

19  Q.    When did you withdraw from the case?

20  A.    October 2020 and I think it was October
21  1st.  If I am wrong there is a letter that documents
22  the date.  By withdrawal I mean where I told Ms. Hagh
23  and the client I was going to withdraw.  I think it was
24  a few days after I filed the motion about withdrawing.

25  Q.    What caused you to want to withdraw from

1   the case?

2          A.      I did not want to withdraw.

3          Q.      Why did you withdraw?

4          A.      I called the board of professional

5   responsibility on October 1st, 2020 or a day or two on

6   either side of that about recent conversations I had

7   with the client and Ms. Hagh that I was concerned

8   about.  I had a feeling I was supposed to withdraw, but

9   you read one of those rules in a book and it says what

10  it says, but I wanted to call whatever they call that

11  where they tell you what they think because it's what

12  they do.  They said I needed to withdraw and said I had

13  to send a letter internally, which I did, and later

14  filed the corresponding motion to withdraw.

15         Q.      If you can answer this question without

16  violating a privilege, because I am sensitive to the

17  privilege issue here, so I will ask the question and

18  you can answer or not answer.  If you can answer this

19  question without violating privilege, what was the

20  ethical issue that caused you to feel that you had to

21  withdraw?

22         A.      When the board person on the very first,

23  you know, the only phone call I had to them about it

24  told me I had to withdraw, that was it.

25         Q.      What were the underlying issues that

1  caused you to call the board?

2      A.    A comment made by the client within about

3  a week of that and things said by Ms. Hagh within about

4  a week of that and those two things happening so close

5  to one another. My concern that if those things were

6  being said that professionally relationship-wise I was

7  concerned I was supposed to withdraw and then being

8  told that is why I did it.

9      Q.    Were they things said about you?

10     A.    Yes.

11     Q.    Were you aware that after your withdrawal

12 the Shoemaker plaintiffs engaged John Edwards to serve

13 as co-counsel in this case?

14     A.    I am.

15     Q.    Do you know when that engagement

16 occurred?

17     A.    I know I have seen the -- and this might

18 not be the right name -- motion for pro hac vice

19 admission Mr. Edwards filed and maybe somebody else in

20 his firm. That would be the date I would give you, but

21 I don't remember the date.

22     Q.    Do you remember if it was shortly after

23 your withdrawal, or was there a time period between?

24     A.    I don't remember it. I was asking you to

25 -- whatever the date he filed the motion and then it

1   was -- an order was entered granting it would be the

2   date.

3           Q.    That's a fair answer.  Do you know what

4   Mr. Edwards' role on the Shoemaker case was?

5           A.    I know what I was told.

6           Q.    What were you told?

7           A.    That he was to be the trial attorney.  He

8   is very well known, very well accomplished and that if

9   the case -- that's my answer unless there is a

10  follow-up.

11          Q.    I guess my follow-up is why didn't Ms.

12  Hagh handle the matter and try the case without

13  co-counsel?

14          MR. SPRAGENS:  Object to the form and

15  foundation.  You can answer.

16          THE WITNESS:  I am going to say the

17  objection didn't affect my answer, Mr. Young.  I don't

18  know how to answer that because I don't know the

19  answer.

20  BY MR. YOUNG:

21          Q.    Did you believe Ms. Hagh was capable of

22  trying this case without co-counsel?

23          MR. PRICE:  Mr. Young, could you rephrase

24  that question.  Any attorney who is licensed here is

25  certainly qualified to try a case.  The question I

1 guess should be more narrow as to that.

2 BY MR. YOUNG:

3       Q.    I will rephrase that question.  Did you

4 have any reservations about Ms. Hagh's ability to try

5 this case without co-counsel?

6       A.    I will tell you why I never thought about

7 that issue in your question to have an answer for you

8 in this deposition.  My understanding was that somebody

9 like Mr. Edwards was going to get brought on board.

10 Knowing that I hadn't thought through what your

11 question is now.  How I would answer that -- I mean

12 there are two ways to answer the question at least, and

13 one of them is not something I am a fan of talking

14 about one way or another.  That's not something I go

15 around thinking about one way or the other.  They

16 either do stuff or they don't.

17       Q.    Sure.  I think your answer is a fair one.

18 Let me make sure I understand.  It was your

19 understanding from the time that you withdrew -- it was

20 always your understanding from the time you withdrew

21 that another co-counsel was going to be brought in?  Is

22 that what you are saying?

23       A.    I knew after I withdrew that somebody

24 like Mr. Edwards was going to be brought on board, yes.

25       Q.    You never took time to think about

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 71 of 134

1   whether he should have been brought in, shouldn't have

2   been brought in, Ms. Hagh was capable or not capable of

3   trying the case, because you always knew there was

4   going to be somebody else coming in?

5        A.     I was told there was going to be an

6   attempt to bring somebody in.  To go back to the board

7   call, I wasn't contemplating whether to withdraw,

8   whether to free up my calendar.  I suddenly was told

9   within a week of those two phone calls with the client

10  and co-counsel told by the board I had to withdraw.

11  When I was told I had to withdraw, I didn't think to --

12  I had to do what I had to do.

13             I wasn't in the position like in an

14  ethics class of certain things.  I was following the

15  board's advice.  I knew very soon after that they,

16  being the plaintiff's side of the case, were going to

17  bring on somebody like John Edwards.  Your question is

18  too fresh for me to have an answer.

19       Q.     That's fine.  I understand.  I think you

20  have given me an appropriate answer.  Appreciate that.

21  Did you ever enter into a new engagement letter with

22  Mr. Keefer after you left Cummings Manookian?

23       A.     Not an agreement like we looked at that's

24  an exhibit, no.

25       Q.     Why not?

1      A.      Well, for a good period of time, I was

2  under the understanding the original agreement laid it

3  out.

4      Q.      Did you think the original agreement

5  continued to govern the relationship between Mr. Keefer

6  and the attorneys on the case?

7      A.      Yes.

8      Q.      Do you know if either Mr. Manookian or

9  Ms. Hagh entered into a new written engagement letter

10  with Mr. Keefer?

11      A.      I do know that.

12      Q.      You know that they did?

13      A.      I know they did, yes.

14      Q.      Do you know when they did?

15      A.      I have a copy of the document.  There is

16  a date on the first page that's one date and a date a

17  couple of weeks or so later that he signed it.

18  Whatever that is I don't remember the date.  I want to

19  say it was in 2020, but I think you can hear my answer.

20  Whatever the document says of course is the date I

21  would point to.

22      Q.      Do you know if it was when you were still

23  representing Mr. Keefer or after you stopped

24  representing Mr. Keefer?

25      A.      It was still while I was representing

1  him.

2      Q.      Did you ever consider entering a new

3  engagement agreement for yourself?

4      A.      Months later when I learned of that

5  additional agreement, yes.

6      Q.      Do you know if John Edwards ever entered

7  into an engagement agreement with Mr. Keefer?

8      A.      I don't know that.

9      Q.      Are you aware that the Shoemaker case

10  ultimately settled prior to trial?

11      A.      Yes.

12      Q.      How do you know that?

13      A.      Two ways.  I don't know which was first.

14  That Caselink filing system that Nashville state courts

15  use I have seen it there and I was told by Mr.

16  Manookian.

17      Q.      I want to be very careful about how I

18  state this next question so Mr. Price doesn't get

19  upset.  Listen carefully to the way I ask this

20  question.  Was the settlement amount ever disclosed to

21  you?

22      A.      I think so if what I was told was

23  correct.

24      Q.      It was by Mr. Manookian?

25      A.      Yes.

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 74 of 134

1    Q.    Have you received any attorney's fees
2  from the Shoemaker case?

3    A.    No.

4    Q.    Why not?

5    A.    Mr. Young, I don't know how to answer
6  that.  They've not been provided to me; that's why not.
7  I know that sounds kind of whatever.

8    Q.    I understand.

9    A.    Okay.

10   Q.    Have you asked to be paid attorney's fees
11 in the case?

12   A.    Yes.

13   Q.    Did you advance any expenses in the
14 Shoemaker case?

15   A.    I did.

16   Q.    How much?

17   A.    This is documented on something I think
18 some people on this Zoom depo have.  It was more than
19 $60,000, but I don't remember the exact number offhand.

20   Q.    Have you been repaid for those expenses?

21   A.    Yes, after the settlement.

22   Q.    When you said some people on this Zoom
23 have that, is that because you provided proof of that
24 to either Mr. Manookian or Ms. Hagh and their counsel?

25   A.    Someone on that list you just said

1  because I know I got a check for it if that makes

2  sense.

3       Q.    It does.

4       A.    I may have sent it to -- I sent it to

5  somebody and soon thereafter those expenses were

6  reimbursed.

7       Q.    Do you know whether all expenses advanced

8  in the Shoemaker case have been repaid in full?

9       A.    No, I don't.  I just know about mine.

10      Q.    Are you aware of any that are

11 outstanding?

12      A.    No.

13      Q.    Do you believe that your firm is entitled

14 to a portion of the fees from the Shoemaker settlement?

15      A.    Yes.

16      Q.    Have you formed an opinion about what

17 percentage your firm is entitled to?

18      A.    We had some, I will call it, settlement

19 discussions about that, and I proposed a percentage, so

20 to the extent that's a yes, then yes.  I did -- yes.

21      Q.    When you say you proposed a percentage,

22 who did you propose a percentage to?

23      A.    To the mediator we used.

24      Q.    There was a mediation about the fee

25 division?

1    A.    Yes, but I -- it wasn't where we all sat

2  down classic mediation.  It was agree to the mediator,

3  send a written statement, talk with the mediator, he

4  talked with us separately.  There was no pow wow at

5  some geographic location.

6    Q.    Before I ask the next question, let me

7  ask do you believe those mediation discussions are

8  privileged or confidential?

9    A.    I do when they occurred.  I leave it up

10 to Mr. Price what happens when there is an attorney's

11 fee dispute what happens to that privilege.

12    MR. PRICE:  I will tell him not to answer

13 that as to the amounts.  Those are settlement

14 negotiations.  We have a lawsuit about that, so other

15 than the fact there were negotiations, that's fine, but

16 I don't expect him to talk amounts or percentages.

17    MR. YOUNG  I was trying to be cognizant

18 of that.  That's why I asked the question the way I

19 did.  I didn't want to step on your toes.

20    Q.    Do you believe that Afsoon Hagh or Hagh

21 Law is entitled to a portion of the fees from the

22 Shoemaker settlement?

23    A.    I can easily answer about Afsoon Hagh.  I

24 don't know enough about Hagh Law to answer that part of

25 the question.  She did work on the case, so, yeah.

1    Q.    Again, I don't want to ask a question

2  that is going to cause you to violate some privilege,

3  but just have you formed an opinion as to what

4  percentage Afsoon Hagh is entitled to?

5    A.    No, except that when I offered a

6  percentage, that I won't state right now, to that

7  mediator I mentioned, the resulting math would have

8  given her a percentage that would answer your question

9  within that settlement discussion.

10    Q.    I understand.  Do you believe that Brian

11  Manookian or Manookian, PLLC, is entitled to a portion

12  of the Shoemaker fees?

13    A.    Yes, I would have thought so for Brian

14  Manookian, but I learned somewhere along the way,

15  whether it's correct or not, he said he is not seeking

16  a fee or portion of the fee is the way to say that.  If

17  that's not true, yes, he did work on the case and did

18  very good work.

19    Q.    Again, have you formed an opinion as to

20  what percentage Mr. Manookian should be entitled to?

21    A.    No.

22    Q.    Do you believe that John Edwards' law

23  firm is entitled to a portion of the fees from the

24  Shoemaker settlement?

25    A.    My understanding is he has already gotten

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 78 of 134

1 a percentage of the attorney's fee per the contract --

2 per some agreement. I told you I don't know if there

3 is a contract -- per an agreement and, yes, he already

4 got it.

5 Q. Do you believe that Cummings Manookian,

6 PLC, is entitled to a portion of the fee from the

7 Shoemaker settlement?

8 A. This is how I would answer that. I know

9 that a small percentage of the work I did that I

10 discussed with you today was while I was at Cummings

11 Manookian. To that extent, yes, because I can talk

12 about me. That's my answer.

13 Q. Have you formed any opinion as to what

14 percentage that should be?

15 A. Yes, and I hope you have it. I did some

16 kind of affidavit or declaration about that at one

17 point where I really looked at the details and tried to

18 estimate what percentage of my work was when I was at

19 Cummings Manookian. I put a lot of time into figuring

20 out that number, although I don't recall it right now.

21 That was my best work to come up with a number. I hope

22 you have that.

23 Q. I am not sure that I do. When was this

24 affidavit drafted?

25 A. Affidavit or declaration. It was in the

1  past 12 months.  It was in the past 12 months.  It

2  would have been since the settlement I believe, but

3  certainly in the past 12 months.

4      Q.    Who did you provide that affidavit or

5  declaration to?

6      A.    That's what I am trying to think of.  I

7  don't remember, but it was with the intention of it

8  being given to you.

9      Q.    Who asked you to prepare it?

10      A.    Mr. Manookian.

11      Q.    That affidavit or declaration lays out

12  what you believe Cummings Manookian's portion should be

13  of the Shoemaker fees?

14      A.    Not exactly.  My memory is it tracks what

15  I thought what percentage of my work was while I was

16  still at Cummings Manookian related to the Shoemaker

17  case.

18      Q.    I understand that.  I guess my follow-up

19  question to that is would it be your testimony today

20  that we could use that percentage and figure out then

21  it would be your opinion that that percentage somehow

22  factors into what Cummings Manookian should be entitled

23  to in fees?

24      A.    Yes, but only as to my work.  I am not

25  aware of some of your -- everybody on this call some of

1  your other issues.

2    Q.    I think I understand.  Let me ask a

3  hypothetical and see if I am understanding correctly.

4  Let's say ultimately you would be entitled to 30

5  percent of the fees.  I am completely making up that

6  number.  If you were entitled to 30 percent of fees and

7  your affidavit indicated that 10 percent of your work

8  was done while at Cummings Manookian, it would be your

9  belief that Cummings Manookian would be entitled to 3

10  percent of the attorney's fees?  Am I understanding

11  that correctly?

12    A.    Yes and no.

13    Q.    Tell me where I am wrong.

14    A.    I am not sure you are wrong, but I am not

15  sure you are right.  Say this thing I remember drafting

16  says I spent 5 percent of my time on the Shoemaker case

17  while I was at Cummings Manookian.  I am not sure of

18  that 5 percent if Brian Cummings actually gets a

19  portion of that and a portion is the firm.  That's the

20  part I am not -- there might be a division of that

21  division.

22    Q.    I understand.  I think I am following you

23  with that.  After this complaint was filed in February

24  2019, was an amended complaint ultimately filed in the

25  Shoemaker case?

1      A.     An amended complaint was later filed.

2      Q.     Who drafted the amended complaint?

3      A.     I know it wasn't me because I had

4 withdrawn.

5      Q.     It was sometime after October 2020?

6      A.     Yes.

7      Q.     If you know, why did it become necessary

8 to file an amended complaint?

9      A.     My understanding is there was a motion

10 hearing or argument or both about whether the complaint

11 sufficiently laid out what I am going to call a direct

12 liability claim against Vanderbilt and Judge Binkley

13 here in Nashville, whatever the specific ruling was,

14 allowed or encouraged amended complaint to cover it

15 that way.

16      Q.     Do you have an opinion whether it was

17 necessary to amend the complaint?

18      A.     If it helped make sure a claim we wanted

19 on behalf of the plaintiff would not be dismissed prior

20 to trial, then sure.  Necessary, great idea, whatever

21 phrase one would use, sure, do that.

22      Q.     I want to ask you about a few other cases

23 that I don't know whether you were involved in or not.

24 You can let me know.  Were you involved in the Miller

25 versus Vanderbilt medical case?

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 82 of 134

1       A.     No.

2       Q.     What about Brooks v. Reinking (phonetic

3 spelling)?

4       A.     No.

5       Q.     What about Beckwith versus Lattimore

6 Black?

7       A.     No.  The reason I hesitated is because

8 someone came to our office one day related to the

9 client side of that case wanting to speak with somebody

10 and I spoke with him, so I didn't want to give a quick

11 no because I know that happened.  I didn't do any work

12 on that case.  I don't even know if I listed it as

13 co-counsel.  I don't think I was.  I know I had that

14 contact, but that was random.  Somebody showed up

15 unscheduled and wanted to talk about it and was

16 involved, so I briefly spoke with that person.

17       Q.     You don't know the current status of that

18 matter?

19       A.     No.  I need to take a two minute break.

20 Sorry for that.

21       Q.     I am actually done.

22       A.     Perfect timing.  I still need a break.

23       (A break was taken.)

24            * * * * *

25

1  BY MR. YOUNG:

2       Q.     Back on the record.  I have a couple of

3  follow-up questions.  You mentioned that you were

4  repaid about $60,000 for expenses you advanced in the

5  Shoemaker case.  Do you recall who repaid you that?

6  Was it John Edwards?  Afsoon Hagh?  Where did those

7  funds come from?

8       A.     I don't remember.  I don't know.

9       Q.     You also testified that --

10      A.     Let me say this.  It wasn't Afsoon Hagh.

11 I didn't receive a check from an individual -- I know

12 that -- or John Edwards.  I didn't get a check that

13 says John Edwards.  Might have been wired from John

14 Edwards' firm, but even with that being my best memory,

15 I am not sure that's right.

16      Q.     You think you got a wire from a law firm?

17      A.     I don't remember a check, but I know it

18 was not from an individual attorney no matter how I got

19 paid.  That would be very unusual and I would remember

20 that.

21      Q.     You don't remember whether Mr. Edwards'

22 firm or Bass Berry Sims or somewhere else?

23      A.     I don't remember.

24      Q.     You mentioned earlier in your testimony

25 that you knew shortly after you withdrew that another

1  co-counsel was going to be brought in on the Shoemaker

2  case. Do you remember that?

3       A.    Yes.

4       Q.    Who told you that, that new counsel was

5  going to be brought in?

6       A.    Mr. Manookian.

7       Q.    Did he say that it was going to be John

8  Edwards or it's going to be somebody else?

9       A.    I don't remember initially that he said

10  John Edwards' name, but then at some point in him

11  talking to me about that at different times it became

12  about John Edwards.

13       MR. YOUNG:  Those are all the questions I

14  have. Thank you.

15             * * * * *

16             EXAMINATION

17  BY MR. SPRAGENS:

18       Q.    Mr. Cummings, this is John Spragens. We

19  met before. I represent Brian Manookian, PLLC, in this

20  matter. Can you hear me?

21       A.    I can.

22       Q.    Just to follow up on Mr. Young's

23  questions he was just mentioning, it's your position

24  that you were repaid all of your costs in the Shoemaker

25  case; is that right?

1    A.    I was repaid the litigation expenses I

2  advanced and paid, yes.

3    Q.    When I say costs I am distinguishing

4  between attorney's fees, but in terms of hard costs you

5  advanced, you were repaid all your hard costs?

6    A.    Yes.

7    Q.    Whatever account those came from those

8  were ultimately the client's funds; is that right?

9    A.    I don't know how to answer that.  I think

10 they were held by the law firm and I think the client

11 probably got their percentage.  I don't know -- it came

12 out of the settlement.  I don't know if it's the

13 client's funds.

14    Q.    I guess what I mean is you were paid

15 pursuant to an agreement between you or Cummings

16 Manookian and the client in the Shoemaker case, right?

17    A.    Repeat that or rephrase it.

18    Q.    You were paid pursuant to an agreement

19 between you, as an attorney, and the client; is that

20 right?

21    A.    I think in part.

22    MR. PRICE:  Objection.

23    THE WITNESS:  I think in part, yes.  It

24 was Mr. Manookian who spoke with me about if I agreed

25 that funds could be transferred to John Edwards' firm

1 that would hasten the ability for me to get my

2 litigation expenses repaid. That was the discussion I

3 had with Mr. Manookian.

4 BY MR. SPRAGENS:

5      Q. But the payment of the funds was pursuant

6 to an agreement between you and the client?

7          MR. PRICE: Object to the form of the

8 question referring to them as funds as opposed to

9 costs.

10          MR. SPRAGENS: I'm happy to rephrase.

11      Q. The repayment of any advanced costs that

12 you were paid, the $60,000 you testified to earlier,

13 that was pursuant to an agreement between you and the

14 client?

15      A. Yes.

16      Q. I think you testified you have been

17 deposed four times; is that right?

18      A. At least four, because those are the four

19 I remember.

20      Q. You mentioned you had your deposition

21 taken in a board of professional responsibility matter;

22 is that right?

23      A. Yes.

24      Q. That was taken by Bill Moody?

25      A. Yep.

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 87 of 134

1    Q.    That deposition related to the Diamond

2  Doctor case you mentioned earlier?

3    A.    Yes, it was related to a complaint with

4  the board by the Diamond Doctor people, yes.

5    Q.    Were all your responses in that

6  deposition truthful?

7    A.    As far as I remember, yes, they were

8  truthful based on what I knew at the time absolutely.

9    Q.    In that deposition you testified you have

10  had no role in any of the actions that were alleged to

11  have violated the rules of professional conduct?

12    A.    No role in the -- the way you phrased

13  that I don't recall that being a question and answer.

14    Q.    Generally speaking, you testified that

15  you didn't have anything to do with any actions related

16  to the Diamond Doctor case that were alleged to violate

17  the rules of professional conduct?

18          MR. PRICE:  Object to leading form of

19  that question.

20          THE WITNESS:  I know if I was asked about

21  whether I had a role in putting up this video website

22  that I remember being the focus of that, I know I had

23  no role in that.  If there is a specific issue, I would

24  need it brought up to me.  I was a defendant in the

25  underlying litigation, so they must have thought I had

1 some role in it, but I would have answered the

2 questions in the deposition honestly.

3 BY MR. SPRAGENS:

4     Q.     If we compared your responses in that

5 deposition to e-mails and text messages between you and

6 Mr. Manookian, is it your view today all those

7 responses would be truthful?

8     A.     Sure, my responses were truthful in that

9 deposition, yes.

10     Q.     Before today's deposition did you speak

11 to Phillip Young at any point?

12     A.     Yes.

13     Q.     On how many occasions did you speak to

14 Mr. Young?

15     A.     At least as many times as I have had to

16 send a check related to matters I settled since I left

17 Cummings Manookian, at least one other time when I know

18 he wanted to get dates for when my deposition was first

19 scheduled, this deposition, and I think I called him at

20 one point. This might have been before I hired Mr.

21 Price, but either way I wanted to make sure my pursuing

22 an attorney's lien issue didn't violate a bankruptcy

23 stay, because I didn't want to run afoul of that in the

24 bankruptcy court.

25     Q.     Any other times you can think of?

1       A.      Not that I remember, but even that, I

2   mean that number already probably is six to eight

3   minimum.

4       Q.      The attorney's lien issue you are

5   referring to is a lawsuit you filed against -- I am

6   sorry if I get this wrong -- Mr. Manookian and/or his

7   law firm and/or Ms. Hagh and her law firm, correct?

8       A.      The attorney's lien issue I was talking

9   about was my interest in an attorney's lien related to

10  the Shoemaker matter.  I don't think Mr. Manookian is a

11  defendant in that.

12      Q.      That's a case currently pending in

13  Davidson County, right?

14      A.      My lawyer would have to tell me where

15  it's pending right now.

16      Q.      Do you know as you sit here who the

17  defendants are?

18      A.      No, because you said somebody that I did

19  not think was a defendant, so maybe I don't know.

20      Q.      As you sit here, who are the defendants

21  you can remember in the attorney's lien action you are

22  referring to about the Shoemaker case?

23      A.      I believe I don't remember because you

24  listed one in your question I didn't think was a

25  defendant.

1      Q.      You don't remember any of them?

2      A.      I can tell who I think it is, but, again,

3   with your question including somebody I don't remember,

4   I am worried I don't remember it right.

5      Q.      That's fine.  Don't rely on me.  Tell me

6   who you think it is.

7      A.      Mr. Keefer and Ms. Hagh.

8      Q.      Did you understand Mr. Young was the

9   receiver in an action pending in Williamson County

10  related to the Chase case?

11     A.      Yes and no.  I don't know if he was the

12  receiver because of the Chase case, but, yes, I know he

13  has the hat of the receiver somehow and it stems from

14  the Chase case is my understanding.

15     Q.      Are you aware of whether he was appointed

16  by the court to collect the sanctions award in or

17  related to the Chase case?

18     A.      I don't know how he got that role.

19     Q.      Have you ever spoken to Jeanne Burton,

20  the trustee in this case?

21     A.      Maybe once, but that's only because I

22  don't remember doing it at all.

23     Q.      Do you have any understanding whether

24  Cummings Manookian is still a going concern as of

25  today's date?

1       A.    I am sorry, which firm?

2       Q.    Cummings Manookian, PLLC.

3       A.    No, I don't know.

4       Q.    Do you know if Cummings Manookian, PLLC,

5 registration is still active with the Tennessee

6 Secretary of State?

7       A.    I do not. Wait. It might be on one of

8 these exhibits. If it's on an exhibit, I know that.

9 Hold on. According to Exhibit 1 to this deposition --

10 and I don't know when this was generated. It says

11 5-9-22. All I know is it says it was dissolved in

12 October of 2020, but I wouldn't have known that if I

13 didn't see this document today.

14       Q.    Was Afsoon Hagh a member of Cummings

15 Manookian?

16       A.    Not while I was there.

17       Q.    After you left did you ever understand

18 that she became a member of the firm?

19       A.    I don't know one way or another.

20       Q.    So I understand, it's not your testimony

21 that she was ever a member of Cummings Manookian; is

22 that right?

23       A.    Correct, not while I was there, and I

24 don't know regarding after I left.

25       Q.    If I understood your testimony earlier,

1  it was your view that she was an independent contractor

2  who worked on occasion on behalf of Cummings Manookian

3  while you were affiliated with them?

4         MR. PRICE:  Objection, foundation.

5         THE WITNESS:  No, that's not what I was

6  trying to say.

7  BY MR. SPRAGENS:

8      Q.    Tell me what you were trying to say.

9      A.    Tell me the question.

10     Q.    I asked if she was an independent

11  contractor who worked on occasion on behalf of Cummings

12  Manookian, but maybe I misunderstood your testimony

13  earlier.  Clarify that point.

14     A.    Sure.  She was somebody who had access to

15  our confidential files on the server.  She was somebody

16  who had access to our building where we had

17  confidential files.  She was somebody who in 2017 I was

18  asked to add to our legal professional liability

19  coverage, the only other attorney besides me and Mr.

20  Manookian.  She was listed as someone at our office

21  address and we were the only law firm there.  She had a

22  Cummings Manookian e-mail address she used.  Those are

23  the things I was thinking of.

24         My understanding beyond that is we -- the

25  firm started paying health coverage that included her,

1  but that's really not the focus of my thoughts, but her

2  access to our confidential files, her work in the firm,

3  her showing up at case management conferences on behalf

4  of the firm and its clients.  That's what I was

5  thinking of.

6        Q.    I believe you testified earlier she was

7  never paid by Cummings Manookian?

8        A.    Not while I was there.  Brian Manookian

9  had told me when he got money obviously they were

10  married.

11        Q.    To that same point, I guess when you say

12  she was added to the health insurance for the firm, did

13  you mean she was independently insured by the firm or

14  that she was a dependent of one of the main partners of

15  the firm?

16        A.    That I don't know.  I know the health

17  insurance was added after the firm began and it was

18  related to that and that I didn't have my own coverage

19  through the firm.

20        Q.    So if I am understanding correctly, Mr.

21  Manookian initiated, obtained health insurance through

22  the firm and Ms. Hagh, as his wife, was a part of that

23  health insurance?

24        A.    That's correct.

25        Q.    Would that have been the same whether or

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 94 of 134

1  not she did any work on behalf of Cummings Manookian?

2       A.     I don't know because I didn't make that

3  request.

4       Q.     Did he have any children at the time the

5  health insurance was initiated?

6       A.     I don't know that either.

7       Q.     You don't recall at the time you

8  practiced there whether Mr. Manookian had any children?

9       A.     I know they had their first child at some

10 point.  I just don't recall what year that was.  It's

11 now 2022.  I left in -- I don't recall if their oldest

12 is four years old or whatever that math would be.

13      Q.     Do you recall whether any children were

14 added to the health insurance plan that Cummings

15 Manookian took out?

16      A.     No, I don't.

17      Q.     You don't recall Cummings Manookian

18 paying Ms. Hagh a salary, do you?

19      A.     No, I don't.

20      Q.     Or any sort of hourly payment either; is

21 that right?

22      A.     Correct.

23      Q.     I believe you testified you don't have

24 any recollection of Ms. Hagh using the office space you

25 described as hers?

1     A.     Sorry, can you repeat that.

2     Q.     I believe you testified earlier, am I

3 correct, that you can't picture Ms. Hagh using the

4 office space that you described as hers?

5     A.     No.  If I said that, that's not what I

6 meant to convey.  I was saying I didn't remember the

7 last time I saw her in it.  I absolutely can see her

8 using the office space.  We moved Jim Pepe out of that

9 office space so she could use it.  That's the reason I

10 remember it.  She was there occasionally.

11     Q.     But at the time you left the firm in

12 August or September 2018, you don't have a recollection

13 of her using that space?

14     A.     No, that's not correct.  When she was

15 there she would use that space.

16     Q.     You have recollection of her being there

17 August and September 2018?

18     A.     Not during those months I do not.

19     Q.     When is the first time before that you

20 can recall her being there using that office space?

21     A.     I don't remember.

22     Q.     Do you have any recollection of her using

23 it in July of 2018?

24     A.     No.  No matter what month you ask I am

25 not going to know.  I was on a different floor of that

1  building.  I am still not going to know if you want to

2  go through other months.

3          Q.      That's fine.  I think you have testified

4  she received mail at the 45 Music Square West address?

5          A.      She received mail there, yes, Whether she

6  was using the address of 45 Music Square West or 47

7  Music Square West.

8          Q.      What's the distinction between those two

9  addresses?

10          A.      One of them doesn't exist as an actual

11  property.

12          Q.      Are they both valid mailing addresses?

13          A.      45 Music Square West is an actual place.

14  There is no building that exist as 47 Music Square

15  West.  Even if mailed to that written address, it got

16  delivered to 45 Music Square West.

17          Q.      Was it your understanding that was just a

18  postal service mixup where they would deliver the

19  47 Music Square West to 45 Music Square West building,

20  or were there two addresses co-located at that same

21  building?

22          A.      I don't know to answer that either way.

23          Q.      Did anyone else or any other entity

24  receive mail at 45 Music Square West or 47 Music Square

25  West during the time you were affiliated with that

1  address?

2       A.    Doug Rice would have.  I know that.

3  Brian Manookian would have.  I would have.  I don't

4  remember if Jim Pepe did.  Afsoon would have.  Outside

5  of that list, I can't think of anyone.  We would get

6  mail for the former occupants, but they weren't there

7  anymore.

8       Q.    Did you ever have any knowledge of Rocky

9  McElhaney's law firm receiving mail at that address?

10      A.    Not that I remember, no.

11      Q.    Do you know if Afsoon Hagh ever stopped

12  using that mailing address?

13      A.    Which one?

14      Q.    45 Music Square West or 47 Music Square

15  West?

16      A.    I don't know one way or another.

17      Q.    After you left Cummings Manookian and Mr.

18  Manookian was suspended from the practice of law, did

19  you believe that Cummings Manookian was still a going

20  concern entitled to represent clients?

21      A.    Can you repeat that and maybe rephrase

22  it.

23      Q.    After you left Cummings Manookian and Mr.

24  Manookian was suspended from the practice of law, did

25  you believe the firm Cummings Manookian could still

1 represent clients?

2      A.    Well, Mr. Manookian was suspended, so he

3 couldn't.  If Ms. Hagh was still there, she could is

4 the only way I can answer that.

5      Q.    You were involved in the formation of

6 Cummings Manookian I think you testified earlier; is

7 that right?

8      A.    Yes.

9      Q.    You understand that a professional

10 limited liability company has to have professionals as

11 members of the company; is that right?

12      A.    That makes sense.  I will say yes.

13      Q.    So my question is without you as a member

14 of the firm or Mr. Manookian as a practicing lawyer in

15 the firm, could Cummings Manookian continue to

16 represent clients?

17           MR. YOUNG:  Objection to the extent it

18 calls for a legal conclusion.

19           THE WITNESS:  I don't know that I have

20 expertise to answer that.  You are asking about after I

21 left whether my old firm could keep operating under the

22 scenario you outlined.

23 BY MR. SPRAGENS:

24      Q.    Sure, without any members practicing law?

25      A.    I don't know.  I would have to look into

1  that.  I understand the question, but I don't know

2  that.

3      Q.      After you withdrew from the firm, did the

4  firm continue to have permission to use your last name

5  as its moniker?

6      A.      That's a good question.  I don't know.

7      Q.      Did you think about that after you left?

8      A.      I am thinking I may have, but I also

9  realize it must not have mattered too much to me

10 because I don't remember if I raised it or what we said

11 about it.

12     Q.      You don't recall if you ever had a

13 conversation with Mr. Manookian or Ms. Hagh or anybody

14 about whether Cummings Manookian could continue to use

15 the name Cummings in its professional marketing?

16     A.      I don't remember that.  I do remember

17 asking that something on their website -- I will call

18 it a button or a tab -- that still allowed people to

19 click on something saying something like meet Brian

20 Cummings, and I know I asked that stop because I wasn't

21 there.  That's the kind of thing I remember, but I

22 don't remember -- to answer the question you asked, I

23 don't remember that specific issue.

24     Q.      Do you recall whether the operating

25 agreement had anything to say about the ongoing use of

1  your name in the event you withdrew from the firm?

2      A.    I don't. I would have to see what it

3  says.

4      Q.    You were asked questions by Mr. Young

5  about the lease arrangement between 45 Music Square

6  West Partners, if I got that name correct, but whatever

7  the entity was that owned 45 Music Square West, and

8  Cummings Manookian. Do you remember those?

9      A.    Yeah. I have a copy here.

10      Q.    I think you testified that the rent

11  payment was based upon the total mortgage payment; is

12  that correct?

13      A.    That's my memory because I think it

14  matched up pretty closely, so, yes. I don't think it

15  was a coincidence.

16      Q.    Have you been a landlord before in other

17  contexts outside of any involvement in that building?

18      A.    Yes.

19      Q.    In your view is there anything unusual or

20  improper about charging a rent rate that covered

21  mortgage payment on a property?

22      A.    I hope not because we did it and, in

23  fact, on the firm's tax returns, it listed the rent as

24  an annual expense on line item 13 on our annual tax

25  returns for everybody to see, so it was no secret.

1  Q.   My question is just really you didn't
2  think there was anything untoward about that?

3  A.   No.

4  Q.   You thought that was part of the way
5  businesses handle these things all the time?

6  A.   I don't know about other businesses.  I
7  didn't think there was anything untoward about it, no.
8  That's why I was saying it was on our annual tax
9  returns for everybody to see.  I saw nothing untoward
10  about it then or now.

11  Q.   I think you testified that Cummings
12  Manookian owned some personal property that was in that
13  building.  Do you recall that?

14  A.   I recall that answer, yes.

15  Q.   Was any of that personal property paid
16  for by the mortgage that 45 Music Square West took out
17  to purchase that building?

18  A.   That I don't know, but I know some of it
19  wasn't.  Some of it was paid for by Cummings Manookian
20  out of the Cummings Manookian operating account and
21  then was listed on tax returns on behalf of Cummings
22  Manookian, not on behalf of the entity that owned the
23  property.

24  Q.   Do you know what furniture or other
25  personal property Cummings Manookian owned?

1          A.     Some of it, yes.

2          Q.     What property is that?

3          A.     These are items bought from JL Design in

4     2016 -- a chandelier, a side table, a desk, a desk that

5     was a lower end desk for 359 as far as dollars, a

6     chair, another chandelier, an almost $11,000 desk.

7     Those are things on one invoice from JL Design, and

8     there was other furniture beyond that because those tax

9     returns show purchases and ownership of property from

10    -- I might get the name wrong -- something like

11    Mitchell Bob or Mitchell Hunt, some furniture store.

12         Q.     You are referring to something you have

13    in front of you?

14         A.     Sure.  This is a 2016 invoice from JL

15    Design that the firm paid on our tax returns for the

16    45 Music Square West, Nashville, Tennessee.

17         Q.     Would you mind if we made that an exhibit

18    to this deposition so we can all get a copy of it?

19         A.     Sure.  I have that Lease Agreement as

20    well if anybody wants it.

21              MR. SPRAGENS:  That's fine.  Let's make

22    the Lease Agreement Exhibit 6 to the deposition if I

23    have my numbering correct and the invoice you were

24    reading from Exhibit 7.

25              MR. YOUNG:  Works for me.

1                    (Exhibit Nos. 6 and 7 were

2                    marked.)

3    BY MR. SPRAGENS:

4        Q.      Have you provided those documents to Mr.

5    Young before today's deposition?

6        A.      No.  I have not been asked to.

7        Q.      I think you mentioned Mahan Associates

8    prepared the franchise and excise tax returns?

9        A.      Yes.

10       Q.      Do you have a document in front of you

11   reflecting that?

12       A.      I do.  I have one for tax year 2016 and

13   one for tax year 2017.  I have also got a document that

14   looks like Mahan prepared that's not a tax filing that

15   shows one of the payments to JL Design for law office

16   furniture in 2016 from the InsBank account.  That's

17   three documents.

18               MR. SPRAGENS:  Is it appropriate to group

19   those together and make those Exhibit 8?

20               MR. YOUNG:  That's fine.

21                    (Exhibit No. 8 was marked.)

22   BY MR. SPRAGENS:

23       Q.      With respect to the property appraisal

24   document that Mr. Young showed you as Exhibit 3, do you

25   know where that $73,806 amount came from?

1      A.      I don't, but let me compare it against

2  2017.  I left this out.  You guys will see on the 2017

3  franchise and excise thing there was also firm

4  purchases of about $38,000 in rugs that were on the tax

5  return from Henry's Auction House Rugs that I don't

6  think I mentioned.  That Mitchell company is called

7  Mitchell Gold and something, but the $70,000 number or

8  73,000 is pretty close to what was listed as

9  depreciated assets on the 2017 tax return where that

10  totals about $63,000, so all I can tell you is the

11  numbers are close, but I, not being there in 2020,

12  don't know why the number got to 73,000.

13      Q.      There was some question earlier about

14  maintenance on computers at the firm.  Remember that?

15      A.      Yeah, but the first few words of the

16  question cut out.  I heard questions about computers.

17  Repeat that.

18      Q.      I was asking if you remember Mr. Young

19  asking some questions about maintaining computers at

20  the office.  Do you remember that?

21      A.      I do.

22      Q.      Do you recall any specific maintenance

23  that was done on computers at the office?

24      A.      There is one document I was just

25  referring to that I think Mahan produced that includes

1 payments by the firm for networking system at law

2 office, so, I presume network relates to computers and

3 that would be a yes, but, otherwise, if I didn't have

4 this document, I wouldn't --

5 Q. What about Cummings Manookian bank

6 accounts; did you ever know Afsoon Hagh to have any

7 signatory authority over Cummings Manookian bank

8 accounts?

9 A. No. That's how I hope I answered Mr.

10 Young. I remember Mr. Manookian and I did. Beyond

11 that I couldn't think of anybody else ever having -- I

12 forget his phrase -- signature authority on those

13 accounts, so whether you ask me about Ms. Hagh or some

14 other person, I don't remember that.

15 Q. Did Ms. Hagh or Hagh Law ever steal or

16 misuse any Cummings Manookian property as far as you

17 are aware?

18 A. No, especially not while I was there, no.

19 I didn't mean to -- I sure hope nothing I said implied

20 that. I never tried to say that.

21 Q. I am only asking because I think you may

22 be aware -- I'm not sure -- have you looked at the

23 adversary proceeding in this case?

24 A. If it's not what my attorney filed about

25 the attorney's lien, then my answer is no.

1    Q.    The allegations in this case by the

2    trustee involve Ms. Hagh and her law firm converting

3    property that was alleged to be Cummings Manookian

4    property and using it on her own behalf, so that's why

5    I was asking that question.  Has she to your knowledge

6    ever misused Cummings Manookian property?

7    A.    My answer is the same, no.  I wanted to

8    be clear.  I was worried something I said I was

9    implying that when I have no knowledge like that.

10    Q.    Let's look at Exhibit 4, the

11    representation agreement of April 19, 2017.  Do you

12    have that there?

13    A.    I have it, yes.

14    Q.    If you turn to page 3 of that exhibit,

15    the last section with the header, the header states,

16    Mediation and Binding Arbitration of any

17    Attorney-client Disputes.  Do you see that section?

18    A.    I do.

19    Q.    Do you understand that section of that

20    agreement to obligate Cummings Manookian to enter into

21    mediation and/or binding arbitration with its clients

22    in the event there is a dispute arising out of that

23    agreement?

24    A.    Yes.  Unless that was a trick question,

25    that's the way I read it.

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5    Page 107 of 134

1  Q.    I mean I don't know.  Is this a fairly

2 standard representation agreement for Cummings

3 Manookian at the time you were affiliated with the

4 firm?

5  A.    We added this type of paragraph after we

6 had started.  This wasn't in our initial agreements,

7 but once it was included, I believe it was included

8 from that point forward.

9  Q.    So at whatever time you all added that

10 section it became kind of a standard section in your

11 representation agreements with clients as far as during

12 the time you were affiliated with Cummings Manookian?

13  A.    Yes.

14  Q.    Looking at the prior section, which

15 starts at the bottom of page 2 and continues to page 3,

16 the header there is Termination of Professional

17 Relationship.  See that?

18  A.    I do.

19  Q.    Feel free to take a second to look at

20 that.  My question is, is this standard language from

21 the representation agreement at least at the time you

22 were affiliated with the firm?

23  A.    Yes, I believe it was.

24  Q.    You and Mr. Manookian were the ones who

25 jointly drafted this representation agreement for your

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1 clients; is that correct?

2      A.    Correct.  Like I said about that

3 paragraph you asked about a minute ago, we would talk

4 about things to add in or put in and then it became the

5 new standard, but, yes, to your question.

6      Q.    My understanding of this section of the

7 agreement the first paragraph essentially covers a

8 situation in which a client fires the firm and the

9 second paragraph covers a situation in which the firm

10 elects to withdraw from representing the client.  Is

11 that fair?

12           MR. PRICE:  Object to the form.

13           THE WITNESS:  I think it says what it

14 says, but I'm willing to answer your question about it.

15 BY MR. SPRAGENS:

16      Q.    Was it your understanding when you were a

17 named partner at that firm that in the event the client

18 discharged Cummings Manookian as its legal

19 representative, Cummings Manookian was entitled to

20 collect advanced costs and also collect from the

21 proceeds of any recovery a reasonable fee for the work

22 the firm performed?

23      A.    Yes, I believe that's what it says.

24      Q.    Was it also your understanding at the

25 time you were affiliated with the firm that if the firm

1 elected to withdraw from representing a client that the

2 firm was still entitled to recover its advanced costs

3 but was not entitled to recover a reasonable fee for

4 its legal representation, an attorney's fee in other

5 words?

6       A.    No.

7       Q.    That was not your understanding?

8       A.    Correct.

9       Q.    What was your understanding?

10       A.    That if the firm chose to withdraw the

11 obligation about costs discussed in the paragraph

12 before was not relieved.

13       Q.    I think you and I agree that far.  What

14 about attorney's fees?

15       A.    That paragraph is silent that if the firm

16 chose to withdraw it doesn't say there is no right to

17 an attorney's fee as covered elsewhere in the

18 agreement.

19       Q.    So in your view those two paragraphs,

20 first of which states that the firm is entitled to

21 recover an attorney's fee, and second of which is

22 silent, that still permits the firm to attempt to

23 recover an attorney's fee in the event it withdraws?

24       A.    Correct, if the firm chose to withdraw,

25 correct.  I keep saying choose.  I think there are

1 withdrawals that aren't a choice, but, yes, is the

2 answer to your question.

3     Q.    When you say there are withdrawals that

4 aren't a choice, what are you thinking of?

5     A.    Well, in the example related to my

6 attorney's lien issue where you are told -- I am told

7 or an attorney is told by the board you are required to

8 withdraw, there is not a choice there.  That would be

9 one difference in my mind from someone or we, a firm,

10 choosing to withdraw.

11     Q.    I believe you testified earlier -- I

12 think we're done with this Exhibit for now -- you

13 withdraw from Cummings Manookian in August or September

14 of 2018; is that correct?

15     A.    Yes.

16     Q.    It's your testimony that you withdrew

17 irrespective of Mr. Manookian's eventual suspension

18 from the practice of law?  In other words, that's not

19 what motivated your withdrawal from the firm?

20     A.    I remember Mr. Young asking me that.  For

21 a lot of reasons, I wanted to go start my own firm.  I

22 don't remember Mr. Manookian's what was put in a

23 question to me as -- I don't know if this was the

24 phrase -- upcoming suspension driving that decision.

25 It may have affected the timing of it, but I don't even

1   remember that being a factor.  If I didn't answer the

2   question, please, reask it.

3        Q.     That's fine.  I think you clarified

4   and/or sort of restated what you said to Mr. Young.

5   When you withdrew from the firm, you relied on that

6   Article 10.1 of the operating agreement we looked at

7   earlier to sort of govern your right to the withdrawal,

8   right?

9        A.     I have to look.  In 10.1 the 10 is the

10  part I don't recognize.

11       Q.     Sure, paragraph on page 19 -- Exhibit 2

12  --

13       A.     Yeah, the 10 part I don't get the

14  reference.  Ten point one is where?

15       Q.     On page 12, withdrawal of member.

16       A.     I will read that and ask you to repeat

17  your question.  Let me read it first.  I read it.  Ask

18  the question.

19       Q.     When you withdrew from the firm, was that

20  the provision of the operating agreement that governed

21  your withdrawal?

22       A.     I don't know how to answer that.  I spoke

23  with Mr. Manookian about the withdrawal and we worked

24  out who between him and me wanted which cases.  I think

25  Shoemaker might have been the only one we were both

1  going to continue to work on.  If that complies with

2  10.1, the answer is yes.  If it's different, we went by

3  our discussions.

4      Q.      When Mr. Manookian was suspended from the

5  practice of law in Tennessee, was it your understanding

6  that would be the same provision Section 10.1 that

7  would govern what would happen under the operating

8  agreement in that event?

9      A.      I don't remember if Mr. Manookian was

10 suspended while I was still at Cummings Manookian that

11 I ever thought about that.  I don't remember thinking

12 about this paragraph and his suspension, so that's why

13 I don't have an answer for you.

14     Q.      You don't disagree the last sentence of

15 Section 10.1 says if any member becomes legally

16 disqualified to practice law in the state of Tennessee,

17 he shall be deemed to have voluntarily withdrawn from

18 the company?

19     A.      That sentence says what you read it to

20 say, yes.

21     Q.      Did there come a time you became aware

22 Ms. Hagh started her own law firm?

23     A.      I have seen her use Hagh Law on things,

24 yes.

25     Q.      Do you know when you first became aware

1 she had done that?

2      A.    No, I don't. I don't. It would have

3 been on -- it might have been on something in the

4 Keefer case, the Shoemaker case, whether it's the first

5 time it's written or first time you saw it, which is

6 the first time I saw it. No, I don't remember when

7 that was. It would have been incidental. I don't

8 think I got some kind of postcard in the mail or

9 anything. I think she started using it and at some

10 point I noticed it. I don't remember when it was.

11      Q.    I was just trying to ask you how you

12 learned that she started her own firm.

13      A.    Maybe I -- I don't remember directly, but

14 I would bet it's that I saw it on something. I saw

15 Hagh Law and that was it.

16      Q.    Let's talk a little bit about the

17 Shoemaker case, which I believe you testified is the --

18 tell me if I got this wrong -- the main case you

19 continued to work on along with Ms. Hagh after you left

20 the firm? Is that fair?

21      A.    Yeah. It's the only one I remember that

22 we worked on together after that departure. If there

23 is another one, it doesn't come to mind.

24      Q.    I think you testified you don't know

25 whether Cummings Manookian informed Mr. Keefer that it

1 was withdrawing from the Shoemaker case; is that right?

2      A.    Yeah.  Mr. Young asked that.  I don't

3 remember either way.  I wasn't trying to say it wasn't

4 done.  I don't remember it.

5      Q.    That's fine.  You don't have any specific

6 reason to doubt that Cummings Manookian told Mr. Keefer

7 it was withdrawing, do you?

8      A.    I don't doubt it.  I have the same answer

9 I told Mr. Young.  I don't know either way.  I am not

10 trying to cast dispersions or validate something.  I

11 don't remember knowing it, so I don't know it today.

12      Q.    It wouldn't surprise you if after you

13 left and you were no longer a member of the firm and

14 after Mr. Manookian was no longer entitled under the

15 operating agreement to be a member of the firm if the

16 firm had to withdraw from that representation, would

17 it?

18           MR. YOUNG:  Objection, foundation.

19           THE WITNESS:  I want to use your word.

20 Did you say surprised?

21 BY MR. SPRAGENS:

22      Q.    Sure, that's what I said.

23      A.    I wouldn't be surprised, no.  I

24 understand what you are asking.  No, I would not be

25 surprised if that occurred.

1    Q.    As I sit here as a lawyer like you

2  reading these documents knowing what transpired, to me

3  there is no Cummings Manookian unless there has been a

4  new member added to the firm.  There is no Cummings

5  Manookian after Cummings withdraws and Manookian is

6  suspended from the practice of law.  Isn't that what

7  you would expect as the signer and co-drafter of the

8  operating agreement?

9         MR. PRICE:  Object to the leading form of

10  that question.

11        MR. SPRAGENS:  This isn't my witness, so

12  I am leading him.

13        MR. PRICE:  I get to object anyway.

14        THE WITNESS:  If you two are done, and I

15  appreciate both of you -- instead of expect, I would

16  not be surprised.  I don't have an expectation about

17  what companies do after I leave.

18  BY MR. SPRAGENS:

19      Q.    You don't know of any other operating

20  agreement that existed after the one we looked at

21  earlier today with Mr. Young and just referenced again

22  a moment ago?

23      A.    No, for Cummings Manookian, no.  Once I

24  left I did not see another operating agreement new or

25  different or any amended operating agreement for a firm

ANNE S. WILSON & ASSOCIATES
615-298-1992

1  I had already left, correct.

2     Q.    A firm that had your name and Mr.

3  Manookian's name and nobody else's name?

4     A.    My answer is the same.

5     Q.    I think you testified that with the

6  Shoemaker case you did not have a separate

7  representation agreement with Mr. Keefer after you left

8  Cummings Manookian.  Do I have that right?

9     A.    Correct.

10    Q.    You drafted the signature blocks on that

11  complaint that we looked at earlier that appear on page

12  69?

13    A.    Yeah, I drafted the whole complaint,

14  sure.  The signature block is part of it.  Want me to

15  pull that up?

16    Q.    Not really.  I am making sure I have your

17  testimony earlier correct, which is I think you said

18  you don't know if Ms. Hagh even reviewed that before it

19  was filed?

20    A.    Correct.  That's what I meant to say, and

21  I will say it this way now.  I don't remember sending

22  this to her to review if that answers your question.

23    Q.    Sure.  Through filing I think you

24  mentioned that you conferred with an expert to evaluate

25  that case?

1      A.      Yes.

2      Q.      Was the expert that you retained and

3 conferred with on that case qualified to testify in the

4 case under Tennessee Healthcare Liability Act?

5      A.      I have been told she wasn't.  I was told

6 by the company that connected me with her and told by

7 her signing the certificate of good faith that she was.

8      Q.      You were asked earlier about the amended

9 complaint.  Do you know whether one of the reasons for

10 that amended complaint was to address that deficiency

11 relating to the expert witness?

12      A.      No, I don't know that.

13      Q.      Just to follow up on something Mr. Young

14 asked you, you don't have any reason to believe that

15 Mr. Manookian failed to notify Mr. Keefer of his

16 suspension from the practice of law in late 2019, do

17 you?

18      A.      Correct.  I don't know one way or another

19 no matter how either one of you ask me that.

20      Q.      Did you take any expert depositions in

21 the Shoemaker case?

22      A.      No.  I had already withdrawn.

23      Q.      I think you testified you prepared

24 summaries for experts though?

25      A.      I did, yes, sir.

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 118 of 134

1   Q.   Were those medical records summaries or

2   testimony summaries or something else?

3   A.   Both of those, and I think it also

4   included a summary of some of the discovery responses

5   because some responses were more pertinent than others.

6   Those are three things I remember summarizing and

7   sending to the experts.

8   Q.   Do you recall whether Ms. Hagh took

9   expert witness depositions in that case?

10   A.   I know Mr. Manookian told me she did, so

11   I believe she did.

12   Q.   Generally speaking, you have had the

13   opportunity to observe Ms. Hagh as a plaintiff's

14   attorney; is that right?

15   A.   Yes, but if you follow up on that, I need

16   some detail about what specifically you would ask

17   about.

18   Q.   I will put it in the broadest way

19   possible.  Among the allegations in this adversary

20   proceeding it's a suggestion Ms. Hagh is not able to

21   practice law on her own.  You heard Mr. Young ask you

22   earlier if -- why couldn't Ms. Hagh try this wrongful

23   death case by herself.  My question is, did you have

24   any reason to think Ms. Hagh was not a capable

25   plaintiff's attorney?

1          MR. YOUNG:  Object to foundation.

2          THE WITNESS:  I do not think Ms. Hagh is

3 not a capable plaintiff's attorney.

4 BY MR. SPRAGENS:

5          Q.     With respect to the Shoemaker case, would

6 you have tried that case by yourself?

7          A.     Yes, but with someone supporting me.

8          Q.     Meaning a paralegal or technological

9 person, or who you thinking about?

10          A.     A few things, but along the lines to say

11 yes to what you are saying and absolutely like a

12 computer presentation person like Doug Rice who we

13 mentioned earlier, and in past trials I used somebody

14 like Mark Hammervold to help with motions in limine to

15 gather stuff maybe, I will say, spontaneously during

16 the nights of trial, maybe handle a lesser witness,

17 but, yeah, I would have tried it.

18          Q.     I mean you mentioned Mr. Hammervold.

19 That's with co-counsel?

20          A.     Sorry, maybe I misunderstood the

21 question.  If you can ask again.

22          Q.     I think Mr. Young was suggesting why

23 couldn't Ms. Hagh try that case by herself meaning as a

24 solo attorney.  My question is, wouldn't you, as a

25 plaintiff's attorney, want to have another attorney to

1  help you try a multi-million dollar wrongful death case
2  with overnight motion practice and all those things you
3  mentioned, and wouldn't you think it was more
4  reasonable to have co-counsel for the trial in a case
5  like that than to do it by yourself?
6          MR. YOUNG:  Object to foundation.
7          THE WITNESS:  Can you rephrase or repeat
8  that.  I understood the words.  I don't understand the
9  question.
10  BY MR. SPRAGENS:
11      Q.    In your experience as a plaintiff's
12  attorney, with a multi-million dollar wrongful death
13  case on the line, is there anything unreasonable about
14  engaging a second attorney to try that case?
15      A.    The way you phrased it, no.
16      Q.    You just testified that you would have
17  Mr. Hammervold help you with a trial of any significant
18  case like this?
19      A.    I did.
20      Q.    Is it your understanding that Ms. Hagh
21  prepared the mediation statement in the Shoemaker case?
22      A.    For the second mediation I did not and,
23  therefore, I think she did.
24      Q.    I believe you testified you withdrew from
25  the Shoemaker case in October 2020; is that correct?

1    A.  Yes. I don't know when the order was

2 entered granting my motion to withdraw, but, yes,

3 that's what I said and that's my memory.

4    Q.  I was a little unclear on what prompted

5 that decision, but am I right in understanding the

6 client made comments that made you understand that he

7 had lost confidence in you?

8    A.  No. That's not it.

9    Q.  What was it that the client said that led

10 you to think you needed to withdraw if you are able to

11 answer that question?

12    MR. PRICE: Don't answer that question

13 because that's attorney-client privileged information.

14 Mr. Keefer may get in this lawsuit and we can work it

15 out at that time.

16 BY MR. SPRAGENS:

17    Q.  I assume you will take your attorney's

18 advice.

19    A.  I will. When it gets worked out, I'll

20 answer it later. I can answer, but I will follow his

21 advice, yes.

22    Q.  I think you testified that you called or

23 otherwise communicated with somebody at the Tennessee

24 Board of Professional Responsibility before deciding to

25 withdraw?

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

Case 3:20-ap-90002 Doc 217-5 Filed 08/12/22 Entered 08/12/22 18:28:11 Desc
Exhibit 5 Page 122 of 134

1       A.     Yes.

2       Q.     Who did you speak with?

3       A.     Russ Willis.

4       Q.     Are you able to tell me what Mr. Willis

5 advised you under the circumstance?

6       A.     I think I am.  He is not a client.  I am

7 looking at my attorney on Zoom.  I don't know why I

8 can't.  I have counsel.  I don't know of any privilege,

9 but Mr. Price is smarter than me on this.

10         MR. PRICE:  He can ask that, but you

11 can't answer the question as to what Mr. Keefer told

12 you.

13         THE WITNESS:  Understood.  I'll answer

14 and try to make sure in my answer about what Mr. Willis

15 said I am not betraying something that falls under

16 other privilege.  I don't want to -- does that make

17 sense?

18 BY MR. SPRAGENS:

19       Q.     Sure.  That's perfectly fine.

20       A.     Mr. Willis said those relationships both

21 with the client and with my co-counsel based on things

22 they said to me appeared -- I don't know if he said

23 broken or irreparable, that I could not ethically

24 continue to represent the client, that I needed to

25 immediately tell the client and co-counsel that I was

1  required to withdraw and then later file a motion about

2  that, but that my communications with them not be

3  broader than them, that just being in our group.  Again

4  to answer this without betraying comments that may fall

5  under privilege, that's how I answer that now without

6  invading privilege that has come up.

7       Q.    Did Mr. Willis give you that advice or

8  anything memorializing that in writing?

9       A.    No.  He told me in that conversation on

10 the phone that day.

11      Q.    Ultimately you withdrew from the

12 Shoemaker case, as opposed to the client terminating

13 you from that case?

14      A.    Correct.  Once the board told me I had to

15 withdraw, I took those steps to withdraw I felt I was

16 required to do.  I will say to add to the other there

17 is a letter I sent to Mr. Keefer and Ms. Hagh that

18 touches on some of these comments.  That's out there

19 until we get a ruling that let's me repeat them somehow

20 orally.

21      Q.    At the time you said that to Ms. Hagh you

22 knew that she was working on behalf of Hagh Law at that

23 time?

24      A.    I don't know one way or another.  I don't

25 know.  Again, I don't know one way or another.

1     Q.     You thought there might be some chance

2  she was still working on behalf of Cummings Manookian

3  at that time?

4     A.     I don't know one way or another.  I sent

5  it to wherever I had contact information from her.  As

6  hopefully you understand, I wasn't concerned about what

7  firm she was working for at the time when I sent that.

8     Q.     Is there any reason at the time that you

9  left Cummings Manookian and started representing Mr.

10 Keefer on behalf of Cummings Injury Law you did not

11 enter into a new representation agreement between your

12 firm and Mr. Keefer?

13    A.     Sure.  There are a few reasons, but they

14 migrate over some time if that's okay to answer that

15 way.  Initially I thought the existing agreement

16 covered it.  At one point -- I don't know the date

17 offhand -- it was around the time I withdrew the client

18 told me he thought the initial agreement continued to

19 cover it.  Somewhere in 2019 around the time of the

20 mediation I had an e-mail exchange with Brian

21 Manookian.  He was not suspended at the time of this

22 e-mail exchange.  He and I confirmed in an e-mail an

23 understanding if the case settled it says something

24 like within 30 to 60 days or 30 to 45 days of the

25 summer '19 e-mail, the fees would be split 50/50 with

1 50 percent going to Brian Cummings/Cummings Law.  I had

2 that.

3          In January 2020 I asked the client when I

4 realized that Ms. Hagh and Mr. Manookian had entered

5 into a new agreement with the client asked them to

6 confirm by e-mail that the terms of the earlier

7 agreement -- that he still wanted me to work on the

8 case, that he still authorized it, that we weren't

9 deleting anything from the earlier agreements, but if

10 there was any question, just confirming he wanted me to

11 continue working on it and still did.  He affirmed that

12 after first texting Mr. Manookian if that was okay to

13 do so.  So those things are why I had the understanding

14 I did.

15          One more thing.  As Mr. Young asked me

16 about what feels like multiple hours ago and maybe it

17 was, everything I had worked on after I left Cummings

18 Manookian that later settled we used a paragraph in the

19 operating agreement through the -- I think somebody

20 said the term was receiver -- whatever the term it is

21 to figure out how to divide it.  When I used that, we

22 kept using that is how I will put it.  There was a

23 history there whether it's directly analogous or partly

24 analogous to add that reason in.

25          Q.     How were you deciding in this deposition

1  which attorney-client communications to testify about

2  and not to testify about?  It seems you just testified

3  about your communications with Mr. Keefer, some

4  communication between him and Mr. Manookian, but you

5  are not willing to testify about other communications

6  with Mr. Keefer.

7        A.    Under Mr. Manookian issue it's that he

8  wasn't the client, but I am leaving it up to my

9  attorney when he directs me not to answer because of

10  privilege.

11        Q.    Are you aware what percentage of the

12  Shoemaker fee the trustee in this case claims are due

13  to Cummings Manookian?

14        A.    No, I am not.

15        Q.    If the trustee takes the position all

16  fees from Shoemaker are Cummings Manookian property, do

17  you agree with that position?

18            MR. YOUNG:  Objection, foundation.

19            THE WITNESS:  If someone claims that the

20  time Brian Cummings spent on this case for years after

21  he left Cummings Manookian falls under the Cummings

22  Manookian umbrella, I would disagree with that.  That's

23  my answer.

24  BY MR. SPRAGENS:

25        Q.    Likewise, would you agree the time Afsoon

1  Hagh spent on the case after she left Cummings

2  Manookian would be due to her or her firm?

3          A.      I am not factually aware of the details.

4  I don't know how to answer that about somebody else,

5  other firms.  I am not arguing against it or for it.

6          Q.      You don't have a view one way or another

7  whether Cummings Manookian continued to exist after you

8  left and Mr. Manookian was suspended from the practice

9  of law?

10         A.      The beginning of that question I need to

11 hear again.

12         Q.      You don't have a view one way or the

13 other whether Cummings Manookian continued to exist

14 after you withdrew and Mr. Manookian was suspended from

15 the practice of law?

16         A.      No.  I don't know one way or another when

17 Cummings Manookian ceased to exist.  I don't know.  I

18 don't know that.

19         Q.      Do you agree that when Mr. Manookian was

20 suspended from the practice of law that would

21 constitute a withdrawal from Cummings Manookian?

22                 MR. YOUNG:  Objection, calls for a legal

23 conclusion.

24                 THE WITNESS:  I don't know.  I am sorry

25 if that's frustrating.  I don't know.  I just don't

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1  know.  Again, I am not arguing for or against it.

2          MR. SPRAGENS:  Thank you very much for

3  your time.

4          MR. YOUNG:  Mr. Gabbert, do you have

5  anything?

6          MR. GABBERT:  No.

7          MR. YOUNG:  I have a few very quick

8  follow-up.

9                    * * * * *

10                 FURTHER EXAMINATION

11  BY MR. YOUNG:

12      Q.    You testified a moment ago when

13  responding to Mr. Spragens that Afsoon Hagh had access

14  to Cummings Manookian confidential files.  Did Mark

15  Hammervold have access to Cummings Manookian

16  confidential files?

17      A.    My understanding is, yes, to the extent

18  it was a file he was working on, that there was some

19  kind of -- this is a Doug Rice issue if that name rings

20  a bell from earlier, that he or somebody else would set

21  up selective access, if even that.

22      Q.    So Mark Hammervold may have had limited

23  access to Cummings Manookian files, correct?

24      A.    Correct, at most.

25      Q.    Afsoon Hagh -- was her access limited or

1 unlimited?

2      A.     I think it's unlimited.  I think it was

3 unlimited.

4      Q.     Did any other attorney, other than you,

5 Mr. Manookian, and Ms. Hagh, have unlimited access to

6 Cummings Manookian confidential files?

7      A.     No.

8      Q.     You mentioned in responding to Mr.

9 Spragens' question that Afsoon Hagh got mail at an

10 address 47 Music Square West.  Where did that address

11 come from?

12           MR. SPRAGENS:  Object to the form.

13           THE WITNESS:  I don't know where it

14 started.  I remember being asked my thoughts on, you

15 know, where it came from, because everybody we've been

16 talking about knows that's not an actual physical

17 presence anywhere.  If that doesn't answer the

18 question, ask another one.  It doesn't exist, so I

19 don't know how else to answer that.  Anybody who was

20 ever asked about 45 Music Square West would know that

21 doesn't exist.

22 BY MR. YOUNG:

23      Q.     Do you know whether Ms. Hagh represented

24 that was her address, or was this just a mistake by the

25 post office?

1      A.     I wasn't trying to say it was a mistake

2  by the post office if it sounded like that.  It doesn't

3  exist.  If somebody used that address -- I know I am

4  the one answering questions, but they would have to

5  answer why they would use an address that doesn't

6  exist.

7      Q.     Do you know if Ms. Hagh used that

8  address?

9      A.     I have seen it on things, yes, but I

10 don't know how often she used it.

11     Q.     Do you know whether Cummings Manookian

12 ever terminated its relationship with Brett Keefer one

13 way or the other?

14     A.     No, and I am -- sounds like something you

15 asked earlier.  I don't know.  I am not trying to say

16 they did or didn't.  I just don't know.

17          MR. YOUNG:  Those are all my questions.

18 Thank you.

19          MR. SPRAGENS:  Nothing further.

20          MR. PRICE:  I have something.  Mr.

21 Spragens asked earlier about the lawsuit.  Let me say

22 there was a lawsuit filed in the circuit court for

23 Davidson County to enforce the attorney's lien Mr.

24 Cummings filed.

25          The defendants in that were Mr. Keefer as

1   the trustee in that. Ms. Afsoon Hagh was also added

2   because she has a claim in that. We joined the trustee

3   because the trustee has a claim in that. The trustee

4   moved that case to bankruptcy court, federal court, now

5   in federal court, and, Craig, let me tell you I have

6   done everything to try to serve Ms. Hagh. The

7   certified mail I sent is not picked up. My agent for

8   service of process goes out to the house that is listed

9   by board of professional responsibility as her office

10   and no one comes to the door.

11         We need to get this thing served so we

12   can move on. I don't feel I ought to chase her like a

13   kid who stole a watermelon out of a patch.

14         Could you ask her to contact me where I

15   can serve her like a professional does. I don't want

16   to have to chase her down at the grocery store or at

17   her doctor's office, so at least we can move this case

18   on.

19         MR. GABBERT: I am not representing her

20   in that matter, so I cannot.

21         MR. PRICE: Could you pass that word to

22   her? I understand. Is she present today? Perhaps she

23   heard.

24         MR. GABBERT: Not to my knowledge.

25         MR. SPRAGENS: I don't know that she is

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 132 of 134

1  here, but sounds like a conversation for another time.

2  Thank you all.

3              (DEPOSITION CONCLUDED.)

Case 3:20-ap-90002   Doc 217-5   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 5   Page 133 of 134

REPORTER'S CERTIFICATE

STATE OF TENNESSEE          )

COUNTY OF DAVIDSON          )

I, Cristi G. Watson, Licensed Court Reporter in and for the State of Tennessee, do hereby certify that the foregoing proceedings were stenographically reported by me on the 9th day of June, 2022, and that the foregoing transcript constitutes a true and accurate record to the best of my ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number following my name below.

IN WITNESS WHEREOF, I have hereunto set my official hand on this 22nd day of June, 2022.

_____
CRISTI G. WATSON
Tennessee License No. 187