Copy
4630

# IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| BRETTON KEEFER, as surviving adult son and next-of-kin of his deceased mother, CHESTA SHOEMAKER, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) |
| VANDERBILT UNIVERSITY MEDICAL CENTER and DR. GRETCHEN EDWARDS, | ) ) ) |
| Defendants. | ) ) |

NO. 19C358

JURY DEMAND

2019 FEB 11 PM 3:50
RICHARD R ROOKER, CLERK
FILED

## COMPLAINT

The Plaintiff respectfully states to the Court and Jury the following:

### PARTIES, VENUE, AND JURISDICTION

1.  The Plaintiff, Bretton Keefer ("Mr. Keefer"), is an adult citizen of the State of Tennessee.

2.  Mr. Keefer is a surviving adult son of Chesta Shoemaker ("Ms. Shoemaker" or "the patient" or "the decedent").

3.  Ms. Shoemaker died on April 14, 2017.

4.  Ms. Shoemaker died at Vanderbilt University Medical Center ("Vanderbilt" or "VUMC").

5.  When Ms. Shoemaker died, she had three sons.

6.  Ms. Shoemaker's three sons are (a) Bretton, (b) David, and (c) Chris.

7.  Bretton Keefer is over the age of 18.

8.  Ms. Shoemaker's other two sons, David and Chris, are minors, who are 9 and 13 at the time of the filing of this lawsuit, respectively.

EXHIBIT
CUMMINS
5 CW
6-9-22

9.    Bretton Keefer has full custody of his two brothers, David and Chris.

10.    Bretton Keefer obtained full custody of his two brothers after their mother, Ms. Shoemaker, died.

11.    Neither of Bretton Keefer's two brothers have any type of relationship with their fathers.

12.    Ms. Shoemaker was not legally married at the time of her death.

13.    The Defendant, Dr. Gretchen Edwards ("Dr. Edwards"), is a physician, licensed to practice medicine in Tennessee. She may be served at Vanderbilt University Medical Center, 1161 21st Ave., Nashville TN 37232.

14.    The Defendant, Vanderbilt University Medical Center ("Vanderbilt"), is a general hospital, licensed by the Tennessee Department of Health Board for Licensing Health Care facilities. Vanderbilt is a "health care provider," as that term is defined by Tenn. Code Ann. §29-26-101(2)(B).

15.    Vanderbilt is a non-profit corporation, formed under the laws of the State of Tennessee. Vanderbilt's principle place of business is Vanderbilt University Medical Center, 1161 21st Ave., Nashville TN 37232.

16.    Vanderbilt may be served through its registered agent, National Registered Agents, Inc., at 800 S. Gay, St., Suite 2021, Knoxville, TN 37929-9710.

17.    This cause of action arose in Davidson County, Tennessee. Venue and a jury demand are proper pursuant to Tenn. Code Ann. §20-4-101(a). This Court has jurisdiction pursuant to Tenn. Code Ann. §16-10-101.

## LEGAL RELATIONSHIP

18.    At the time of the matters contained in this Complaint, Ms. Shoemaker had a physician-patient relationship with Dr. Edwards.

2

Copy

19. In April 2017, Dr. Edwards was an employee of Vanderbilt.

20. In April 2017, Dr. Edwards was participating in a residency program at Vanderbilt.

21. The fact that Dr. Edwards was participating in a residency program at Vanderbilt in April 2017 meant Dr. Edwards had not yet successfully completed an approved residency program where she had already demonstrated having the knowledge, experience, and competence to complete any such program.

22. In April 2017, Dr. Edwards was a person selected by Vanderbilt to be involved in providing care and treatment to Ms. Shoemaker during her April 13, 2017 Vanderbilt admission.

23. When Dr. Edwards was chosen by Vanderbilt to be involved in providing case and treatment to Ms. Shoemaker, Dr. Edwards was participating in a residency program at Vanderbilt and Dr. Edwards had not yet successfully completed the requirements of that training program.

24. During Dr. Edwards' involvement with providing care and treatment to Ms. Shoemaker during the April 13, 2017 Vanderbilt admission, Dr. Edwards was an agent of Vanderbilt.

25. During Dr. Edwards' involvement with providing care and treatment to Ms. Shoemaker during the April 13, 2017 Vanderbilt admission, Dr. Edwards was an apparent agent of Vanderbilt.

26. At the time of the matters contained in this Complaint, Ms. Shoemaker had a hospital-patient relationship with Vanderbilt.

27. All of the health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt were employees of Vanderbilt.

28. All of the health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt were employees or agents of Vanderbilt.

3

Copy

29. All of the health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt were selected or staffed by Vanderbilt to be involved in Ms. Shoemaker's care and treatment.

30. Ms. Shoemaker did not choose any of the health care providers who provided care and treatment to her during her April 13, 2017 admission to Vanderbilt.

## STATEMENT OF FACTS AND ALLEGATIONS

31. The Vanderbilt medical records for Ms. Shoemaker's April 13, 2017 admission ("Vanderbilt records") are completely accurate.

32. The Vanderbilt medical records for Ms. Shoemaker's April 13, 2017 contain multiple inaccuracies.

33. The health care providers who created documentation in the Vanderbilt records had an obligation to make their documentation as accurate as possible.

34. The health care providers who created documentation in the Vanderbilt records had an obligation to make their documentation as complete as possible.

35. If a Vanderbilt health care provider made their documentation as accurate and complete as possible, that provider should not have to make an additional note later mentioning things that were not in earlier documentation about the same event.

36. Dr. Edwards made at least one mistake on the morning of April 13, 2017 when she was attempting to place a central line via Ms. Shoemaker's right internal jugular vein ("R IJ").

37. Dr. Edwards made at least one significant mistake on the morning of April 13, 2017 when she was attempting to place a central line via Ms. Shoemaker's R IJ.

38. The R IJ and the right common carotid artery are different vessels in the human body, as shown here:

4

Copy



RIGHT INTERNAL JUGULAR

RIGHT COMMON CAROTID

39.   When Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards did not intend to penetrate Ms. Shoemaker's right common carotid artery.

40.   When Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards did not intend to cannulate Ms. Shoemaker's right common carotid artery ("R CCA").

41.   Dr. Edwards did not promptly recognize on the April 13, 2017 that she had penetrated Ms. Shoemaker's right common carotid artery when Dr. Edwards had attempted to place a central line via the R IJ.

Copy

42. Dr. Edwards did not promptly recognize on the April 13, 2017 that she had cannulated Ms. Shoemaker's right common carotid artery when Dr. Edwards had attempted to place a central line via the R IJ.

43. If Dr. Edwards had properly performed the attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards would not have penetrated Ms. Shoemaker's R CCA.

44. If Dr. Edwards had properly performed the attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards would not have cannulated Ms. Shoemaker's R CCA.

45. The fact that Dr. Edwards penetrated Ms. Shoemaker's R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ means that Dr. Edwards did not properly perform that procedure.

46. The fact that Dr. Edwards cannulated Ms. Shoemaker's R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ means that Dr. Edwards did not properly perform that procedure.

47. Dr. Edwards should not have penetrated Ms. Shoemaker R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ.

48. Dr. Edwards should not have cannulated Ms. Shoemaker R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ.

49. The unintentional penetration of the right common carotid artery in a live person is a medical issue that can cause death.

50. When the unintentional penetration of the right common carotid artery in a live person occurs, early detection is critical.

6

51.     The unintentional cannulation of the right common carotid artery in a live person during the attempted placement of a central line in an internal jugular vein is a medical issue that can cause death.

52.     When the unintentional cannulation of the right common carotid artery in a live person occurs during the attempted placement of a central line in an internal jugular vein, early detection is critical.

53.     When the unintentional penetration of the right common carotid artery occurs during the attempted placement of a central line in an internal jugular, this can be detected by the provider attempting to place the central line.

54.     When the unintentional penetration of the right common carotid artery occurs during the attempted placement of a central line in an internal jugular, this can easily be detected by the provider attempting to place the central line if that provider has an appropriate amount of experience and competence.

55.     When the unintentional cannulation of the right common carotid artery occurs during the attempted placement of a central line in an internal jugular, this can be promptly detected by the provider attempting to place the central line if the provider has an appropriate amount of experience and competence.

56.     On April 13, 2017, an employee of Vanderbilt unintentionally penetrated Ms. Shoemaker's R CCA.

57.     On April 13, 2017, an employee of Vanderbilt unintentionally cannulated Ms. Shoemaker's R CCA.

58.     On April 13, 2017, an agent of Vanderbilt unintentionally penetrated Ms. Shoemaker's R CCA.

7

Copy

59. On April 13, 2017, an agent of Vanderbilt unintentionally cannulated Ms. Shoemaker's R CCA.

60. The type of penetration that occurred of Ms. Shoemaker's R CCA on April 13, 2017 can be properly referred to as a cannulation of the R CCA.

61. Dr. Edwards is the provider who penetrated Ms. Shoemaker's R CCA on April 13, 2017 when she meant to be placing a central line in the R IJ.

62. Dr. Edwards is the provider who cannulated Ms. Shoemaker's R CCA on April 13, 2017 when she meant to be placing a central line in the R IJ.

63. When Dr. Edwards penetrated Ms. Shoemaker's R CCA during the attempted placement of a central line in the R IJ, Dr. Edwards was what Vanderbilt referred to in the Vanderbilt records at the time as a "trainee."

64. When Dr. Edwards cannulated Ms. Shoemaker's R CCA during the attempted placement of a central line in the R IJ, Dr. Edwards was what Vanderbilt referred to in the Vanderbilt records at the time as a "trainee."

65. When Dr. Edwards did not promptly recognize on August 13, 2017 that she cannulated Ms. Shoemaker's R IJ, Dr. Edwards was what Vanderbilt referred to in the Vanderbilt records at the time as a "trainee."

66. Nothing regarding Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ was supposed to involve penetrating the R CCA.

67. Nothing regarding Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ was supposed to involve cannulating the R CCA.

68. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards did not know she had penetrated the R CCA.

8

Copy

69. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards did not know she had cannulated the R CCA.

70. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards had absolutely no concern regarding whether she had penetrated the R CCA.

71. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards had absolutely no concern regarding whether she had cannulated the R CCA.

72. Dr. Edwards was not experienced enough to be permitted to attempt to place a central line in Ms. Shoemaker on April 13, 2017 without supervision by a more experienced physician.

73. Dr. Edwards claims to have used ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

74. Dr. Edwards did not use ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

75. Dr. Edwards did not use ultrasound during the entire attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

76. If Dr. Edwards had properly used ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, she would have recognized visually on the monitor that displayed what the ultrasound showed that the wire was placed into the R CCA.

77. If Dr. Edwards had properly used ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, she would have recognized visually on the monitor that displayed what the ultrasound showed that the catheter was placed into the R CCA.

9

Copy

78. During Dr. Edwards' April 13, 2017 attempt to place a central line in Ms. Shoemaker's R IJ, Dr. Edwards did not ask anyone for help.

79. Within one hour of Dr. Edwards completing her attempt to place a central line in Ms. Shoemaker's R IJ, Dr. Edwards did not ask anyone for help.

80. Dr. Edwards could have asked another provider to help her with the April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ during the performance of that procedure.

81. Nothing prevented Dr. Edwards from asking another provider to help her with the April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ during the performance of that procedure.

82. No one placed a central line in Ms. Shoemaker in the Vanderbilt ER on April 13, 2017.

83. The central line that was placed by Dr. Edwards on the morning of April 13, 2017 was not urgent.

84. The central line that was placed by Dr. Edwards on the morning of April 13, 2017 was not urgent.

85. The central line that Dr. Edwards placed on the morning of April 13, 2017 was not used the first hour after it was placed.

86. The central line that Dr. Edwards placed on the morning of April 13, 2017 was not used the first two hours after it was placed.

87. The central line that Dr. Edwards placed on the morning of April 13, 2017 was not used the first three hours after it was placed.


Copy

88. The central line that Dr. Edwards attempted to place via Ms. Shoemaker's R IJ on the morning of April 13, 2017 could have been placed by a more experienced physician.

89. The central line that Dr. Edwards attempted to place via Ms. Shoemaker's R IJ on the morning of April 13, 2017 did not have to be placed by a resident.

90. The central line that Dr. Edwards attempted to place via Ms. Shoemaker's R IJ on the morning of April 13, 2017 did not have to be placed by any type of provider who the Vanderbilt records referred to as a "trainee" at that time.

91. Dr. Edwards could have asked another provider to check on the patient or on her central line placement after her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ.

92. Nothing prevented Dr. Edwards from asking another provider to check on the patient or on her central line placement within one hour after her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ.

93. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards penetrated Ms. Shoemaker's R CCA was hours after it occurred.

94. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards penetrated Ms. Shoemaker's R CCA was hours after it could have been recognized.

95. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards cannulated Ms. Shoemaker's R CCA was hours after it occurred.

96. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards cannulated Ms. Shoemaker's R CCA was hours after it could have been recognized.

Case 3:20-ap-90002    Doc 217-7    Filed 08/12/22    Entered 08/12/22 18:28:11    Desc
Exhibit 7    Page 11 of 69



97.    The Vanderbilt medical records document different times, by as much as 30 or 60 minutes different depending on the documentation, that it was first recognized that the central line that was meant to be placed in Ms. Shoemaker's R IJ instead cannulated her R CCA.

98.    The Vanderbilt medical records document different times, by as much as 30 or 60 minutes different depending on the documentation, that it was first recognized that Ms. Shoemaker had a neurological change for the worse as a result of the central line that was meant to be placed in Ms. Shoemaker's R IJ instead cannulated her R CCA.

99.    After Dr. Edwards learned that the central line that she was supposed to place in Ms. Shoemaker's R IJ instead was placed into Ms. Shoemaker's R CCA, Dr. Edwards made a second note regarding that procedure that added things into the Vanderbilt record regarding that attempted placement of a central line that Dr. Edwards did not include in her earlier note about the same attempted central line placement.

100.    On April 13, 2017, Chesta Shoemaker (age 44) presented to the Emergency Department at Vanderbilt by EMS via transfer from UMC Lebanon with complaints of abdominal pain.

101.    The abdominal pain that Ms. Shoemaker had upon arrival to the Vanderbilt was documented by Vanderbilt personnel to be "moderate."

102.    Vanderbilt's documentation that Ms. Shoemaker's abdominal pain upon arrival to Vanderbilt was moderate is completely accurate.

103.    The EMS personnel who transported Ms. Shoemaker from UMC Lebanon to Vanderbilt on April 13, 2017 prepared documentation on April 13, 2017 regarding Ms. Shoemaker's status at and around that time.



104. The documentation that EMS prepared on April 13, 2017 regarding Ms. Shoemaker documents that Ms. Shoemaker had experienced pain for two weeks, along with nausea and constipation with decreased bowel movements over those two weeks.

105. The documentation prepared by EMS on April 13, 2017 states that Ms. Shoemaker's Underlying Medical Condition was Pain – Abdominal.

106. The documentation prepared by EMS on April 13, 2017 regarding Ms. Shoemaker that is in the Vanderbilt records is completely accurate.

107. The Vanderbilt records for Ms. Shoemaker's April 13, 2017 admission to Vanderbilt include a document entitled "Transfer Order."

108. According to the Transfer Order in the Vanderbilt records, the Diagnosis for Ms. Shoemaker at the referring hospital was Abdominal Pain.

109. Ms. Shoemaker's vital signs at 0143 on April 13, 2017 prior to arrival at Vanderbilt are documented in documentation in included in the Vanderbilt records as BP 108/71, HR 102, RR 12, O2 saturation 94%, and temperature 97.5.

110. Ms. Shoemaker's vitals while in transport via EMS from UMC Lebanon to Vanderbilt included the following vital signs, which are included in documentation in the Vanderbilt records:

|     | 0227   | 0242   |
| --- | ------ | ------ |
| BP  | 111/73 | 105/67 |
| HR  | 120    | 123    |
| RR  | 18     | 16     |

111. Ms. Shoemaker was admitted to the ER Vanderbilt at 0303 on April 13, 2017 and she was seen by a physician at 0313 on April 13, 2017.

13

Copy

112.    According to the Vanderbilt records, a CT scan from the referring facility, UMC Lebanon, demonstrated an intra-abdominal infection via a large perinephric abscess with pyelonephritis, with a massive amount of portal venous/SMV air, but with the colon and intestines appearing healthy without any wall thickening or fluid collections.

113.    Vanderbilt's independent interpretation of the CT scan performed at UMC Lebanon in April 2017 is in the Vanderbilt records.

114.    Vanderbilt's independent interpretation of the CT scan performed at UMC Lebanon in April 2017 in the Vanderbilt records is accurate and complete.

115.    On the morning of April 13, 2017 at Vanderbilt, Ms. Shoemaker was not hypotensive.

116.    On the morning of April 13, 2017 at Vanderbilt, Ms. Shoemaker was documented to have a temperature of 98.0, which is afebrile.

117.    Ms. Shoemaker did not have a fever at Vanderbilt on the morning of April 13, 2017.

118.    When Ms. Shoemaker was assessed and examined in the Emergency Department at Vanderbilt on the morning of April 13, 2017, she was documented by the physician who examined her as being "nontoxic-appearing".

119.    When Ms. Shoemaker was assessed and examined in the Emergency Department at Vanderbilt on the morning of April 13, 2017, she was "nontoxic-appearing".

120.    The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that Ms. Shoemaker denied (1) bloody stools, (2) nausea, (3) vomiting, (4) chest pain and (5) SOB.

14



121. The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that there was no history of smoking, alcohol use, or illicit drug use.

122. The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that her surgical history was a cholecystectomy.

123. The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that on Physical Exam, there were hypoactive bowel sounds, RLQ and RUQ abdominal tenderness, and she was tachycardic with regular rhythm and no murmur.

124. At 0312 on April 13, 2017, Ms. Shoemaker's vital signs were documented by an Emergency Department Triage Nurse at Vanderbilt as BP 131/77, HR 130, RR 26, O2 91%, and temp 98.2.

125. At 0320 on April 13, 2017, Ms. Shoemaker's labs included:

WBC 16.0

HGB 8.7

PCV 28

Plt-Ct 83

MCV 83

Creatinine 1.03

126. Ms. Shoemaker's creatinine improved on the morning of April 13, 2017 after fluid resuscitation, including that her creatinine was 1.3 at the outside hospital and it improved to 1.03 with fluid resuscitation.

15



127. Beginning at 0335 on April 13, 2017, Flowsheet documentation was recorded at Vanderbilt, which included System Assessments and vitals.

128. Vasopressin is a mediation that is an option for treating sepsis.

129. Vasopressin is a mediation that is an option for treating septic shock.

130. In April 2017, Vasopressin was a medication used at Vanderbilt to treat sepsis.

131. In April 2017, Vasopressin was a medication used at Vanderbilt to treat septic shock.

132. By the end of the morning of April, 13, 2017, no Vanderbilt physician had ordered that Ms. Shoemaker be given Vasopressin.

133. The April 13, 2017 Flowsheet documentation by Vanderbilt documents that Ms. Shoemaker was not given Vasopressin on the morning of April 13, 2017.

134. Ms. Shoemaker was not given Vasopressin on the morning of April 13, 2017.

135. The first time that Ms. Shoemaker was given Vasopressin on April 13, 2017 was after 1300 that day.

136. At 0349 on April 13, 2017, an Emergency General Surgery consult was performed at Vanderbilt by Dr. Sandra Kavalukas.

137. Dr. Kavalukas performed a consult on the morning of April 13, 2017 and opined that "this looks like emphysematous pyelonephritis with extension into the peritoneal cavity and crossover into the portal system" but noted that no primary intestinal pathology was seen to warrant surgery, and that they would defer to urology with regard to percutaneous draining and antibiotic management.

138. Dr. Kavalukas' consult note documented, in part, that Ms. Shoemaker was afebrile, but there was leukocytosis, lactic academia, and notable anemia on labs.

16

Copy

139. At 0630 on April 13, 2017, Vanderbilt documented that consent was obtained for (1) placement of an arterial line and (2) placement of a central venous/pulmonary artery catheter.

140. The "central venous/pulmonary artery catheter" referenced in the consent form signed on April 13, 2017 in the Vanderbilt records can properly be referred to as a "central line".

141. There is no audio recording or video recording of any conversation that occurred with Ms. Shoemaker on the morning of April 13, 2017 to obtain informed consent for the attempted placement of a central line that day.

142. There is no documentation of any conversation that occurred with Ms. Shoemaker on the morning of April 13, 2017 to obtain informed consent for the attempted placement of a central line that day other than what is in the Vanderbilt records.

143. The only witness to the conversation that Dr. Edwards had with Ms. Shoemaker to obtain informed consent for the placement of a central line in the R IJ on the morning of April 13, 2017 other than Dr. Edwards and Ms. Shoemaker was Darrell Goodwin.

144. Dr. Edwards is not aware of any witness to the conversation that Dr. Edwards had with Ms. Shoemaker to obtain informed consent for the placement of a central line in the R IJ on the morning of April 13, 2017 other than Dr. Edwards and Ms. Shoemaker other than Darrell Goodwin.

145. Vanderbilt is not aware of any witness to the conversation that Dr. Edwards had with Ms. Shoemaker to obtain informed consent for the placement of a central line in the R IJ on the morning of April 13, 2017 other than Dr. Edwards and Ms. Shoemaker other than Darrell Goodwin.

146. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement identified multiple risks as risks associated with the procedure.

17

Copy

147.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not include informing Ms. Shoemaker that the provider who would perform the central line placement was a resident.

148.    Ms. Shoemaker was not given the option of having someone more experienced than Dr. Edwards to place the central line on April 13, 2017.

149.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify an arterial injury as a risk involved with the procedure.

150.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify an arterial puncture as a risk involved with the procedure.

151.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify a cannulation of an artery as a risk involved with the procedure.

152.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify stroke as a risk involved with the procedure.

153.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify brain injury as a risk involved with the procedure.

154.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify death as a risk involved with the procedure.

155.    On April 13, 2017, Dr. Edwards knew that she was so inexperienced in performing the central line placement procedure that she was required to be supervised by a more senior physician.

156.    On April 13, 2017, Dr. Edwards knew that she was a resident.

18

157. On April 13, 2017, Dr. Edwards did not tell Ms. Shoemaker that Dr. Edwards was a resident.

158. On April 13, 2017, Dr. Edwards knew that the cannulation of the R CCA during the attempted placement of a central line in the R IJ was a known risk of that procedure.

159. On April 13, 2017, Dr. Edwards knew that if the R CCA was cannulated during the attempted placement of a central line in the R IJ, that event could cause a stroke.

160. On April 13, 2017, Dr. Edwards knew that if the R CCA was cannulated during the attempted placement of a central line in the R IJ, that event could cause a brain injury.

161. On April 13, 2017, Dr. Edwards knew that if the R CCA was cannulated during the attempted placement of a central line in the R IJ, that event could cause the patient's death.

162. By 0706 on April 13, 2017, a Surgical Critical Care consult was completed and a detailed, corresponding note was prepared.

163. The note prepared regarding the Surgical Critical Care consult performed on the morning of April 13, 2017 is accurate with regard to all things contained in that documentation.

164. At or around 0750 on April 13, 2017, Dr. Edwards attempted a central venous line insertion in Ms. Shoemaker via the R IJ site.

165. On the morning of April 13, 2017, Dr. Edwards was a surgical resident.

166. Dr. Edwards had not completed her surgical residency by April 13, 2017.

167. By April 13, 2017, Dr. Edwards did not have privileges at any hospital to place a central line without the supervision of a more senior physician.

168. By April 13, 2017, Dr. Edwards did not have privileges at any hospital to perform any type of invasive procedure without the supervision of a more experienced physician.

Case 3:20-ap-90002   Doc 217-7   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 7   Page 19 of 69

Copy

169. The first documentation that Dr. Edwards prepared regarding her attempted placement of a central line in Ms. Shoemaker's R IJ is entitled "Procedure Note".

170. Dr. Edwards could have included any information she chose to include in her Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

171. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 includes all of the information that was known to Dr. Edwards about that attempted procedure at the time she prepared that documentation.

172. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 is complete.

173. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 is completely accurate.

174. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 was not amended by the end of the day on April 14, 2017.

175. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 has never been amended in any way compared to how that note existed when first prepared.

176. Dr. Edwards was the only person considered to be a Proceduralist who was directly involved with performing the placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

177. Dr. Edwards used the thin-wall needle (Seldinger) technique in attempting to place the central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

Copy

178. Dr. Edwards used the catheter-over-the-needle (modified Seldinger) technique in attempting to place the central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

179. Dr. Addison May ("Dr. May") was not physically present in the room where Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 during Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

180. Dr. May was not physically present in the room where Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 during the entire time that Dr. Edwards performed an attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

181. Dr. May should have been physically present in the room where Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 during the entire time that Dr. Edwards performed an attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

182. Dr. May was not present when anyone had a conversation with Ms. Shoemaker on the morning of April 13, 2017 to obtain informed consent for the attempted placement of a central line that day.

183. Dr. May did not prepare any documentation on the morning of April 13, 2017 regarding Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017 that is in the Vanderbilt medical records.

184. Dr. May did not prepare any documentation on the morning of April 13, 2017 regarding his supervision of Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017.

21

Copy

185.. Dr. May never prepared any type of documentation, informal or formal, regarding Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017.

186. Dr. May never prepared any type of documentation, informal or formal, regarding his supervision of Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017.

187. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May did not see what the ultrasound guidance showed during the entire time that Dr. Edwards used ultrasound guidance during that procedure.

188. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May should have personally observed at that time what the ultrasound guidance showed during the entire time that Dr. Edwards used ultrasound guidance during that procedure.

189. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May did not see what the ultrasound guidance showed during at least half the time that Dr. Edwards used ultrasound guidance during that procedure.

190. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May should have personally observed at that time what the ultrasound guidance showed during at least half the time that Dr. Edwards used ultrasound guidance during that procedure.

191. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May did not see what the ultrasound guidance showed during any of the time that Dr. Edwards used ultrasound guidance during that procedure.



192. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May should have personally observed at that time what the ultrasound guidance showed during some of the time that Dr. Edwards used ultrasound guidance during that procedure.

193. All of the people who prepared documentation regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt should have prepared their documentation to be as accurate as possible based on what was known at the time they initially prepared any such documentation.

194. All of the people who prepared documentation regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt should have prepared their documentation to be as complete as possible based on what was known at the time they initially prepared any such documentation.

195. If any portion of the documentation in the Vanderbilt records regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt was at any time found or determined to be inaccurate in any way by anyone at Vanderbilt, that documentation could have been amended to improve the accuracy and factual truth of that documentation.

196. If any portion of the documentation in the Vanderbilt records regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt was at any time found or determined to be inaccurate in any way by anyone at Vanderbilt, that documentation should have been amended to improve the accuracy and factual truth of that documentation.

197. Ms. Shoemaker did not have any unusual anatomical issues on April 13, 2017 that were in any way related to Dr. Edwards' attempt to place a central line in her R IJ that morning.

198. No one at Vanderbilt ever documented on or after April 13, 2017 that Ms. Shoemaker had any unusual anatomical issues on April 13, 2017 that were in any way related to Dr. Edwards' attempt to place a central line in her R IJ that morning.

199. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 documents that the procedure that was reportedly performed with ultrasound guidance.

200. If ultrasound guidance was used on April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ, a low-resolution ultrasound device would have clearly shown the distinctive and different anatomical locations of Ms. Shoemaker's R IJ and R CCA for Dr. Edwards to recognize.

201. If ultrasound guidance was used on April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ, a low-resolution ultrasound device would have clearly shown the distinctive and different anatomical locations of Ms. Shoemaker's R IJ and the R CCA for Dr. May to recognize.

202. The ultrasound device that was available for Dr. Edwards to use during her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ was able to distinctly show on a monitor where Ms. Shoemaker's R IJ was located.

203. The ultrasound device that was available for Dr. Edwards to use during her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ was able to distinctly show on a monitor where Ms. Shoemaker's R CCA was located.

Copy

204. On April 13, 2017, there were no technical problems or other problems with the ultrasound equipment that was available to be used during Dr. Edwards' placement of a central line in Ms. Shoemaker's R IJ that morning.

205. Any blood that Dr. Edwards aspirated during her attempted placement of a central line in Ms. Shoemaker's R IJ was from the R CCA.

206. Dr. Edwards aspirated from Ms. Shoemaker's R CCA during her attempted placement of a central line in Ms. Shoemaker's R IJ was arterial.

207. Dr. Edwards did not aspirate any venous blood from Ms. Shoemaker during her attempted placement of a central line in Ms. Shoemaker's R IJ.

208. Dr. Edwards' Procedure Note regarding the central line placement does not mention aspirating any of the lumens of the central line she attempted to place in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

209. Dr. Edwards aspirated all lumens of the central line she placed in Ms. Shoemaker on the morning of April 13, 2017.

210. If Dr. Edwards aspirated any lumens of the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, that action would have provided Dr. Edwards with information indicating that any such lumen was not in a vein.

211. If Dr. May was physically present with Dr. Edwards when Dr. Edwards aspirated the lumens of the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, that action would have provided Dr. May with information indicating that any such lumen was not in a vein.

212. Dr. May did not observe Dr. Edwards aspirating any of the lumens of the central line that she placed in Ms. Shoemaker on the morning of April 13, 2017.

Copy

213. Dr. May did not observe Dr. Edwards aspirating all of the lumens of the central line that she placed in Ms. Shoemaker on the morning of April 13, 2017.

214. Blood from the R CCA would have a different appearance than blood from the R IJ.

215. Dr. Edwards knew on April 13, 2017 that blood from the R CCA would have a different appearance than blood from the R IJ.

216. On April 13, 2017, Dr. Edwards knew what the difference looked like between blood from the arterial system and venous blood.

217. Dr. May knew on April 13, 2017 that blood from the R CCA would have a different appearance than blood from the R IJ.

218. On April 13, 2017, Dr. May knew what the difference looked like between blood from the arterial system and venous blood.

219. Blood flowing in the R CCA flows at a higher pressure than blood flowing in the R IJ.

220. Dr. Edwards knew on April 13, 2017 that blood in the R CCA would flow at a different pressure than blood in the R IJ.

221. On April 13, 2017, Dr. Edwards was not very experienced with discerning the difference between pressure flow associated with arterial blood compared to pressure flow associated with venous blood.

222. Dr. May knew on April 13, 2017 that blood in the R CCA would flow at a different pressure than blood in the R IJ.

26

Copy

223.   On April 13, 2017, Dr. May was experienced with discerning the difference between pressure flow associated with arterial blood compared to pressure flow associated with venous blood.

224.   The pressure flow for the central line placement on the morning of April 13, 2017 is not recorded in the Vanderbilt records.

225.   Dr. Edwards did not attempt to confirm venous placement of the needle used in her attempted placement of the guidewire in Ms. Shoemaker's R IJ on the morning of April 13, 2017 prior to threading the guidewire.

226.   Dr. Edwards did not accurately confirm venous placement of the needle used in her attempted placement of the guidewire in Ms. Shoemaker's R IJ on the morning of April 13, 2017 prior to threading the guidewire.

227.   On the morning of April 13, 2017, Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ to identify and see the actual locations of Ms. Shoemaker's R IJ and R CCA.

228.   On the morning of April 13, 2017, Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ to identify and see the actual locations of Ms. Shoemaker's R IJ and R CCA at the same time that Dr. Edwards was attempting to place the central line into the R IJ.

229.   Dr. Edwards' use of ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 included using ultrasound guidance to distinguish the R IJ from the R CCA.

Copy

230. When Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards was able to see the R IJ and the R CCA on the monitor screen via her use of ultrasound.

231. Dr. Edwards could see the R CCA on the ultrasound monitor screen when she penetrated the R CCA.

232. Dr. Edwards could see the R CCA on the ultrasound monitor screen when she cannulated the R CCA.

233. On the morning of April 13, 2017, imaging was recorded that showed what could be seen via Dr. Edwards' use of the ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ.

234. The imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ still exists.

235. The imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ existed at some point on April 14, 2017.

236. By the end of the day on April 13, 2017, Vanderbilt knew that the central line that Dr. Edwards attempted to place on the morning of April 13, 2017 in Ms. Shoemaker's R IJ in fact had cannulated the R CCA.

237. The fact that Dr. Edwards' attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was known to be a problem for Ms. Shoemaker once it was recognized.

28

Copy

238. The fact that Dr. Edwards' attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was recognized by Vanderbilt by April 14, 2017 to be a mistake made by Dr. Edwards.

239. The fact that Dr. Edwards' attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was recognized by Vanderbilt by April 14, 2017 to be a mistake made by Dr. Edwards.

240. The fact that Dr. Edwards did not recognize on April 13, 2017 that her attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was recognized by Vanderbilt by April 14, 2017 to be a mistake/failure made by Dr. Edwards.

241. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in the R IJ on the morning of April 13, 2017 does not mention any concern about penetrating the R CCA.

242. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in the R IJ on the morning of April 13, 2017 does not mention any concern about cannulating the R CCA.

243. Dr. Edwards was not trying to cannulate the R CCA during her attempted placement of a central line in the R IJ on the morning of April 13, 2017.

244. No one ever taught Dr. Edwards that it was acceptable to cannulate the R CCA during an attempted placement of a central line in the R IJ.

245. Dr. Edwards has never read, either in Vanderbilt's residency program or elsewhere, that it is acceptable to cannulate the R CCA during an attempted placement of a central line in the R IJ.

29

246.   Dr. Edwards did not want the R CCA cannulated with the central line as a result of her attempted central line placement on the morning of April 13, 2017.

247.   Dr. Edwards did not use continuous monitoring of hemodynamic waveform during the catheter advancement when she placed a central line in Ms. Shoemaker on the morning of April 13, 2017.

248.   If Dr. Edwards had recognized while she was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 that she had cannulated the R CCA, Dr. Edwards would have acted around that time to address that issue.

249.   If Dr. Edwards had recognized while she was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 that she had cannulated the R CCA, Dr. Edwards would have acted around that time to correct that issue.

250.   The earlier that the cannulation of Ms. Shoemaker's R IJ was recognized on April 13, 2017 would have meant an earlier chance to address that mistake.

251.   The earlier that the cannulation of Ms. Shoemaker's R IJ was addressed on April 13, 2017 would have meant an increased likelihood of a good outcome for Ms. Shoemaker.

252.   The longer that Ms. Shoemaker's R IJ was cannulated on April 13, 2017 increased the amount of time that Ms. Shoemaker's brain was receiving a decreased amount of oxygenated blood.

253.   If any imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ existed by the end of the day on April 13, 2017 and it was deleted after it was recognized that Dr. Edwards' attempted placement of a central line in the R IJ on the morning of

April 13, 2017 cannulated the R CCA, that imaging was destroyed after it was known that Ms. Shoemaker's R CCA was cannulated during that procedure.

254. Any imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ would be evidence to use in considering whether Dr. Edwards properly performed that procedure that day under the recognized standard of acceptable professional practice, including whether she should have recognized that she may have cannulated the R CCA.

255. Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the catheter was placed and was where it was supposed to be.

256. Dr. Edwards should have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the catheter was placed and was where it supposed to be.

257. Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the guide wire ("wire") she used was where it was supposed to be.

258. Dr. Edwards should have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the wire she used was where it was supposed to be.

259. There was nothing that prevented Dr. Edwards from using ultrasound on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.



260. There were methods other than ultrasound available to Dr. Edwards on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

261. Dr. Edwards could have used fluoroscopy on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

262. Dr. Edwards did not use fluoroscopy on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

263. There was nothing that prevented Dr. Edwards from using fluoroscopy on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

264. Dr. Edwards could have used transesophageal echocardiography (TEE) on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

265. Dr. Edwards did not use TEE on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

266. There was nothing that prevented Dr. Edwards from using TEE on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

267. There were methods other than ultrasound available to Dr. Edwards on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

268. Dr. Edwards could have used manometry on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

269.   Dr. Edwards did not use manometry on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

270.   There was nothing that prevented Dr. Edwards from using manometry on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

271.   Dr. Edwards could have used pressure measurement on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

272.   Dr. Edwards did not use pressure measurement on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

273.   There was nothing that prevented Dr. Edwards from using pressure measurement on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

274.   Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 documents that blood was aspirated.

275.   Arterial blood aspirated during Dr. Edwards' attempted central line placement on the morning of April 13, 2017 would look different than venous blood.

276.   On the morning of April 13, 2017, Dr. Edwards was experienced enough to know the difference between what blood aspirated from the R IJ looked like compared against what blood aspirated from the R CCA would look like.

277.   On the morning of April 13, 2017, Dr. May was experienced enough to know the difference between what blood aspirated from the R IJ looked like compared against what blood aspirated from the R CCA would look like.

33

Copy

278. The blood that was aspirated on the morning of April 13, 2017 during Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ was not venous blood.

279. The blood that was aspirated on the morning of April 13, 2017 during Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ did not include any venous blood.

280. On April 13, 2017, Dr. Edwards documented in her Procedure Note that the central line placement procedure was "successful" with no immediate complications.

281. Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ was not a "success."

282. Dr. Edwards documented in her Procedure Note that there were two lumens used during her attempt to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

283. Only two lumens were used when Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

284. The portable chest x-ray (PCXR) performed during Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 does not demonstrate whether the R CCA was cannulated or not cannulated.

285. The PCXR performed during Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 does not demonstrate whether the catheter is venous or not venous.

286. At 0800 on April 13, 2017, an arterial line was placed at Ms. Shoemaker's left radial site.

287. The Proceduralists listed in the Vanderbilt records for the placement of an arterial line at 0800 on April 13, 2017 procedure are Dr. Amanda Craig and Dr. Gretchen Edwards.

34

Copy

288. The Proceduralists who performed the placement of an arterial line at 0800 on April 13, 2017 procedure are Dr. Amanda Craig and Dr. Edwards.

289. Dr. May is listed in the Vanderbilt records as being personally present throughout the entire procedure involving the placement of an arterial line in Ms. Shoemaker at 0800 on April 13, 2017.

290. Dr. May was physically present the entire time that Dr. Craig and Dr. Edwards placed an arterial line via Ms. Shoemaker's left radial site on the morning of April 13, 2017.

291. Dr. May was not physically present the entire time that Dr. Craig and Dr. Edwards placed an arterial line via Ms. Shoemaker's left radial site on the morning of April 13, 2017.

292. At 0815 on April 13, 2017, Ms. Shoemaker was intubated by Dr. Edwards for "Airway Protection".

293. The O2 saturation rate, HR, and BP prior to the intubation on the morning of April 13, 2017, and then after that intubation, respectively, were O2 95, HE 122, BP 118/80 and O2 100, HR 122, and BP 210/80.

294. At 1000 on April 13, 2017, Ms. Shoemaker went to CT for a procedure.

295. Beginning at 1106[1] on April 13, 2017, a CT-guided right flank drain placement x2 and an attempted (aborted) CT-guided right percutaneous nephrostomy were performed on Ms. Shoemaker in Interventional Radiology.

296. The Procedural Sedation Record for the drain placement procedure documents that the Time Out was performed at 1106 and that the Post Sedation Evaluation was performed at 1247.

297. Once the two drains were in place, approximately one liter of bloody, purulent fluid mixed with air was drained from Ms. Shoemaker on April 13, 2017.

---

[1] The procedure start time of 1106 is documented at VUMC 124.

Copy

298.    At 1305 on April 13, 2017, Ms. Shoemaker was back to her patient room from CT.

299.    Ms. Shoemaker's vital signs dropped as follows in the hours after the central line was placed:

|  | 0905[2] | 1000 | 1305 | 1405 | 1505 |
|---|---|---|---|---|---|
| HR |  | 138 | 109 | 104 | 103 |
| RR |  | 28 | 12 | 15 | 11 |
| ABP | 185/87 | 173/89 | 77/45 | 94/52 | 101/59 |
| Mean | 114 | 114 | 56 | 68 | 75 |

300.    When Ms. Shoemaker's vital signs dropped significantly from 1000 to 1305 on April 13, 2017, the Vanderbilt personnel involved with Ms. Shoemaker's care and treatment did not have an explanation at that time for that drop.

301.    When Ms. Shoemaker's vital signs dropped significantly from 1000 to 1305 on April 13, 2017, the Vanderbilt personnel involved with Ms. Shoemaker's care and treatment did not notify a physician.

302.    The Vanderbilt records document that at 1405 on April 13, 2017 the team was at bedside (in the patient's room), "vital signs monitored throughout procedure" and "verconium and sedation given with team present for procedure".

---

[2] VUMC 296

36



303. Dr. Edwards created an Acute Event Note at 1400 on April 13, 2017 regarding her placement of the central line earlier that same day.

304. The Acute Event Note created on April 13, 2017 by Dr. Edwards was created *after* Dr. Edwards learned that the central line she placed on the morning of April 13, 2017 was in the R CCA.

305. Nothing included in Dr. Edwards" Acute Event Note created on April 13, 2017 was documented to in any way help Ms. Shoemaker's status or outcome.

306. Per Dr. Edwards' Acute Event Note, Dr. Edwards used ultrasound guidance when she inserted the R IJ MAC on the morning of April 13, 2017.

307. Per Dr. Edwards' Acute Event Note, she reportedly noted the return of venous-appearing blood during her central line placement earlier on April 13, 2017.

308. During Dr. Edwards' attempt to place a central line in the R IJ on the morning of April 13, 2017, there was not a return of venous blood.

309. Dr. Edwards' documentation in the Acute Event Note she created does not state that there was a return of venous blood during her central line placement earlier on April 13, 2017.

310. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she did not mention the return of venous-appearing blood during that procedure.

311. Dr. Edwards has never created documentation in the Vanderbilt records for Ms. Shoemaker's April 13, 2017 that states that there was a return of actual venous blood during her central line placement earlier on April 13, 2017.

312. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she could have mentioned the return of venous-appearing blood during that procedure in that Procedure Note.

313. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, nothing prevented her from mentioning the return of venous-appearing blood during that procedure in that Procedure Note.

314. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she could have mentioned the return of actual venous blood during that procedure in that Procedure Note.

315. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, nothing prevented her from mentioning the return of actual venous blood during that procedure in that Procedure Note.

316. Per Dr. Edwards' Acute Event Note, she noted the return of non-pulsatile blood during her central line placement earlier on April 13, 2017.

317. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she did not mention the return of non-pulsatile blood during that procedure.

318. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she could have mentioned the return of non-pulsatile blood during that procedure.

319. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, nothing prevented her from mentioning the return of non-pulsatile blood during that procedure in that Procedure Note.



320. Dr. Edwards documented in the Vanderbilt records that Ms. Shoemaker developed a significant vasopressor requirement after she returned from IR, that a PA catheter was then placed, and upon that placement high pressures with an arterial wave form were noted.

321. According to Dr. Edwards' documentation in the Vanderbilt records, the first time that Ms. Shoemaker had a significant vasopressor requirement on April 13, 2017 was after the drain placement procedure was completed.

322. According to Dr. Edwards' documentation in the Vanderbilt records, it was only after Ms. Shoemaker returned to her room after the drain placement procedure that it was first recognized by any Vanderbilt personnel that the central line Dr. Edwards placed that morning was arterial.

323. According to Dr. Edwards' documentation in the Vanderbilt records, Vascular Surgery was "immediately" contacted after it was recognized that the central line Dr. Edwards placed that morning was arterial.

324. According to Dr. Edwards' documentation in the Vanderbilt records, Vascular Surgery recommend removal of the central line that was in the R CCA, including because the patient was not on anti-coagulants.

325. According to Dr. Edwards' documentation in the Vanderbilt records, Dr. Edwards removed the central line that she had placed in the R CCA with Ms. Shoemaker in a head-down position and pressure was held for 30 minutes.

326. Dr. Richard Betzold ("Dr. Betzold") was a physician at Vanderbilt on April 13, 2017.

327. Dr. Betzold was involved in at least part of Ms. Shoemaker's care and treatment at Vanderbilt on April 13, 2017.

COPY

328.   Dr. Betzold documented in Ms. Shoemaker's Vanderbilt records.

329.   Dr. Betzold's documentation in Ms. Shoemaker's records at Vanderbilt is factually complete.

330.   Dr. Betzold's documentation in Ms. Shoemaker's records at Vanderbilt is completely accurate.

331.   Dr. Betzold's documentation in the Vanderbilt records states that a Left-sided IJ (L IJ) central line was placed in Ms. Shoemaker at 1430.

332.   According to Dr. Betzold's documentation and the times documented in the drain placement procedure records, the L IJ central line was placed two hours after the drain placement procedure was completed.

333.   There is documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker.

334.   The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation regarding at least one R IJ site.

335.   The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker is completely accurate.

336.   The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that there were two R IJ sites started on the morning of April 13, 2017 for MAC[3] lines.

337.   The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that one R IJ site was used for insertion by Dr. Edwards at 0700 on April 13, 2017.

---

[3] MAC is Multi-Lumen Access Catheter

40

Copy

338. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that one R IJ site was used for an insertion at 0730 on April 13, 2017, and that documentation does not indicate who inserted anything at that site at that time.

339. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that the MAC line placed by Dr. Edwards at the R IJ at 0700 on April 13, 2017 was removed by Dr. Edwards at 1530 that same day.

340. If the documentation in the Vanderbilt chart stating that the MAC line placed by Dr. Edwards in the R IJ on the morning of April 13, 2017 was removed at 1530 that same day is correct, then documentation by at least one Vanderbilt physician regarding the supposed time that line was removed is inaccurate.

341. At 1430 on April 13, 2017, Dr. Betzold documented that a Central Venous Line Insertion occurred in Ms. Shoemaker's left internal jugular ("L IJ").

342. Dr. Betzold's documentation regarding the placement of a L IJ central line in Ms. Shoemaker on the afternoon of April 13, 2017 does not list anyone as the Proceduralist for this insertion.

343. Dr. Betzold's documentation regarding the placement of a L IJ central line in Ms. Shoemaker on the afternoon of April 13, 2017 states that Dr. May was available to provide instruction to the trainee/proceduralist who performed that procedure, but that Dr. May was not personally present.

344. Dr. Betzold's documentation regarding the placement of a L IJ central line in Ms. Shoemaker on the afternoon of April 13, 2017 states that consent could not be obtained for this line placement because the procedure was deemed emergent.

41



345. According to the Vanderbilt records, at 1500 on April 13, 2017, the chaplain attempted to visit Ms. Shoemaker but a sterile procedure was being performed at that time.

346. The chaplain's documentation in the Vanderbilt records regarding trying to visit Ms. Shoemaker in her room at 1500 on April 13, 2017 does not identify what type of procedure was being performed at that time.

347. Based on the documentation in the Vanderbilt records created by Dr. Edwards, her removal of the central line that cannulated the R CCA was completed prior to 1500 on April 13, 2017.

348. By 1500 on April 13, 2017, Dr. Edwards had completed her removal of the central line that had cannulated the R CCA.

349. Based on the documentation in the Vanderbilt records created by Dr. Betzold, his placement of a L IJ central line on the afternoon of April 13, 2017 was completed prior to 1500 on April 13, 2017.

350. By 1500 on April 13, 2017, the placement of a L IJ central line had been completed.

351. On April 13, 2017, Dr. Betzold prepared an Acute Event Note regarding the placement of a L IJ central line that day.

352. Dr. Betzold's April 13, 2017 Acute Event note is not timed.

353. In April 2017, Vanderbilt required that all documentation in medical records be timed.

354. In April 2017, Vanderbilt required that physician documentation in medical records be timed.

355. In April 2017, Dr. Betzold was required to time the Acute Event Note he prepared on April 13, 2017.

42

Copy

356. Nothing prevented Dr. Betzold from timing the Acute Event Note he prepared regarding the April 13, 2017 placement of L IJ central line.

357. According to Dr. Betzold's Acute Event Note prepared on April 13, 2017, it was at 1500 that it was recognized that a catheter was in Ms. Shoemaker's carotid artery.

358. According to Dr. Betzold's Acute Event Note prepared on April 13, 2017, it was at or after 1500 when he placed a L IJ line in Ms. Shoemaker.

359. The Procedure Note prepared by Dr. Betzold regarding his placement of a L IJ line in Ms. Shoemaker on April 13, 2017 and the Acute Event Note prepared by Dr. Betzold on April 13, 2017 indicate different times that he placed a L IJ line in Ms. Shoemaker on the afternoon of April 13, 2017.

360. According to Dr. Betzold's Acute Event Note, Dr. Betzold called Dr. May at 1530 on April 13, 2017 after placing the L IJ line in Ms. Shoemaker, and they thereafter called Vascular Surgery.

361. According to Dr. Betzold's Acute Event Note, the R IJ line was not removed from Ms. Shoemaker's R CCA until after Dr. Betzold called Dr. May at 1530 on April 13, 2017, including because it was after the call to Dr. May that Vascular Surgery was called and then recommended removing the R IJ line and holding pressure, which was done.

362. Dr. Betzold documented that Ms. Shoemaker was following commands and moving all four extremities at 1730 on April 13, 2017 after sedation weaning, and that her neurological exam changed around 1900 on April 13, 2017 – which led to Neurology and Vascular Surgery being contacted.

363. Dr. Betzold's documentation regarding whether Ms. Shoemaker was able to move all four extremities at 1730 on April 13, 2017 is completely accurate.

43



364. According to the Vanderbilt records, at 1600 on April 13, 2017, Dr. Edwards and Regina Betz attempted the placement of a pulmonary artery catheter (PAC) in the left internal jugular under reported ultrasound guidance and an MAC cordis introducer was used.

365. The documentation in the Vanderbilt records regarding the placement of a L IJ catheter in Ms. Shoemaker involving Dr. Edwards on the afternoon of April 13, 2017 is completely accurate.

366. The placement of a L IJ catheter in Ms. Shoemaker by Dr. Edwards, solely or with assistance, occurred at 1600 on April 13, 2017.

367. When a L IJ catheter was placed in Ms. Shoemaker on the afternoon of April 13, 2017 by Dr. Edwards, solely or with others' assistance, this was done after it was recognized that the central line placed earlier that day by Dr. Edwards was in the R CCA.

368. C-arm/fluoroscopy was not used when Dr. Edwards was involved in placing a L IJ catheter in Ms. Shoemaker on the afternoon of April 13, 2017.

369. There was continuous monitoring of hemodynamic waveform during the catheter advancement via the L IJ in Ms. Shoemaker on the afternoon of April 13, 2017.

370. According to the Vanderbilt records, by the time Dr. Edwards' reportedly placed a L IJ catheter in Ms. Shoemaker, Dr. Betzold had already placed a new central line that afternoon via the L IJ.

371. Dr. Edwards and Dr. Betzold did not perform separate procedures on the afternoon of April 13, 2017 via Ms. Shoemaker's L IJ.

372. It was during Dr. Edwards' involvement in placing a L IJ catheter in Ms. Shoemaker on the afternoon of April 13, 2017 that any Vanderbilt personnel first recognized that a line placed that same morning was in the R CCA.

44

Copy

373.   According to the Vanderbilt records, at least one person on Ms. Shoemaker's treatment team noticed by or at 1805 on April 13, 2017 that Ms. Shoemaker was not following commands or moving her extremities equally.

374.   The Vanderbilt records document that, by or at 1805 on April 13, 2017, Ms. Shoemaker had were left-sided deficits, which included no movement on the left, and that other Vanderbilt personnel were notified of these facts.

375.   If the portion of the Vanderbilt records that documents Ms. Shoemaker had left-sided neurological changes by or at 1805 on April 13, 2017 is accurate, then Dr. Betzold's documentation in the Vanderbilt records that represents that it was not until approximately 1900 on April 13, 2017 when Ms. Shoemaker's neurological exam changed is inaccurate.

376.   At 1830 on April 13, 2017, a Code Stroke was called and Ms. Shoemaker was being prepared for CT.

377.   According to the Vanderbilt records, at 1830 on April 13, 2017, a Code Stroke was called and Ms. Shoemaker was being prepared for CT.

378.   A Code Stroke was called at 1830 on April 13, 2017 in response to a change for the worse in Ms. Shoemaker's neurological exam.

379.   If the portion of the Vanderbilt records that a Code Stroke was called at 1830 on April 13, 2017 is accurate, then Dr. Betzold's documentation in the Vanderbilt records that represents that it was not until approximately 1900 on April 13, 2017 when Ms. Shoemaker's neurological exam changed is inaccurate.

380.   According to the Vanderbilt records, at approximately 1901 on April 13, 2017, Dr. Johnathan Ratcliff ("Dr. Ratcliff"), a Vascular Surgery fellow, was notified by an SICU fellow on



call that Ms. Shoemaker had developed acute neurological decline after removal of an inadvertently placed central line into the R CCA.

381. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, Ms. Shoemaker had been seen by another member of the Vascular Surgery team in the afternoon of April 13, 2017 who recommended removal of the central line that was in the R CCA and that manual pressure applied to the neck, and that this occurred "hours" before Dr. Ratcliff was called about Ms. Shoemaker's condition.

382. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, there was a non-lateralizing neurological exam at 1730 on April 13, 2017.

383. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, a formal consult request to the vascular surgery team was placed at 1903 on April 13, 2017 after recognition of the neurological decline.

384. In response to Ms. Shoemaker's neurological changes, Dr. Ratcliff recommended that a CT Head/CT angiogram of the head/neck be performed.

385. In response to Ms. Shoemaker's neurological changes, the Neurology Stroke Team recommended that a CT Head/CT angiogram of the head/neck be performed.

386. It was Dr. Ratcliff, along with his attending, Dr. Curci, who reviewed the imaging studies and who discussed the plan of care with the primary team and with other consultant teams.

387. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, the radiographic studies performed in response to Ms. Shoemaker's neurological changes were notable for focal R CCA dissection, an AV fistula between R IJ and R CCA, and occlusion of the R ICA with MCA/ACA distribution stroke.

46



388.     The A V fistula between Ms. Shoemaker's R IJ and R CCA was caused by Dr. Edwards' attempted mistakenly penetrating the R CCA during her attempt to place a central line in the R IJ on the morning of April 13, 2017.

389.     Ms. Shoemaker's neurological change on April 13, 2017 was caused by the injury to Ms. Shoemaker's R IJ caused by Dr. Edwards' attempt to place a R IJ central line earlier that day, which led to a massive brain injury.

390.     The only cause for Ms. Shoemaker's neurological change on April 13, 2017 was the injury to Ms. Shoemaker's R IJ caused by Dr. Edwards' attempt to place a R IJ central line earlier that day, which led to a massive brain injury.

391.     Given the severity of Ms. Shoemaker's neurologic injury, Neurosurgery was consulted and Dr. Ratcliff spoke with the Neurosurgery resident on call, Dr. Voce, on the phone at 2119 on April 13, 2017 and Dr. Voce reported that the Neurosurgery team planned on a R ICA thrombectomy. The Cerebrovascular Neurosurgery service assumed the care for the R carotid injury at that point.

392.     According to the Vanderbilt records, at approximately 2000 on April 13, 2017, a Neurology consult was performed due to the left hemiplegia that existed after the puncture of Ms. Shoemaker's right carotid artery. The consult note refers to an "acute event note" that reportedly includes a "description of the events surrounding placement for venous catheter".

393.     Within the Neurology consult note prepared as a result of the Neurology consult that was performed at approximately 2000 on April 13, 2017 is mention that Ms. Shoemaker's son initially noticed some asymmetry of movement at an "unclear" time, and that this asymmetry of movement was recognized by the staff at approximately 1730-1800.

Copy

394.    The Neurology consult note prepared related to the Neurology consult performed at approximately 2000 on April 13, 2017 is completely accurate.

395.    If the Neurology consult note is accurate that the staff recognized asymmetry of movement at approximately 1730-1800 on April 13, 2017, then Dr. Betzold's documentation in the Vanderbilt records that represents that it was not until approximately 1900 on April 13, 2017 when Ms. Shoemaker's neurological exam changed is inaccurate.

396.    According to the Neurology consult note prepared on April 13, 2017, when Ms. Shoemaker returned from the placement of an abdominal drain for a perinephric access on April 13, 2017 she was noted to have pressor requirements and a Swan-Ganz catheter was placed.

397.    According to the Neurology consult note prepared on April 13, 2017, when a Swan-Ganz catheter was placed in Ms. Shoemaker after she returned to her from the drain placement, there was an arterial waveform, which led to discussions with Vascular Surgery; the removal of a right-sided line was removed, and the placement a left-sided central venous catheter.

398.    According to the Neurology consult note prepared on April 13, 2017, it was around the time that a left-sided venous catheter was placed in Ms. Shoemaker in her room on the afternoon of April 13, 2017 that someone recognized that Ms. Shoemaker was moving asymmetrically.

399.    According to the Neurology consult note prepared on April 13, 2017, her NIH Stroke Scale Score was 24.

400.    According to the Neurology consult note prepared on April 13, 2017, due to Ms. Shoemaker's poor neurological exam on April 13, 2017 indicating brainstem dysfunction and the likelihood of progressive cerebral edema, it was opined on April 13, 2017 by at least one Vanderbilt physician that the patient's condition would progress to brain death.

48

ᴄopy

401. According to the Vanderbilt records, at approximately 2100 on April 13, 2017, a Vascular Surgery consult was performed by Dr. Allison Umfress due to Ms. Shoemaker's "acute onset" left-sided neurologic deficits after the cannulation of the R common carotid artery.

402. According to the Vanderbilt records, Ms. Shoemaker's carotid artery was "cannulized" during the attempted IJ central venous catheter insertion earlier that day at Vanderbilt.

403. According to the Vanderbilt records, the Physical Exam performed after the cannulation of the R CCA was recognized demonstrated that the patient followed commands in her RUE and RLE, but not in her LUE or LLE, and her pupils were pinpoint but reactive.

404. According to the Vanderbilt records, no site checks of the central line that Dr. Edwards attempted to place in the R IJ were performed on April 13, 2017 prior to Ms. Shoemaker returning from the drain placement procedure that afternoon.

405. According to the Vanderbilt records, by 2127 on April 13, 2017, Dr. May documented that the R IJ catheter that was placed on the morning of April 13, 2017 was placed under US guidance, that it was after Ms. Shoemaker returned from Radiology for percutaneous drainage of her abscess it was discovered that the IJ catheter was in the R carotid, and that the patient had a normal neurologic exam at that time.

406. If Dr. May's documentation that Ms. Shoemaker had a normal neurological exam at the time it was discovered that the IJ catheter was in the R CCA is accurate, then the Vanderbilt documentation stating that Ms. Shoemaker did not follow commands in her LUE or LLE when it was recognized that the R CCA was cannulated is inaccurate.

407. If the Vanderbilt documentation stating that Ms. Shoemaker did not follow commands in her LUE or LLE after it was recognized that the R CCA was cannulated is accurate,

49

Copy

then Dr. May's documentation that Ms. Shoemaker had a normal neurological exam at the time the R CCA cannulation was discovered is inaccurate.

408.    According to documentation prepared by Dr. May at 2130 on April 13, 2017, the catheter that had cannulated Ms. Shoemaker's R CCA was reportedly removed at 1730 on April 13, 2017.

409.    According to documentation prepared by Dr. May at 2130 on April 13, 2017, Ms. Shoemaker's neurological exam was normal at 1730 on April 13, 2017.

410.    According to documentation prepared by Dr. May at 2130 on April 13, 2017, Dr. May was told at 1852 on April 13, 2017 that Ms. Shoemaker's neurological examination changed at approximately 1830.

411.    According to the Vanderbilt documentation, with the window of occlusion reportedly being between 1730 and 1830 on April 13, 2017, it was believed that an attempted thrombectomy was of potential benefit and that team was mobilized at approximately 2100 on April 13, 2017.

412.    According to documentation prepared by Dr. May, the cannulation of Ms. Shoemaker's R CCA and the corresponding neurological changes was a severe complication.

413.    According to documentation prepared by Dr. May, Dr. May noticed "the in-house CC faculty" of the fact that Ms. Shoemaker's R CCA was cannulized as the result of an attempt to place a R IJ central line.

414.    By April 14, 2017, Dr. May notified "the in-house CC faculty" that a resident, Dr. Edwards, had cannulated Ms. Shoemaker's R CCA in Dr. Edwards' attempt to place a R IJ central line.

copy

415.   By 0030 on April 14, 2017, a cerebral angiogram and clot retrieval were performed at Vanderbilt on Ms. Shoemaker.

416.   The Vanderbilt records include a History section in the documentation related to the cerebral angiogram and clot retrieval performed on Ms. Shoemaker.

417.   The documented History in Vanderbilt's documentation related to the cerebral angiogram and clot retrieval states, in part, "with inadvertent placement of the catheter transjugular into the right common carotid artery with subsequent R CCA-IJ fistula formation".

418.   At 0105 on April 14, 2017, Nurse Practitioner Melissa Wiley ("NP Wiley") performed a Neurology consult.

419.   NP Wiley prepared documentation regarding the Neurology consult she performed on April 14, 2017.

420.   NP Wiley's documentation in the Vanderbilt records is completely accurate.

421.   NP Wiley documented that the fact that the R IJ catheter was in the R carotid artery was discovered while the percutaneous drain and nephrostomy tube placement were performed in Interventional Radiology on April 13, 2017.

422.   NP Wiley's documentation that it was during the April 13, 2017 drain placement procedure that it was discovered that the R IJ catheter was in the R CCA differs with other documentation in the same set of Vanderbilt records regarding when it was first discovered that the R IJ catheter was in the R CCA.

423.   If NP Wiley's documentation is accurate that the fact the R IJ catheter was in the R CCA was discovered during the drain placement procedure, that makes the timing of that discovery hours earlier than this discovery is documented as having occurred in at least one other part of the Vanderbilt records.

51


Copy

424. By 0115 on April 14, 2017, Dr. David Voce ("Dr, 'Voce'") performed a Neurosurgery consult.

425. Dr. Voce prepared documentation in the Vanderbilt records regarding the Neurology consult he performed and his corresponding opinions.

426. Dr. Voce's documentation in the Vanderbilt records is completely accurate.

427. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had a R MCA ACA territory infarct after iatrogenic R carotid thrombosis.

428. In Dr. Voce's documentation, "iatrogenic" means the condition or event was caused by the act of a health care provider.

429. In Dr. Voce's documentation, "iatrogenic" means the condition or event was caused by medical treatment that was provided.

430. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered an infarct throughout much of the right side of her brain.

431. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered the loss of gray-white differentiation within the left distal ACA territory of her brain, and also in the right side.

432. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered a new left midline shift in her brain.

433. Midline shift occurs when something pushes the natural center of the brain to one side or another.

434. In Ms. Shoemaker's case, the midline shift in her brain was caused by increased intracranial pressure.



435. The increased pressure in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been cannulated.

436. The increased pressure in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been perforated.

437. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered an uncal herniation in her brain.

438. Uncal herniation means that the brain has been severely squeezed by unusual amounts of pressure and squeezes down toward the brain stem.

439. The uncal herniation in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been cannulated.

440. The uncal herniation in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been perforated.

441. Beginning at 0919 on April 14, 2017, the appearance of the R IJ site was documented.

442. At 1515 on April 14, 2017, Vanderbilt completed a Provider of Identification of Surrogate form regarding Ms. Shoemaker.

443. Vanderbilt did not attempt to complete a Provider of Identification Surrogate form regarding Ms. Shoemaker between the time she was admitted on April 13, 2017 and before the cannulation of her R CCA was identified.

444. At 2205 on April 14, 2017, the decision to withdraw care from Ms. Shoemaker was made based on the extent of her new brain injury and her very poor prognosis.

445. There was no discussion at Vanderbilt about withdrawing care from Ms. Shoemaker prior to it being discovered that she had suffered a brain injury.



446. Ms. Shoemaker did not have a brain injury when she was admitted to Vanderbilt on April 13, 2017.

447. Ms. Shoemaker did not have a brain injury at the time that Dr. Edwards started to perform her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

448. Terminal extubation was performed at 2210 on April 14, 2017 after Ms. Shoemaker's mother and father arrived.

449. Ms. Shoemaker's Death Certificate ("Death Certificate") is in the Vanderbilt records.

450. The Death Certificate is completely accurate.

451. The Death Certificate was signed by Dr. Eli Zimmerman.

452. When Dr. Zimmerman signed the Death Certificate, he was a Vanderbilt physician.

453. When Dr. Zimmerman signed the Death Certificate, he was a Vanderbilt employee.

454. When Dr. Zimmerman signed the Death Certificate, he was an agent of Vanderbilt.

455. The Death Certificate documents that the Immediate Cause of Death for Ms. Shoemaker was "ischemic stroke."

456. Ms. Shoemaker suffered the ischemic stroke that caused her death as a result of her R CCA being penetrated as a result of Dr. Edwards attempting to place a central line in the R IJ on the morning of April 13, 2017.

457. The Death Certificate does not list anything other than "ischemic stroke" as a cause of death or as contributing to cause the death.

458. The Vanderbilt records include a Report of Death.

459. The Report of Death in the Vanderbilt records is completely accurate.

54.



460.    The Report of Death in the Vanderbilt records states that Ms. Shoemaker's Admitting Diagnosis was perinephric abscess.

461.    The Report of Death in the Vanderbilt records states that Ms. Shoemaker's death was caused by a diagnostic or therapeutic procedure.

462.    The procedure that caused Ms. Shoemaker's death was Dr. Edwards' attempt to place a central line in the R IJ on the morning of April 13, 2017.

463.    Ms. Shoemaker had at least an average life expectancy on April 13, 2017 had her R CCA not been cannulated.

464.    Ms. Shoemaker did not have diabetes on April 13, 2017.

465.    Ms. Shoemaker did not have heart disease on April 13, 2017.

466.    Ms. Shoemaker did not have lung disease on April 13, 2017.

467.    Ms. Shoemaker did not have cardiovascular disease on April 13, 2017.

468.    Ms. Shoemaker did not have liver disease on April 13, 2017.

469.    Ms. Shoemaker did not have any brain abnormalities on April 13, 2017 prior to her R CCA being cannulated.

470.    Ms. Shoemaker did not have neurological disease on April 13, 2017 prior to her R CCA being cannulated.

## HEALTH CARE LIABILITY CLAIMS

471.    The Plaintiff incorporates the factual averments and allegations set forth above as if fully described herein.

472.    The relationship of health care provider – patient existed between Ms. Shoemaker and Dr. Edwards on April 13, 2017.

Copy

473. . Dr. Edwards owed Ms. Shoemaker a duty to provide appropriate care and treatment on April 13, 2017 at Vanderbilt.

474. Dr. Edwards failed to comply with the applicable recognized standard of acceptable professional practice ("standard of care") when she provided care and treatment to Ms. Shoemaker during the April 13, 2017 admission to Vanderbilt.

475. The ways in which Dr. Edwards failed to comply with the applicable standard of care includes, but is not limited to:

    a. Dr. Edwards negligently failed to properly perform the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    b. Dr. Edwards negligently failed to properly identify the relevant anatomy during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    c. Dr. Edwards negligently failed to properly confirm the placement of the wire during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    d. Dr. Edwards negligently failed to properly confirm the placement of the catheter during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    e. Dr. Edwards negligently failed to timely recognize that she perforated the R CCA on April 13, 2017.

476. The relationship of health care provider-patient existed between Ms. Shoemaker and every provider involved with Ms. Shoemaker's care and treatment during her April 13, 2017 admission to Vanderbilt.

477. The health care providers at Vanderbilt who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission owed Ms. Shoemaker a duty to provide appropriate care and treatment on April 13, 2017 at Vanderbilt.



478.    The health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission failed to comply with the applicable standard of care when they provided care and treatment to Ms. Shoemaker during the April 13, 2017 admission to Vanderbilt.

479.    The ways in which the health care providers at Vanderbilt failed to comply with the applicable standard of care includes, but is not limited to:

a.  Negligently failing to properly perform the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

b.  Negligently failing to properly identify the relevant anatomy during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

c.  Negligently failing to properly confirm the placement of the wire during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

d.  Negligently failing to properly confirm the placement of the catheter during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

e.  Negligently failing to timely recognize that Ms. Shoemaker's R CCA was penetrated on April 13, 2017.

f.  Negligently allowing Dr. Edwards to perform the attempted placement of the R IJ line on April 13, 2017 without proper education, training, experience, or supervision.

480.    All of the above acts of negligence, including because of the severe risk to Ms. Shoemaker of suffering a penetration of her R CCA and that iatrogenic event not being timely recognized and treated to avoid that mistake from being fatal, also constitute reckless conduct.

## CAUSATION AND DAMAGES

481.   The Plaintiff incorporates the factual averments and allegations set forth above as if fully described herein.

482.   As a direct and proximate result of the negligence of at least one of the Defendants, Ms. Shoemaker suffered a brain injury at Vanderbilt on April 13, 2017.

483.   As a direct and proximate result of the negligence of at least one of the Defendants, Ms. Shoemaker suffered a fatal brain injury at Vanderbilt on April 13, 2017.

484.   As a direct and proximate result of the negligent acts and omissions of the Defendants, Ms. Shoemaker suffered a brain injury at Vanderbilt on April 13, 2017.

485.   As a direct and proximate result of the negligent acts and omissions of the Defendants, Ms. Shoemaker suffered a fatal brain injury at Vanderbilt on April 13, 2017.

486.   As a direct and proximate result of the negligence of at least one of the Defendants, Ms. Shoemaker died on April 14, 2017.

487.   As a direct and proximate result of the negligent acts and omissions of the Defendants, Ms. Shoemaker died on April 14, 2017.

488.   The injury to Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 at Vanderbilt was not timely recognized.

489.   As a direct and proximate result of the negligent acts and omissions of at least one of the Defendants, the injury to Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

490.   As a direct and proximate result of the negligent acts and omissions of the Defendants, the injury to Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

491. As a direct and proximate result of the negligent acts and omissions of at least one of the Defendants, the cannulation of Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

492. As a direct and proximate result of the negligent acts and omissions of the Defendants, the cannulation of Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

493. The injury to Ms. Shoemaker's R CCA on April 13, 2017 at Vanderbilt caused her to suffer a fatal brain injury.

494. The cannulation of Ms. Shoemaker's R CCA on April 13, 2017 at Vanderbilt caused her to suffer a fatal brain injury.

495. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated caused her to suffer a fatal brain injury.

496. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated was a cause of her death.

497. The length of time that the cannulation of Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated caused her to suffer a fatal brain injury.

498. The length of time that the cannulation of Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated was a cause of her death.

499. The injury to Ms. Shoemaker's R CCA on April 13, 2017 was the only act that started the chain of events that caused her death.

500. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went unrecognized and untreated caused her to suffer a fatal brain injury.

copy

501.  The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went unrecognized and untreated was a cause of her death.

502.  The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went unrecognized and untreated was a substantial factor in the causing her death.

503.  If Ms. Shoemaker's R CCA had not been penetrated on April 13, 2017, Ms. Shoemaker would not have died on April 14, 2017.

504.  The penetration of Ms. Shoemaker's R CCA on April 13, 2017 was a substantial factor in starting the chain of events that caused her death.

505.  On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA could cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

506.  On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA would cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

507.  If Ms. Shoemaker's R CCA had not been injured on April 13, 2017, Ms. Shoemaker would not have died on April 14, 2017.

508.  If the injury to Ms. Shoemaker's R CCA caused at Vanderbilt on April 13, 2017 had been timely recognized and timely treated, Ms. Shoemaker would not have died on April 14, 2017.

509.  The injury to Ms. Shoemaker's R CCA on April 13, 2017 was a substantial factor in starting the chain of events that caused her death.

510.  The failure to timely recognize that the injury to Ms. Shoemaker's R CCA occurred was a substantial factor in starting the chain of events that caused her death.

60

511. The failure to timely treat the injury to Ms. Shoemaker's R CCA was a substantial factor in starting the chain of events that caused her death.

512. On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA could cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

513. On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA would cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

514. This lawsuit seeks all compensatory damages available in a wrongful death action in Tennessee, including economic damages and non-economic damages. These requested damages include, but are not limited to, medical expenses, lost earnings, lost earning capacity, funeral expenses, burial expenses, physical pain and suffering emotional pain and suffering, loss of consortium (including the loss of consortium suffered by Ms. Shoemaker's adult son, Bretton, and by her two minor sons, David and Chris – both of whom Mr. Bretton has full custody of), and the pecuniary value of Ms. Shoemaker's life.

515. This lawsuit seeks punitive damages for the acts described herein involving a conscious disregard for the known risk of harm posed to Ms. Shoemaker, which constitutes reckless conduct.

516. The medical expenses charged by Vanderbilt for the care and treatment provide to Ms. Shoemaker during her April 13, 2017 admission in response to the injury to Ms. Shoemaker's R CCA were reasonable in amount.

Copy

517. The medical care provided by Vanderbilt to Ms. Shoemaker during her April 13, 2017 admission in response to the R CCA injury was necessary as a result of the R CCA injury that occurred.

## COMPLIANCE WITH STATUTORY NOTICE AND GOOD FAITH REQUIREMENTS

518. The Plaintiff, through counsel, complied with the provisions of Tenn. Code Ann. §29-26-121 requiring individuals asserting a potential health care liability claim to give written notice of such potential claim to each health care provider that will be a named Defendant at least 60 days prior to filing a complaint ("Pre-Suit Notice" or "Notice").

519. On or by March 27, 2018, Notice was given to the Defendants in accordance with Tenn. Code Ann. §29-26-121.

520. The Affidavit of Brian Cummings and supporting documentation demonstrating compliance with regard to Notice are attached to this Complaint as **Exhibit 1**.

521. The Complaint was filed more than 60 days after March 27, 2018.

522. March 27, 2018 was less than one year from the date of Ms. Shoemaker's April 14, 2017 death.

523. The Complaint was filed more than 60 days after Defendants received Pre-Suit Notice.

524. The Defendants had the opportunity to review the facts of this matter between the time of their receipt of Pre-Suit Notice and the filing of this Complaint.

525. Neither the Defendants nor any agent acting on a Defendant's behalf, ever communicated to counsel for the Plaintiff any inability or problem with obtaining or reviewing the

62

pertinent medical records, which counsel for the Plaintiff provided directly or provided access to via an appropriate, HIPAA-compliant release for the Defendants to use to obtain records.[4]

526.    In accordance with Tenn. Code Ann. §29-26-122, the Plaintiff's counsel has consulted with one or more experts who provided a signed written statement confirming that upon information and belief they are competent under Tenn. Code Ann. §29-26-115 to express opinions in this case and believe, based on the information available from medical records concerning the care and treatment of the Plaintiff's deceased mother, that there is a good faith basis to maintain this action consistent with the requirements of Tenn. Code Ann. §29-26-115 ("good faith requirement").

527.    The Certificate of Good Faith demonstrating compliance with the good faith requirement is attached to this Complaint as **Exhibit 2.**

## THE COMPLAINT WAS TIMELY FILED

528.    This lawsuit arises from the professional negligence committed by the Defendants on April 13, 2017 that caused Ms. Shoemaker's April 14, 2017 death.

529.    The Plaintiff provided proper Pre-Suit Notice of this lawsuit to the Defendants.

530.    The Pre-Suit Notice described in this section was provided within the application period.

531.    More than 60 days passed between the Defendants being sent Pre-Suit Notice and the filing of this lawsuit.

---

[4] Since the Defendants are Vanderbilt and a Vanderbilt physician, it should also be noted that the Defendants were already authorized to review Ms. Shoemaker's records from Vanderbilt per 45 C.F.R. §164.506 (allowing use for "health care operations") and 45 C.F.R. §164.501 (defining "health care operations" to include "conducting or arranging for medical review, legal services...").

63

532. More than 60 days passed between the Defendants receiving Pre-Suit Notice and the filing of this lawsuit.

533. Per Tennessee law, the Plaintiff was required to send Pre-Suit Notice to the Defendants within one year of Ms. Shoemaker's death.

534. Ms. Shoemaker died at Vanderbilt on April 14, 2017.

535. One year from Ms. Shoemaker's death was April 14, 2018.

536. Pre-Suit Notice was sent out to the Defendants by April 13, 2018.

537. The Defendants received Pre-Suit Notice by April 13, 2018.

538. As a result of sending Pre-Suit Notice to the Defendants by April 13, 2018, the Plaintiff received an additional 120 days from April 14, 2018 to file a corresponding lawsuit pursuant to Tennessee law.

539. August 12, 2018 is 120 days after April 14, 2018.

540. The parties entered into two Tolling Agreements regarding this matter.

541. The parties entered into the Tolling Agreements to attempt to resolve this matter via mediation, but this matter did not resolve at the mediation that occurred.

542. The most recent Tolling Agreement ("Tolling Agreement") entered into between the parties is a five page document that was signed by counsel for Vanderbilt and by counsel for the Plaintiff.[5]

543. The Tolling Agreement states on page 1 that "Respondent" includes "Vanderbilt University Medical Center and its physicians, staff, agents and employees, including, but not limited to, Gretchen Edwards."

---

[5] Counsel for Vanderbilt communicated to counsel for the Plaintiff on February 6, 2019 that he had no concern regarding the Tolling Agreement being referenced in the Complaint.

copy

544. The Tolling Agreement states on page 1 that "Claimants" includes Bretton Keefer, including on behalf of the decedent, Chesta Shoemaker.

545. The Tolling Agreement states on page 1 that the Effective Date for purposes of the Tolling Agreement is July 24, 2018.

546. July 24, 2018 is prior to August 12, 2018.

547. The number of days from July 24, 2018 to August 12, 2018 is 19 days.

548. The Tolling Agreement states on page 2, including in paragraph 2, that the Tolling Agreement terminates on February 1, 2019.

549. Per the Tolling Agreement, the statute of limitations did not run from July 24, 2018 through February 1, 2019.

550. The Tolling Agreement stopped the running of the statute of limitations at a point when at least 19 days were left to file a health care liability lawsuit regarding Ms. Shoemaker's death.

551. The Tolling Agreement states on page 2, including in the first sentence of paragraph 3, that "Claimant and Respondent hereby agree, through their counsel, to toll the statutes of limitations and repose for the filing of any Claims or causes of action/lawsuits by Claimants against the Respondent."

552. The Tolling Agreement states on page 2, including in the second sentence of paragraph 3, that "all applicable statute of limitations and/or statutes of repose will be tolled as to the Respondent from the Effective Date until 6:00 p.m. CST on February 1, 2019."

553. With the "Effective Date" in the Tolling Agreement being July 24, 2018, the Tolling Agreement tolled the statute of limitations from July 24, 2018 through February 1, 2019.

Copy

554. The Tolling Agreement states on page 2, including in the third sentence of paragraph 3, that "The period of time that the statutes are tolled shall be added to the time for bringing an action for any of Claimant's Claims pursuant to state and/or federal law."

555. The period of time from the Effective Date of the Tolling Agreement of July 24, 2018 to when the Tolling Agreement terminated, February 1, 2019, is 192 days.

556. When 192 days is added to August 12, 2018 (which would have been the statute of limitations filing deadline absent a Tolling Agreement), the resulting date is February 20, 2019.

557. When 19 days is added to February 1, 2019, the resulting date is February 20, 2019.

558. Per Tennessee law and the Tolling Agreement, this lawsuit is timely filed if it was filed by February 20, 2019.

559. This lawsuit was filed by February 20, 2019.

560. February 13, 2019 is one week prior to the February 20, 2019 deadline for the filing of this lawsuit, pursuant to Tennessee law and pursuant to the Tolling Agreement.

561. This lawsuit was filed by February 13, 2019.

562. This lawsuit was filed with in the applicable statute of limitations period, including when the Tolling Agreement is considered.

563. This suit was filed within the applicable statute of limitations period (as extended by Tenn. Code Ann. §29-26-121 and per the 192 days "added" to the limitations period via the Tolling Agreement).

## INAPPLICABILITY OF STATUTORY NON-ECONOMIC DAMAGES CAPS

564. Tenn. Code Ann. §29-39-102 purports to impose a monetary cap on the amount of "non-economic" damages that a jury can award in a personal injury or wrongful death case, with a different monetary cap applying in a wrongful death case involving the parent of a minor child.

66

565. Ms. Shoemaker had three sons at the time of her April 14, 2017 death.

566. Ms. Shoemaker had two minor sons at the time of her April 14, 2017 death.

567. Each of Ms. Shoemaker's three surviving sons has their own loss of consortium claim as part of this wrongful death lawsuit.

568. None of the three sons' loss of consortium claims is exactly the same as any other son, including based on their ages, the remaining years of their youth that they will not have their mother, their personal and unique relationships with their mother, and for other factual reasons.

569. Pursuant to Tenn. Code Ann. §29-39-102(h), there is no cap on the amount of non-economic damages a jury can award a plaintiff in a case where "the defendant intentionally... falsified ... records containing material evidence with the purpose of wrongfully evading liability in the case at issue."

570. The Defendants are not protected by any statutory cap on non-economic damages because the Vanderbilt records contain entries, including incorrect times for key events (i.e. when it was first discovered that Ms. Shoemaker's R CCA was cannulated; when Ms. Shoemaker first demonstrated a neurological change for the worse on April 13, 2017) and because documentation made after knowledge of the fact that Ms. Shoemaker's R CCA was cannulated suddenly and conveniently for the Defendants included details not mentioned in similar documentation made that same day about the same procedure but that was made prior to the creator of the additional documentation learning that the R CCA was cannulated by the resident physician.

571. The Defendants are not protected by any statutory cap on punitive damages because Tennessee's statutory cap on punitive damages is unconstitutional, including as held by the Sixth Circuit Court of Appeals (federal court) in 2018.

67

Copy

572.    Alternatively, Tenn. Code Ann. §29-39-102 is unconstitutional because it violates the right to a trial by jury enshrined in both the United States Constitution and the Tennessee Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff prays for the following relief:

1.    That proper process issue and be served upon the Defendants, and the Defendants be required to appear and answer this Complaint within the time required by law;

2.    That the Plaintiff be awarded fair and reasonable damages, including compensatory damages up to $15,000,000 and punitive damages up to $30,000,000;

3.    That the Plaintiff be awarded the costs of trying this action;

4.    That this action be heard by a jury;

5.    That costs of this action be taxed to the Defendants;

6.    That prejudgment interest be awarded to the Plaintiff for economic damages;

7.    That the Plaintiff be awarded all and any such other and further relief as the Court deems proper; and,

8.    That Plaintiff's right to amend this Complaint to conform to the evidence be reserved.

COPY

Respectfully submitted,

*Brian Cummings*

**Brian Cummings, #19354**
Cummings Law
4235 Hillsboro Pike #300
Nashville, TN 37215
(615) 800-6822 (phone)
(615) 815-1876 (fax)
brian@cummingsinjurylaw.com

**Afsoon Hagh, #28393**
Cummings Manookian PLC
45 Music Square West
Nashville, Tennessee 37203
(615) 266-3333 (phone)
(615) 266-0250 (fax)
afsoon@cummingsmanookian.com

*Attorneys for the Plaintiff*

69