```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2              FOR THE MIDDLE DISTRICT OF TENNESSEE

 3                      NASHVILLE DIVISION

 4

 5  IN RE:                           )
                                     )
 6  CUMMINGS MANOOKIAN, PLLC,        )
                                     )
 7      Debtor,                      )
                                     )
 8  JEANNE ANN BURTON, TRUSTEE,      )
                                     )
 9      Plaintiff,                   )
                                     )
10  V.                               )NO. 3:19-bk-07235
                                     )Chapter 7
11  HAGH LAW, PLLC; APSOON           )Judge Walker
    HAGH; MANOOKIAN, PLLC; and       )
12  FIRST-CITIZENS BANK & TRUST      )
    COMPANY,                         )
13                                   )
        Defendants.                  )
14                                   )

15  ------------------------------------------------------

16                       DEPOSITION OF

17                  RONETTE LEAL MCCARTHY

18                      JUNE 8, 2022

19  ------------------------------------------------------

20

21

22

23                     LEA ANNE GRAY
                  ANNE WILSON & ASSOCIATES
24                   P.O. Box 150651
                Nashville, Tennessee  37215
25                   (615) 298-1992
```

```
 1                    APPEARANCES

 2
      FOR THE TRUSTEE, JEANNE ANN BURTON:
 3    PHILLIP G. YOUNG, JR., ESQUIRE
      Thompson Burton PLLC
 4    6100 Tower Circle, Suite 200
      Franklin, Tennessee  37067
 5

 6    FOR BRIAN MANOOKIAN AND MANOOKIAN, PLLC:
      JOHN SPRAGENS, ESQUIRE
 7    Spragens Law, PLC
      311 22nd Avenue North
 8    Nashville, Tennessee  37203

 9
      FOR FIRST CITIZENS BANK & TRUST:
10    CRAIG V. GABBERT, JR., ESQUIRE
      BASS BERRY & SIMS
11    150 Third Avenue South
      Suite 2800
12    Nashville, Tennessee  37201

13

14

15                  TABLE OF CONTENTS

16
      RONETTE LEAL MCCARTHY
17    Stipulations. . . . . . . . . . . . . . . . . . 3
      Examination by Mr. Young. . . . . . . . . . . . 4
18    Examination by Mr. Spragens . . . . . . . . . . 32
      Reporter's Certificate. . . . . . . . . . . . . 76
19

20

21                  E X H I B I T S

22    NUMBER            DESCRIPTION              PAGE

23     1    Engagement Letter                     10

24     2    5/23/18 Letter                        13

25     3    Privilege Log                         17
```

RONETTE LEAL MCCARTHY
Stipulations. . . . . . . . . . . . . . . . . . 3
Examination by Mr. Young. . . . . . . . . . . . 4
Examination by Mr. Spragens . . . . . . . . . . 32
Reporter's Certificate. . . . . . . . . . . . . 76

1    Engagement Letter                     10
2    5/23/18 Letter                        13
3    Privilege Log                         17

```
 1

 2

 3                  S T I P U L A T I O N S

 4

 5

 6        The deposition of Ronette Leal McCarthy was

 7   taken via Zoom on the 8th day of June, 2022,

 8   beginning at or about 10:00 a.m., at the instance of

 9   the Trustee, pursuant to the provisions of the

10   Tennessee Rules of Civil Procedure.

11        It is agreed that Lea Anne Gray, court reporter

12   and notary public for the State of Tennessee, may

13   swear the witness, take her deposition by

14   stenographic means, and afterwards reduce same to

15   typewritten form.

16        All formalities as to notice, caption,

17   certificate, and signing of the deposition by the

18   deponent are waived.  All objections, except as to

19   the form of the question, are reserved to the hearing

20   of said matter.

21

22

23

24

25
```

1                    RONETTE LEAL MCCARTHY,

2    having been first duly sworn, testified as follows:

3    EXAMINATION BY MR. YOUNG:

4         Q.  Good morning, Ms. McCarthy.  My name is

5    Phillip Young, and I represent Jeanne Burton, who is

6    the court-appointed Bankruptcy Trustee for Cummings

7    Manookian, PLLC.  And, just for the record, I'll let

8    everyone know that Ms. Burton is in the room with me

9    this morning.

10        Ms. McCarthy, could you please state your full

11   name for the record?

12        A.  Certainly.  Ronette Leal McCarthy.

13        Q.  Have you ever given a deposition

14   before?

15        A.  I have not.

16        Q.  So I'm going to explain some rules that

17   you probably know, but we'll go through them, anyway.

18   They're specially important, since, you know, Zoom

19   depositions are a little more awkward, even than

20   regular depositions.  I'll ask that you answer all of

21   my questions audibly with a yes or a no, not just a

22   head shake or an uh-huh or huh-uh.  I'll ask that you

23   answer all questions that I ask, even if another

24   attorney objects, unless someone specifically tells

25   you not to answer.  And if that happens, we'll

1    resolve that issue before we move on.  I expect this
2    to be relatively short, but if you need to take a
3    break, let me know.  As long as we're not in the
4    middle of a question, I'll be happy to take a break.
5    I'm going to ask you a few questions that are sort of
6    unique to Zoom depositions.  Where are you physically
7    located today?
8              A.   Today, I'm in my home.
9              Q.   Is there anyone else in the room with
10   you?
11             A.   There is not.
12             Q.   Okay.  How many screens are powered on
13   in the room that you're in?
14             A.   Just one.
15             Q.   Do you have any paper in front of you
16   this morning?
17             A.   Just the exhibits.
18             Q.   So you don't have any notes, whether
19   they're on paper or pulled up on your screen?
20             A.   I do not.
21             Q.   Do you have any communication apps open
22   on your computer, like texting or instant messaging
23   or anything like that?
24             A.   I do not.
25             Q.   Ms. McCarthy, you're a licensed

```
 1    attorney; is that correct?
 2              A.   I am.
 3              Q.   In what state are you licensed?
 4              A.   Illinois.
 5              Q.   Do you currently practice law with that
 6    license?
 7              A.   I do.
 8              Q.   In what area of law do you practice?
 9              A.   There's a few.  I'm inhouse counsel for
10    Elements Cremation Company.  I have my own practice,
11    where I do real estate closings, end of life issues,
12    wills, trusts, small business representations, and
13    then a piece of it is referrals in regards to
14    personal injury matters.
15              Q.   You said you are inhouse counsel.  I'm
16    sorry.  I didn't catch the name of the company.
17    What's the name of the company?
18              A.   Elements Cremation.
19              Q.   And I assume that's a crematory?
20              A.   Correct.
21              Q.   Ms. McCarthy, you're familiar with a
22    Fitzgerald v. Osborne case that was filed in
23    Tennessee, aren't you?
24              A.   I am.
25              Q.   And I'm going to preface this by
```

1    saying, I don't want you to violate any

2    attorney/client privilege or anything like that, so

3    I'm not asking you any of those questions.  And if my

4    questions get afoul of that, I'm sure you'll let me

5    know.  But my intention is not to violate -- to ask

6    you to violate the attorney/client privilege.  But

7    without violating any attorney/client privilege,

8    explain to me how you became involved in the

9    Fitzgerald versus Osborne matter.

10            A.   The Fitzgeralds and myself have been

11   friends for probably 40 plus years.  And in that

12   regard, they came to me asking for assistance after

13   their daughter passed.  They had already received

14   calls from other counsel and were thinking that they

15   needed to find representation.

16            Q.   So did you assist them in finding

17   Tennessee counsel?

18            A.   I did.

19            Q.   What did you do in order to help them

20   find Tennessee counsel?

21            A.   I reached out to a number of Tennessee

22   counsel.  I went through some initial intake, as I do

23   with all clients who come to me looking for counsel

24   to represent them in any personal injury matter.  So

25   I had phone calls with a few different counsel

7

Case 3:20-ap-90002   Doc 217-14   Filed 08/12/22   Entered 08/12/22 18:28:11   Desc
Exhibit 14   Page 7 of 84

1    licensed in Tennessee.

2              Q.  And you eventually spoke to Brian
3    Manookian about that representation?

4              A.  I did.

5              Q.  How did you get Mr. Manookian's name?

6              A.  From another friend that lives in
7    Tennessee.

8              Q.  So he was referred to you by someone
9    else?

10             A.  By a -- yeah, by a private party.

11             Q.  Again, without violating any privilege,
12   tell me about your conversations with Mr. Manookian
13   prior to the Fitzgeralds meeting with him.

14             A.  It was basic introduction, learning
15   about his practice area.  He described his wins, his
16   success rate, his commitment to his clients.

17             Q.  Approximately how many times did you
18   speak with Mr. Manookian before the Fitzgeralds met
19   him?

20             A.  I believe it was only a couple of times
21   on the phone.

22             Q.  And why did you ultimately refer the
23   Fitzgeralds to Mr. Manookian?

24             A.  He seemed to be the best choice for
25   them to have commitment to his clients.  I'm not

1    unfamiliar with working with personal injury counsel,
2    and, at that point, he seemed to be the one that
3    would work the hardest for them.
4              Q.   At the time you first had conversations
5    with Mr. Manookian, did you understand him to be a
6    member of a law firm?
7              A.   I did.
8              Q.   What was the name of that firm?
9              A.   Cummings Manookian.
10             Q.   Did the Fitzgeralds ultimately engage
11   Cummings Manookian to represent them?
12             A.   That is my understanding, yes, in what
13   I read on the retainer agreement.
14             Q.   And were you ever given a copy of an
15   engagement letter between Cummings Manookian and the
16   Fitzgeralds?
17             A.   I was.
18             Q.   Was that before or after they signed
19   the engagement letter?
20             A.   After they signed it.
21             Q.   Okay.  I want to ask you to look at
22   what's been marked as -- pre-marked as Exhibit One.
23   And I circulated it around to all parties this
24   morning.  And I'll represent to you, just to make
25   sure that we're looking at the right letter, Exhibit

1    One, it's a letter on Cummings Manookian letterhead

2    dated May 23, 2018, addressed to Marty and Melissa

3    Fitzgerald with a RE line of legal representation and

4    engagement.  Do you see that letter?

5                   A.  I do.

6                   Q.  Okay.

7                   A.  Excuse me if I have to blow my nose.

8    We live here in Illinois, where allergies are

9    abundant right now.  So --

10                  Q.  No problem.

11                  A.  -- I apologize.

12                  Q.  We might be in the same position but

13   for a lot of rain the last few days.

14   (EXHIBIT NO. 1 WAS DESIGNATED.)

15   BY MR. YOUNG:

16                  Q.  Have you seen this document that's

17   marked as Exhibit One before?

18                  A.  I have.

19                  Q.  Okay.  What is this?

20                  A.  This is the legal representation and

21   engagement letter to me, and Marty and Melissa

22   Fitzgerald and the Cummings Manookian Law Firm.

23                  Q.  And is this the copy of the engagement

24   letter that was sent to you?  And I'll specifically

25   direct you to page two, second paragraph of the

1    contingency fee section, where it says, We will work

2    with Attorney Ronette McCarthy in this matter.  Was

3    this the copy of the engagement letter that was sent

4    to you?

5            A.  It is.

6            Q.  And did you produce a copy of this

7    document to the Trustee in response to a subpoena?

8            A.  I did.

9            Q.  And that language that I just read,

10   where it specifically references you, was that

11   language in the version of this letter that was sent

12   to you?

13           A.  It was.

14           Q.  And do you recall when this letter was

15   sent to you?

16           A.  It was a few weeks after the

17   engagement, upon my request.

18           Q.  So you asked for a copy of it?

19           A.  Correct.

20           Q.  And this is what was sent to you,

21   what's been marked as Exhibit One?

22           A.  Yes.

23           Q.  Now, I want to ask you to pick up the

24   document that's been pre-marked as Exhibit Two,

25   which, again, is another letter on Cummings Manookian

1    letterhead dated May 23, 2018, same date, to Marty

2    and Melissa Fitzgerald regarding legal representation

3    and engagement.  But I'll represent to you, this is

4    slightly different than the one that you just looked

5    at.  And, specifically, I'll direct you, again, to

6    page two, under the contingency fee section, second

7    paragraph.  Do you see where it says, We may work

8    with other attorneys in this matter?  Do you see

9    that?

10           A.  Yes.

11           Q.  Do you see your name referenced

12   anywhere in that paragraph?

13           A.  I do not.

14           Q.  Have you ever seen a copy of this

15   letter that's been marked as Exhibit Two?

16           A.  Not until it became marked as Exhibit

17   Two.

18           Q.  So today is the first time you've ever

19   seen a copy of this letter?

20           A.  I saw it when you forwarded it, when

21   the first deposition was scheduled, a number of weeks

22   ago.

23           Q.  Prior to me sending this to you as a

24   potential exhibit, you had never seen this copy of

25   this letter?

```
 1              A.  I had not.

 2              Q.  Do you know whether this letter was

 3    ever reviewed by the Fitzgeralds?

 4              A.  I do not.

 5              Q.  And you were never sent a copy of this

 6    letter by either the Fitzgeralds or by Mr. Manookian?

 7              A.  I was not.

 8              Q.  So you don't know whether or not they

 9    signed a copy of this letter?

10              A.  I do not.

11              Q.  Or whether they authorized this letter?

12              A.  I do not.

13    (EXHIBIT NO. 2 WAS DESIGNATED.)

14    BY MR. YOUNG:

15              Q.  Did you ever speak with an attorney

16    named Afsoon Hagh prior to the Fitzgeralds engaging

17    Cummings Manookian in this matter?

18              A.  No.

19              Q.  Did Mr. Manookian ever tell you that

20    Ms. Hagh would be working on the case?

21              A.  Yes, at one point.

22              Q.  Okay.  When was that?

23              A.  When he was suspended.

24              Q.  And we'll talk about that in a minute.

25    But prior to his suspension, you had never spoken
```

1    with Ms. Hagh?

2                A.   I had not.

3                Q.   And you didn't know that she was

4    involved in the case at all?

5                A.   My only knowledge was that she worked

6    at the firm, with Brian and with Cummings, as well.

7                Q.   What were you told about her role at

8    Cummings Manookian, if anything?

9                A.   From my recollection, just that it

10   would be very limited.  Brian was the point person;

11   it was Brian's case; Brian was the primary contact.

12   It was always all about Brian being in charge and

13   leading the case.

14               Q.   Were you ever told whether Ms. Hagh was

15   a partner and associate, a contractor, anything like

16   that with Cummings Manookian?

17               A.   I don't think that conversation ever

18   came up.

19               Q.   And the only thing you were told about

20   her role in the case was that it was going to be

21   limited?

22               A.   I'm not even certain that those words

23   were used, limited, but that she was, you know, part

24   of the firm, but I didn't know to what degree.

25               Q.   And prior to Mr. Manookian's

1    suspension, you had never spoken with Ms. Hagh?

2              A.  No.

3              Q.  And I'm jumping ahead just a bit, but

4    after his suspension, approximately how many times

5    did you speak with Ms. Hagh?

6              A.  Probably just one or two.

7              Q.  And were those substantive

8    conversations about the case?

9              A.  They were not.  She responded to my

10   continual calls after I learned Brian was suspended,

11   and per court order, they were to notify counsel,

12   myself, and I had no notice.

13             Q.  You weren't given notice of the

14   suspension?

15             A.  I was not.

16             Q.  How did you learn about the suspension?

17             A.  The client.

18             Q.  How did the client learn about his

19   suspension?

20             A.  Conversation with Brian is my

21   understanding.

22             Q.  Tell me about your involvement in the

23   Fitzgerald case.

24             A.  That is sort of a broad question.

25   Would you like to be more specific?

1          Q.   Yeah, sure.  What was your role in the

2     case?  Did you draft pleadings; did you review

3     pleadings; did you -- how often did you communicate

4     with counsel; how often did you communicate with the

5     client, those types things?

6          A.   Okay.  Brian and I talked often and

7     communicated often throughout, from the beginning

8     until close to when it settled.

9          Q.   Did you review pleadings?

10         A.   I did.  There were various pleadings

11    forwarded.  One specific that I can mention is the

12    summary judgment motion.  The PowerPoint drafts were

13    even forwarded.  And the conversation with Brian was,

14    you know, take a look at it, let's review it.

15         Q.   Who forwarded you the drafted motion

16    for summary judgment?

17         A.   I'd have to look at the e-mails, which

18    I have not.  I believe that may have been during the

19    time that Brian was suspended, so it may have come

20    from Afsoon.

21         Q.   And who forwarded you the PowerPoint

22    presentation?

23         A.   It may have been the same, but, again,

24    that's just from my memory.

25              MR. SPRAGENS:  I'm sorry.  I just want

1    to object to your -- I'm looking at this privilege

2    log, and I'm trying to understand if the witness is

3    asserting work product privilege or not over these

4    communications.

5    BY MR. YOUNG:

6           Q.   Let's talk about the privilege log.  In

7    response to a subpoena for documents in this case,

8    you produced a privilege log to the Trustee, correct?

9           A.   Correct, yes.

10          Q.   And did that privilege log detail all

11   of the conversations, whether written or by

12   telephone, that you had regarding the Fitzgerald

13   matter?

14          A.   Yes.

15          Q.   And I'll ask you to look at what's been

16   pre-marked as Exhibit Three to this deposition and

17   ask if this is the privilege log that you compiled in

18   response to the Trustee's subpoena?

19          A.   It is.

20          Q.   And is all of the information on this

21   log true and correct to the best of your knowledge?

22          A.   Yes.

23   (EXHIBIT NO. 3 WAS DESIGNATED.)

24   BY MR. YOUNG:

25          Q.   And to Mr. Spragens' point, I'm going

1   to ask you some questions about this exhibit, but I'm

2   not asking you for privileged information.  So if we

3   get to the point where you feel like I'm asking

4   something that's privileged, I trust that you'll let

5   me know, because I'm not intending to ask you to

6   violate any privilege.  But I do want to ask you

7   about some of the entries.

8       Specifically, let's look at the entries prior to

9   May 23, 2018.  There is a handful of, it looks

10  like -- one, two, three, four, five, six -- six lines

11  prior to May 23, 2018; is that right?

12          A.  Correct.

13          Q.  And if you look back at Exhibit One,

14  you will see that May 23, 2018 is the date that the

15  Fitzgeralds engaged Cummings Manookian; is that

16  right?

17          A.  Pursuant to this privilege log, yes.

18          Q.  Right.  Those entries prior to May

19  23rd, does that fairly describe your communications

20  prior to the execution of the engagement letter

21  between the Fitzgeralds and Cummings Manookian?

22          A.  To my knowledge, yes.

23          Q.  And all of these are communications

24  directly with Brian Manookian, correct?

25          A.  To my knowledge, yes.

1          Q.  Except for the first one, which says,

 2   Number of telephone conferences with the Fitzgeralds,

 3   right?

 4          A.  Yes.

 5          Q.  And once the engagement letter was

 6   signed, it looks like there were a number of e-mails

 7   between you and Mr. Manookian concerning the

 8   Fitzgerald case from around June 4, 2018 through

 9   November; is that right?

10          A.  Through November of 2018, yes.

11          Q.  And other than the very first one that

12   says, Around 6/4/2018, telephone conference with

13   Fitzgeralds, other than that and a 10/2/2018 e-mail

14   from Manookian to Marty Fitzgerald and RLM, which I

15   assume is you, correct?  RLM, is you?

16          A.  Correct, yes.

17          Q.  Other than those two, it looks like all

18   of these communications from June to November were

19   between you and Mr. Manookian; is that right?

20          A.  Yes.

21          Q.  It looks like some of those e-mails

22   were from you to Mr. Manookian, and some were from

23   Mr. Manookian to you; is that accurate?

24          A.  Yes.

25          Q.  Is it fair to say that you were being

1    kept in the loop about what was going on with regards
2    to the Fitzgerald case during that time?
3           A.  Yes.
4           Q.  Were you reviewing any pleadings before
5    they were filed during this time?
6           A.  There were documents that were
7    forwarded to me.  I don't know if I reviewed them
8    prior to the filing.
9           Q.  Do you remember if you reviewed the
10   complaint before it was filed?
11          A.  No.
12          Q.  You don't recall or you didn't?
13          A.  I don't recall if I did or not.
14          Q.  And during the time from the execution
15   of the engagement agreement on May 23, 2018 until the
16   end of November 2018, you had no e-mails or
17   conversations with Afsoon Hagh?
18          A.  I would have to look back here and see
19   when my first -- that one conversation was with her,
20   but, again, not recalling the date of Mr. Manookian's
21   suspension, I had not had telephone conversations
22   with Afsoon prior to that.
23          Q.  If I represent to you that the date he
24   was suspended was in December of 2018, then would you
25   agree that you had no conversations with Afsoon Hagh

1    prior to November of 2018?

2            A.   If that's the date of his suspension, I

3    had no prior conversations with Afsoon.

4            Q.   Was Ms. Hagh copied on any e-mails from

5    Mr. Manookian to you during this time?

6            A.   Periodically.  It was not consistent.

7            Q.   Prior to his suspension, Afsoon Hagh

8    never sent you any draft documents?

9            A.   No.

10           Q.   You mentioned earlier that, at some

11   point, you became aware that Mr. Manookian's law

12   license had been suspended.  Do you recall when you

13   learned that?

14           A.   From your telling me right now, the

15   suspension was in December of 2018, I'm going to say

16   it was on or, you know, after that date.  I remember

17   when I did learn about it.  It was, you know, a

18   number of days, if not more than a week plus, that

19   the suspension had already taken effect.

20           Q.   I think you mentioned that you learned

21   about that from the Fitzgeralds?

22           A.   I learned about it -- and I do want to

23   correct that, too.  I learned about it from the

24   Fitzgeralds, but almost at the same time, too, I had

25   done my own search and saw that he was suspended, as

1    well.

2              Q.   Do you know how the Fitzgeralds learned

3    of the suspension?

4              A.   I don't recall if it was either Brian

5    Manookian or Afsoon, but one of them told them.

6              Q.   Do you know if they were notified by

7    telephone or by letter?

8              A.   I do not know.

9              Q.   Have you ever seen a copy of the letter

10   from Mr. Manookian to the Fitzgeralds notifying them

11   of his suspension?

12             A.   No.

13             Q.   Do you know whether the Fitzgeralds

14   ever interviewed other counsel in December of 2018

15   about engaging new counsel?

16             A.   From my conversation with Ms. Hagh, it

17   was that they were just going to stay with the same

18   law firm.  There didn't seem to be any response from

19   her that there was going to be any review of any

20   other counsel during that time.

21             MR. SPRAGENS:  I just want to confirm

22   for the record that Ms. McCarthy is restating her

23   client's statements to her right now.

24   BY MR. YOUNG:

25             Q.   During the time that Mr. Manookian was

1    suspended, did you have any discussions with

2    Ms. Hagh?

3              A.   Yes, one or two.

4              Q.   Were those by e-mail or by telephone?

5              A.   Telephone.

6              Q.   Would those be reflected in this

7    privilege log?

8              A.   Yes.  Well, I see one of them, but that

9    would have been later.

10             Q.   Which one do you see?

11             A.   I see one on April 3, 2019, in regards

12   to -- with a procedural call in regards to mediation,

13   trial date, scheduling.

14             Q.   And just for the record, that April 3rd

15   e-mail was from you to Ms. Hagh, correct?

16             A.   That was an e-mail, correct.  Yeah.

17             Q.   And if you look at the next page on

18   April 15th, there is an e-mail from Ms. Hagh to you,

19   correct?

20             A.   Correct.  It was, again, just regarding

21   scheduling, nothing substantive.

22             Q.   Other than those two instances, do you

23   see any entry on this privilege log that evidences a

24   communication between you and Ms. Hagh?

25             A.   I do not.

1          Q.   So your recollection is that you only
2     had one or two conversations with Ms. Hagh while
3     Mr. Manookian was suspended?
4          A.   I did, and her -- she returned one of
5     my voicemails left, and I don't -- I can't tell you
6     if it was a voicemail left on the general office
7     number or on her direct number, and it was a
8     conversation just to say, Brian will call you to
9     discuss, you know, the suspension and what's
10    occurring.
11         Q.   During the time that Mr. Manookian's
12    license was suspended, did Ms. Hagh ever send you
13    drafts of pleadings, that you recall?
14         A.   I believe, during that time, it was
15    just the summary judgment PowerPoint presentation.
16         Q.   Did Mr. Manookian ever send you drafts
17    of pleadings while he was suspended?
18         A.   Not to my memory were there drafts sent
19    from him.  There were telephone conversations.
20         Q.   I want to ask you about a couple of
21    specific entries on this log.  If you will, get out
22    Exhibit Three.  And the first one that I'm going to
23    ask about is on February 4, 2019.  There's an entry
24    that says, e-mail from Manookian to RLM.  And the
25    summary says, Update regarding summary judgment

1    motion.  Do you see that?

2              A.  I do.

3              Q.  So you received an e-mail on February

4    4, 2019 from Mr. Manookian updating you on the status

5    of the summary judgment?

6              A.  Yes.

7              Q.  That didn't come from Afsoon Hagh?

8              A.  No.

9              Q.  Do you remember if she was copied on

10   that e-mail?

11             A.  I do not.

12             Q.  In February of 2019, did you find it

13   odd that Mr. Manookian was providing you that update

14   and not Ms. Hagh?

15             A.  I don't know if I would call it odd.

16             Q.  How would you describe it?

17             A.  It seemed to me that he was just as

18   involved in the case as he had always been.

19             Q.  The next entry on this log says,

20   February 4, 2019 to March 4, 2019 --

21             A.  Correct.

22             Q.  -- communications from RLM to

23   Manookian, return e-mails from Manookian.  And the

24   summary says, Update strategy discussions regarding

25   pending motions.  Do you see that?

```
 1              A.   Yes.

 2              Q.   And were all of those communications

 3    during that time with Brian Manookian?

 4              A.   Yes.

 5              Q.   Was Afsoon Hagh actively involved in

 6    any of those communications?

 7              A.   Could you describe what you mean by

 8    actively?

 9              Q.   Did any of those e-mails or calls come

10    from Ms. Hagh?

11              A.   Not to my knowledge, no.  Not to my

12    memory, no.

13              Q.   Do you know if she was copied on those

14    e-mails?

15              A.   I do not recall.  Again, she would be

16    copied sporadically on things during the entire

17    matter.

18              Q.   Next, look at the next two entries.  It

19    looks like you e-mailed Afsoon Hagh on April 3, 2019.

20    It says, e-mail from RLM to Afsoon Hagh.  Summary,

21    initial e-mail to Afsoon Hagh regarding scheduling of

22    mediation and trial update.  And then the next entry,

23    on the same day, shows an e-mail from Mr. Manookian

24    to you that says, Update regarding litigation and

25    pending motions.  Do you see that?
```

1                  A.  I do.

          2                  Q.  Did Mr. Manookian respond to your

          3     e-mail asking Ms. Hagh for an update?

          4                  A.  I would have to look at the e-mail.  I

          5     don't recall.  I know that the e-mail was back and

          6     forth with us, mine to Afsoon telling her, but I

          7     don't recall if Brian was responding to that or not.

          8                  Q.  And the only e-mail from Ms. Hagh on

          9     this list, if you'll turn to the next page, appears

         10     on April 15, 2019; is that right?

         11                  A.  Correct.

         12                  Q.  And that says, e-mails from Hagh to

         13     RLM, update regarding scheduling of litigation.  Do

         14     you see that?

         15                  A.  I do.

         16                  Q.  And then let's look down the next few

         17     lines, from April 30, 2019 through May 8, 2019.

         18     There are a few entries that say, Update regarding

         19     reinstatement of law license and regarding

         20     reinstatement acknowledgement.  Do you see that?

         21                  A.  I do.

         22                  Q.  What do you remember about those

         23     communications?

         24                  A.  Brian telling me that he was back.

         25                  Q.  And after Mr. Manookian's

1    reinstatement, did you continue to be involved in

 2    this case?

 3              A.  Yes.

 4              Q.  What did you do after his

 5    reinstatement?

 6              A.  I'm looking at the timeline here.  I

 7    recall that the mediation was coming and the trial

 8    date, and there was always discussion of me being

 9    present for the mediation and for the trial.  So

10    there was discussion in regards to that.  In looking,

11    I can see that there were e-mails in regards to trial

12    strategy that Brian talked about, and in regards to

13    what his thoughts were in regards to witnesses, you

14    know, just how the trial was going to play out.  We

15    had many back and forths in regards to that.

16              Q.  So you were involved -- I'm sorry.  I

17    think there was some feedback.  You were involved in

18    those discussions?

19              A.  I'm sorry.  I couldn't hear what you

20    said.

21              Q.  Were you involved in those discussions

22    about litigation updates and strategies?

23              A.  With Mr. Manookian?

24              Q.  Yes?

25              A.  Yes.

1          Q.   You said there was discussion about you
2    being involved in the mediation.  Were you ultimately
3    present at the mediation?
4          A.   I was not.
5          Q.   Why not?
6          A.   Brian said he was going to proceed
7    forward with just himself.
8          Q.   Do you know why?
9          A.   I do not.
10          Q.   But you were aware that mediation
11    occurred?
12          A.   I was.
13          Q.   When did you learn that the case had
14    settled?
15          A.   Sometime after the case had settled.
16          Q.   How did you learn that the case was
17    settled?
18          A.   From third-parties and from --
19          Q.   I'm sorry.  Go ahead.
20          A.   -- from third-parties and discussion
21    with The Court myself.
22          Q.   Mr. Manookian never let you know that
23    the case settled?
24          A.   He did not.
25          Q.   Ms. Hagh never let you know the case

1    settled?

      2            A.   He did not -- or she did not.

      3            Q.   The Fitzgeralds never let you know the

      4    case settled?

      5            A.   I do not believe, the Fitzgeralds.

      6            Q.   Did they tell you immediately after

      7    that the case had settled?

      8            A.   I knew a short time after.

      9            Q.   From the Fitzgeralds?

     10            A.   I don't recall which came first, to be

     11    honest.

     12            Q.   Were you ever told that the Fitzgeralds

     13    didn't want you to share in the fees in this case?

     14            A.   No.

     15            Q.   You see that the last several entries

     16    on this log in August of 2019 into October of 2019

     17    all reference the scheduling of a telephone

     18    conference.  Do you see that?

     19            A.   I do.

     20            Q.   Did you ever have that telephone

     21    conference?

     22            A.   No.

     23            Q.   Were these messages ever returned to

     24    you?

     25            A.   Some of them were returned from

1    Mr. Manookian with a, I'll call you later or I have a
2    one o'clock meeting, but there was never a
3    conversation.
4           Q.  You were never told, in response to any
5    of these communications, that the case had settled?
6           A.  Not from Mr. Manookian.
7           Q.  Let's take a break until 10:40.  I'm
8    getting close to being done.
9    (Whereupon, after a short break, the following
10   proceedings were had.)
11   BY MR. YOUNG:
12          Q.  Ms. McCarthy, from your perspective,
13   what was Afsoon's -- Afsoon Hagh's role in the
14   Fitzgerald case?
15          A.  From my perspective, some support
16   possibly to Brian, but it seems -- at least all of my
17   contact with her had been very administrative,
18   meaning scheduling, you know.  But, again, that was
19   only a few times.
20          Q.  What did she do that you believe
21   assisted in the outcome of this case?
22          A.  I don't know her to have any impact in
23   the outcome of this case.
24          Q.  Is there anything else that you would
25   like to say about your involvement in the Fitzgerald

1  matter or anything else that you think is important

2  for the parties to know in this case?

3      A.  Nothing that comes to mind.

4      Q.  I have no further questions.

5  EXAMINATION BY MR. SPRAGENS:

6      Q.  Ms. McCarthy, my name is John Spragens.

7  I represent Brian Manookian and Manookian PLLC in

8  this matter.  Can you hear me okay?

9      A.  I can hear you, yes.

10      Q.  I believe you testified that you

11  referred the case to Mr. Manookian; is that right?

12      A.  I did.  Is it not possible to see you,

13  Mr. Spragens?

14      Q.  No.  I'm just going to stay by phone

15  today, due to my office situation at the moment.

16      What other lawyers did you speak with, besides

17  Mr. Manookian, before referring the case?

18      A.  You know, I would have to look back.

19  This goes back a number of years.  That's something

20  that I did not review in preparation for this

21  deposition.  But there was a number of them that I

22  spoke to in Tennessee.

23      Q.  Was the subpoena that you produced, the

24  privilege log, in response to asking you for those

25  communications, or did it not ask for those

1   communications?

2              A.   For which communications?

3              Q.   Any communications with other attorneys

4   about the Fitzgerald case.

5              A.   I don't believe so.

6              Q.   And as you sit here today, you don't

7   recall what other attorneys you spoke to on behalf of

8   the Fitzgeralds?

9              A.   I talked to lots of attorneys

10  throughout the United States in regards to cases like

11  this.  I cannot give you specific names in regards to

12  who I talked to before Brian Manookian.

13             Q.   I think you testified that you and the

14  Fitzgeralds were friends for over 40 years; is that

15  correct?

16             A.   Yes.

17             Q.   How did you first come to know the

18  Fitzgeralds?

19             A.   Growing up in the same town.

20             Q.   And is that a town in Illinois?

21             A.   It is, yes.

22             Q.   What town is that?

23             A.   Sterling.

24             Q.   And which of the Fitzgeralds did you

25  first come to know?

```
 1              A.   Probably Melissa, but it could have
 2    been both of them.  Marty was the older brother to
 3    another friend of ours.
 4              Q.   How did you come to speak with them
 5    about their loss that led to the case that we have
 6    been talking about today?
 7              A.   I was a very close friend and assisted
 8    with the funeral services for them.
 9              Q.   I think you testified that you provide
10    legal advice about end of life issues; is that right?
11              A.   Correct.
12              Q.   Is that through a law firm?
13              A.   No.  Well, both, I guess, yes.  So
14    estates and trusts, and then in regards to families
15    that need cremation services that may need to be
16    pointed in the right direction after a loved one
17    passes, in regards to -- it could be simple things,
18    like what do they do with the driver's license to,
19    you know, who do they have to notify if they want to
20    sell a car.
21              Q.   What was the law firm -- I'm sorry --
22    that you mentioned at the beginning of that response?
23              A.   The law firm?  I don't believe I told
24    you my law firm name.
25              Q.   Oh, okay.  Could you, please?
```

1            A.   Yep.  Leal McCarthy Law Group.

 2            Q.   And is that an active law practice

 3    today?

 4            A.   It's new.  So it's new, yes.  If you

 5    are asking what I was practicing under at the time of

 6    this matter, it would be just the Law Office of

 7    Ronette Leal McCarthy.

 8            Q.   Was that incorporated in any way?

 9            A.   The Law Office of Ronette Leal

10    McCarthy, no.

11            Q.   So you were a solo practitioner, in the

12    sense that you didn't have, like, an LLC or some

13    other corporate form?

14            A.   Correct.

15            Q.   At that time, that the Fitzgeralds

16    spoke with you after the loss of their daughter, were

17    you also working inhouse at Element Cremation?

18            A.   I was.

19            Q.   Did they come to you with respect to

20    the services that Element Cremation provided or just

21    independently as friends?

22            A.   No.  It had nothing to do with that.

23    We're personal friends.

24            Q.   What is your role as an inhouse

25    attorney at Element Cremation?

```
 1              A.  To help in regards to any business
 2   aspects of Elements Cremation.  And then as I already
 3   stated, if there is any families that have any
 4   questions in regards to, you know, notifying social
 5   security, how to, you know, finalize insurance
 6   payments, maybe life insurance, what do they have to
 7   do with a home, a car, those type of things.
 8              Q.  I think you testified that you're
 9   licensed to practice law in Illinois; is that right?
10              A.  Yes.
11              Q.  Are you licensed to practice law in
12   Tennessee?
13              A.  I am not.
14              Q.  Are you licensed to practice law in any
15   other states?
16              A.  I am not.
17              Q.  With respect to your Illinois law
18   license, that's been active since before January 1,
19   2018?
20              A.  Correct.
21              Q.  Are you affiliated with any other
22   businesses or law practices, aside from your own
23   personal practice and Element Creation?
24              A.  No.  It's cremation.  Elements
25   Cremation.
```

```
 1                Q.   Sorry.  I think I said that, but my
 2    connection may not be very good.
 3                A.   Okay.
 4                Q.   And at the time that the Fitzgeralds
 5    contacted you about Megan's death, you were
 6    affiliated with your own law practice and Element
 7    Cremation; is that right?
 8                A.   If you want to say affiliated with,
 9    again, that's where I work.  The Fitzgeralds
10    contacted me, because I'm their personal friend.
11                Q.   But were you also maintaining a private
12    practice, at the time?
13                A.   Correct.
14                Q.   Were you representing clients in that
15    practice, at the time?
16                A.   It's more an advisory role.  I have two
17    young children.  And so I would have to look back in
18    2018, but I did have some other clients that were
19    similar to the Fitzgeralds that were all using, you
20    know, other counsel for personal injury matters.
21                Q.   At the time they came to you, which was
22    prior to May 18, 2018, did you have engagement
23    agreements with any clients, other than through your
24    work at Element Cremation?
25                A.   No.  Other personal injury firms had
```

1    engagement agreements with clients that I had
2    referred to them.
3         Q.   Did you ever have an engagement
4    agreement with the Fitzgeralds, other than the
5    agreement that we looked at earlier today, the
6    Cummings Manookian agreement?
7         A.   Individually, no.  That's not my
8    position.
9         Q.   Do you have any ownership interest in
10   Element Cremation?
11        A.   No.
12        Q.   How did you get Mr. Manookian's name,
13   originally, do you recall?
14        A.   I believe I answered that with
15   Mr. Young.  Would you like me to answer it, again?
16        Q.   Sure.
17        A.   I did some research in regards to
18   counsel in the Tennessee area, and then I also have
19   some individuals that live outside -- friends that
20   live outside of the Nashville area, and both through
21   my research and then a friend, his name came up.
22        Q.   So when you say research, you mean
23   online research?
24        A.   Correct, yes.  Just looking at who the
25   counsel are, and, you know, the area they practice,

1    doing some reading on them.

2          Q.   And who was the friend you spoke with

3    before referring the case to Mr. Manookian?

4          A.   John Menefee.

5          Q.   And how did Mr. Menefee know

6    Mr. Manookian, to the extent that you are aware?

7          A.   I do not know.

8          Q.   What was the nature of his experience

9    with him in the past, such that he gave you a

10   recommendation?

11         A.   I don't believe Mr. Manookian and

12   Mr. Menefee know each other directly.

13         Q.   Is Mr. Menefee an attorney?

14         A.   He is not.

15         Q.   Do you know anything about

16   Mr. Menefee's awareness of or experience with

17   Mr. Manookian before that referral?

18         A.   Again, I don't believe it was personal

19   experience.

20         Q.   But do you know anything about what led

21   him to, if I'm understanding you correctly, vouch for

22   Mr. Manookian as an appropriate referral source?

23         A.   I do not.

24         Q.   And am I understanding you correctly

25   that Mr. Menefee vouched for Mr. Manookian as an

1    appropriate referral source, let's say, referral

2    recipient for you?

3              A.  I would not use the word vouch, no.  It

4    was a name that he was provided.  I cannot tell you

5    who or where it came from.  And I had also came

6    across Brian Manookian's name, so kind of twice

7    seeing the name and hearing it.  I don't believe

8    there was any vouching on Mr. Menefee's part of Brian

9    Manookian.

10             Q.  So is it correct that you sort of

11   contacted Mr. Menefee to ask him if he had any

12   recommendations for personal injury and wrongful

13   death attorneys in Middle Tennessee?

14             A.  Yes.

15             Q.  And do you recall if the only name he

16   came back with was Mr. Manookian's, or were there

17   multiple names?

18             A.  I believe that there were a couple.

19   There was at least one other, but I had already kind

20   of crossed that person off my list.

21             Q.  And who was that?

22             A.  You know, again, I don't recall exact

23   names, but I know that there were two names that

24   Mr. Menefee gave me.

25             Q.  I'm sorry.  Did you say two names or a

1    few names?

2            A.   Two.   It was two.   But I don't remember

3    who.   I talked to a number of counsel prior to that,

4    and then a number of counsel, you know, at the

5    conclusion of the Fitzgerald matter, too.   So I don't

6    remember names.

7            Q.   The other counsel that you talked to

8    before recommending Mr. Manookian to the Fitzgeralds,

9    did you have phone conversations with them, or how

10   did you come across the other counsels' names?

11           A.   The wonderful world of Google.

12           Q.   Got it.   Was there anybody else, other

13   than Mr. Menefee, that you relied on locally for

14   expertise?

15           A.   I wouldn't call Mr. Menefee's referral

16   to me as an expertise, because, again, he's not an

17   attorney.   He's a lay person.   It just happened to be

18   a name that he told me, and since Brian was a name

19   that I hadn't crossed out, yet, it was kind of, you

20   know, there's that name again, and I should probably

21   reach out to him.

22           Q.   Is Mr. Menefee owed any portion of the

23   Fitzgerald fee, as far as you know?

24           A.   No.

25           Q.   And you're not planning to pay him

1   anything as a result of any fee in this case?

2               A.   No.   I believe that would be illegal.

3               Q.   You are claiming a portion of the fee

4   in the Fitzgerald matter?

5               A.   Yes.

6               Q.   And what portion of the fee do you

7   contend you're entitled to recover?

8               A.   That had always been up to discussion

9   between Brian and I.  And in the -- you know, it has

10  gone back and forth so many times in regards to the

11  bankruptcy matter, but our -- my fee that I am

12  standard with is a third, a third of a third.  That's

13  based off of, you know, work like this throughout

14  Illinois and other states.

15              Q.   And do you have a written agreement

16  with Mr. Manookian or anyone else memorializing that?

17              A.   The engagement letter, and then there's

18  e-mails confirming it.

19              Q.   So, first, with respect to the

20  engagement letter, does it specify what your portion

21  of the contingency fee will be?

22              A.   It does not.

23              Q.   And do you have e-mails in which it

24  spells out what your portion of the contingency fee

25  will be?

1                A.   I do.

 2                Q.   And that portion is one-third of

 3       one-third?

 4                A.   There was discussion, yes.

 5                Q.   Can you tell me what you mean by, there

 6       was discussion?

 7                A.   Yes.  That's what it says in the

 8       e-mail.

 9                Q.   And did both sides, from your

10       perspective, agree to that?

11                A.   Yes, because we went into great

12       conversation about what I was going to do with that

13       third of mine.

14                Q.   What were you going to do with that

15       third?

16                A.   The Fitzgeralds had planned on giving

17       to a not-for-profit during the case, prior to the

18       case and even during the case.  It wasn't decided

19       exactly which one.  They were very committed to

20       Megan's swimming and her school and also her future

21       pursuits, in regards to making prosthetics for

22       veterans that had lost limbs.  So I had always talked

23       with Mr. Manookian that I would not be keeping the

24       third that I was going to take, but it was going to

25       be distributed amongst the not-for-profits that the

1    Fitzgeralds had selected.  I asked him to not have

2    that conversation with them when they met.  He went

3    into great, great conversations with me about how

4    wonderful that was, and how he had many times not

5    taken his amount, because he felt so committed to

6    different families that he had represented over time.

7              Q.   And is it still your intention to

8    donate that portion of -- I mean, your full portion

9    of any recovery in this bankruptcy case to that

10   not-for-profit?

11             A.   I think that question is irrelevant.

12             Q.   That's fine.  Is that still your

13   intention?

14             A.   I'm not going to answer that question,

15   because I don't know what the answer to that is, at

16   this point.

17             Q.   You're an attorney, and you're aware

18   that the Rules of Civil Procedure require you to

19   answer the questions, even if you think they are

20   irrelevant, in a deposition?

21             A.   I do.  And I don't have an answer for

22   you.  I can't -- I honestly cannot tell you what will

23   be done if there's a recovery.

24             Q.   Because as you sit here today, it's not

25   your intention to give all of that money to that

1    not-for-profit; is that correct?

2              A.   My intention is to make certain that I

3    can pay the legal fees that I have incurred in

4    regards to representation for my involvement in this

5    bankruptcy matter.

6              Q.   And those legal fees are the time

7    you've spent that's memorialized in the privilege

8    log?

9              A.   No.   I had to hire counsel in regards

10   to the bankruptcy matter that represented me

11   initially, that represented me to get my claim heard.

12             Q.   Are you represented today in the

13   bankruptcy matter?

14             A.   I am not.

15             Q.   What's the total of your legal fees in

16   the bankruptcy matter?

17             A.   Approximately $26,000.

18             Q.   So your intention is to pay those legal

19   fees, and then do you know what's going to happen

20   with the remainder of any amount that you're paid in

21   the bankruptcy?

22             A.   I do not.

23             Q.   When was the last time you spoke with

24   Marty or Melissa Fitzgerald?

25             A.   Approximately, right around the

1    conclusion of this matter.  So whenever the date

2    would be.  Right around the fall of 2019.

3           Q.  And what was the nature of that

4    conversation?

5           A.  The -- it was a text message.

6           Q.  And can you tell me what it said?

7           A.  From which part?  The text message,

8    basically, just said that the matter was concluded,

9    and that was about it.

10          Q.  Is that a text message you sent them or

11   they sent you?

12          A.  I would have to look back and see who

13   initiated it.  It's not something that I reviewed for

14   this deposition.

15          Q.  Does that not fall within the scope of

16   the documents that you were asked to provide for the

17   deposition?

18          A.  No, because it was a friendly -- I

19   mean, this matter was over, you know.  We're friends.

20          Q.  And that was in 2019?

21          A.  Correct.

22          Q.  Have you maintained your friendship

23   since that time?

24          A.  I have not.

25          Q.  And is that a decision you made, or a

1    decision that they made, or that both sides made?

2              A.   I'm not sure that there is a correct

3    answer to that.  What I have heard is that there were

4    other things told to them in regards to how I was

5    going to utilize the money, which wasn't true.

6              Q.   What was told to them, as far as you

7    heard?

8              A.   I was told that I was money-seeking,

9    and that I was going to use all of the proceeds for

10   my own benefit, and that I had even encouraged

11   Mr. Manookian to go after the Plaintiff individually

12   for more money outside of the insurance award.

13             Q.   And do you deny that?

14             A.   I absolutely, categorically deny that.

15             Q.   Who told you that?

16             A.   A third-party.

17             Q.   And who was that?

18             A.   Another friend of ours.

19             Q.   What was that friend's name?

20             A.   It came from multiple friends.

21             Q.   And what were their names?

22             A.   Andrew Burton, Jessica Wright.

23             Q.   Anyone else?

24             A.   No.

25             Q.   You said that it was a false

```
 1    representation that you were going to keep the money
 2    for yourself, but you also --
 3              A.  I'm sorry.  You cut out.
 4              Q.  I'm sorry.  I believe you said that it
 5    was a false representation that was made that you
 6    were going to keep the remainder of the money for
 7    yourself, or the attorney's fee for yourself, but you
 8    also, today, are not prepared to testify what you're
 9    going to do with the money; is that right?
10              A.  Absolutely correct.  A lot has
11    transpired between 2019 and 2022, and so for me to
12    answer that question honestly, I can't, because I
13    don't have an answer.  It may still be donated, but
14    it just may not be donated to the Fitzgeralds' not-
15    or-profit.
16              Q.  So is it fair to say that you've had a
17    falling out with them?
18              A.  If that's what you want -- that's not
19    how I would categorize it, but if you wish to use
20    those words.
21              Q.  How would you categorize it?
22              A.  We just haven't talked in some time and
23    aren't friends, at this point.  From what I have
24    heard, they have been lied to, in regards to many
25    things that I represented to Mr. Manookian, and it
```

1      has made for a very strained relationship.

2                  Q.   The statement that you said was false

3      is not necessarily false today?

4                  A.   Which is that?

5                  Q.   What you're planning to do with your

6      portion of any recovery.

7                  A.   I don't believe that you asked me if

8      the statement is false.  What statement?  Can you

9      read the statement back to me that you are asking if

10     it's false?

11                 Q.   I don't have a live transcript of this

12     deposition, but I believe what you said was that they

13     were told that you were going to keep your portion of

14     the proceeds, rather than donating it to their

15     nonprofit or their not-for-profit, and, today, you

16     can't say one way or the other of what you're going

17     to do with that portion of the proceeds; is that

18     right?

19                 A.   That's correct.

20                 Q.   Other than your initial referral of the

21     Fitzgeralds to Mr. Manookian, did you offer legal

22     advice to the family about the case?

23                 A.   I think you would have to be more

24     specific in regards to what legal advice.  We did

25     have conversations throughout the case.

1          Q.   Well, I am trying to walk that line, as
2     I'm sure you appreciate, between asking you about the
3     nature of the conversations and just finding out if
4     you gave them legal advice during the litigation.  So
5     I have to rely on your own judgment as an attorney
6     here to find out if, in your view, you provided them
7     legal advice after the initial referral.
8          A.   Yes, we had conversations in regards to
9     the case.
10          Q.   And were those in the nature of sort of
11     strategy and kind of big picture conversations?
12          A.   I would have to look back at what our
13     communications were to answer that for you.
14          Q.   Did you include those communications in
15     the privilege log?
16          A.   There were mentions of the Fitzgeralds
17     in the privilege log, yes.
18          Q.   Let's look at Exhibit Three that was
19     designated by Mr. Young as your -- Exhibit Three to
20     this deposition, which was the privilege log that you
21     produced in response to his subpoena.  Can you
22     identify for me any communications in here between
23     you and the Fitzgeralds, period?
24          A.   On the first page, around 6/4/2018,
25     telephone conversation with the Fitzgeralds.  In

1    regards to the 2/10 -- 2/18 -- I'm sorry -- the 2/18,

2    e-mail from Manookian to Marty Fitzgerald and I,

3    there was communication there.

4              Q.   That's an e-mail that you received?

5              A.   Correct.  But nowhere else is the

6    Fitzgerald name mentioned, in my quick review.

7              Q.   I think on June 4, 2019, there were

8    e-mails to the Fitzgeralds and you from Manookian; is

9    that right?

10             A.   Yes.  On June 4, 2019, yes.

11             Q.   There's no communications after May 22,

12   2018, in which you -- oh, excuse me.  I apologize --

13   after June 4, 2018, in which you were providing any

14   information to them; is that right?

15             A.   Missy and I would have telephone calls

16   separately, as friends.  You know, our only -- the

17   conversation wouldn't necessarily be in regards to

18   the case and what legal strategies were happening,

19   but, again, we were friends, as well.

20             Q.   Well, that's tricky --

21             A.   It is.

22             Q.   -- because that's the two hats that, I

23   guess, you were wearing.  But nothing else that

24   you've memorialized in this privilege log in which

25   you communicated legal advice to them or legal

1   strategy to them; is that right?

2          A.  No.  In regards to the case, that was

3   Brian's role.

4          Q.  Do you know whether the Fitzgeralds

5   believe that you are entitled to a fee in this case

6   today?

7          A.  I do not know.  I have not asked them

8   that question.

9          Q.  With respect to the privilege log, when

10  it says Manookian, does that always mean Brian

11  Manookian or might that mean the law firm?

12         A.  No.  If you look at 5/18/2018, after

13  Brian Manookian's name, I put a (Manookian).  It

14  always means Brian Manookian.

15         Q.  Okay.  Is there somewhere on the

16  privilege log where you document a conversation about

17  Mr. Manookian's suspension from the practice of law?

18         A.  There's a couple mentions of that.  The

19  first one -- if you can find it quicker than I can,

20  you can note it.  I know on 4/30, on page two,

21  4/30/2019, there's updates regarding the instatement

22  of law license.  And then, two lines after that,

23  5/8/2019, from me.  So there's three of them, I

24  guess, right there in a row regarding the

25  reinstatement of the law license between Brian and

1    myself.

2              Q.   Anything about the original suspension,

3    which Mr. Young represented to you --

4              A.   Yeah, I'm looking.

5              Q.   -- went into effect in December of

6    2018?

7              A.   I'm not seeing anything in regards to

8    the suspension.

9              Q.   I think you testified that you learned

10   about the suspension from the Fitzgeralds; is that

11   right?

12             A.   Melissa, correct.

13             Q.   And that was in a friendly phone call

14   with Ms. Fitzgerald?

15             A.   Correct.

16             Q.   But you don't know when that took

17   place?

18             A.   I do not.

19             Q.   And that's not memorialized in this

20   privilege log anywhere?

21             A.   No.

22             Q.   You don't have any reason to believe

23   that Mr. Manookian did not inform the Fitzgeralds

24   about his initial suspension, do you?

25             A.   No.

1        Q.   Did Melissa tell --

2        A.   Well --

3        Q.   I'm sorry.  Go ahead.

4        A.   Brian Manookian told me that he told

5   them, so I'm going to believe him on his word, at

6   that point, that he told them.

7        Q.   How did Melissa learn about the

8   suspension?

9        A.   I don't -- if you're asking specifics,

10  if it was a telephone call or a letter, I can't

11  answer that.  I just knew that she knew about it.

12       Q.   I guess my first question probably is,

13  did she learn about it from Mr. Manookian or from

14  some other source?

15       A.   I don't know.  My memory tells me that

16  it was from Mr. Manookian himself.

17       Q.   Okay.  And that's -- I was trying to

18  clear up that point.  But you don't have any reason

19  to believe that Mr. Manookian failed to inform the

20  Fitzgeralds about his suspension?

21       A.   No.  He -- no.  I believe he told them,

22  told them, from my recollection, that once the

23  suspension was over, everything was going to go, you

24  know, back to how it was, he would be involved after

25  that point.  I know that I was one that was not

1    notified per the, you know, per the court order, as
2    he was to notify all referring counsel, as well.
3            Q.   And that's a court order that you
4    reviewed after talking to Melissa Fitzgerald?
5            A.   Correct.   I'm not certain what it's
6    called in your state, but the Tennessee attorney
7    reviewed the plan commission.   I mean, in Illinois,
8    that's what it's called.   So, I mean, if that's the
9    name for Tennessee.   I could be wrong.
10           Q.   In Illinois, it's the IRADC; is that
11   right?
12           A.   Yes.
13           Q.   And here, we have the Tennessee Board
14   of Professional Responsibility, which we call the
15   BPR.
16           A.   Sure.   Okay.   So, yes, I reviewed it on
17   their website.
18           Q.   Do you understand that's an order of
19   the Tennessee Supreme Court?
20           A.   Correct.
21           Q.   And so you understand that upon the
22   order of the Tennessee Supreme Court, Mr. Manookian
23   was no longer entitled to practice law while his
24   license was suspended?
25           A.   Yes.

1          Q.   Did you talk to Melissa Fitzgerald as a
2    friend or as an attorney about whether they were
3    going to speak with other lawyers in his absence?
4          A.   You cut out horribly during that
5    question, Mr. Spragens, but I believe you asked if I
6    talked to Melissa Fitzgerald during that time period
7    in regards to whether they were going to review
8    other -- or interview other counsel.  Is that what
9    you were asking?
10          Q.   Yes, ma'am.  Sorry about the
11    technological problem.
12          A.   That's okay.  All she said to me was
13    that Brian had notified -- from, again, my memory,
14    Brian had notified her of the suspension, assured
15    them that everything was going to be, you know,
16    handled just as it was, everything would be smooth
17    and be continued, and that his firm would continue on
18    until he was back able to practice law, again.
19          Q.   And was it your understanding, at some
20    point, that Afsoon Hagh began representing the
21    Fitzgeralds in this case?
22          A.   I don't believe I ever had that belief
23    or information, that she was the sole one
24    representing them.  I knew that there was some other
25    party at the law firm, as well, even though I had

1    never talked to them.  I don't think I was under the

2    assumption as to who was doing the work when |

3    Mr. Manookian wasn't there.

4                Q.   The other party that you are referring

5    to is Mr. Cummings?

6                A.   Correct.

7                Q.   Did you come to learn, at any time,

8    whether Mr. Cummings had resigned from the law firm?

9                A.   I did not.

10               Q.   You understood that he was a named

11   partner in the law firm at the beginning of the

12   representation?

13               A.   No.  I don't believe I was ever

14   explained his relationship with the firm.

15               Q.   You knew that the firm was called

16   Cummings Manookian, though?

17               A.   Yes.

18               Q.   And in that initial representation

19   letter, it did say that Ms. Hagh would be an attorney

20   who would work on the case; is that right?

21               A.   I would have to look back at the letter

22   to see specifically, names.

23               Q.   Well, looking at Exhibit One to this

24   deposition, it says, All work on this matter will be

25   done by Brian Manookian, Brian Cummings or Afsoon

1    Hagh; is that right?

2              A.  Yes.

3              Q.  You don't have any reason to believe

4    that Ms. Hagh is not qualified to practice plaintiff

5    personal injury or wrongful death law, do you?

6              A.  I do not.

7              Q.  And, in fact, after Mr. Manookian was

8    suspended, she sent you that PowerPoint presentation;

9    is that right?

10             A.  Correct.

11             Q.  Was it your understanding that she also

12   drafted the summary judgement opposition?

13             A.  I don't have an understanding as to who

14   drafted it.

15             Q.  Was it your understanding that she

16   drafted the PowerPoint in opposition to the summary

17   judgment?

18             A.  I don't have any understanding in

19   regards to that.  I do recall her telling me that

20   Brain would call me to discuss it.

21             Q.  Do you have any understanding of

22   whether Ms. Hagh argued the summary judgment

23   opposition at the hearing?

24             A.  I do not know.

25             Q.  You didn't attend that hearing?

1              A.   I did not.

2              Q.   Did you ask who was going to be

3    handling this case in Mr. Manookian's absence?

4              A.   Ask who?

5              Q.   Anybody.

6              A.   Again, the law firm, did I ask that

7    specific question; no.  I mean, when I see an

8    attorney part of a named law firm, Cummings

9    Manookian, and one is suspended, I'm going to assume

10   the other party, as you just note, Brian Cummings and

11   Afsoon Hagh, would, you know, carry on.  Brian always

12   assured me that everything would be handled, even in

13   his absence, just as it was as he was there.

14             Q.   Do you have any view of whether the

15   Fitzgeralds received a fair outcome in their case?

16             A.   I don't know.

17             Q.   Do you know whether Mr. Cummings ever

18   retired from Cummings Manookian?

19             A.   I have no knowledge.

20             Q.   Is it your understanding that if both

21   named partners of that firm were not able to practice

22   law, that that firm could not continue as a going

23   concern?

24             MR. YOUNG:  Objection, to the extent

25   that it calls for a legal conclusion for Tennessee

```
 1   law.

 2   BY MR. SPRAGENS:

 3            Q.  You can answer, Ms. McCarthy.

 4            A.  You have to re-ask your question,

 5   please.

 6            Q.  Sure.  Is it your understanding that if

 7   Mr. Cummings was no longer affiliated with the firm

 8   and Mr. Manookian was not entitled to practice law,

 9   that that firm would no longer be a going concern?

10            A.  You're asking me for an opinion, and

11   I -- it seems almost like a hypothetical.  I don't

12   know either of those things to be true, so I can't

13   answer that question.

14            Q.  Do you know of any law firms in

15   Illinois in which there is no partner who is able to

16   practice law?

17            A.  I haven't reviewed all of the law firms

18   in Illinois.

19            Q.  I know, but do you know of any that you

20   have?  You're a lawyer in Illinois.  Would it

21   surprise you if there was a law firm in Illinois

22   where it was owned by someone other than a lawyer?

23            A.  You know what, I don't know what our

24   rule in Illinois states, as if a non-lawyer can own a

25   law firm or not.
```

1    Q.  But you don't think that you could
2  practice law for private clients through Element
3  Cremation, do you?
4    A.  I'm not exactly certain of your
5  question.
6    Q.  Well, when you represent clients
7  individually, you don't represent them through
8  Element Cremation; you represent them through your
9  own practice; is that right?
10    A.  Correct.  It's two distinct entities.
11  I do not represent; I'm inhouse counsel.  Do you
12  understand what inhouse counsel means?
13    Q.  I think so.
14    A.  Okay.  So I'm inhouse counsel for
15  Elements Cremation.  I do not represent clients in
16  Elements Cremation.
17    Q.  What percentage of the clients that you
18  represent in your private practice also use Element
19  Cremation for its services?
20    A.  Next to none.  That's not the carryover
21  that I do.
22    Q.  I think you testified that you had an
23  impression that Ms. Hagh had a limited role in the
24  case during the period before Mr. Manookian's
25  suspension; is that right?

1          A.   Yes.

2          Q.   And it was your understanding that she

3    had a limited role in the firm; is that right?

4          A.   I don't believe I answered that.   I

5    don't know what her role in the firm is.

6          Q.   You said she was copied on e-mails,

7    periodically?

8          A.   Yes.

9          Q.   Did she talk to you by phone multiple

10   times after Mr. Manookian's suspension?

11         A.   She did not talk to me multiple times

12   after his suspension.

13         Q.   Okay.  How many times did she talk to

14   you after he was suspended?

15         A.   Twice.

16         Q.   And what dates were those?  Feel free

17   to refer to the privilege log.

18         A.   And when we say talked, it could be an

19   e-mail.  The 4/3/2019 e-mail from me, I guess, that's

20   from me to her.  The 4/15/2019 e-mail from Hagh to

21   RLM.

22         Q.   I think you testified that you talked

23   to her on the phone twice, didn't you?

24         A.   She did -- yeah, she did respond to --

25   again, I don't know if it was a general voicemail.  I

1     had left voicemails for Mr. Cummings, Mr. Manookian

2     in a general voice mailbox after he was suspended to

3     know the status in regards to how things were going

4     to be moving forward.  Afsoon did return the call

5     saying Brian would call me.  That was the extent of

6     our conversation.

7              Q.  So you only talked to her on the phone

8     one time?

9              A.  Yeah, I believe so, now that I'm

10    thinking about it.  Excuse my error earlier.

11             Q.  So it's one e-mail and one phone call,

12    and that's the extent of your communications with

13    Ms. Hagh?

14             A.  From my direct communication with her,

15    correct.  As you mentioned, she was copied on things,

16    periodically, not consistently.

17             Q.  And just for clarity, the e-mails in

18    which she was copied, your privilege log does not

19    reflect whether she was copied on an e-mail or not;

20    is that right?

21             A.  My privilege log would show if she was.

22    So, again, there's only a couple of times her name

23    even appears on here.

24             Q.  Okay.  So this privilege log, where it

25    says, e-mail from Manookian to RLM, or RLM to

1   Manookian, or Manookian to clients, all of that would
 2   reflect whether or not she was cc'd on a
 3   communication?
 4           A.  I don't know.  I would have to look
 5   back at the e-mail, now, since you are asking.
 6           Q.  I mean, I just -- frankly, I don't see
 7   anything where you indicate somebody being cc'd on a
 8   communication, so that's why I'm asking.
 9           A.  No.  I mean, if it was, like the
10   10/2/2018 e-mail from Manookian to Marty and myself,
11   it would note.  Yeah, cc'd.  You're correct.  I don't
12   know that, either.
13           Q.  All right.  So she may have been cc'd
14   on any number of these e-mails in the privilege log?
15           A.  Again, I don't know.  I would have to
16   look back at the e-mails.
17           Q.  Okay.  I'm just getting you to agree
18   with me that we can't tell from looking at the
19   privilege log whether or not she was cc'd on an
20   e-mail; is that fair?
21           A.  You cannot tell in regards to if there
22   was anyone copied on it or not.
23           Q.  And that would include Ms. Hagh?
24           A.  Possibly.
25           Q.  Is that a yes to that question?

1               A.   Sure, yes.   I mean, whoever was copied,
        2   no, you cannot tell.   But I can tell you, from my
        3   review of the e-mail for this matter prior to doing
        4   this privilege log, I have not looked at them after,
        5   it was very sporadic that she was on any e-mails.   It
        6   was merely as a copy.   There was never engagement
        7   with her, except for the couple of times noted.
        8               Q.   And I appreciate that you're
        9   distinguishing between -- you've got the to and the
       10   from on the privilege, just not necessarily the cc,
       11   and I get that, and I don't have any dispute with you
       12   there.   Did you maintain contemporaneous time records
       13   of your work on the Fitzgerald case?
       14               A.   What kind of contemporaneous time
       15   records are you --
       16               Q.   I'm referring to where you --
       17               A.   Like a time log?
       18               Q.   Yeah, your time entries or how much
       19   time you spent on the case, as it went along.
       20               A.   No.   There is no need to do so, as the
       21   referring.   I do not keep my time, in regards to
       22   matters that I refer.
       23               Q.   Well, you understand that the rules
       24   require you to be paid in proportion for your
       25   services or in some other arrangement as the client

1    may approve?

2              A.  I do, and that's in regards to
3    Tennessee law.

4              Q.  And this case was pending in Tennessee?

5              A.  Yes.  So in regards to the substantive
6    issues or anything, yes, there would be -- you know,
7    I could tell you the time, but e-mails, no.  I don't
8    keep the e-mails and the telephone conversations as
9    time for them.

10             Q.  So if I understand, the privilege log
11   reflects some communications, but that privilege log
12   was generated in response to the subpoena in this
13   bankruptcy case?

14             A.  Correct, yes.

15             Q.  Other than that privilege log, you did
16   not maintain contemporaneous logs of your work on the
17   case?

18             A.  I have a file that has my work in it in
19   regards to this case.

20             Q.  What's in that file?

21             A.  Just printouts of the e-mails, summary
22   judgment motion, some research that Brian and I had
23   talked about that I was looking into, in regards to,
24   potentially, bringing in a possible claim against
25   business insurance providers.

1          Q.  And that's the hard copy?

2          A.  Pardon?

3          Q.  I'm sorry.

4          A.  You cut out, again.  And I don't know

5     if there is someone else with you in the room, but I

6     keep hearing another voice, Mr. Spragens.

7          Q.  There is no one else in the room with

8     me, and I hear the same feedback that you do, so I'm

9     not sure where it's coming from.  But that's

10    maintained in hard copy?

11         A.  Yes.

12         Q.  In that file, just for clarity, there

13    is not, like, a log where you say, on this date, I

14    spent this amount of time on this case?

15         A.  I have not reviewed that file, and it's

16    no longer, like, in my current possession.  It's

17    packed away.  So to say what's specifically in it, I

18    cannot.  I know how I typically keep my notes, but I

19    can't tell you what specifically -- how they were,

20    you know, kept there.

21         Q.  Okay.  Well, we'll do this the hard

22    way.  I'm just trying to find out, do you maintain

23    regular records of your time spent on work, or do you

24    not?

25         A.  I do.  I keep -- but it's more -- it's

1   like a running list, a time.  So, for example, 11:24

2   a.m., and then, at the conclusion of a telephone

3   conference or me working on something, there will be

4   an end time, so, for example, 12 noon, making it up,

5   if I was doing something between now and 12 noon.

6           Q.   So does that mean that you do have

7   contemporaneous time records of your work on the

8   Fitzgerald matter?

9           A.   Yes.  If you want to call my note

10  entries on paper, yes, that would be, I guess,

11  contemporaneous time.  When I think of

12  contemporaneous time notes, I'm thinking of when I

13  worked in a law firm on litigation matters, and we

14  actually had a time system where you would put in

15  your time spent on a matter.

16          Q.   Sure.  I understand.  So while you

17  don't have a fancy billing software, for example, you

18  do jot down your notes of the time you spent on these

19  cases?

20          A.   I do.

21          Q.   And you expect that that would be in a

22  file, which I believe you said was in storage, now?

23          A.   Correct.

24          Q.   Is that external storage or in your

25  house or in your office somewhere?

```
 1              A.   External.

 2              Q.   Would you have the ability to get that,

 3    if it's needed?

 4              A.   Yes.

 5              Q.   And have you done so in connection with

 6    this bankruptcy or this subpoena that Mr. Young sent

 7    you?

 8              A.   No.

 9              Q.   When was the first time you spoke to

10    Mr. Young?

11              A.   I would have absolutely no idea, in

12    regards to that.  Whenever -- the first time I spoke

13    to Mr. Young.  You know, it wasn't me; my counsel

14    spoke to Mr. Young.  So a few months back, I guess.

15    I don't know.  I would have to have something to

16    refresh my memory to tell me the date when

17    communication occurred between Mr. Young and either

18    my counsel or myself.

19              Q.   And that was your counsel in connection

20    with the Cummings Manookian bankruptcy?

21              A.   Correct, yes.

22              Q.   Did you or your counsel speak to

23    Mr. Young when he -- during the time period before

24    the bankruptcy, when he had been appointed receiver

25    in a state court action in Tennessee?
```

1          A.   I would have no idea of the answer to
2     that question without looking at a timeline,
3     Mr. Spragens.  And I -- I don't know which matter
4     you're, you know, referring to there, either.
5          Q.   So as far as you're aware, the first
6     contact that you or anybody on your behalf had with
7     Mr. Young was your attorney in this bankruptcy
8     talking to Mr. Young as Trustee for -- or counsel for
9     the Trustee in this bankruptcy?
10         A.   Again, I don't know, Mr. Spragens.  I
11    would have to look back at the dates to see when it
12    was.
13         Q.   And what would we look at to find that
14    out?
15         A.   I guess, an e-mail between myself and
16    when I hired representation in regards to the
17    bankruptcy matter.
18         Q.   So I guess what I'm trying to find out
19    is, did you ever speak to Mr. Young before the
20    bankruptcy was initiated?
21         A.   You kind of positioned that in regards
22    to some other matter, as well.  So are you just
23    asking in regards to the bankruptcy matter, or -- I'm
24    a little unclear.
25         Q.   My question is whether you spoke to

1    Mr. Young before the bankruptcy matter was opened.

2              A.  Again, I don't know.  I would have to

3    look back and see when my counsel initiated

4    conversation.

5              Q.  Did you retain counsel before the

6    Cummings Manookian bankruptcy?

7              A.  I retained counsel in regards to the

8    bankruptcy.

9              Q.  Okay.  So prior to learning about the

10   Cummings Manookian bankruptcy, you had not retained a

11   lawyer to deal with your fee in this matter?

12             A.  No.

13             Q.  And prior to learning about the

14   Cummings Manookian bankruptcy, your lawyer wouldn't

15   have had any contact with Mr. Young?

16             A.  I guess you can draw that conclusion.

17             Q.  You agree that that's correct?

18             A.  There wouldn't be a need for my counsel

19   to have communication.  I hired counsel in regards to

20   the bankruptcy matter and filing a claim.

21             Q.  And then my only other question about

22   this is, prior to the bankruptcy matter, you didn't

23   have any communications with Mr. Young?

24             A.  No.

25             Q.  And what about any communications with

1    Jeanne Burton, who is the Trustee in this matter?

2    Have you had any?

3              A.  No.

4              Q.  When was the last time you spoke to

5    Mr. Young before today's deposition?

6              A.  Again, I would have to look back at

7    dates, but it was in regards to my deposition not

8    going, the first -- for the first schedule.  So

9    whatever that date was.

10             Q.  Have you and Mr. Young had any

11   conversation where you discussed the substance of the

12   questions that he would ask you during today's

13   deposition?

14             A.  No.

15             Q.  And about how many times have you

16   directly talked to Mr. Young before today's

17   deposition?

18             A.  Maybe three.  It was in regards to the

19   scheduling of it, when I would be available, the

20   scope, which is exactly the scope on the notice of

21   the deposition, and how long he anticipated, which

22   we're about half an hour over what he anticipated the

23   deposition to run.

24             Q.  Did you understand that after

25   Mr. Manookian was suspended from the practice of law,

1    he had an obligation to keep you informed about

2    matters relating to the transfer of his file to

3    another attorney?

4              A.   You cut out at the very beginning, so I

5    didn't hear what you asked.

6              Q.   Did you understand whether

7    Mr. Manookian, when he was suspended from the

8    practice of law, had an obligation to keep you

9    informed about matters relating to the transfer of

10   his client file to another attorney?

11             A.   Did I understand that he had a duty to

12   me to let me know if the file was transferred to

13   another attorney; is that what you're asking me?

14             Q.   No.  Did you understand whether, due to

15   his duty to his former client, he had an obligation

16   to apprise future attorneys about matters relating to

17   the representation?

18             A.   Your question is confusing me.  Maybe

19   you could break it apart.

20             Q.   Sure.  When an attorney is suspended

21   from the practice of law, do you have any

22   understanding about whether they're expected to, as a

23   part of the hand-off of their client file to other

24   attorneys, who are continuing to represent the

25   client, if they have any obligation to communicate

1    with those other attorneys about the representation,

2    notwithstanding the fact that they have been

3    suspended from the practice of law?

4         A.  If you're asking to referring

5    attorneys, yes, I believe he had a duty to let

6    referring attorneys know.  If you're talking

7    generally, to the world of attorneys, I don't know

8    what his responsibility is to tell other attorneys.

9         Q.  And I also mean to the client's next

10   attorney.  After Mr. Manookian hands off that file to

11   somebody else, he has a duty to continue

12   communicating with respect to the hand-off of the

13   client file; do you agree with that?

14        A.  Mr. Spragens, I am sorry.  I don't know

15   if it's my end or yours, but you broke up horribly,

16   again, at the beginning of that question.

17        Q.  Sure.  And I'm sorry about that.  My

18   question is, do you have any understanding about

19   whether an attorney, who is suspended from the

20   practice of law, is required to communicate on behalf

21   of his client with that client's next attorney as

22   part of the transition process of that file going

23   from the suspended attorney to the ongoing

24   representation?

25        A.  I have absolutely no idea.

1   Mr. Manookian was the first counsel I have ever come
2   in contact with before that has been suspended.

3         Q.   And that's -- let me ask you this.  Do
4   you know whether Mr. Manookian consulted with the
5   Tennessee Board of Professional Responsibility about
6   his obligations in handing off the client file upon
7   his suspension and what he was required to do going
8   forward to ensure that the client was represented?

9         A.   I have no idea what his conversations
10   were with your Tennessee Board of Professional
11   Responsibility.

12         Q.   Okay.  Well, I appreciate your time
13   today, Ms. McCarthy.  I don't have anything further,
14   at this time.

15         A.   Thank you.

16         MR. GABBERT:   No questions from Craig
17   Gabbert.

18         MR. YOUNG:   Ms. McCarthy, I have no
19   further questions.  Thank you for your time, today.

20         WITNESS:   Thank you.

21         FURTHER DEPONENT SAITH NOT

22         /signature waived/

23         Sworn to before me when taken
         _____
24         LEA ANNE GRAY, LCR 445
         Court Reporter for the
25         State of Tennessee

```
1
2                         CERTIFICATE
3
4              I, Lea Anne Gray, court reporter for the
5     State of Tennessee, do hereby certify that the
6     foregoing transcript was recorded stenographically by
7     me and reduced to typewritten form by me.
8              I FURTHER CERTIFY that the foregoing
9     transcript is a true and correct transcript, to the
10    best of my ability, of the testimony given by the
11    said witness at the time and place specified herein.
12             I FURTHER CERTIFY that I am not a relative
13    or employee or attorney or counsel of any of the
14    parties, nor a relative or employee of such attorney
15    or counsel, or financially interested directly or
16    indirectly in this action.
17             IN WITNESS WHEREOF, I have hereunto set my
18    hand this 27th day of June, 2022.
19    _____
20             LEA ANNE GRAY, LCR 445
21             Court Reporter for the
22             State of Tennessee
23
24
25
```

## $

**$26,000** [1] - 45:17

## /

**/signature** [1] - 75:22

## 1

**1** [3] - 2:23, 10:14, 36:18
**10** [1] - 2:23
**10/2/2018** [2] - 19:13, 64:10
**10:00** [1] - 3:8
**10:40** [1] - 31:7
**11:24** [1] - 68:1
**12** [2] - 68:4, 68:5
**13** [1] - 2:24
**15** [1] - 27:10
**150** [1] - 2:11
**150651** [1] - 1:24
**15th** [1] - 23:18
**17** [1] - 2:25
**18** [1] - 37:22

## 2

**2** [2] - 2:24, 13:13
**2/10** [1] - 51:1
**2/18** [2] - 51:1
**200** [1] - 2:4
**2018** [19] - 10:2, 12:1, 18:9, 18:11, 18:14, 19:8, 19:10, 20:15, 20:16, 20:24, 21:1, 21:15, 22:14, 36:19, 37:18, 37:22, 51:12, 51:13, 53:6
**2019** [17] - 23:11, 24:23, 25:4, 25:12, 25:20, 26:19, 27:10, 27:17, 30:16, 46:2, 46:20, 48:11, 51:7, 51:10
**2022** [4] - 1:18, 3:7, 48:11, 76:18
**22** [1] - 51:11
**22nd** [1] - 2:7
**23** [6] - 10:2, 12:1, 18:9, 18:11, 18:14, 20:15
**23rd** [1] - 18:19
**27th** [1] - 76:18
**2800** [1] - 2:11
**298-1992** [1] - 1:25

## 3

**3** [5] - 2:17, 2:25, 17:23, 23:11, 26:19
**30** [1] - 27:17
**311** [1] - 2:7
**32** [1] - 2:18
**37067** [1] - 2:4
**37201** [1] - 2:12
**37203** [1] - 2:8
**37215** [1] - 1:24
**3:19-bk-07235** [1] - 1:10
**3rd** [1] - 23:14

## 4

**4** [9] - 2:17, 19:8, 24:23, 25:4, 25:20, 51:7, 51:10, 51:13
**4/15/2019** [1] - 62:19
**4/3/2019** [1] - 62:19
**4/30** [1] - 52:20
**4/30/2019** [1] - 52:21
**40** [2] - 7:11, 33:14
**445** [2] - 75:24, 76:20

## 5

**5/18/2018** [1] - 52:12
**5/23/18** [1] - 2:24
**5/8/2019** [1] - 52:23

## 6

**6/4/2018** [2] - 19:12, 50:24
**6100** [1] - 2:4
**615** [1] - 1:25

## 7

**7** [1] - 1:10
**76** [1] - 2:18

## 8

**8** [2] - 1:18, 27:17
**8th** [1] - 3:7

## A

**a.m** [2] - 3:8, 68:2
**ability** [2] - 69:2, 76:10
**able** [3] - 56:18, 59:21, 60:15
**absence** [1] - 56:3, 59:3, 59:13
**absolutely** [4] - 47:14, 48:10, 69:11, 74:25
**abundant** [1] - 10:9
**accurate** [1] - 19:23
**acknowledgement** [1] - 27:20
**action** [2] - 69:25, 76:16
**active** [2] - 35:2, 36:18
**actively** [2] - 26:5, 26:8
**addressed** [1] - 10:2
**administrative** [1] - 31:17
**advice** [6] - 34:10, 49:22, 49:24, 50:4, 50:7, 51:25
**advisory** [1] - 37:16
**affiliated** [4] - 36:21, 37:6, 37:8, 60:7
**afoul** [1] - 7:4
**Afsoon** [19] - 13:16, 16:20, 20:17, 20:22, 20:25, 21:3, 21:7, 22:5, 25:7, 26:5, 26:19, 26:20, 26:21, 27:6, 31:13, 56:20, 57:25, 59:11, 63:4
**Afsoon's** [1] - 31:13
**afterwards** [1] - 3:14
**ago** [1] - 12:22
**agree** [5] - 20:25, 43:10, 64:17, 71:17, 74:13
**agreed** [1] - 3:11
**agreement** [6] - 9:13, 20:15, 38:4, 38:5, 38:6, 42:15
**agreements** [2] - 37:23, 38:1
**ahead** [3] - 15:3, 29:19, 54:3
**allergies** [1] - 10:8
**almost** [2] - 21:24, 60:11
**amount** [3] - 44:5, 45:20, 67:14
**AND** [1] - 2:6
**andrew** [1] - 47:22
**ANN** [2] - 1:8, 2:2
**Anne** [2] - 3:11, 76:4
**ANNE** [4] - 1:23, 1:23, 75:24, 76:20
**answer** [16] - 4:20, 4:23, 4:25, 38:15, 44:14, 44:15, 44:19, 44:21, 47:3, 48:12, 48:13, 50:13, 54:11, 60:3, 60:13, 70:1
**answered** [2] - 38:14, 62:4
**anticipated** [2] -

**anyway** [1] - 4:17
**apart** [1] - 73:19
**apologize** [2] - 10:11, 51:12
**APPEARANCES** [1] - 2:1
**appointed** [2] - 4:6, 69:24
**appreciate** [3] - 50:2, 65:8, 75:12
**apprise** [1] - 73:16
**appropriate** [2] - 39:22, 40:1
**approve** [1] - 66:1
**apps** [1] - 5:21
**April** [6] - 23:11, 23:14, 23:18, 26:19, 27:10, 27:17
**APSOON** [1] - 1:11
**area** [5] - 6:8, 8:15, 38:18, 38:20, 38:25
**argued** [1] - 58:22
**arrangement** [1] - 65:25
**aside** [1] - 36:22
**aspects** [1] - 36:2
**asserting** [1] - 17:3
**assist** [1] - 7:16
**assistance** [1] - 7:12
**assisted** [2] - 31:21, 34:7
**associate** [1] - 14:15
**ASSOCIATES** [1] - 1:23
**assume** [3] - 6:19, 19:15, 59:9
**assumption** [1] - 57:2
**assured** [2] - 56:14, 59:12
**attend** [1] - 58:25
**attorney** [23] - 4:24, 6:1, 13:15, 35:25, 39:13, 41:17, 44:17, 50:5, 55:6, 56:2, 57:19, 59:8, 70:7, 73:3, 73:10, 73:13, 73:20, 74:10, 74:19, 74:21, 74:23, 76:13, 76:14
**Attorney** [1] - 11:2
**attorney's** [1] - 48:7
**attorney/client** [3] - 7:2, 7:6, 7:7
**attorneys** [12] - 12:8, 33:3, 33:7, 33:9, 40:13, 73:16, 73:24, 74:1, 74:5, 74:6, 74:7, 74:8
**audibly** [1] - 4:21

**August** [1] - 30:16
**authorized** [1] - 13:11
**available** [1] - 72:19
**Avenue** [2] - 2:7, 2:11
**award** [1] - 47:12
**aware** [5] - 21:11, 29:10, 39:6, 44:17, 70:5
**awareness** [1] - 39:16
**awkward** [1] - 4:19

## B

**BANK** [2] - 1:12, 2:9
**Bankruptcy** [1] - 4:6
**BANKRUPTCY** [1] - 1:1
**bankruptcy** [23] - 42:11, 44:9, 45:5, 45:10, 45:13, 45:16, 45:21, 66:13, 69:6, 69:20, 69:24, 70:7, 70:9, 70:17, 70:20, 70:23, 71:1, 71:6, 71:8, 71:10, 71:14, 71:20, 71:22
**based** [1] - 42:13
**basic** [1] - 8:14
**BASS** [1] - 2:10
**became** [3] - 7:8, 12:16, 21:11
**began** [1] - 56:20
**beginning** [6] - 3:8, 16:7, 34:22, 57:11, 73:4, 74:16
**behalf** [3] - 33:7, 70:6, 74:20
**belief** [1] - 56:22
**benefit** [1] - 47:10
**BERRY** [1] - 2:10
**best** [3] - 8:24, 17:21, 76:10
**between** [14] - 9:15, 18:21, 19:7, 19:19, 23:24, 42:9, 48:11, 50:2, 50:22, 52:25, 65:9, 68:5, 69:17, 70:15
**big** [1] - 50:11
**billing** [1] - 68:17
**bit** [1] - 15:3
**blow** [1] - 10:7
**Board** [3] - 55:13, 75:5, 75:10
**Box** [1] - 1:24
**BPR** [1] - 55:15
**Brain** [1] - 58:20
**break** [5] - 5:3, 5:4, 31:7, 31:9, 73:19
**Brian** [36] - 8:2, 14:6,

14:11, 14:12, 15:10, 15:20, 16:6, 16:13, 16:19, 18:24, 22:4, 24:8, 26:3, 27:7, 27:24, 28:12, 29:6, 31:16, 32:7, 33:12, 40:6, 40:8, 41:18, 42:9, 52:10, 52:13, 52:14, 52:25, 56:13, 56:14, 57:25, 59:10, 59:11, 63:5, 66:22

**BRIAN** [1] - 2:6
**brian** [2] - 14:10, 54:4
**Brian's** [2] - 14:11, 52:3
**bringing** [1] - 66:24
**broad** [1] - 15:24
**broke** [1] - 74:15
**brother** [1] - 34:2
**Burton** [5] - 2:3, 4:5, 4:8, 47:22, 72:1
**BURTON** [2] - 1:8, 2:2
**business** [3] - 6:12, 36:1, 66:25
**businesses** [1] - 36:22
**BY** [9] - 4:3, 10:15, 13:14, 17:5, 17:24, 22:24, 31:11, 32:5, 60:2

### C

**cannot** [6] - 33:11, 40:4, 44:22, 64:21, 65:2, 67:18
**caption** [1] - 3:16
**car** [2] - 34:20, 36:7
**carry** [1] - 59:11
**carryover** [1] - 61:20
**case** [55] - 6:22, 13:20, 14:4, 14:11, 14:13, 14:20, 15:8, 15:23, 16:2, 17:7, 19:8, 20:2, 25:18, 28:2, 29:13, 29:15, 29:16, 29:23, 29:25, 30:4, 30:7, 30:13, 31:5, 31:14, 31:21, 31:23, 32:2, 32:11, 32:17, 33:4, 34:5, 39:3, 42:1, 43:17, 43:18, 44:9, 49:22, 49:25, 50:9, 51:18, 52:2, 52:5, 56:21, 57:20, 59:3, 59:15, 61:24, 65:13, 65:19, 66:4, 66:13, 66:17, 66:19, 67:14
**cases** [2] - 33:10,

68:19
**catch** [1] - 6:16
**categorically** [1] - 47:14
**categorize** [2] - 48:19, 48:21
**cc** [1] - 65:10
**cc'd** [5] - 64:2, 64:7, 64:11, 64:13, 64:19
**certain** [4] - 14:22, 45:2, 55:5, 61:4
**certainly** [1] - 4:12
**CERTIFICATE** [1] - 76:2
**Certificate** [1] - 2:18
**certificate** [1] - 3:17
**certify** [1] - 76:5
**CERTIFY** [2] - 76:8, 76:12
**Chapter** [1] - 1:10
**charge** [1] - 14:12
**children** [1] - 37:17
**choice** [1] - 8:24
**Circle** [1] - 2:4
**circulated** [1] - 9:23
**CITIZENS** [2] - 1:12, 2:9
**Civil** [2] - 3:10, 44:18
**claim** [3] - 45:11, 66:24, 71:20
**claiming** [1] - 42:3
**clarity** [2] - 63:17, 67:12
**clear** [1] - 54:18
**client** [12] - 15:17, 15:18, 16:5, 65:25, 73:10, 73:15, 73:23, 73:25, 74:13, 74:21, 75:6, 75:8
**client's** [3] - 22:23, 74:9, 74:21
**clients** [12] - 7:23, 8:16, 8:25, 37:14, 37:18, 37:23, 38:1, 61:2, 61:6, 61:15, 61:17, 64:1
**close** [3] - 16:8, 31:8, 34:7
**closings** [1] - 6:11
**coming** [2] - 28:7, 67:9
**commission** [1] - 55:7
**commitment** [2] - 8:16, 8:25
**committed** [2] - 43:19, 44:5
**communicate** [4] - 16:3, 16:4, 73:25, 74:20
**communicated** [2] -

16:7, 51:25
**communicating** [1] - 74:12
**communication** [8] - 5:21, 23:24, 51:3, 63:14, 64:3, 64:8, 69:17, 71:19
**communications** [21] - 17:4, 18:19, 18:23, 19:18, 25:22, 26:2, 26:6, 27:23, 31:5, 32:25, 33:1, 33:2, 33:3, 50:13, 50:14, 50:22, 51:11, 63:12, 66:11, 71:23, 71:25
**company** [2] - 6:16, 6:17
**Company** [1] - 6:10
**COMPANY** [1] - 1:12
**compiled** [1] - 17:17
**complaint** [1] - 20:10
**computer** [1] - 5:22
**concern** [2] - 59:23, 60:9
**concerning** [1] - 19:7
**concluded** [1] - 46:8
**conclusion** [5] - 41:5, 46:1, 59:25, 68:2, 71:16
**conference** [4] - 19:12, 30:18, 30:21, 68:3
**conferences** [1] - 19:2
**confirm** [1] - 22:21
**confirming** [1] - 42:18
**confusing** [1] - 73:18
**connection** [3] - 37:2, 69:5, 69:19
**consistent** [1] - 21:6
**consistently** [1] - 63:16
**consulted** [1] - 75:4
**contact** [5] - 14:11, 31:17, 70:6, 71:15, 75:2
**contacted** [3] - 37:5, 37:10, 40:11
**contemporaneous** [6] - 65:12, 65:14, 66:16, 68:7, 68:11, 68:12
**contend** [1] - 42:7
**CONTENTS** [1] - 2:15
**contingency** [4] - 11:1, 12:6, 42:21, 42:24
**continual** [1] - 15:10
**continue** [4] - 28:1, 56:17, 59:22, 74:11
**continued** [1] - 56:17

**continuing** [1] - 73:24
**contractor** [1] - 14:15
**conversation** [16] - 14:17, 15:20, 16:13, 20:19, 22:16, 24:8, 31:3, 43:12, 44:2, 46:4, 50:25, 51:17, 52:16, 63:6, 71:4, 72:11
**conversations** [18] - 8:12, 9:4, 15:8, 17:11, 20:17, 20:21, 20:25, 21:3, 24:2, 24:19, 41:9, 44:3, 49:25, 50:3, 50:8, 50:11, 66:8, 75:9
**copied** [10] - 21:4, 25:9, 26:13, 26:16, 62:6, 63:15, 63:18, 63:19, 64:22, 65:1
**copy** [14] - 9:14, 10:23, 11:3, 11:6, 11:18, 12:14, 12:19, 12:24, 13:5, 13:9, 22:9, 65:6, 67:1, 67:10
**corporate** [1] - 35:13
**Correct** [1] - 66:14
**correct** [43] - 6:1, 6:20, 11:19, 17:8, 17:9, 17:21, 18:12, 18:24, 19:15, 19:16, 21:23, 23:15, 23:16, 23:19, 23:20, 25:21, 27:11, 33:15, 34:11, 35:14, 36:20, 37:13, 38:24, 40:10, 45:1, 46:21, 47:2, 48:10, 49:19, 51:5, 53:12, 53:15, 55:5, 55:20, 57:6, 58:10, 61:10, 63:15, 64:11, 68:23, 69:21, 71:17, 76:9
**correctly** [2] - 39:21, 39:24
**counsel** [39] - 6:9, 6:15, 7:14, 7:17, 7:20, 7:22, 7:23, 7:25, 9:1, 15:11, 16:4, 22:14, 22:15, 22:20, 37:20, 38:18, 38:25, 41:3, 41:4, 41:7, 45:9, 55:2, 56:8, 61:11, 61:12, 61:14, 69:13, 69:18, 69:19, 69:22, 70:8, 71:3, 71:5, 71:7, 71:18, 71:19, 75:1, 76:13, 76:15
**counsels'** [1] - 41:10

**couple** [6] - 8:20, 24:20, 40:18, 52:18, 63:22, 65:7
**COURT** [1] - 1:1
**court** [7] - 3:11, 4:6, 15:11, 55:1, 55:3, 69:25, 76:4
**Court** [5] - 29:21, 55:19, 55:22, 75:24, 76:21
**court-appointed** [1] - 4:6
**CRAIG** [1] - 2:10
**Craig** [1] - 75:16
**Creation** [1] - 36:23
**Cremation** [15] - 6:10, 6:18, 35:17, 35:20, 35:25, 36:2, 36:25, 37:7, 37:24, 38:10, 61:3, 61:8, 61:15, 61:16, 61:19
**cremation** [1] - 34:15, 36:24
**crematory** [1] - 6:19
**crossed** [2] - 40:20, 41:19
**cummings** [1] - 57:5
**Cummings** [27] - 4:6, 9:9, 9:11, 9:15, 10:1, 10:22, 11:25, 13:17, 14:6, 14:8, 14:16, 18:15, 18:21, 38:6, 57:8, 57:16, 57:25, 59:8, 59:10, 59:17, 59:18, 60:7, 63:1, 69:20, 71:6, 71:10, 71:14
**CUMMINGS** [1] - 1:6
**current** [1] - 67:16
**cut** [4] - 48:3, 56:4, 67:4, 73:4

### D

**date** [12] - 12:1, 18:14, 20:20, 20:23, 21:2, 21:16, 23:13, 28:8, 46:1, 67:13, 69:16, 72:9
**dated** [2] - 10:2, 12:1
**dates** [3] - 62:16, 70:11, 72:7
**daughter** [2] - 7:13, 35:16
**days** [2] - 10:13, 21:18
**deal** [1] - 71:11
**death** [3] - 37:5, 40:13, 58:5
**Debtor** [1] - 1:7
**December** [4] - 20:24,

21:15, 22:14, 53:5
**decided** [1] - 43:18
**decision** [2] - 46:25, 47:1
**Defendants** [1] - 1:13
**degree** [1] - 14:24
**deny** [2] - 47:13, 47:14
**DEPONENT** [1] - 75:21
**deponent** [1] - 3:18
**DEPOSITION** [1] - 1:16
**deposition** [19] - 3:6, 3:13, 3:17, 4:13, 12:21, 17:16, 32:21, 44:20, 46:14, 46:17, 49:12, 50:20, 57:24, 72:5, 72:7, 72:13, 72:17, 72:21, 72:23
**depositions** [3] - 4:19, 4:20, 5:6
**describe** [3] - 18:19, 25:16, 26:7
**described** [1] - 8:15
**DESCRIPTION** [1] - 2:22
**designated** [1] - 50:19
**DESIGNATED** [3] - 10:14, 13:13, 17:23
**detail** [1] - 17:10
**different** [3] - 7:25, 12:4, 44:6
**direct** [4] - 10:25, 12:5, 24:7, 63:14
**direction** [1] - 34:16
**directly** [4] - 18:24, 39:12, 72:16, 76:15
**discuss** [2] - 24:9, 58:20
**discussed** [1] - 72:11
**discussion** [7] - 28:8, 28:10, 29:1, 29:20, 42:8, 43:4, 43:6
**discussions** [4] - 23:1, 25:24, 28:18, 28:21
**dispute** [1] - 65:11
**distinct** [1] - 61:10
**distinguishing** [1] - 65:9
**distributed** [1] - 43:25
**DISTRICT** [1] - 1:2
**DIVISION** [1] - 1:3
**document** [4] - 10:16, 11:7, 11:24, 52:16
**documents** [4] - 17:7, 20:6, 21:8, 46:16
**donate** [1] - 44:8
**donated** [2] - 48:13, 48:14

**donating** [1] - 49:14
**done** [5] - 21:25, 31:8, 44:23, 57:25, 69:5
**down** [2] - 27:16, 68:18
**draft** [2] - 16:2, 21:8
**drafted** [4] - 16:15, 58:12, 58:14, 58:16
**drafts** [4] - 16:12, 24:13, 24:16, 24:18
**draw** [1] - 71:16
**driver's** [1] - 34:18
**due** [2] - 32:15, 73:14
**duly** [1] - 4:2
**during** [18] - 16:18, 20:2, 20:5, 20:14, 21:5, 22:20, 24:11, 24:14, 26:3, 26:16, 43:17, 43:18, 50:4, 56:4, 56:6, 61:24, 69:23, 72:12
**During** [1] - 22:25
**duty** [4] - 73:11, 73:15, 74:5, 74:11

## E

**e-mail** [29] - 19:13, 23:4, 23:15, 23:16, 23:18, 24:24, 25:3, 25:10, 26:20, 26:21, 26:23, 27:3, 27:4, 27:5, 27:8, 43:8, 51:2, 51:4, 62:19, 62:20, 63:11, 63:19, 63:25, 64:5, 64:10, 64:20, 65:3, 70:15
**e-mailed** [1] - 26:19
**e-mails** [21] - 16:17, 19:6, 19:21, 20:16, 21:4, 25:23, 26:9, 26:14, 27:12, 28:11, 42:18, 42:23, 51:8, 62:6, 63:17, 64:14, 64:16, 65:5, 66:7, 66:8, 66:21
**effect** [2] - 21:19, 53:5
**either** [6] - 13:6, 22:4, 60:12, 64:12, 69:17, 70:4
**Element** [10] - 35:17, 35:20, 35:25, 36:23, 37:6, 37:24, 38:10, 61:2, 61:8, 61:18
**Elements** [4] - 6:10, 36:2, 61:15, 61:16
**elements** [2] - 6:18, 36:24
**employee** [2] - 76:13, 76:14

**encouraged** [1] - 47:10
**end** [5] - 6:11, 20:16, 34:10, 68:4, 74:15
**engage** [1] - 9:10
**engaged** [1] - 18:15
**Engagement** [1] - 2:23
**engagement** [17] - 9:15, 9:19, 10:4, 10:21, 10:23, 11:3, 11:17, 12:3, 18:20, 19:5, 20:15, 37:22, 38:1, 38:3, 42:17, 42:20, 65:6
**engaging** [2] - 13:16, 22:15
**ensure** [1] - 75:8
**entire** [1] - 26:16
**entities** [1] - 61:10
**entitled** [4] - 42:7, 52:5, 55:23, 60:8
**entries** [8] - 18:7, 18:8, 18:18, 24:21, 26:18, 27:18, 30:15, 65:18, 68:10
**entry** [4] - 23:23, 24:23, 25:19, 26:22
**error** [1] - 63:10
**ESQUIRE** [3] - 2:3, 2:6, 2:10
**estate** [1] - 6:11
**estates** [1] - 34:14
**eventually** [1] - 8:2
**evidences** [1] - 23:23
**exact** [1] - 40:22
**exactly** [3] - 43:19, 61:4, 72:20
**Examination** [1] - 2:17, 2:18
**EXAMINATION** [2] - 4:3, 32:5
**example** [3] - 68:1, 68:4, 68:17
**except** [3] - 3:18, 19:1, 65:7
**excuse** [3] - 10:7, 51:12, 63:10
**execution** [2] - 18:20, 20:14
**EXHIBIT** [3] - 10:14, 13:13, 17:23
**Exhibit** [13] - 9:22, 9:25, 10:17, 11:21, 11:24, 12:15, 12:16, 17:16, 18:13, 24:22, 50:18, 50:19, 57:23
**exhibit** [2] - 12:24, 18:1
**exhibits** [1] - 5:17

**expect** [2] - 5:1, 68:21
**expected** [1] - 73:22
**experience** [3] - 39:8, 39:16, 39:19
**expertise** [2] - 41:14, 41:16
**explain** [2] - 4:16, 7:8
**explained** [1] - 57:14
**extent** [4] - 39:6, 59:24, 63:5, 63:12
**external** [1] - 68:24
**External** [1] - 69:1

## F

**fact** [2] - 58:7, 74:2
**failed** [1] - 54:19
**fair** [4] - 19:25, 48:16, 59:15, 64:20
**fairly** [1] - 18:19
**fall** [2] - 46:2, 46:15
**falling** [1] - 48:17
**false** [6] - 47:25, 48:5, 49:2, 49:3, 49:8, 49:10
**familiar** [1] - 6:21
**families** [3] - 34:14, 36:3, 44:6
**family** [1] - 49:22
**fancy** [1] - 68:17
**far** [3] - 41:23, 47:6, 70:5
**February** [4] - 24:23, 25:3, 25:12, 25:20
**fee** [12] - 11:1, 12:6, 41:23, 42:1, 42:3, 42:6, 42:11, 42:21, 42:24, 48:7, 52:5, 71:11
**feedback** [2] - 28:17, 67:8
**fees** [5] - 30:13, 45:3, 45:6, 45:15, 45:19
**felt** [1] - 44:5
**few** [10] - 5:5, 6:9, 7:25, 10:13, 11:16, 27:16, 27:18, 31:19, 41:1, 69:14
**file** [13] - 66:18, 66:20, 67:12, 67:15, 68:22, 73:2, 73:10, 73:12, 73:23, 74:10, 74:13, 74:22, 75:6
**filed** [3] - 6:22, 20:5, 20:10
**filing** [2] - 20:8, 71:20
**finalize** [1] - 36:5
**financially** [1] - 76:15
**fine** [1] - 44:12
**Firm** [1] - 10:22

**firm** [27] - 9:6, 9:8, 14:6, 14:24, 22:18, 34:12, 34:21, 34:23, 34:24, 52:11, 56:17, 56:25, 57:8, 57:11, 57:14, 57:15, 59:6, 59:8, 59:21, 59:22, 60:7, 60:9, 60:21, 60:25, 62:3, 62:5, 68:13
**firms** [3] - 37:25, 60:14, 60:17
**first** [21] - 4:2, 9:4, 12:18, 12:21, 19:1, 19:11, 20:19, 24:22, 30:10, 33:17, 33:25, 42:19, 50:24, 52:19, 54:12, 69:9, 69:12, 70:5, 72:8, 75:1
**FIRST** [2] - 1:12, 2:9
**FIRST-CITIZENS** [1] - 1:12
**fitzgerald** [1] - 53:14
**Fitzgerald** [24] - 6:22, 7:9, 10:3, 10:22, 12:2, 15:23, 17:12, 19:8, 19:14, 20:2, 31:14, 31:25, 33:4, 41:5, 41:23, 42:4, 45:24, 51:2, 51:6, 55:4, 56:1, 56:6, 65:13, 66:8
**Fitzgeralds** [45] - 7:10, 8:13, 8:18, 8:23, 9:10, 9:16, 13:3, 13:6, 13:16, 18:15, 18:21, 19:2, 19:13, 21:21, 21:24, 22:2, 22:10, 22:13, 30:3, 30:5, 30:9, 30:12, 33:8, 33:14, 33:18, 33:24, 35:15, 37:4, 37:9, 37:19, 38:4, 41:8, 43:16, 44:1, 49:21, 50:16, 50:23, 50:25, 51:8, 52:4, 53:10, 53:23, 54:20, 56:21, 59:15
**Fitzgeralds'** [1] - 48:14
**five** [1] - 18:10
**following** [1] - 31:9
**follows** [1] - 4:2
**FOR** [4] - 1:2, 2:2, 2:6, 2:9
**foregoing** [2] - 76:6, 76:8
**form** [4] - 3:15, 3:19, 35:13, 76:7
**formalities** [1] - 3:16

former [1] - 73:15
forth [2] - 27:6, 42:10
forths [1] - 28:15
forward [3] - 29:7, 63:4, 75:8
forwarded [6] - 12:20, 16:11, 16:13, 16:15, 16:21, 20:7
four [1] - 18:10
Franklin [1] - 2:4
frankly [1] - 64:6
free [1] - 62:16
friend [8] - 8:6, 34:3, 34:7, 37:10, 38:21, 39:2, 47:18, 56:2
friend's [1] - 47:19
friendly [2] - 46:18, 53:13
friends [10] - 7:11, 33:14, 35:21, 35:23, 38:19, 46:19, 47:20, 48:23, 51:16, 51:19
friendship [1] - 46:22
front [1] - 5:15
full [2] - 4:10, 44:8
funeral [1] - 34:8
FURTHER [3] - 75:21, 76:8, 76:12
future [2] - 43:20, 73:16

## G

Gabbert [1] - 75:17
GABBERT [2] - 2:10, 75:16
general [3] - 24:6, 62:25, 63:2
generally [1] - 74:7
generated [1] - 66:12
given [4] - 4:13, 9:14, 15:13, 76:10
Google [1] - 41:11
GRAY [3] - 1:23, 75:24, 76:20
Gray [2] - 3:11, 76:4
great [3] - 43:11, 44:3
Group [1] - 35:1
growing [1] - 33:19
guess [10] - 34:13, 51:23, 52:24, 54:12, 62:19, 68:10, 69:14, 70:15, 70:18, 71:16

## H

hagh [17] - 15:5, 22:16, 23:15, 23:18, 23:24, 24:2, 24:12, 25:14, 26:10, 27:3,

27:8, 29:25, 58:4, 58:22, 61:23, 63:13, 64:23
HAGH [2] - 1:11, 1:11
Hagh [21] - 13:16, 13:20, 14:1, 14:14, 15:1, 20:17, 20:25, 21:4, 21:7, 23:2, 25:7, 26:5, 26:19, 26:20, 26:21, 27:12, 56:20, 57:19, 58:1, 59:11, 62:20
Hagh's [1] - 31:13
half [1] - 72:22
hand [3] - 73:23, 74:12, 76:18
hand-off [2] - 73:23, 74:12
handful [1] - 18:9
handing [1] - 75:6
handled [2] - 56:16, 59:12
handling [1] - 59:3
hands [1] - 74:10
happy [1] - 5:4
hard [3] - 67:1, 67:10, 67:21
hardest [1] - 9:3
hats [1] - 51:22
head [1] - 4:22
hear [5] - 28:19, 32:8, 32:9, 67:8, 73:5
heard [4] - 45:11, 47:3, 47:7, 48:24
hearing [5] - 3:19, 40:7, 58:23, 58:25, 67:6
help [2] - 7:19, 36:1
hereby [1] - 76:5
herein [1] - 76:11
hereunto [1] - 76:17
himself [2] - 29:7, 54:16
hire [1] - 45:9
hired [2] - 70:16, 71:19
home [2] - 5:8, 36:7
honest [1] - 30:11
honestly [2] - 44:22, 48:12
horribly [2] - 56:4, 74:15
hour [1] - 72:22
house [1] - 68:25
hypothetical [1] - 60:11

## I

idea [4] - 69:11, 70:1,

74:25, 75:9
identify [1] - 50:22
illegal [1] - 42:2
Illinois [13] - 6:4, 10:8, 33:20, 36:9, 36:17, 42:14, 55:7, 55:10, 60:15, 60:18, 60:20, 60:21, 60:24
immediately [1] - 30:6
impact [1] - 31:22
important [2] - 4:18, 32:1
impression [1] - 61:23
IN [3] - 1:1, 1:5, 76:17
include [2] - 50:14, 64:23
incorporated [1] - 35:8
incurred [1] - 45:3
independently [1] - 35:21
indicate [1] - 64:7
indirectly [1] - 76:16
individually [2] - 47:11, 61:7
Individually [1] - 38:7
individuals [1] - 38:19
inform [2] - 53:23, 54:19
information [4] - 17:20, 18:2, 51:14, 56:23
informed [2] - 73:1, 73:9
inhouse [7] - 6:9, 6:15, 35:17, 35:24, 61:11, 61:12, 61:14
initial [6] - 7:22, 26:21, 49:20, 50:7, 53:24, 57:18
initiated [3] - 46:13, 70:20, 71:3
injury [7] - 6:14, 7:24, 9:1, 37:20, 37:25, 40:12, 58:5
instance [1] - 3:8
instances [1] - 23:22
instant [1] - 5:22
instatement [1] - 52:21
insurance [4] - 36:5, 36:6, 47:12, 66:25
intake [1] - 7:22
intending [1] - 18:5
intention [6] - 7:5, 44:7, 44:13, 44:25, 45:2, 45:18
interest [1] - 38:9
interested [1] - 76:15
interview [1] - 56:8

interviewed [1] - 22:14
introduction [1] - 8:14
involved [10] - 7:8, 14:4, 25:18, 26:5, 28:1, 28:16, 28:17, 28:21, 29:2, 54:24
involvement [3] - 15:22, 31:25, 45:4
IRADC [1] - 55:10
irrelevant [2] - 44:11, 44:20
issue [1] - 5:1
issues [3] - 6:11, 34:10, 66:6

## J

January [1] - 36:18
JEANNE [1] - 1:8, 2:2
Jeanne [2] - 4:5, 72:1
Jessica [1] - 47:22
John [2] - 32:6, 39:4
JOHN [1] - 2:6
jot [1] - 68:18
JR [2] - 2:3, 2:10
Judge [1] - 1:11
judgement [1] - 58:12
judgment [9] - 16:12, 16:16, 24:15, 24:25, 25:5, 50:5, 58:17, 58:22, 66:22
jumping [1] - 15:3
JUNE [1] - 1:18
June [7] - 3:7, 19:8, 19:18, 51:7, 51:10, 51:13, 76:18

## K

keep [10] - 48:1, 48:6, 49:13, 65:21, 66:8, 67:6, 67:18, 67:25, 73:1, 73:8
keeping [1] - 43:23
kept [2] - 20:1, 67:20
kind [6] - 40:6, 40:19, 41:19, 50:11, 65:14, 70:21
knowledge [6] - 14:5, 17:21, 18:22, 18:25, 26:11, 59:19

## L

language [2] - 11:9, 11:11
last [4] - 10:13, 30:15, 45:23, 72:4
law [45] - 6:5, 6:8, 9:6,

21:11, 22:18, 27:19, 34:12, 34:21, 34:23, 34:24, 35:2, 36:9, 36:11, 36:14, 36:17, 36:22, 37:6, 52:11, 52:17, 52:22, 52:25, 55:23, 56:18, 56:25, 57:8, 57:11, 58:5, 59:6, 59:8, 59:22, 60:1, 60:8, 60:14, 60:16, 60:17, 60:21, 60:25, 61:2, 66:3, 68:13, 72:25, 73:8, 73:21, 74:3, 74:20
Law [5] - 2:7, 10:22, 35:1, 35:6, 35:9
LAW [1] - 1:11
lawyer [5] - 60:20, 60:22, 60:24, 71:11, 71:14
lawyers [2] - 32:16, 56:3
lay [1] - 41:17
LCR [2] - 75:24, 76:20
Lea [2] - 3:11, 76:4
LEA [1] - 1:23, 75:24, 76:20
leading [1] - 14:13
LEAL [3] - 1:17, 2:16, 4:1
Leal [5] - 3:6, 4:12, 35:1, 35:7, 35:9
learn [5] - 15:16, 15:18, 21:17, 29:13, 29:16, 54:7, 54:13, 57:7
learned [7] - 15:10, 21:13, 21:20, 21:22, 21:23, 22:2, 53:9
learning [3] - 8:14, 71:9, 71:13
least [2] - 31:16, 40:19
led [2] - 34:5, 39:20
left [3] - 24:5, 24:6, 63:1
legal [16] - 10:3, 10:20, 12:2, 34:10, 45:3, 45:6, 45:15, 45:18, 49:21, 49:24, 50:4, 50:7, 51:18, 51:25, 59:25
Letter [2] - 2:23, 2:24
letter [27] - 9:15, 9:19, 9:25, 10:1, 10:4, 10:21, 10:24, 11:3, 11:11, 11:14, 11:25, 12:15, 12:19, 12:25, 13:2, 13:6, 13:9, 13:11, 18:20, 19:5, 22:7, 22:9, 42:17,

42:20, 54:10, 57:19, 57:21

**letterhead** [2] - 10:1, 12:1

**license** [9] - 6:6, 21:12, 24:12, 27:19, 34:18, 36:18, 52:22, 52:25, 55:24

**licensed** [6] - 5:25, 6:3, 8:1, 36:9, 36:11, 36:14

**lied** [1] - 48:24

**life** [3] - 6:11, 34:10, 36:6

**limbs** [1] - 43:22

**limited** [5] - 14:10, 14:21, 14:23, 61:23, 62:3

**line** [2] - 10:3, 50:1

**lines** [3] - 18:10, 27:17, 52:22

**list** [3] - 27:9, 40:20, 68:1

**litigation** [5] - 26:24, 27:13, 28:22, 50:4, 68:13

**live** [4] - 10:8, 38:19, 38:20, 49:11

**lives** [1] - 8:6

**LLC** [1] - 35:12

**locally** [1] - 41:13

**located** [1] - 5:7

**log** [33] - 17:2, 17:6, 17:8, 17:10, 17:17, 17:21, 18:17, 23:7, 23:23, 24:21, 25:19, 30:16, 32:24, 45:8, 50:15, 50:17, 50:20, 51:24, 52:9, 52:16, 53:20, 62:17, 63:18, 63:21, 63:24, 64:14, 64:19, 65:4, 65:17, 66:10, 66:11, 66:15, 67:13

**Log** [1] - 2:25

**logs** [1] - 66:16

**look** [24] - 9:21, 16:14, 16:17, 17:15, 18:8, 18:13, 20:18, 23:17, 26:18, 27:4, 27:16, 32:18, 37:17, 46:12, 50:12, 50:18, 52:12, 57:21, 64:4, 64:16, 70:11, 70:13, 71:3, 72:6

**looked** [3] - 12:4, 38:5, 65:4

**looking** [11] - 7:23, 9:25, 17:1, 28:6, 28:10, 38:24, 53:4,

57:23, 64:18, 66:23, 70:2

**looks** [5] - 18:9, 19:6, 19:17, 19:21, 26:19

**loop** [1] - 20:1

**loss** [2] - 34:5, 35:16

**lost** [1] - 43:22

**loved** [1] - 34:16

# M

**ma'am** [1] - 56:10

**mail** [29] - 19:13, 23:4, 23:15, 23:16, 23:18, 24:24, 25:3, 25:10, 26:20, 26:21, 26:23, 27:3, 27:4, 27:5, 27:8, 43:8, 51:2, 51:4, 62:19, 62:20, 63:11, 63:19, 63:25, 64:5, 64:10, 64:20, 65:3, 70:15

**mailbox** [1] - 63:2

**mailed** [1] - 26:19

**mails** [21] - 16:17, 19:6, 19:21, 20:16, 21:4, 25:23, 26:9, 26:14, 27:12, 28:11, 42:18, 42:23, 51:8, 62:6, 63:17, 64:14, 64:16, 65:5, 66:7, 66:8, 66:21

**maintain** [3] - 65:12, 66:16, 67:22

**maintained** [2] - 46:22, 67:10

**maintaining** [1] - 37:11

**manookian** [3] - 55:22, 60:8, 75:1

**Manookian** [91] - 4:7, 8:3, 8:12, 8:18, 8:23, 9:5, 9:9, 9:11, 9:15, 10:1, 10:22, 11:25, 13:6, 13:17, 13:19, 14:8, 14:16, 18:15, 18:21, 18:24, 19:7, 19:14, 19:19, 19:22, 19:23, 21:5, 22:5, 22:10, 22:25, 24:3, 24:16, 24:24, 25:4, 25:13, 25:23, 26:3, 26:23, 27:2, 28:23, 29:22, 31:1, 31:6, 32:7, 32:11, 32:17, 33:12, 38:6, 39:3, 39:6, 39:11, 39:17, 39:22, 39:25, 40:9, 41:8, 42:16, 43:23, 47:11, 48:25, 49:21,

51:2, 51:8, 52:10, 52:11, 52:14, 53:23, 54:4, 54:13, 54:16, 54:19, 57:3, 57:16, 57:25, 58:7, 59:9, 59:18, 63:1, 63:25, 64:1, 64:10, 69:20, 71:6, 71:10, 71:14, 72:25, 73:7, 74:10, 75:4

**MANOOKIAN** [4] - 1:6, 1:11, 2:6

**Manookian's** [13] - 8:5, 14:25, 20:20, 21:11, 24:11, 27:25, 38:12, 40:6, 40:16, 52:13, 52:17, 59:3, 62:10

**manookian's** [1] - 61:24

**Manookian)** [1] - 52:13

**March** [1] - 25:20

**marked** [8] - 9:22, 10:17, 11:21, 11:24, 12:15, 12:16, 17:16

**Marty** [8] - 10:2, 10:21, 12:1, 19:14, 34:2, 45:24, 51:2, 64:10

**matter** [34] - 3:20, 7:9, 7:24, 11:2, 12:8, 13:17, 17:13, 26:17, 32:1, 32:8, 35:6, 41:5, 42:4, 42:11, 45:5, 45:10, 45:13, 45:16, 46:1, 46:8, 46:19, 57:24, 65:3, 68:8, 68:15, 70:3, 70:17, 70:22, 70:23, 71:1, 71:11, 71:20, 71:22, 72:1

**matters** [7] - 6:14, 37:20, 65:22, 68:13, 73:2, 73:9, 73:16

**McCarthy** [16] - 3:6, 4:4, 4:10, 4:12, 5:25, 6:21, 11:2, 22:22, 31:12, 32:6, 35:1, 35:7, 35:10, 60:3, 75:13, 75:19

**MCCARTHY** [3] - 1:17, 2:16, 4:1

**mean** [15] - 26:7, 38:22, 43:5, 44:8, 46:19, 52:10, 52:11, 55:7, 55:8, 59:7, 64:6, 64:9, 65:1, 68:6, 74:9

**meaning** [1] - 31:18

**means** [3] - 3:14,

52:14, 61:12

**mediation** [7] - 23:12, 26:22, 28:7, 28:9, 29:2, 29:3, 29:10

**meeting** [2] - 8:13, 31:2

**Megan's** [2] - 37:5, 43:20

**Melissa** [11] - 10:2, 10:21, 12:2, 34:1, 45:24, 53:12, 54:1, 54:7, 55:4, 56:1, 56:6

**member** [1] - 9:6

**memorialized** [3] - 45:7, 51:24, 53:19

**memorializing** [1] - 42:16

**memory** [6] - 16:24, 24:18, 26:12, 54:15, 56:13, 69:16

**Menefee** [4] - 39:4, 39:5, 39:12, 39:25

**menefee** [5] - 39:13, 40:11, 40:24, 41:13, 41:22

**Menefee's** [2] - 39:6, 40:8

**menefee's** [1] - 41:15

**mention** [1] - 16:11

**mentioned** [5] - 21:10, 21:20, 34:22, 51:6, 63:15

**mentions** [2] - 50:16, 52:18

**merely** [1] - 65:6

**message** [3] - 46:5, 46:7, 46:10

**messages** [1] - 30:23

**messaging** [1] - 5:22

**met** [2] - 8:18, 44:2

**Middle** [1] - 40:13

**MIDDLE** [1] - 1:2

**middle** [1] - 5:4

**might** [2] - 10:12, 52:11

**mind** [1] - 32:3

**mine** [2] - 27:6, 43:13

**minute** [1] - 13:24

**Missy** [1] - 51:15

**moment** [1] - 32:15

**money** [7] - 44:25, 47:5, 47:8, 47:12, 48:1, 48:6, 48:9

**money-seeking** [1] - 47:8

**months** [1] - 69:14

**morning** [4] - 4:4, 4:9, 5:16, 9:24

**motion** [4] - 16:12,

16:15, 25:1, 66:22

**motions** [2] - 25:25, 26:25

**move** [1] - 5:1

**moving** [1] - 63:4

**MR** [14] - 4:3, 10:15, 13:14, 16:25, 17:5, 17:24, 22:21, 22:24, 31:11, 32:5, 59:24, 60:2, 75:16, 75:18

**multiple** [4] - 40:17, 47:20, 62:9, 62:11

# N

**name** [23] - 4:4, 4:11, 6:16, 6:17, 8:5, 9:8, 12:11, 32:6, 34:24, 38:12, 38:21, 40:4, 40:6, 40:7, 40:15, 41:18, 41:20, 47:19, 51:6, 52:13, 55:9, 63:22

**named** [4] - 13:16, 57:10, 59:8, 59:21

**names** [10] - 33:11, 40:17, 40:23, 40:25, 41:1, 41:6, 41:10, 47:21, 57:22

**NASHVILLE** [1] - 1:3

**Nashville** [4] - 1:24, 2:8, 2:12, 38:20

**nature** [4] - 39:8, 46:3, 50:3, 50:10

**necessarily** [3] - 49:3, 51:17, 65:10

**need** [5] - 5:2, 34:15, 65:20, 71:18

**needed** [2] - 7:15, 69:3

**never** [12] - 12:24, 13:5, 13:25, 15:1, 21:8, 29:22, 29:25, 30:3, 31:2, 31:4, 57:1, 65:6

**new** [2] - 22:15, 35:4

**next** [10] - 23:17, 25:19, 26:18, 26:22, 27:9, 27:16, 61:20, 74:9, 74:21

**NO** [3] - 10:14, 13:13, 17:23

**non** [1] - 60:24

**non-lawyer** [1] - 60:24

**none** [1] - 61:20

**nonprofit** [1] - 49:15

**noon** [2] - 68:4, 68:5

**North** [1] - 2:7

**nose** [1] - 10:7

**NOT** [1] - 75:21

not-for-profit [4] -
43:17, 44:10, 45:1,
49:15
not-for-profits [1] -
43:25
notary [1] - 3:12
note [4] - 52:20,
59:10, 64:11, 68:9
noted [1] - 65:7
notes [4] - 5:18,
67:18, 68:12, 68:18
nothing [4] - 23:21,
32:3, 35:22, 51:23
notice [4] - 3:16,
15:12, 15:13, 72:20
notified [4] - 22:6,
55:1, 56:13, 56:14
notify [1] - 15:11,
34:19, 55:2
notifying [2] - 22:10,
36:4
notwithstanding [1] -
74:2
November [5] - 19:9,
19:10, 19:18, 20:16,
21:1
nowhere [1] - 51:5
NUMBER [1] - 2:22
Number [1] - 19:2
number [11] - 7:21,
12:21, 19:6, 21:18,
24:7, 32:19, 32:21,
41:3, 41:4, 64:14

**O**

o'clock [1] - 31:2
object [1] - 17:1
objection [1] - 59:24
objections [1] - 3:18
objects [1] - 4:24
obligation [4] - 73:1,
73:8, 73:15, 73:25
obligations [1] - 75:6
occurred [2] - 29:11,
69:17
occurring [1] - 24:10
October [1] - 30:16
odd [2] - 25:13, 25:15
OF [3] - 1:2, 1:16, 2:15
offer [1] - 49:21
office [3] - 24:6,
32:15, 68:15
Office [2] - 35:6, 35:9
often [4] - 16:3, 16:4,
16:6, 16:7
older [1] - 34:2
once [2] - 19:5, 54:22
One [6] - 9:22, 10:1,
10:17, 11:21, 18:13,

57:23
one [33] - 5:14, 9:2,
12:4, 13:21, 15:6,
16:11, 18:10, 19:1,
19:11, 20:19, 22:5,
23:3, 23:8, 23:10,
23:11, 24:2, 24:4,
24:22, 31:2, 34:16,
40:19, 43:2, 43:3,
43:19, 49:16, 52:19,
54:25, 56:23, 59:9,
63:8, 63:11, 67:7
one-third [2] - 43:2,
43:3
ongoing [1] - 74:23
online [1] - 38:23
open [1] - 5:21
opened [1] - 71:1
opinion [1] - 60:10
opposition [3] - 58:12,
58:16, 58:23
or-profit [1] - 48:15
order [6] - 7:19, 15:11,
55:1, 55:3, 55:18,
55:22
original [1] - 53:2
originally [1] - 38:13
Osborne [2] - 6:22,
7:9
outcome [3] - 31:21,
31:23, 59:15
outside [3] - 38:19,
38:20, 47:12
owed [1] - 41:22
own [8] - 6:10, 21:25,
36:22, 37:6, 47:10,
50:5, 60:24, 61:9
owned [1] - 60:22
ownership [1] - 38:9

**P**

P.O [1] - 1:24
packed [1] - 67:17
page [6] - 10:25, 12:6,
23:17, 27:9, 50:24,
52:20
PAGE [1] - 2:22
paid [2] - 45:20, 65:24
paper [3] - 5:15, 5:19,
68:10
paragraph [3] - 10:25,
12:7, 12:12
pardon [1] - 67:2
part [6] - 14:23, 40:8,
46:7, 59:8, 73:23,
74:22
parties [5] - 9:23,
29:18, 29:20, 32:2,
76:14

partner [3] - 14:15,
57:11, 60:15
partners [1] - 59:21
party [5] - 8:10, 47:16,
56:25, 57:4, 59:10
passed [1] - 7:13
passes [1] - 34:17
past [1] - 39:9
pay [3] - 41:25, 45:3,
45:18
payments [1] - 36:6
pending [3] - 25:25,
26:25, 66:4
per [3] - 15:11, 55:1
percentage [1] - 61:17
period [4] - 50:23,
56:6, 61:24, 69:23
periodically [3] - 21:6,
62:7, 63:16
person [3] - 14:10,
40:20, 41:17
personal [1] - 6:14,
7:24, 9:1, 35:23,
36:23, 37:10, 37:20,
37:25, 39:18, 40:12,
58:5
perspective [3] -
31:12, 31:15, 43:10
PHILLIP [1] - 2:3
Phillip [1] - 4:5
phone [9] - 7:25, 8:21,
32:14, 41:9, 53:13,
62:9, 62:23, 63:7,
63:11
physically [1] - 5:6
pick [1] - 11:23
picture [1] - 50:11
piece [1] - 6:13
place [2] - 53:17,
76:11
Plaintiff [2] - 1:9,
47:11
plaintiff [1] - 58:4
plan [1] - 55:7
planned [1] - 43:16
planning [2] - 41:25,
49:5
play [1] - 28:14
PLC [1] - 2:7
pleadings [7] - 16:2,
16:3, 16:9, 16:10,
20:4, 24:13, 24:17
PLLC [7] - 1:6, 1:11,
1:11, 2:3, 2:6, 4:7,
32:7
plus [2] - 7:11, 21:18
point [12] - 9:2, 13:21,
14:10, 17:25, 18:3,
21:11, 44:16, 48:23,
54:6, 54:18, 54:25,

56:20
pointed [1] - 34:16
portion [11] - 41:22,
42:3, 42:6, 42:20,
42:24, 43:2, 44:8,
49:6, 49:13, 49:17
position [2] - 10:12,
38:8
positioned [1] - 70:21
possession [1] -
67:16
possible [2] - 32:12,
66:24
possibly [2] - 31:16,
64:24
potential [1] - 12:24
potentially [1] - 66:24
powered [1] - 5:12
PowerPoint [5] -
16:12, 16:21, 24:15,
58:8, 58:16
practice [28] - 6:5, 6:8,
6:10, 8:15, 35:2,
36:9, 36:11, 36:14,
36:23, 37:6, 37:12,
37:15, 38:25, 52:17,
55:23, 56:18, 58:4,
59:21, 60:8, 60:16,
61:2, 61:9, 61:18,
72:25, 73:8, 73:21,
74:3, 74:20
practices [1] - 36:22
practicing [1] - 35:5
practitioner [1] -
35:11
pre [2] - 9:22, 11:24,
17:16
pre-marked [3] - 9:22,
11:24, 17:16
preface [1] - 6:25
preparation [1] -
32:20
prepared [1] - 48:8
present [2] - 28:9,
29:3
presentation [3] -
16:22, 24:15, 58:8
primary [1] - 14:11
printouts [1] - 66:21
private [4] - 8:10,
37:11, 61:2, 61:18
Privilege [1] - 2:25
privilege [34] - 7:2,
7:6, 7:7, 8:11, 17:1,
17:3, 17:6, 17:8,
17:10, 17:17, 18:6,
18:17, 23:7, 23:23,
32:24, 45:7, 50:15,
50:17, 50:20, 51:24,
52:9, 52:16, 53:20,

62:17, 63:18, 63:21,
63:24, 64:14, 64:19,
65:4, 65:10, 66:10,
66:11, 66:15
privileged [2] - 18:2,
18:4
problem [2] - 10:10,
56:11
procedural [1] - 23:12
Procedure [2] - 3:10,
44:18
proceed [1] - 29:6
proceedings [1] -
31:10
proceeds [3] - 47:9,
49:14, 49:17
process [1] - 74:22
produce [1] - 11:6
produced [3] - 17:8,
32:23, 50:21
product [1] - 17:3
Professional [3] -
55:14, 75:5, 75:10
profit [5] - 43:17,
44:10, 45:1, 48:15,
49:15
profits [1] - 43:25
proportion [1] - 65:24
prosthetics [1] - 43:21
provide [2] - 34:9,
46:16
provided [3] - 35:20,
40:4, 50:6
providers [1] - 66:25
providing [2] - 25:13,
51:13
provisions [1] - 3:9
public [1] - 3:12
pulled [1] - 5:19
pursuant [2] - 3:9,
18:17
pursuits [1] - 43:21
put [2] - 52:13, 68:14

**Q**

qualified [1] - 58:4
questions [12] - 4:21,
4:23, 5:5, 7:3, 7:4,
18:1, 32:4, 36:4,
44:19, 72:12, 75:16,
75:19
quick [1] - 51:6
quicker [1] - 52:19

**R**

rain [1] - 10:13
rate [1] - 8:16
rather [1] - 49:14

**RE** [2] - 1:5, 10:3
**re** [1] - 60:4
**re-ask** [1] - 60:4
**reach** [1] - 41:21
**reached** [1] - 7:21
**read** [3] - 9:13, 11:9, 49:9
**reading** [1] - 39:1
**real** [1] - 6:11
**reason** [3] - 53:22, 54:18, 58:3
**recalling** [1] - 20:20
**received** [4] - 7:13, 25:3, 51:4, 59:15
**receiver** [1] - 69:24
**recipient** [1] - 40:2
**recollection** [3] - 14:9, 24:1, 54:22
**recommendation** [1] - 39:10
**recommendations** [1] - 40:12
**recommending** [1] - 41:8
**record** [4] - 4:7, 4:11, 22:22, 23:14
**recorded** [1] - 76:6
**records** [4] - 65:12, 65:15, 67:23, 68:7
**recover** [1] - 42:7
**recovery** [3] - 44:9, 44:23, 49:6
**reduce** [1] - 3:14
**reduced** [1] - 76:7
**refer** [3] - 8:22, 62:17, 65:22
**reference** [1] - 30:17
**referenced** [1] - 12:11
**references** [1] - 11:10
**referral** [7] - 39:17, 39:22, 40:1, 41:15, 49:20, 50:7
**referrals** [1] - 6:13
**referred** [3] - 8:8, 32:11, 38:2
**referring** [9] - 32:17, 39:3, 55:2, 57:4, 65:16, 65:21, 70:4, 74:4, 74:6
**reflect** [2] - 63:19, 64:2
**reflected** [1] - 23:6
**reflects** [1] - 66:11
**refresh** [1] - 69:16
**regard** [1] - 7:12
**regarding** [12] - 12:2, 17:12, 23:20, 24:25, 25:24, 26:21, 26:24, 27:13, 27:18, 27:19, 52:21, 52:24

**regards** [45] - 6:13, 20:1, 23:11, 23:12, 28:10, 28:11, 28:12, 28:13, 28:15, 33:10, 33:11, 34:14, 34:17, 36:1, 36:4, 38:17, 42:10, 43:21, 45:4, 45:9, 47:4, 48:24, 49:24, 50:8, 51:1, 51:17, 52:2, 53:7, 56:7, 58:19, 63:3, 64:21, 65:21, 66:2, 66:5, 66:19, 66:23, 69:12, 70:16, 70:21, 70:23, 71:7, 71:19, 72:7, 72:18
**regular** [2] - 4:20, 67:23
**reinstatement** [5] - 27:19, 27:20, 28:1, 28:5, 52:25
**relating** [3] - 73:2, 73:9, 73:16
**relationship** [2] - 49:1, 57:14
**relative** [2] - 76:12, 76:14
**relatively** [1] - 5:2
**relied** [1] - 41:13
**rely** [1] - 50:5
**remainder** [2] - 45:20, 48:6
**remember** [6] - 20:9, 21:16, 25:9, 27:22, 41:2, 41:6
**Reporter** [2] - 75:24, 76:21
**reporter** [2] - 3:11, 76:4
**Reporter's** [1] - 2:18
**represent** [14] - 4:5, 7:24, 9:11, 9:24, 12:3, 20:23, 32:7, 61:6, 61:7, 61:8, 61:11, 61:15, 61:18, 73:24
**representation** [14] - 7:15, 8:3, 10:3, 10:20, 12:2, 45:4, 48:1, 48:5, 57:12, 57:18, 70:16, 73:17, 74:1, 74:24
**representations** [1] - 6:12
**represented** [7] - 44:6, 45:10, 45:11, 45:12, 48:25, 53:3, 75:8
**representing** [3] - 37:14, 56:20, 56:24
**request** [1] - 11:17

**require** [2] - 44:18, 65:24
**required** [2] - 74:20, 75:7
**research** [5] - 38:17, 38:21, 38:22, 38:23, 66:22
**reserved** [1] - 3:19
**resigned** [1] - 57:8
**resolve** [1] - 5:1
**respect** [5] - 35:19, 36:17, 42:19, 52:9, 74:12
**respond** [2] - 27:2, 62:24
**responded** [1] - 15:9
**responding** [1] - 27:7
**response** [9] - 11:7, 17:7, 17:18, 22:18, 31:4, 32:24, 34:22, 50:21, 66:12
**Responsibility** [3] - 55:14, 75:5, 75:11
**responsibility** [1] - 74:8
**restating** [1] - 22:22
**result** [1] - 42:1
**retain** [1] - 71:5
**retained** [2] - 71:7, 71:10
**retainer** [1] - 9:13
**retired** [1] - 59:18
**return** [2] - 25:23, 63:4
**returned** [3] - 24:4, 30:23, 30:25
**review** [8] - 16:2, 16:9, 16:14, 22:19, 32:20, 51:6, 56:7, 65:3
**reviewed** [3] - 13:3, 20:7, 20:9, 46:13, 55:4, 55:7, 55:16, 60:17, 67:15
**reviewing** [1] - 20:4
**RLM** [9] - 19:14, 19:15, 24:24, 25:22, 26:20, 27:13, 62:21, 63:25
**role** [10] - 14:7, 14:20, 16:1, 31:13, 35:24, 37:16, 52:3, 61:23, 62:3, 62:5
**Ronette** [5] - 3:6, 4:12, 11:2, 35:7, 35:9
**RONETTE** [3] - 1:17, 2:16, 4:1
**room** [5] - 4:8, 5:9, 5:13, 67:5, 67:7
**row** [1] - 4:22
**rule** [1] - 60:24
**Rules** [2] - 3:10, 44:18

**rules** [2] - 4:16, 65:23
**run** [1] - 72:23
**running** [1] - 68:1

## S

**SAITH** [1] - 75:21
**saw** [2] - 12:20, 21:25
**schedule** [1] - 72:8
**scheduled** [1] - 12:21
**scheduling** [7] - 23:13, 23:21, 26:21, 27:13, 30:17, 31:18, 72:19
**school** [1] - 43:20
**scope** [2] - 46:15, 72:20
**screen** [1] - 5:19
**screens** [1] - 5:12
**search** [1] - 21:25
**second** [2] - 10:25, 12:6
**section** [2] - 11:1, 12:6
**security** [1] - 36:5
**see** [20] - 10:4, 12:7, 12:8, 12:11, 18:14, 20:18, 23:8, 23:10, 23:11, 23:23, 25:1, 25:25, 26:25, 27:14, 27:20, 28:11, 30:15, 30:18, 32:12, 46:12, 57:22, 59:7, 64:6, 70:11, 71:3
**seeing** [2] - 40:7, 53:7
**seeking** [1] - 47:8
**seem** [1] - 22:18
**selected** [1] - 44:1
**sell** [1] - 34:20
**send** [2] - 24:12, 24:16
**sending** [1] - 12:23
**sense** [1] - 35:12
**sent** [12] - 10:24, 11:3, 11:11, 11:15, 11:20, 13:5, 21:8, 24:18, 46:10, 46:11, 58:8, 69:6
**separately** [1] - 34:8
**services** [5] - 34:8, 34:15, 35:20, 61:19, 65:25
**set** [1] - 76:17
**settled** [9] - 16:8, 29:14, 29:15, 29:17, 29:23, 30:1, 30:4, 30:7, 31:5
**several** [1] - 30:15
**shake** [1] - 4:22
**share** [1] - 30:13
**short** [3] - 5:2, 30:8,

31:9
**show** [1] - 63:21
**shows** [1] - 26:23
**sides** [2] - 43:9, 47:1
**signed** [4] - 9:18, 9:20, 13:9, 19:6
**signing** [1] - 3:17
**similar** [1] - 37:19
**simple** [1] - 34:17
**SIMS** [1] - 2:10
**sit** [2] - 33:6, 44:24
**situation** [1] - 32:15
**six** [2] - 18:10
**slightly** [1] - 12:4
**small** [1] - 6:12
**smooth** [1] - 56:16
**social** [1] - 36:4
**software** [1] - 68:17
**sole** [1] - 56:23
**solo** [1] - 35:11
**someone** [4] - 4:24, 8:8, 60:22, 67:5
**sometime** [1] - 29:15
**somewhere** [2] - 52:15, 68:25
**sorry** [15] - 6:16, 16:25, 28:16, 28:19, 29:19, 34:21, 37:1, 40:25, 48:3, 48:4, 51:1, 54:3, 67:3, 74:14, 74:17
**Sorry** [1] - 56:10
**sort** [4] - 5:5, 15:24, 40:10, 50:10
**source** [3] - 39:22, 40:1, 54:14
**South** [1] - 2:11
**specially** [1] - 4:18
**specific** [6] - 15:25, 16:11, 24:21, 33:11, 49:24, 59:7
**specifically** [8] - 4:24, 10:24, 11:10, 12:5, 18:8, 57:22, 67:17, 67:19
**specifics** [1] - 54:9
**specified** [1] - 76:11
**specify** [1] - 42:20
**spells** [1] - 42:24
**spent** [6] - 45:7, 65:19, 67:14, 67:23, 68:15, 68:18
**spoken** [2] - 13:25, 15:1
**sporadic** [1] - 65:5
**sporadically** [1] - 26:16
**spragens** [1] - 70:10
**SPRAGENS** [5] - 2:6, 16:25, 22:21, 32:5,

60:2
**Spragens** [8] - 2:7, 2:18, 32:6, 32:13, 56:5, 67:6, 70:3, 74:14
**Spragens'** [1] - 17:25
**standard** [1] - 42:12
**State** [4] - 3:12, 75:25, 76:5, 76:22
**state** [4] - 4:10, 6:3, 55:6, 69:25
**statement** [4] - 49:2, 49:8, 49:9
**statements** [1] - 22:23
**states** [3] - 36:15, 42:14, 60:24
**States** [1] - 33:10
**STATES** [1] - 1:1
**status** [2] - 25:4, 63:3
**stay** [2] - 22:17, 32:14
**stenographic** [1] - 3:14
**stenographically** [1] - 76:6
**Sterling** [1] - 33:23
**still** [3] - 44:7, 44:12, 48:13
**Stipulations** [1] - 2:17
**storage** [2] - 68:22, 68:24
**strained** [1] - 49:1
**strategies** [2] - 28:22, 51:18
**strategy** [4] - 25:24, 28:12, 50:11, 52:1
**subpoena** [7] - 11:7, 17:7, 17:18, 32:23, 50:21, 66:12, 69:6
**substance** [1] - 72:11
**substantive** [3] - 15:7, 23:21, 66:5
**success** [1] - 8:16
**Suite** [2] - 2:4, 2:11
**summary** [12] - 16:12, 16:16, 24:15, 24:25, 25:5, 25:24, 26:20, 58:12, 58:16, 58:22, 66:21
**support** [1] - 31:15
**Supreme** [2] - 55:19, 55:22
**surprise** [1] - 60:21
**suspended** [22] - 13:23, 15:10, 16:19, 20:24, 21:12, 21:25, 23:1, 24:3, 24:12, 24:17, 55:24, 58:8, 59:9, 62:14, 63:2, 72:25, 73:7, 73:20, 74:3, 74:19, 74:23,

75:2
**suspension** [27] - 13:25, 15:1, 15:4, 15:14, 15:16, 15:19, 20:21, 21:2, 21:7, 21:15, 21:19, 22:3, 22:11, 24:9, 52:17, 53:2, 53:8, 53:10, 53:24, 54:8, 54:20, 54:23, 56:14, 61:25, 62:10, 62:12, 75:7
**swear** [1] - 3:13
**swimming** [1] - 43:20
**Sworn** [1] - 75:23
**sworn** [1] - 4:2
**system** [1] - 68:14

## T

**TABLE** [1] - 2:15
**technological** [1] - 56:11
**telephone** [15] - 17:12, 19:2, 19:12, 20:21, 22:7, 23:4, 23:5, 24:19, 30:17, 30:20, 50:25, 51:15, 54:10, 66:8, 68:2
**TENNESSEE** [1] - 1:2
**Tennessee** [30] - 1:24, 2:4, 2:8, 2:12, 3:10, 3:12, 6:23, 7:17, 7:20, 7:21, 8:1, 8:7, 32:22, 36:12, 38:18, 40:13, 55:6, 55:9, 55:13, 55:19, 55:22, 59:25, 66:3, 66:4, 69:25, 75:5, 75:10, 75:25, 76:5, 76:22
**testified** [8] - 4:2, 32:10, 33:13, 34:9, 36:8, 53:9, 61:22, 62:22
**testify** [1] - 48:8
**testimony** [1] - 76:10
**text** [3] - 46:5, 46:7, 46:10
**texting** [1] - 5:22
**THE** [3] - 1:1, 1:2, 2:2
**thinking** [3] - 7:14, 63:10, 68:12
**Third** [1] - 2:11
**third** [11] - 29:18, 29:20, 42:12, 43:2, 43:3, 43:13, 43:15, 43:24, 47:16
**third-parties** [2] - 29:18, 29:20
**third-party** [1] - 47:16
**Thompson** [1] - 2:3

thoughts [1] - 28:13
**three** [3] - 18:10, 52:23, 72:18
**Three** [1] - 17:16, 24:22, 50:18, 50:19
**throughout** [4] - 16:7, 33:10, 42:13, 49:25
**timeline** [2] - 28:6, 70:2
**today** [16] - 5:7, 5:8, 12:18, 32:15, 33:6, 34:6, 35:3, 38:5, 44:24, 45:12, 48:8, 49:3, 49:15, 52:6, 75:13, 75:19
**today's** [2] - 72:5, 72:12, 72:16
**took** [1] - 53:16
**total** [1] - 45:15
**Tower** [1] - 2:4
**town** [3] - 33:19, 33:20, 33:22
**transcript** [4] - 49:11, 76:6, 76:9
**transfer** [2] - 73:2, 73:9
**transferred** [1] - 73:12
**transition** [1] - 74:22
**transpired** [1] - 48:11
**trial** [6] - 23:13, 26:22, 28:7, 28:9, 28:11, 28:14
**tricky** [1] - 51:20
**true** [4] - 17:21, 47:5, 60:12, 76:9
**trust** [1] - 18:4
**TRUST** [2] - 1:12, 2:9
**Trustee** [7] - 3:9, 4:6, 11:7, 17:8, 70:8, 70:9, 72:1
**TRUSTEE** [2] - 1:8, 2:2
**Trustee's** [1] - 17:18
**trusts** [2] - 6:12, 34:14
**trying** [5] - 17:2, 50:1, 54:17, 67:22, 70:18
**turn** [1] - 27:9
**twice** [2] - 40:6, 62:15, 62:23
**two** [17] - 10:25, 12:6, 15:6, 18:10, 19:17, 23:3, 23:22, 24:2, 26:18, 37:16, 40:23, 40:25, 41:2, 51:22, 52:20, 52:22, 61:10
**Two** [4] - 11:24, 12:15, 12:17, 41:2
**type** [1] - 36:7
**types** [1] - 16:5
**typewritten** [2] - 3:15,

76:7
**typically** [1] - 67:18

## U

**ultimately** [3] - 8:22, 9:10, 29:2
**unclear** [1] - 70:24
**under** [3] - 12:6, 35:5, 57:1
**understood** [1] - 57:10
**unfamiliar** [1] - 9:1
**unique** [1] - 5:6
**UNITED** [1] - 1:1
**United** [1] - 33:10
**unless** [1] - 4:24
**up** [9] - 5:19, 11:23, 14:18, 33:19, 38:21, 42:8, 54:18, 68:4, 74:15
**Update** [4] - 24:25, 25:24, 26:24, 27:18
**update** [4] - 25:13, 26:22, 27:3, 27:13
**updates** [2] - 28:22, 52:21
**updating** [1] - 25:4
**utilize** [1] - 47:5

## V

**various** [1] - 16:10
**version** [1] - 11:11
**versus** [1] - 7:9
**veterans** [1] - 43:22
**via** [1] - 3:7
**view** [2] - 50:6, 59:14
**violate** [4] - 7:1, 7:5, 7:6, 18:6
**violating** [2] - 7:7, 8:11
**voice** [2] - 63:2, 67:6
**voicemail** [2] - 24:6, 62:25
**voicemails** [2] - 24:5, 63:1
**vouch** [2] - 39:21, 40:3
**vouched** [1] - 39:25
**vouching** [1] - 40:8

## W

**waived** [2] - 3:18, 75:22
**walk** [1] - 50:1
**Walker** [1] - 1:11
**WAS** [3] - 10:14, 13:13, 17:23

**wearing** [1] - 51:23
**website** [1] - 55:17
**week** [1] - 21:18
**weeks** [2] - 11:16, 12:21
**WHEREOF** [1] - 76:17
**wills** [1] - 6:12
**WILSON** [1] - 1:23
**wins** [1] - 8:15
**wish** [1] - 48:19
**witness** [3] - 3:13, 17:2, 76:11
**WITNESS** [2] - 75:20, 76:17
**witnesses** [1] - 28:13
**wonderful** [2] - 41:11, 44:4
**word** [2] - 40:3, 54:5
**words** [2] - 14:22, 48:20
**world** [2] - 41:11, 74:7
**Wright** [1] - 47:22
**written** [2] - 17:11, 42:15
**wrongful** [2] - 40:12, 58:5

## Y

**years** [3] - 7:11, 32:19, 33:14
**YOUNG** [10] - 2:3, 4:3, 10:15, 13:14, 17:5, 17:24, 22:24, 31:11, 59:24, 75:18
**Young** [4] - 2:17, 4:5, 38:15, 53:3
**young** [17] - 37:17, 50:19, 69:6, 69:10, 69:13, 69:14, 69:17, 69:23, 70:7, 70:8, 70:19, 71:1, 71:15, 71:23, 72:5, 72:10, 72:16
**yourself** [3] - 48:2, 48:7

## Z

**Zoom** [3] - 3:7, 4:18, 5:6