**EXHIBIT**

6



**HARPETH**
**COURT REPORTERS**

(615) 933-6786
www.harpethcourtreporters.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE:                              ) Case No:
                                    ) 3:19-bk-07235
     CUMMINGS MANOOKIAN, PLLC,      ) Chapter 7
                                    )
          Debtor,                   ) Honorable Charles
_____  ) M. Walker
                                    )
Jeanne Ann Burton, in her           )
capacity as Chapter 7               )
Trustee,                            )
                                    )
          Plaintiff,                )
                                    )
v.                                  ) Adv. No:
                                    ) 3:20-ap-90002
Hagh Law, PLLC, Afsoon Hagh,        )
Manookian PLLC,                     )
                                    )
          Defendants.               )
_____  )

Deposition of

JEANNE ANN BURTON, TRUSTEE

Taken on behalf of the Defendants

Commencing at 10:09 a.m.

April 20, 2022

Reported by:

Harpeth Court Reporters
Franklin, Tennessee
Sabrina L. Schneider, LCR No. 455

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3        PHILLIP YOUNG, ESQ.
          Thompson Burton, PLLC
 4        One Franklin Park
          6100 Tower Circle, Suite 200
 5        Franklin, Tennessee 37067
          (615) 465-6008
 6        phillip@thompsonburton.com

 7   For the Defendant HAGH LAW, PLLC, and AFSOON HAGH:

 8        CRAIG V. GABBERT, JR., ESQ.
          Bass Berry & Sims
 9        150 Third Avenue South, Suite 2800
          Nashville, Tennessee 37201
10        (615) 742-6277
          cgabbert@bassberry.com

11
     For the Defendant MANOOKIAN, PLLC:
12
          JOHN SPRAGENS, ESQ.
13        Spragens Law, PLC
          311 22nd Avenue North
14        Nashville, Tennessee 37203
          (615) 983-8900
15        john@spragenslaw.com

16   Also Present:

17        Brian Manookian

18

19

20

21

22

23

24

25
```

```
                        I N D E X

                INDEX OF EXAMINATIONS

                                           Page

By Mr. Spragens...................................5

By Mr. Gabbert..................................116

By Mr. Spragens.................................122



                INDEX OF EXHIBITS

Exhibit      Description                    Page
```

No. 1  5/23/18 letter in re: Fitzgerald new
       Legal Representation and Engagement......45
No. 2  12/7/18 letter in re: Fitzgerald
       Withdrawal by Brian Manookian and
       Cummings Manookian......................50
No. 3  Plaintiff's Responses to Manookian
       PLLC's First Set of Written Discovery
       to the Plaintiff.........................81
No. 4  4/19/17 letter in re: Goodwin/Keefer
       Legal Representation and Engagement......81

1        The deposition of JEANNE ANN BURTON, TRUSTEE,
2  was taken on behalf of the Defendants on the 20th day
3  of April, 2022, in the offices of the U.S. Customs
4  House, 701 Broadway, Nashville, Tennessee, for all
5  purposes under the Federal Rules of Civil Procedure.
6        The formalities as to notice, caption,
7  certificate, et cetera, are waived.  All objections,
8  except as to the form of the questions, are reserved
9  to the hearing.
10        It is agreed that Sabrina L. Schneider, being
11  a Notary Public and Court Reporter for the State of
12  Tennessee, may swear the witness, and that the reading
13  and signing of the completed deposition by the witness
14  are reserved.
15
16
17
18
19
20                        *  *  *
21
22
23
24
25

```
 1              JEANNE ANN BURTON, TRUSTEE
 2   was called as a witness, and after having been first
 3   duly sworn, testified as follows:
 4                 E X A M I N A T I O N
 5   BY MR. SPRAGENS:
 6   Q.      Good morning, Ms. Burton.
 7   A.      Good morning.
 8   Q.      I'm John Spragens.  We've met before.  And you
 9   understand that you're here today to give a deposition
10   in the adversary proceeding that you filed as trustee
11   for Cummings Manookian, PLLC?
12   A.      Yes.
13   Q.      What is Cummings Manookian, PLLC?
14   A.      It was a professional limited liability
15   company, a law business, a law practice.
16   Q.      And is it currently in operation?
17   A.      No.
18   Q.      When did it cease operations?
19   A.      The date of the filing of the bankruptcy
20   petition.
21   Q.      And do you know what date that was?
22   A.      November 6, 2019.
23   Q.      Are you aware of what operations it was
24   conducting prior to November 6, 2019?
25   A.      Other than a general law practice, the
```

```
 1  practice of law.

 2  Q.     Let's take, for example, October of 2019.

 3  What operations was Cummings Manookian, PLLC,

 4  conducting during that time?

 5  A.     I think at that time the Shoemaker case was

 6  ongoing.  I don't think that case had been settled at

 7  that time.

 8  Q.     Had that case been filed as of October 2019?

 9  A.     Yes.

10  Q.     And that's the Shoemaker case you're talking

11  about?

12  A.     Yes.

13  Q.     When was that case filed?

14  A.     It's either February 2019 or February 2018,

15  but I think it was 2019.

16  Q.     And in October of 2019, what -- let me just

17  stop right now.  When I say "Cummings Manookian,"

18  you'll know that I mean Cummings Manookian, PLLC; is

19  that right?

20  A.     Yes.

21  Q.     What was Cummings Manookian doing in October

22  of 2019 on the Shoemaker case?

23  A.     I don't -- I do not know.  Let me think about

24  that.

25  Q.     Sure.
```

1  A.      I don't know.  I know we recently got some
2  discovery on that, but I don't know specifically what
3  was going on in that case at that time.
4  Q.      Who was working for Cummings Manookian in
5  October of 2019?
6  A.      Afsoon Hagh was working on that case, and I
7  can't -- are you asking me for Cummings Manookian or
8  all of the lawyers that were working on that case at
9  that time?
10  Q.      Right now I'm just talking about Cummings
11  Manookian.
12  A.      Afsoon Hagh.  And without the date of
13  Mr. Manookian's suspension in front of me -- it was in
14  October of 2019.  I'm sorry.  I get confused on these
15  dates.  Unless Mr. Manookian was suspended at that
16  time, I believe he would have been working on that
17  case.
18  Q.      So as you sit here today, your best
19  recollection is that in October 2019, Mr. Manookian
20  was working for Cummings Manookian?
21  A.      He may have -- he may have already formed
22  Manookian, PLLC, but it's our position that --
23  well, it gets a little -- I know that Mr. Manookian,
24  Manookian, PLLC, as of -- was it August?  Without the
25  dates in front of me -- there is a recently produced

1  engagement letter that shows that Manookian, PLLC,

2  had a engagement letter with the plaintiff in the

3  Shoemaker case, and so I think there's still a

4  question about whether or not that ended Cummings

5  Manookian's representation in the case or whether it

6  continued on after that engagement letter.

7  Q.      In October 2019, who was employed by Cummings

8  Manookian?

9  A.      Well, it's one of our theories of the case

10  that even though Mr. Manookian was practicing under

11  the name of Manookian, PLLC, and Afsoon Hagh may have

12  been practicing under the name of Hagh Law, that they

13  were still conducting the business of Cummings

14  Manookian.

15  Q.      In October 2019, did Cummings Manookian make

16  any payments to Afsoon Hagh or Hagh Law?

17  A.      I do not know.

18  Q.      In October 2019, did Cummings Manookian make

19  any payments to Manookian, PLLC?

20  A.      I do not know.  I don't have bank records.

21  Q.      In October 2019, did Cummings Manookian make

22  any payments to Brian Manookian?

23  A.      I do not know.  I don't have bank records.

24  Q.      Do you have any information that Cummings

25  Manookian made any payments to Afsoon Hagh in 2019?

```
 1   A.      I know that Afsoon Hagh, and forgive me if
 2   I mispronounce her name, she -- in 2019, she received
 3   payment of a portion of the attorney fee in the
 4   Fitzgerald case.
 5          At the meeting of creditors, I believe that
 6   Mr. Manookian testified that Ms. Hagh -- Hagh?
 7   Q.      That's how I say it.
 8   A.      Okay.  Ms. Hagh worked in the firm but that
 9   she was not compensated.
10   Q.      So it's your belief as you sit here today that
11   in 2019, prior to November 6, Afsoon Hagh was employed
12   by Cummings Manookian?
13   A.      Yes.
14   Q.      Do you have any records to suggest that Afsoon
15   Hagh was employed by Cummings Manookian in 2019?
16   A.      No.
17   Q.      Have you endeavored to obtain employment
18   records from the State of Tennessee with respect to
19   Cummings Manookian?
20   A.      No.
21   Q.      Do you know if those records are available?
22   A.      What -- I don't understand what type of
23   records you're referencing.
24   Q.      Well, you're aware that employers pay certain
25   taxes on behalf of employees; is that right?
```

```
 1   A.        Correct.

 2   Q.        And they may pay workers' compensation, they

 3   may obtain insurance on behalf of employees as well;

 4   is that right?

 5   A.        Correct.  They can.

 6   Q.        Have you checked with the State of Tennessee

 7   to determine whether Cummings Manookian was paying

 8   taxes on behalf of any employees in 2019?

 9   A.        I have not.

10   Q.        When was Manookian, PLLC, formed?

11   A.        I believe it was 2015, 2017.

12   Q.        Are you giving me two different --

13   A.        Yeah.  I don't remember without looking.  I

14   checked that, but -- and I know I asked Mr. Manookian

15   at the meeting of creditors, but I can't remember if

16   it was in '15 or '17.

17   Q.        A couple of times you've mentioned that you

18   would need to look at something.  What would you look

19   at to refresh your recollection of these dates?

20   A.        The -- what you pull from the secretary of

21   state for -- when you do the business search, that

22   information there, and also the -- I think the meeting

23   of creditors tape or notes.  It's recorded.

24   Q.        Back to Cummings Manookian.  In October of

25   2019, did Cummings Manookian file any cases in that
```

```
 1  month?

 2  A.      I do not know.

 3  Q.      You don't have any evidence that it filed any

 4  cases at that time?

 5  A.      No.

 6  Q.      Did Cummings Manookian send any correspondence

 7  in October of 2019?

 8  A.      There may have been correspondence sent in

 9  the Shoemaker case, but no, I don't know that.  I

10  don't know if Cummings Manookian -- if you're talking

11  about on Cummings Manookian letterhead, if it sent

12  correspondence, I don't know that.

13  Q.      Do you have any evidence of any bank

14  transactions by Cummings Manookian in October of 2019?

15  A.      I do not.  I don't have bank records.

16  Q.      Did Cummings Manookian maintain a website in

17  October of 2019?

18  A.      I do not know that.

19  Q.      Did Cummings Manookian accept any new cases in

20  October of 2019?

21  A.      I do not know.

22  Q.      Did Cummings Manookian purchase anything in

23  October of 2019?

24  A.      I do not know.

25  Q.      Did Cummings Manookian file anything in court
```

1   in October of 2019?

2   A.      I do not know.

3   Q.      What attorneys were working for Cummings

4   Manookian in October of 2019?

5   A.      Afsoon Hagh and Brian Manookian, if it was

6   during a period when he wasn't suspended, under other

7   firm names.

8   Q.      I'm a little confused about when you say that

9   they worked for Cummings Manookian but under other

10  firm names.  Can you explain what you mean by that?

11  A.      Yeah.  That may be more of a legal argument,

12  but one of the causes of action in the complaint is

13  successor liability or just continuation of the

14  business of Cummings Manookian with the same people,

15  same location, same cases, different names.

16  Q.      Was Brian Cummings still involved in Cummings

17  Manookian in October of 2019?

18  A.      If he was not suspended, I would say yes.

19  Q.      I asked about Brian Cummings.

20  A.      Oh, I'm sorry.  No.  I think he withdrew and

21  formed Cummings Law in -- he withdrew and formed

22  Cummings Law, I believe, sometime in 2018.

23  Q.      And you alleged in the complaint that that was

24  in September of 2018.  Does that sound correct to you?

25  A.      I don't know.

```
 1   Q.      So after Mr. Cummings withdrew from Cummings
 2   Manookian, he formed a different corporate entity; is
 3   that correct?
 4   A.      That's correct.
 5   Q.      And do you know the name of that entity?
 6   A.      I believe it's Cummings Law.
 7   Q.      And did Mr. Cummings continue to work on
 8   behalf of Cummings Manookian, even though he had
 9   formed Cummings Law?
10   A.      I don't -- no, I don't think so, because there
11   were cases that he took with him when he left Cummings
12   Manookian.  And when those cases -- as those cases
13   settled, then there was a portion -- at least during
14   the receivership, there was a portion of the fees that
15   were paid to Cummings Manookian, fees and expenses.
16   Q.      Was Cummings Law a continuation of Cummings
17   Manookian in your view?
18   A.      No.
19   Q.      Why not?
20   A.      Because he always used Cummings Law after --
21   and I can only speak to the cases that were pending
22   during the receivership.  There was a list of about
23   15 cases.  And he took some of those cases and worked
24   on those and -- again, as I said, as they settled out.
25           On the Shoemaker case, when that case was
```

1    filed, he was listed as Brian Cummings of Cummings
2    Law and -- or whatever, the name of his firm, and
3    Afsoon Hagh was as an attorney for Cummings Manookian.
4    He wasn't operating out of the same office space.
5    Everything was separate at that point.  And I think
6    there was some type of withdrawal letter or email from
7    the firm.
8    Q.      So in your mind the distinction between Hagh
9    Law and Manookian, PLLC, when they started their own
10   entities, versus Cummings Law is that they did not --
11   well, let's say one distinction is that they did not
12   send any notice to clients that they were starting
13   their own entities?
14   A.      I don't know whether they did that or not.  I
15   don't know that they did that.
16   Q.      And then it's also your position that they
17   used the same office space as distinct from Cummings
18   Law; is that right?
19   A.      Correct.
20   Q.      And then you made a reference to Ms. Hagh
21   filing something on behalf of Cummings Manookian; is
22   that right?
23   A.      Correct.
24   Q.      Do you know if she filed that or if Brian
25   Cummings filed that?

```
1    A.      Both of their names were on that Shoemaker
2    complaint.
3    Q.      And who signed that complaint?
4    A.      I don't recall.
5    Q.      Is it possible that Brian Cummings signed that
6    complaint?
7    A.      It's possible.
8    Q.      And would you expect that if he signed that
9    complaint, that he wrote Ms. Hagh's name on that
10   complaint?
11   A.      I would think he -- I don't know.  I don't
12   know who would have prepared the complaint and who
13   reviewed it before it was filed.  I would think they
14   both would, but I don't know that.
15   Q.      But you understand that when someone signs a
16   complaint, they are the person or entity making the
17   representation to the Court, correct?
18   A.      Yes.
19   Q.      And so if Mr. Cummings signed the complaint
20   and listed Afsoon Hagh at Cummings Manookian, that
21   would have been his representation to the Court, not
22   her representation, right?
23   A.      Correct.
24   Q.      And at the time that that complaint was filed,
25   Mr. Cummings was no longer involved in Cummings
```

1  Manookian, right?

2  A.      I think that's right.  I think that Shoemaker

3  complaint was filed in 2019, and he withdrew in '18,

4  2018.

5  Q.      And so when he filed that, he was acting on

6  behalf of Cummings Law; is that right?

7  A.      Correct.

8  Q.      Mr. Manookian's law license was suspended in

9  December 2018; is that correct?

10  A.      Correct.

11  Q.      So as of --

12  A.      What happened in -- I'm not sure about that.

13  Ask me that again.

14  Q.      Mr. Manookian's law license was temporarily

15  suspended in December 2018; is that correct?  And I'm

16  not trying to hide the ball.  I'm reading from

17  Paragraph 10 of your complaint.

18  A.      Okay.  Yes.

19  Q.      So as of that time, Mr. Manookian was no

20  longer acting on behalf of Cummings Manookian; is that

21  right?

22  A.      He would have been suspended from the practice

23  of law and should not have been.

24  Q.      And you don't have any evidence that

25  Mr. Manookian was continuing to act on behalf of

1  Cummings Manookian at that time, do you?

2  A.      There's a privilege log that Ronette McCarthy

3  produced that lists communications between her and

4  Brian Manookian after that date, during the period

5  where he was suspended, but obviously we don't have

6  the -- haven't taken her deposition and don't have

7  email addresses or other contact information.

8  Q.      Right.  So you don't have any evidence that he

9  continued to practice law after December 2018, do you?

10  A.      Other than what that privilege log may

11  represent.

12  Q.      And you're aware that when someone is

13  suspended from the practice of law, the Board of

14  Professional Responsibility allows them to transition

15  their files to other attorneys, correct?

16  A.      Yes.

17  Q.      So just because Mr. Manookian had

18  conversations about a case with somebody, that doesn't

19  mean he was engaged in the unauthorized practice of

20  law, does it?

21  A.      I don't -- I don't know.  I don't know.

22  Q.      But it wouldn't be your position in this

23  litigation that he was engaged in the unauthorized

24  practice of law simply because he had a conversation

25  about a case that he had to withdraw from?

```
 1   A.        Correct.
 2   Q.        And he did, in fact, withdraw as counsel on
 3   December 13th, 2018, from the Fitzgerald case, didn't
 4   he?
 5   A.        He did.  Well, he filed a motion that he was
 6   withdrawing, but there was never an order submitted.
 7   Q.        Did the Tennessee Supreme Court submit an
 8   order that withdrew Mr. Manookian from all of his
 9   cases?
10   A.        I do not know.
11   Q.        Have you made any effort to look at the
12   Supreme Court order dealing with Mr. Manookian's law
13   license?
14   A.        I've read the -- I'm trying to think if I've
15   read the actual order or just the -- I guess what you
16   would call the notice or the summary.
17   Q.        But, I mean, you don't dispute that there is a
18   court order that withdrew Mr. Manookian from his
19   cases, do you?
20   A.        I do not know that.
21   Q.        What's the significance -- I guess the first
22   question is:  So then you don't dispute that, do you?
23   A.        Dispute?
24   Q.        That there was a court order that withdrew
25   Mr. Manookian from his cases by operation of the
```

1   Tennessee Supreme Court?

2   A.      I don't know.

3   Q.      Is it your position that because you allege

4   he did not submit a proposed order that he somehow

5   continued to represent clients after December 13,

6   2018?

7   A.      There's one argument that Cummings Manookian

8   didn't withdraw, but in that same -- it's more like --

9   it's entitled a motion.  I think of it more as a

10  notice since there wasn't any order.  But it said that

11  Afsoon Hagh -- Hagh -- excuse me -- would continue to

12  represent the plaintiffs, and in the signature line it

13  had both -- Cummings Manookian and both of their

14  names.

15  Q.      On March 25th, 2019, Ms. Hagh formed Hagh Law;

16  is that correct?

17  A.      Correct.  Well, I'm not sure about that exact

18  date, but I think that's correct.

19  Q.      And she was the sole member of Hagh Law; is

20  that correct?

21  A.      I do not -- I think so, but I don't know that.

22  I don't know that.

23  Q.      Just as a general matter, you're aware that a

24  PLLC has to be formed by professionals; is that right?

25  A.      Correct.

```
 1   Q.       And in this context that would be attorneys?
 2   A.       Correct.
 3   Q.       And only attorneys can be the members of a
 4   PLLC that is engaged in the practice of law; is that
 5   right?
 6   A.       Ask me that again, please.
 7   Q.       I'll try to phrase it better.  The only people
 8   who can be members of a PLLC engaged in the practice
 9   of law are attorneys; is that right?
10   A.       I don't know that, but I would say that's
11   correct.
12   Q.       When was Cummings Manookian originally formed?
13   A.       It was either 2015 or 2017.  I want to say --
14   I want to say '15, but it could have been -- I think
15   it's '15, but, again, I'm not sure.
16   Q.       As of January 1, 2019, do you agree with me
17   that Cummings Manookian had no members who could
18   practice law?
19   A.       January 1, 2019?  Mr. Manookian was suspended
20   in December of 2019?
21   Q.       '18.
22   A.       '18.  I'm sorry.  And your question is January
23   2019?
24   Q.       Yes, ma'am.
25   A.       And Mr. Cummings had already withdrawn.  No
```

1  members.  I would say that's correct.

2  Q.     And so would you agree with me that without

3  any member authorized to practice law, Cummings

4  Manookian, PLLC, could not have been engaged in the

5  practice of law at that time?

6  A.     I don't -- I don't know the answer to that.  I

7  don't know.  I don't know if the associate in the firm

8  could continue the practice there.

9  Q.     And what associate are you thinking of?

10  A.    Or agent.  Afsoon Hagh or Hagh.

11  Q.    And what's the basis for your understanding

12  that her title was associate?

13  A.    That was just my impression at the meeting of

14  creditors, that she was an associate, that she worked

15  on cases in the firm, that she was the wife of

16  Mr. Manookian, but she was not compensated.

17  Q.    And do you have any evidence that she's ever

18  been a member of Cummings Manookian?

19  A.    No.

20  Q.    In fact, the only people who have ever been

21  members of Cummings Manookian are Brian Cummings and

22  Brian Manookian, correct?

23  A.    To my knowledge.  I don't know that 100

24  percent sure, but to my knowledge, I think that's

25  correct.

1  Q.      So you mentioned that you got an impression at

2  the meeting of creditors that Ms. Hagh was functioning

3  as an associate for Cummings Manookian; is that

4  correct?

5  A.      Yes, that she worked in the firm.

6  Q.      And what gave you that impression?

7  A.      That's just my recollection of the testimony

8  at the meeting of creditors.

9  Q.      When was the meeting of creditors?

10 A.      It was December -- early December 2019.  It's

11 usually about a month after the petition's filed.

12 Q.      And you're aware that Ms. Hagh formed Hagh

13 Law, PLLC, in March of 2019?

14 A.      I think that's correct.

15 Q.      And you're aware that as of March 2019, she

16 was signing pleadings with the signature block Hagh

17 Law, PLLC?

18 A.      I think maybe sometime in April she was.  I

19 think there were some other pleadings that may have

20 just -- may not have said Afsoon Hagh, but -- it

21 didn't say Cummings Manookian but just Afsoon Hagh

22 and the same address and telephone number as Cummings

23 Manookian.

24 Q.      And what address is that?

25 A.      It's 45 -- I can't remember the entire

1  address.  It's 45-something.

2  Q.     Is it 45 Music Square West?

3  A.     Yes.

4  Q.     Do you have any evidence that Ms. Hagh worked

5  at 45 Music Square West?

6  A.     That's the address that she used.

7  Q.     So other than putting that address on filings,

8  do you have any evidence that she maintained a

9  physical presence there?

10 A.     I've never seen her there.  My recollection

11 from the meeting of creditors was that she worked at

12 Cummings Manookian, and Cummings Manookian practiced

13 law in that building, that 45 Music.

14 Q.     And your recollection of the meeting of

15 creditors is that someone testified that Ms. Hagh

16 worked at Cummings Manookian?

17 A.     That's my recollection.  Mr. Manookian was

18 the -- was the representative.  I remember he said

19 there was a paralegal and that Ms. Hagh practiced in

20 the firm, worked in the firm, worked on cases.  I

21 can't remember the exact testimony on that.  But that

22 she was not compensated.

23 Q.     And at the time that you heard that testimony,

24 was that describing current events or was it a time in

25 the past?

1  A.     I don't recall.  I think we were going through

2  the history of the -- I don't recall.  We were going

3  through the history of the firm, like when it was

4  started, who the members were, how many employees did

5  it have, does it have.

6  Q.     And you've never heard anyone say that in 2019

7  Ms. Hagh worked for Cummings Manookian, have you?

8  A.     2019?  I think the receiver -- Phillip Young,

9  as receiver, felt that Ms. Hagh was continuing the

10 practice or working -- working on Cummings Manookian

11 cases.

12 Q.     And what's the basis for your understanding

13 that Mr. Young had that view?

14 A.     Because he had filed attorneys liens on the

15 recoveries in those -- in those cases.

16 Q.     And did you have any understanding as to why

17 Mr. Young, as receiver, believed that Ms. Hagh was

18 acting on behalf of Cummings Manookian in 2019?

19 A.     Well, Cummings Manookian was the only firm

20 that had an engagement letter.  There weren't any

21 other engagement letters.  The motion or the notice

22 that was filed in court said that Afsoon Hagh would

23 be -- would continue working on the case.

24        There were pleadings that were filed by Afsoon

25 Hagh that either used Cummings Manookian or some --

1  or, you know, just her name and the address and
2  telephone number and maybe email addresses for
3  Cummings Manookian.
4  Q.      And is everything that you just testified
5  about with regard to 2019?
6  A.      I think it may be that in March or April of
7  2019 that Ms. Hagh started using Hagh Law on her
8  letterhead, sometime around -- around that time, maybe
9  in April.
10 Q.      And in the period between --
11 A.      Excuse me.  I'm sorry.  I didn't mean to
12 interrupt you.  And that had to do with the Fitzgerald
13 case with respect to the -- yeah.  I'm sorry.  That's
14 right.  That was the Fitzgerald case.  I was trying to
15 remember what might have been going on in the
16 Shoemaker case around that time.
17 Q.      In the period between December 13, 2018, and
18 March or April 2019, there were no attorney members of
19 Cummings Manookian who were authorized to practice
20 law; is that right?
21 A.      Between what dates?
22 Q.      December 13, 2018, and March or April of 2019.
23 A.      Members?
24 Q.      Yes, ma'am.
25 A.      Correct.

```
 1   Q.      Did Cummings Manookian have a contract with
 2   Ms. Hagh to work for a certain period of time?
 3   A.      I do not know.
 4   Q.      Do you know if there was any written agreement
 5   between Cummings Manookian and Ms. Hagh regarding
 6   employment or contract work?
 7   A.      I do not know.
 8   Q.      Is it your position that everything that
 9   Ms. Hagh did in 2019 with respect to the practice of
10   law was on behalf of Cummings Manookian?
11   A.      I think that's a legal conclusion.  But
12   certainly Cummings Manookian had the only engagement
13   letter.  So if Ms. Hagh is going to claim that she did
14   any work on the case apart from Cummings Manookian,
15   it's my understanding that she has to -- that would be
16   some type of equitable argument and she would have to
17   produce time records, which I don't think there are
18   time records, or show the value of her services.
19           And, again, it's -- I think it's more to be
20   revealed by, you know, other discovery in the case and
21   whether or not there was successor liability or just
22   continuation of Cummings Manookian beyond that March
23   -- I think you were talking about a March or April
24   2019 date.
25   Q.      And it's your position that Ms. Hagh and
```

1  Hagh Law, PLLC, are not entitled to the benefit of a

2  separate corporate identity after March 25th, 2019; is

3  that correct?

4  A.     I don't know what you mean by they're not

5  entitled to the benefit.

6  Q.     Well, you would agree with me that PLLC or an

7  LLC is a legal entity that has certain protections

8  under the law?

9  A.     Yes.

10  Q.     And you agree with me that Ms. Hagh formed a

11  PLLC in March of 2019?

12  A.     Correct.

13  Q.     But notwithstanding that, in your view, she's

14  not entitled to the legal protections of a separate

15  corporate entity at that time?

16  A.     And I don't know what you mean by legal

17  protections, but she certainly had the right to form a

18  PLLC.

19  Q.     And she did so?

20  A.     She did.

21  Q.     But you allege that the work that she did

22  during that time period was not on behalf of her PLLC

23  but it was on behalf of Cummings Manookian?

24  A.     Yeah, I think that's the -- that's the

25  question.  She didn't have a separate engagement

1  letter with the Fitzgeralds.

2  Q.      And you know that?

3  A.      It's the only one that's been produced to

4  us.  I think there was a -- I think in the Fitzgerald

5  discovery there was an unsigned engagement letter with

6  Hagh Law.

7  Q.      And that was on Hagh Law letterhead?

8  A.      I think it was.  It was just -- you know, that

9  discovery production was recent, and I'm still going

10 through, but I believe -- I believe that's correct.

11 Q.      In Paragraph 17 of your complaint, you state,

12 "Upon information and belief, Afsoon Hagh, now doing

13 business as Hagh Law, continued utilizing Cummings

14 Manookian's office space, Cummings Manookian's

15 furnishings and equipment, Cummings Manookian's

16 telephone numbers and email addresses all to work on

17 Cummings Manookian's files."

18         What's the basis for that allegation?

19 A.      I think that's just facts.  I don't understand

20 your question.

21 Q.      Well, how do you know that she continued using

22 Cummings Manookian's office space, for example?

23 A.      Well, there were pleadings that were being

24 filed, correspondence that listed that as her address.

25 And I think it's a reasonable assumption that if she's

1   using that as her address, then that is where she's
    2   practicing law.
    3   Q.      Well, that's a mailing address, correct?
    4   A.      It's a physical address, law office address.
    5   Q.      Well, if she had listed a PO Box, you would
    6   not have assumed that she worked at the post office,
    7   correct?
    8   A.      Correct.
    9   Q.      So just because someone uses an address to
   10   receive pleadings doesn't mean that they necessarily
   11   work at that address, does it?
   12   A.      If it was just a mailing address.  But I know
   13   that a law firm operated out of that.
   14   Q.      I'm sorry.  Go ahead.
   15   A.      I forgot the -- I'm sorry.  Mr. Manookian
   16   interrupted, so I lost my train of thought there.  Can
   17   you repeat the question?
   18   Q.      Sure.  Just for the record, he was whispering
   19   to me, and I'm sorry if it distracted you.
   20   A.      It was.
   21   Q.      She used a mailing address that you were
   22   aware that Cummings Manookian had, at which Cummings
   23   Manookian had existed.  Is that what you're saying?
   24   A.      Correct.
   25   Q.      But you don't know that she ever set foot in

```
1   that building, do you?

2   A.      I do not.

3   Q.      And you're aware that other attorneys use that

4   same mailing address to receive mail?

5   A.      I don't know that.

6   Q.      Have you ever seen Rocky McElhaney's name

7   associated with 45 Music Square West?

8   A.      No.

9   Q.      But the basis for your allegation that she

10  continued utilizing Cummings Manookian's office space

11  is solely that she put that address on documents

12  submitted to the Court?

13  A.      Correct.

14  Q.      What's the basis --

15  A.      At this point.  At this point.

16  Q.      And as you sit here today, you haven't

17  identified any other evidence to support that

18  allegation, about her continued use of office space?

19  A.      Other than what we've talked about.

20  Q.      What about your allegation that she continued

21  using Cummings Manookian's furnishings and equipment?

22  What's the basis for that allegation?

23  A.      The same assumption; that if she's using that

24  office space, then there is -- it's an assumption that

25  there's furniture, furnishings, computers, equipment,
```

1    that sort of thing in there.  And the receiver --

2    Phillip Young, the receiver, actually went to that

3    office address.

4    Q.      And did he see Ms. Hagh at that office?

5    A.      I do not know.

6    Q.      So like the allegation that she continued

7    using that office space, the allegation that she

8    continued using furnishings and equipment is derived

9    solely from your knowledge that she listed 45 Music

10   Square West on pleadings?

11   A.      Correct.

12   Q.      No other knowledge?

13   A.      Correct.

14   Q.      Can you identify any specific furnishings and

15   equipment that she used at 45 Music Square West?

16   A.      No.

17   Q.      Can you identify the dates that she was using

18   the furnishings and equipment at 45 Music Square West?

19   A.      I don't know when she started working at

20   Cummings Manookian, but I know the building was sold

21   in May of '20 or '21.  '21?  Maybe '21.  So I would

22   think after that date.

23   Q.      But as you sit here today, you don't know that

24   she ever set foot at 45 Music Square West, do you?

25   A.      No.

```
1   Q.      The allegation that Ms. Hagh used Cummings
2   Manookian's telephone numbers and email addresses,
3   what's your basis for that allegation?
4   A.      Pleadings and correspondence, emails.
5   Q.      What email addresses are you referring to
6   there?
7   A.      I think it's -- is it afsoon@cm -- I don't
8   remember.  There's one at cmtriallawyers or something.
9   I don't remember specifically, but I have seen those
10  email addresses associated with her name that
11  contained some identification of Cummings Manookian in
12  it, CM.
13  Q.      Have you seen her use any other email
14  addresses?
15  A.      Probably, but I don't know that.
16  Q.      Did she have a Hagh Law email address?
17  A.      I would think so.  I think so.
18  Q.      Did she have a tennesseetriallawyers.com email
19  address?
20  A.      I know that I have seen a
21  tennesseetriallawyers but don't know who that's
22  connected to.
23  Q.      And your best recollection of the Cummings
24  Manookian email domain is cmtriallawyers.com; is that
25  correct?
```

1    A.       That's one of them, but there may have been

2    afsoon@ -- I'm sorry.  I just don't recall.

3    Q.       Where would you look for that information,

4    about which email addresses she was using, pursuant to

5    your allegation in Paragraph 17?

6    A.       Pleadings and emails.

7    Q.       And do you know what telephone number Ms. Hagh

8    was using that you associated with Cummings Manookian?

9    A.       I can't recite the number to you, but it would

10   be one of -- it was the same number that was on the

11   Cummings Manookian letterhead.

12   Q.       And what dates was she using Cummings

13   Manookian telephone numbers and email addresses?

14   A.       I would -- my recollection is at least up

15   until April -- March/April of 2019.  And, again, I

16   haven't been through all of the discovery.

17   Q.       And the significance of that date in your mind

18   is that's when she started Hagh Law, PLLC?

19   A.       That, and I think after that point there are

20   some -- there are documents that show the Hagh Law and

21   maybe -- but the same address, same telephone number

22   for a while, and then I do think maybe the telephone

23   number changed.  And I can't recall if that was the

24   number that was still associated in some way with

25   Cummings Manookian.

```
1    Q.       And then you refer in Paragraph 17 to Cummings

2    Manookian's client files.  Were those also Cummings

3    Law's client files, or were some of them also Cummings

4    Law's client files?

5    A.       They were -- that referred to that list of

6    15 or 16 cases at the time the complaint was filed and

7    cases in which Cummings Manookian had an interest.

8    Q.       And were those also Hagh Law's client files?

9    A.       I don't believe so.

10   Q.       Did those files belong to the law firms or to

11   the client?

12   A.       Well, the file belongs to the client.  The

13   cause of action belongs to the client.

14   Q.       You alleged in Paragraph 17 that neither

15   Afsoon Hagh or Hagh Law compensated Cummings Manookian

16   for use of Cummings Manookian property or client

17   files; is that correct?

18   A.       Yes.  Now, client files are -- I'm referring

19   to the attorney fees and expenses that were due, not

20   the -- like, the file itself.

21   Q.       So your view is that the funds that went to

22   Hagh Law should have been paid to Cummings Manookian?

23   A.       Yes.

24   Q.       And then when you refer to property in

25   that paragraph, you're referring to office space,
```

```
 1   furnishings and equipment, telephone numbers and email
 2   addresses?
 3   A.      Correct.
 4   Q.      And we just discussed what you know about
 5   that.
 6   A.      Yes, sir.
 7   Q.      Has Cummings Manookian ever owned office
 8   space?
 9   A.      I don't know if it's ever owned office space.
10   Q.      Who owned 45 Music Square West?
11   A.      That's a good question.  It was a little
12   convoluted.  It seems like it was two trusts or two
13   other partnerships that were comprised of Brian
14   Manookian and Brian Cummings, is the best of my
15   recollection.  But I was never -- I never was provided
16   with a copy of the lease to see who the landlord was.
17   But it's some type of -- I don't even remember now the
18   name that's on the tax assessor's records as the
19   owner.
20   Q.      You agree that Cummings Manookian didn't own
21   that building, though?
22   A.      That is correct.
23   Q.      And there's nothing improper or unethical
24   about forming a corporation to own a building, is
25   there?
```

```
1   A.      No.

2   Q.      It's pretty common, in fact?

3   A.      I don't know if it's common, but there's

4   nothing wrong with it.

5   Q.      You don't take issue with the fact that there

6   was a different corporate entity that owned 45 Music

7   Square West?

8   A.      Correct.

9   Q.      Do you know if there was a lease between the

10  owner of 45 Music Square West and Cummings Manookian?

11  A.      Mr. Manookian said there was.

12  Q.      Do you know if there was a lease between 45

13  Music Square West and any other entity?

14  A.      No, I do not know that.

15  Q.      You don't have any information that Ms. Hagh

16  ever signed a lease at that building, do you?

17  A.      I do not.

18  Q.      Since you haven't seen the lease, you can't

19  say that Cummings Manookian was entitled to the

20  exclusive use of that property, can you?

21  A.      No, but my recollection is that Mr. Manookian

22  said they had the entire building at the meeting of

23  creditors.

24  Q.      Do you know how many floors that building is?

25  A.      I do not.  I know it's more than one story.
```

```
 1   I've seen a picture of it.
 2   Q.      And I guess you never visited the building
 3   yourself?
 4   A.      No.
 5   Q.      But Mr. Young has?
 6   A.      Correct.
 7             MR. SPRAGENS:  We're at a good stopping
 8   point if you want to take a five-minute break, if you
 9   don't mind.
10             MR. YOUNG:  That's fine.
11             (Recess observed.)
12   BY MR. SPRAGENS:
13   Q.      Ms. Burton, we were talking earlier about the
14   furniture at 45 Music Square West.  Do you recall
15   that?
16   A.      Correct.
17   Q.      Do you know who owned the furniture at
18   45 Music Square West?
19   A.      No.  I assumed that the law firm owned it, but
20   I don't know.
21   Q.      You don't have any information telling you --
22   A.      No invoices, anything like that, no.
23   Q.      Do you know whether 45 MSW Partners owned that
24   furniture?
25   A.      I do not know.
```

1  Q.      You mentioned Mr. Young's role as receiver in

2  the, sort of, predecessor to this case.  Do you recall

3  that?

4  A.      Correct.

5  Q.      Did you have any interactions with Mr. Young

6  when he was the receiver?

7  A.      No.

8  Q.      When did you decide to bring this adversary

9  proceeding?

10 A.      When we were -- and I say "we."  The hearing

11 that I -- after the case was filed and there was a

12 hearing in Lawrenceburg, and I forgot before -- what

13 that judge's name is, but there was an injunction

14 about the monies that the Court had frozen.  And so

15 there was discussion about -- between me and you and

16 Mr. Young and Brian Manookian -- I think Ron Stein was

17 there, but I don't know if he was in the room with us.

18         But we talked about now that the bankruptcy

19 court -- the bankruptcy had been filed, the bankruptcy

20 case would be the proper forum to settle that or make

21 that determination.  And so we negotiated, I guess, on

22 when the state court injunction would expire, and the

23 judge put that in an order.  And we had to get that

24 adversary proceeding filed before that injunction went

25 down in the -- in the adversary and the component of

```
 1   it for a turnover of the funds before that injunction
 2   expired.
 3   Q.      At the time of that state court hearing, had
 4   you already engaged Mr. Young as your attorney?
 5   A.      No.
 6   Q.      At what point did you do that?
 7   A.      It was before the adversary was filed, but I
 8   don't remember -- I don't remember the date, but I
 9   don't think it was -- I don't think it was before that
10   hearing in Lawrenceburg.
11   Q.      Do you have a written engagement agreement
12   with Mr. Young?
13   A.      No.
14   Q.      What sets out the terms under which he's
15   representing you in terms of his payment?
16   A.      The motion that's filed with the Court sets
17   out the compensation.
18   Q.      And was it solely your decision to bring it,
19   the adversary proceeding?
20   A.      Yes.
21   Q.      When did you make that decision?
22           MR. YOUNG:  Objection.  Asked and
23   answered.
24   BY MR. SPRAGENS:
25   Q.      You can answer.
```

1   A.      When did I make the decision to -- after that

2   court hearing and I knew that the adversary needed to

3   be brought before that injunction expired.

4   Q.      And sometime between that hearing and when the

5   adversary proceeding was filed, you hired Mr. Young as

6   special counsel and sought court approval of that?

7   A.      Correct.

8   Q.      Prior to this case, did you ever work in the

9   same office as Judge Walker prior to his service as a

10   judge?

11   A.      No.  He was in the -- he was in the U.S.

12   Trustee's office.  And the panel trustees are, I guess

13   you would call, private or independent contractors.

14   We're not employees of the U.S. Trustee's office.

15   Q.      Did you have dealings with him when he worked

16   in the U.S. Trustee's office?

17   A.      Occasionally.  He was not -- each trustee is

18   kind of assigned an attorney that oversees them or

19   looks at their cases, you know, and -- but he was

20   not mine.  Maybe every once in a while, if he'd been

21   involved in a Chapter 11 case that got converted to

22   a Chapter 7 case and he'd been the U.S. attorney --

23   U.S. Trustee attorney on that case, then we might have

24   some communication about things that went on in the

25   Chapter 11.

```
 1   Q.      Did you hear Judge Walker at our last hearing
 2   make a reference to being contacted by members of the
 3   bar about security concerns with respect to
 4   Mr. Manookian?
 5                MR. YOUNG:  Objection.  Relevance.
 6                THE WITNESS:  Yes.
 7   BY MR. SPRAGENS:
 8   Q.      Do you know anything about who contacted Judge
 9   Walker?
10   A.      I do not.
11                MR. YOUNG:  Objection.  Relevance.
12                THE WITNESS:  I'm sorry.  I do not.
13   BY MR. SPRAGENS:
14   Q.      You identified yourself as someone with
15   personal knowledge of facts in this case; is that
16   correct?
17   A.      As trustee, yes.
18   Q.      And just in broad strokes, can you give me
19   what areas of the case you have personal knowledge
20   about?
21   A.      Just records and matters that are presented
22   to me:  the petition; testimony at the meeting of the
23   creditors; conversations with -- specifically with
24   respect to that adversary proceeding; conversations
25   with the receiver, Mr. Young.  I mean, everything that
```

1  I know comes to me secondhand.

2          And we do some -- I won't call that

3  investigating in our office, but if we get a business,

4  we may look at the Secretary of State's records to see

5  if it was active when it was dissolved, who the

6  members were.  So it's really just what comes to me

7  once a case is filed.

8  Q.       When you say "conversations with the receiver,

9  Mr. Young," what conversations are you talking about?

10  A.       When the case was filed and I was appointed

11  as trustee, the receiver, you know, contacted me and

12  said:  There's this receivership and, you know, this

13  is what's going on.  Any records that I have, I'll be

14  glad to give those to you.  There's money that's being

15  -- that will be collected that will now come to you in

16  the bankruptcy case, just because that was pretty much

17  going to stop everything in the receivership.

18  Q.       And that was prior to the December 2019

19  hearing in Lawrenceburg that you had those

20  conversations?

21  A.       Correct.

22  Q.       And you found out about the receivership

23  because Mr. Young called you?

24  A.       Correct.

25  Q.       Did he make any suggestions to you about a

1  course of action that you might want to pursue?

2  A.     No.  No.  Just kind of informing me.  I mean,

3  I get -- it's not unusual to get those kinds of cases

4  when you get appointed.  No, just that there was a

5  receivership and kind of what the status of that

6  receivership was.

7  Q.     How did you decide to attend the hearing in

8  Lawrenceburg?

9  A.     Well, the automatic stay was in effect, so I

10  wanted to make sure nobody was doing anything that

11  violated the automatic stay, but I was -- I viewed

12  that as a proceeding that was going to safeguard

13  potential assets of the bankruptcy estate.  And I'm

14  okay with that.  You know, sometimes secure creditors

15  will take possession of a vehicle or they'll secure a

16  piece of real estate or whatever.

17       So I just wanted to go to that hearing to --

18  basically to see what was going on, what the judge was

19  going to do.  And I knew a subject of that was going

20  to be the funds that the Court had ordered be held,

21  and I think there was a question of whether that

22  needed to be paid into the court or not.  So I had an

23  interest in seeing what happened to those funds.

24  Q.     Did there come a time when Mr. Young stopped

25  acting as receiver in the state court case?

```
1   A.      I think once the bankruptcy -- I would say
2   once the bankruptcy case was filed and certainly when
3   he became employed as attorney for the trustee.
4   Q.      Who appointed Mr. Young as the receiver?
5   A.      I think the Court did, the state court.
6   Q.      Do you know which court?
7   A.      No, I don't.  I don't know what judge that
8   was.
9   Q.      Is it your understanding that there was an
10  order appointing him receiver?
11  A.      Correct.
12  Q.      Was there ever an order ending the
13  receivership?
14  A.      I don't know if there is or not.
15  Q.      Did Mr. Young file anything to withdraw his
16  role as receiver or to terminate his role as receiver?
17  A.      I don't -- I don't know.  I don't know that.
18  I think there -- I don't know.
19  Q.      But it's your belief or understanding, at
20  least, that he stopped functioning as receiver when he
21  became special counsel to the trustee?
22  A.      Right.  Or before that, before that date.
23  Q.      And I'm sorry if I asked this already, but was
24  it your idea to hire Mr. Young or did he suggest to
25  you that you might want to hire him?
```

1    A.       No.  Mine.  My idea.

2    Q.       With respect to your knowledge, which is what

3    got us on to this topic, you don't have any firsthand

4    knowledge of the facts that are at issue in this case

5    prior to December of 2019, do you?

6    A.       Ask me that again, please.

7    Q.       You don't have any firsthand knowledge or

8    personal knowledge of the facts in this case prior to

9    your getting involved in December of 2019, do you?

10   A.       Correct.  Prior to the bankruptcy filing, I

11   was not involved in any way.

12   Q.       So your knowledge is derivative of what

13   Mr. Young told you as receiver, plus the materials and

14   evidence that's been produced in this case so far?

15   A.       Right.  The petition that was filed in the

16   case and the testimony at the meeting of creditors.

17   Q.       I'm going to hand you a letter with the date

18   of May 23rd, 2018, at the top.  And there's an exhibit

19   sticker on it, but that exhibit sticker is not

20   actually relevant to this deposition.

21            MR. SPRAGENS:  So we'll mark that as

22   Exhibit 1.

23            (Marked Exhibit No. 1.)

24   BY MR. SPRAGENS:

25   Q.       Have you seen that letter before?

```
 1   A.      I have.

 2   Q.      And what is that letter?

 3   A.      It's an engagement letter between Cummings

 4   Manookian and Marty and Melissa Fitzgerald.

 5   Q.      And you don't have any reason to doubt the

 6   authenticity of this letter, do you?

 7   A.      Well, I have seen another engagement letter

 8   where the first page is the same and I believe the

 9   third page is the same, where the second page, second

10   paragraph under Contingency Fees, mentions Ronette

11   McCarthy and her being paid a fee in the case.

12   Q.      And does that mean that you doubt the

13   authenticity of this letter?

14   A.      No.  I believe there was an engagement letter.

15   Q.      Is the other letter that you just described

16   also dated May 23rd, 2018?

17   A.      It is.  It has the same change in the date and

18   initial, and the signatures look the same.  The date's

19   the same.

20   Q.      So the other version of the letter that you've

21   seen has a different Page 2?

22   A.      Correct.

23   Q.      But both versions of that letter have the same

24   paragraphs on Page 3 under Termination of Professional

25   Relationship, correct?
```

```
 1    A.       I believe so.

 2    Q.       And this letter is an agreement between

 3    Cummings Manookian and Marty and Melissa Fitzgerald?

 4    A.       Correct.

 5    Q.       And on May 23rd of 2018, Mr. Manookian had the

 6    authority to enter into this agreement on behalf of

 7    Cummings Manookian, correct?

 8    A.       Correct.

 9    Q.       And as of that date, he was a member of

10    Cummings Manookian?

11    A.       Correct.

12    Q.       And you agree that that letter is a binding

13    contract between Cummings Manookian and the

14    Fitzgeralds?

15    A.       Correct.

16    Q.       And in the second paragraph on Page 3 of

17    this letter, it says, "You have the right to change

18    attorneys to another attorney or firm at any time by

19    sending us a letter to that effect.  This right to

20    discharge this firm as your representative requires

21    that you remain responsible for all costs and expenses

22    incurred prior to receipt of your letter.

23             "If you terminate the representation before

24    the conclusion of the matter, we will additionally be

25    entitled to receive, from the proceeds of any
```

1  recovery, a reasonable fee for the work we have
2  performed based upon the amount of time required, the
3  complexity of the matter, the time frame within which
4  the work was performed, our experience, ability,
5  reputation, the responsibility involved, and the
6  results obtained."
7          Did I read that paragraph correctly?
8  A.      Yes.
9  Q.      And then the next paragraph says, "We may
10 choose to withdraw from representing you and request
11 in writing that you obtain another attorney or firm to
12 represent you.  A withdrawal by this firm does not
13 relieve you of the responsibility to pay advanced
14 costs."
15         Did I read that correctly?
16 A.      Yes.
17 Q.      So you would agree with me that this letter
18 states that in the event Cummings Manookian withdraws
19 from a representation -- or from this representation
20 with the Fitzgeralds, it is entitled to recover its
21 costs; is that correct?
22              MR. YOUNG:  Objection to the extent it
23 calls for a legal conclusion, but you can answer.
24              THE WITNESS:  I do think its entitled to
25 costs, but I think it's silent -- I think where you're

1  going is about the fees, and I think it's silent as

2  to that.  And also where it says, "We say choose to

3  withdraw from representing you," I don't know that --

4  the facts under which Brian Manookian withdrew were

5  not of his own choosing.  And it's our position, my

6  position, that Afsoon Hagh continued to represent the

7  Fitzgeralds.

8  Q.      You agree with me that the first paragraph

9  that I read entitles Cummings Manookian to receive an

10 attorney's fee in the event the Fitzgeralds terminate

11 the relationship, right?

12          MR. YOUNG:  Object to the extent it calls

13 for a legal conclusion.

14          THE WITNESS:  Correct.

15 BY MR. SPRAGENS:

16 Q.      But that language does not appear in the next

17 paragraph which spells out the parties' rights in the

18 event Cummings Manookian chooses to withdraw; is that

19 correct?

20 A.      Correct.

21 Q.      You don't dispute that this letter was binding

22 on Cummings Manookian at the time that the agreement

23 was entered into, do you?

24 A.      No, I don't dispute that.

25 Q.      Let's look at another exhibit.  I just handed

1  you a letter dated December 17, 2018, which we will

2  mark as Exhibit 2 to this deposition.  Do you see

3  that?

4  A.      Yes.

5                  (Marked Exhibit No. 2.)

6  BY MR. SPRAGENS:

7  Q.      This is a letter sent by Mr. Manookian on

8  behalf of Cummings Manookian to the Fitzgeralds; is

9  that correct?

10  A.      That's what it purports to be, yes.

11  Q.      And this letter was produced to the receiver

12  prior to the bankruptcy being filed; is that correct?

13  A.      I think so.  I don't know about that.  I know

14  Mr. Manookian gave me a copy of this.

15  Q.      Are you aware whether Mr. Young had a copy of

16  this letter when he was serving as receiver?

17  A.      I think so, but I'm not sure.

18  Q.      And this letter -- well, do you dispute that

19  this letter was sent to Mr. and Mrs. Fitzgerald?

20  A.      I don't know if it was or not.

21  Q.      Do you see that it has Mr. Manookian's

22  signature on it?

23  A.      Correct.

24  Q.      And in this letter he informs the Fitzgeralds

25  that he's been suspended from the practice of law

```
 1  and that he and Cummings Manookian are required to
 2  withdraw from the representation; is that correct?
 3  A.      That's what it says, yes.
 4  Q.      And that's because Brian Cummings was no
 5  longer with Cummings Manookian and Brian Manookian was
 6  suspended from the practice of law, right?
 7  A.      I don't know why.  I'm sorry.  Ask that
 8  question again.
 9  Q.      Well, is it your understanding that as of
10  December 7th, 2018, Cummings Manookian would be
11  required to withdraw from representing the Fitzgeralds
12  because there were no members of Cummings Manookian
13  with an active law license?
14          MR. YOUNG:  Object to the extent it calls
15  for a legal conclusion.
16          THE WITNESS:  And I don't know about
17  that.  I know that Brian Manookian had to withdraw.
18  Whether Cummings Manookian had to withdraw, I'm not --
19  I don't know.  And I think they must have thought they
20  didn't because Afsoon Hagh continued representation of
21  the Fitzgeralds.
22  BY MR. SPRAGENS:
23  Q.      You don't dispute that as of December 7th,
24  2018, Mr. Manookian had the authority to bind Cummings
25  Manookian, do you?
```

1  A.      I don't know.

2  Q.      Well, you know that in December of 2018 he was

3  a member of Cummings Manookian, right?

4  A.      Yes, sir, he was.  He was.  I don't remember

5  what his actual suspension date was, but I know that

6  he was required to inform clients of his suspension.

7  Q.      And my question is:  Wouldn't you agree

8  with me that Mr. Manookian, as a member of Cummings

9  Manookian, was able to bind Cummings Manookian to an

10 agreement as of December 2018?

11 A.      I don't know the answer to that.

12 Q.      And why not?

13 A.      Because I don't know the answer to that.

14 Q.      Well, a minute ago we talked about the May

15 2018 letter in which you agreed Mr. Manookian could

16 enter into an agreement on behalf of Cummings

17 Manookian, right?

18 A.      Right.

19 Q.      So here we are on December 7, 2018.  He's sent

20 a letter.  And he has the authority to bind Cummings

21 Manookian as of that date, too, doesn't he?

22 A.      I don't know.  He was the only member of

23 Cummings Manookian at that -- at that time.

24 Q.      And you would agree with me that a member can

25 bind a PLLC?

```
 1   A.      Yes.  Yes.

 2   Q.      So in December of 2018, as the sole member of

 3   Cummings Manookian, Mr. Manookian had the capacity to

 4   make agreements on behalf of Cummings Manookian; is

 5   that right?

 6   A.      I think he was.  I don't know that this was an

 7   agreement.

 8   Q.      Well, you see here, the second paragraph

 9   of this letter says, "Pursuant to our legal

10   representation and engagement agreement" -- do you

11   understand that to refer to the May 23rd, 2018,

12   letter?

13   A.      Yes.

14   Q.      -- "Cummings Manookian is entitled to

15   reimbursement of certain advanced costs and expenses

16   in this case.  I estimate those costs and expenses to

17   be less than $3,000.  Because Cummings Manookian is

18   withdrawing from this matter, it will not be entitled

19   to any portion of an attorney's fee and specifically

20   disclaims the same under the terms of our prior

21   engagement agreement.  You may provide this letter to

22   any future attorneys representing you in this case as

23   confirmation of the same."

24           Did I read that correctly?

25   A.      Yes.
```

1    Q.    And so this letter is invoking the last
2    provisions of the May 23rd, 2018, attorney-client
3    agreement; is that right?
4    A.    Well, I think that client agreement was silent
5    on whether or not Cummings Manookian would be entitled
6    to a fee.
7    Q.    I understand that that's your position.  But
8    Cummings Manookian said it wasn't entitled to a fee in
9    2018, correct?
10   A.    Correct.
11   Q.    And Mr. Manookian had the authority to make
12   that decision on behalf of Cummings Manookian in
13   December of 2018, did he not?
14   A.    Correct.
15   Q.    So as of December 7th, 2018, Cummings
16   Manookian disclaimed any entitlement to fees in the
17   Fitzgerald matter, correct?
18   A.    That's what the letter states.  I never was
19   furnished with any proof that the Fitzgeralds received
20   this letter.
21   Q.    So if Mr. Fitzgerald testifies that he
22   received this letter, would that satisfy you that
23   Cummings Manookian claimed any fee in the Fitzgerald
24   case on December 7, 2018?
25   A.    I don't know.  It will depend on what

1  Mr. Fitzgerald has to say about that.  I would like to
 2  see the certified -- signed, certified mail receipt.
 3  And regardless of what the letter says, the motion
 4  that was filed with the court said that Brian
 5  Manookian was withdrawing but that Afsoon Hagh was
 6  going to continue to represent the plaintiffs, and
 7  that was signed by Mr. Manookian and it had Afsoon
 8  Hagh's name on it and the Cummings Manookian
 9  information and name.
10  Q.      But you don't disagree with me that in
11  December 2018, Cummings Manookian wrote that it
12  disclaimed any fee in the Fitzgerald case?
13  A.      Brian Manookian did, yes.
14  Q.      And Brian Manookian spoke for Cummings
15  Manookian when he did that, correct?
16  A.      Correct.
17  Q.      And shortly after that date, there were no
18  licensed attorneys as member of Cummings Manookian,
19  correct?
20  A.      No.  Well, I would say that -- well, no,
21  that's not correct, I don't think, because I think
22  Brian Manookian was still a member of Cummings
23  Manookian.  He was just suspended temporarily, and
24  then later he was reinstated.  But I think he remained
25  a member of Cummings Manookian, but he was suspended.

```
 1   His law license was suspended.

 2   Q.      Right.  So he did not have an active law

 3   license at that time?

 4   A.      Correct.

 5   Q.      And therefore, soon after this letter was

 6   sent, there were no members of Cummings Manookian with

 7   an active law license?

 8   A.      Active, correct.

 9   Q.      But it's your position in this case that

10   Cummings Manookian did not withdraw from representing

11   the Fitzgeralds in December 2018?

12   A.      Correct.

13   Q.      You'd agree with me, based on the way you

14   described the notice of withdrawal mentioning that

15   Ms. Hagh was going to continue to work on it, that it

16   was silent about the firm that she was affiliated

17   with?

18   A.      The signature block on that pleading was

19   Cummings Manookian.

20   Q.      And was that pleading Cummings Manookian's

21   withdrawal?

22   A.      It was Brian Manookian's withdrawal.

23              MR. SPRAGENS:  I think we can put that

24   the exhibit aside now.

25   BY MR. SPRAGENS:
```

```
 1   Q.      With respect to the allegations in your
 2   complaint, you allege that Afsoon Hagh, Hagh Law, and
 3   Manookian, PLLC, converted property; is that right?
 4   A.      Correct.  That was -- yes.
 5   Q.      And what's the property that you allege was
 6   converted or wrongfully appropriated?
 7   A.      Office space, furnishings, intellectual
 8   property like emails, telephone numbers, and then
 9   fees that were -- I don't know that that would be
10   considered under the property part, but the fees that
11   I claim are due to Cummings Manookian.
12   Q.      And the sole source of information for that
13   allegation is the pleadings that Ms. Hagh signed?
14   A.      Correct.
15   Q.      Did Manookian, PLLC, have a bank account?
16   A.      Yes.  Yes.
17           I'm sorry.  Manookian, PLLC?
18   Q.      Yes, ma'am.
19   A.      I don't know.
20   Q.      Who do you anticipate will have more
21   information about the facts that underlie your claim
22   for conversion?
23   A.      Brian Manookian, Afsoon Hagh, Brian Cummings.
24   And my attorney may have an idea that there are more,
25   but those are the ones that I can think of.
```

1  Q.      And before you filed this complaint, did you

2  attempt to talk with anybody who might have more

3  information about the conversion to get that

4  information?

5  A.      Only the receiver -- or the person who had

6  served as receiver.

7  Q.      So the receiver, Mr. Young, is the source of

8  all your knowledge about the first claim in your

9  complaint?

10          MR. YOUNG:  Objection.  I don't think

11  that's what she testified to.

12          THE WITNESS:  What was the question

13  again?

14  BY MR. SPRAGENS:

15  Q.      The receiver, Mr. Young, was the source of all

16  the factual information that underlies the conversion

17  claim in your complaint?

18  A.      That, and the petition and the testimony at

19  the meeting of creditors.

20  Q.      Do you know if Mr. Young tried to get that

21  information from Mr. Manookian, Mr. Cummings or

22  Ms. Hagh when he was serving as receiver?

23  A.      I know that during the receivership he had

24  conversations with Mr. Manookian and Mr. Cummings,

25  maybe even Mr. Hammervold, but that wouldn't -- that

1    probably wouldn't have anything to do with this, but I
2    don't know about Afsoon Hagh.
3    Q.      And it was Mr. Young, when serving as
4    receiver, who developed this understanding that there
5    had been some conversion that had taken place; is that
6    right?
7    A.      Yes.
8    Q.      And did he tell you that in the conversations
9    that you had after you were appointed trustee?
10   A.      Yes.  And when I had employed him as special
11   counsel and we were discussing filing the complaint
12   and what would be in the -- you know, what our
13   possible causes of action were.
14   Q.      But in that first conversation where he called
15   you up and he said, I'm the court-appointed receiver
16   in this case and here's what's gone on, he basically,
17   more or less, told you that there had been this
18   conversion that had taken place?
19   A.      We really didn't talk about anything in detail
20   about that, just that the case was filed and I was
21   appointed the trustee.  He had information because he
22   was receiver in a case that involved the debtor.
23   Q.      At what point did he tell you that he believed
24   that Ms. Hagh was continuing to practice law on behalf
25   of Cummings Manookian?

1  A.      After the case was filed, when we were

2  discussing the complaint, the receivership proceeding

3  and the complaint.

4  Q.      And he drafted the complaint, right?

5  A.      He did.

6  Q.      With respect to the second claim for relief,

7  State Law and Fraudulent Transfer, you allege that

8  Ms. Hagh, Hagh Law, and Manookian, PLLC, wrongfully

9  took the property of Cummings Manookian in attempt to

10  hinder, delay, and defraud creditors of Cummings

11  Manookian; is that right?

12  A.      Right.

13  Q.      And the property that you're talking about

14  there is the property that you discussed earlier,

15  specifically intellectual property, furniture, case

16  files.  What else?

17  A.      Correct.

18  Q.      Office space?

19  A.      Correct.

20  Q.      Anything different about the property in that

21  count from what we discussed earlier?

22  A.      No.

23  Q.      And, again, with respect to this count, you

24  don't have independent knowledge, other than from

25  Mr. Young, about the facts in this -- that underlie

1   the fraudulent transfer claim, do you?

2   A.     I know that the settlement funds from the

3   Fitzgerald case were transferred to Afsoon Hagh or

4   were paid out to Hagh Law -- I'm sorry I keep

5   mispronouncing that -- Hagh Law, and I know that from

6   the receivership pleadings that I was looking at

7   before that hearing in Lawrenceburg.

8   Q.     And those would be pleadings that Mr. Young

9   drafted?

10   A.     Correct.  And the responses to those.

11   Q.     And it's Mr. Young who decided what claims

12   would be brought in this case?

13   A.     We discussed those.  I mean, some of them

14   are -- you know, yes, that's the purpose of having an

15   attorney, you know, what the facts bear out and what

16   the causes of action would be, but I could see that

17   there was potentially a fraudulent conveyance action.

18   Q.     Based on what?

19   A.     That there were funds to which -- or accounts

20   receivable to which Cummings Manookian was entitled

21   that were transferred or conveyed to another --

22   another party.  And that doesn't necessarily mean that

23   the recipient did anything wrong or illegal.  It's

24   just that that's a provision of the bankruptcy

25   fraudulent transfers.

(615) 933-6786
www.harpethcourtreporters.com
Case 3:20-ap-90002   Doc 335-6   Filed 11/17/25   Entered 11/17/25 21:30:43   Desc
Exhibit J. Burton Depo. Tr.   Page 62 of 147

```
 1   Q.       But you developed the understanding that
 2   Cummings Manookian was entitled to those funds from
 3   Mr. Young?
 4              MR. YOUNG:  Objection.  Attorney-client
 5   privilege.  We're getting awfully close now.  She's
 6   talked about -- I was already retained when this
 7   complaint was drafted.  So I'm saying attorney-client
 8   privilege and instruct her not to answer.
 9   BY MR. SPRAGENS:
10   Q.       Okay.  Don't tell me anything that Mr. Young
11   told you as your attorney, but in those conversations
12   that you had with Mr. Young prior to becoming your
13   attorney, you developed an understanding that Cummings
14   Manookian was entitled to these funds?
15   A.       Yes.  In talking to Steve Lefkovitz, who was
16   the debtor's bankruptcy attorney, I asked about those
17   funds, and that's when I was told that those funds
18   weren't property of the bankruptcy estate, and
19   Mr. Manookian also told me that, what his position
20   was.
21   Q.       So Mr. Manookian, as the sole member of
22   Cummings Manookian, and Mr. Lefkovitz, as the attorney
23   for Cummings Manookian, both told you that that was
24   not Cummings Manookian's property, correct?
25   A.       That's what they were claiming.
```

```
1    Q.       That's what they told you?

2    A.       Yes.  Yes.

3    Q.       And Mr. Young, as receiver, said it was

4    Cummings Manookian's property?

5    A.       He believed it was.

6    Q.       With respect to the state law and federal

7    fraudulent transfer claims, what are the fraudulent

8    transfers that are at issue?

9    A.       Specifically at the -- well, at the time that

10   that complaint was filed, the Fitzgerald funds and

11   then also the Shoemaker funds.  There were other --

12   yeah, those.  Because the other cases, I believe

13   Mr. Cummings was handling those and had paid either --

14   well, for the ones that are in the complaint, would

15   be handing Cummings Manookian's portion over to the

16   trustee.

17   Q.       And that was with respect to Fitzgerald at

18   the time the complaint was filed and subsequently

19   Shoemaker?

20   A.       Right.  I knew Shoemaker was out there that

21   hadn't been settled.  I knew those two cases were out

22   there that were originally Cummings Manookian cases

23   that had not been settled.

24   Q.       The fourth claim for relief is Tortious

25   Interference with Contract.  Tell me your
```

1  understanding of that allegation, please.

2  A.      That to the extent that -- or Cummings

3  Manookian was entitled to the attorney fees, and

4  specifically I think that was speaking to the

5  Fitzgerald case -- were entitled to the fees by virtue

6  of the engagement letter, and to the extent that

7  Brian Manookian or Afsoon Hagh interfered with that

8  contractual agreement to breach or to break that

9  contract or make others think that there was no longer

10 an agreement.

11 Q.      So, you know, Brian Manookian is not a party

12 to this case, right?

13 A.      No, he is not.

14 Q.      And, in fact, you didn't bring this claim

15 against Manookian, PLLC, only against Afsoon Hagh and

16 Hagh Law, correct?

17 A.      No.  Manookian, PLLC, is listed as a

18 defendant.

19 Q.      Right.  But the tortious interference with

20 contract claim is just against Afsoon Hagh and Hagh

21 Law, right?

22 A.      That may be right.  I think it's listed

23 underneath each count.

24 Q.      And you say that "Afsoon Hagh and Hagh Law

25 coerced the Fitzgerald case defendants from remitting

1  to Cummings Manookian $1.35 million in attorney's

2  fees."

3  A.      When that case settled, I think there was

4  discussion about the payment of those -- of the

5  settlement proceeds.  And those proceeds ended up

6  being paid to -- were instructed -- I think the order,

7  the settlement order was changed to show Afsoon Hagh,

8  Hagh Law, as the attorney for the plaintiff, and the

9  settlement proceeds were to be paid or were paid to

10  Afsoon Hagh.

11  Q.      When you say the order was changed, you're not

12  saying that there was funny business/meddling with the

13  Court order?

14  A.      No, no.  Mr. Meisner, I believe, was

15  instructed to change the order.

16  Q.      Because Mr. Meisner, as far as you know,

17  thought that Ms. Hagh and Hagh Law were representing

18  the Fitzgeralds, right?

19  A.      Apparently not.  And, again, this is discovery

20  that I'm just seeing, but there was an email where --

21  and I think it was Brian Manookian who emailed and

22  said the order looks fine but it needs to be changed

23  to show that Afsoon Hagh is attorney for the

24  plaintiffs.  And I haven't seen the order, so --

25  before or after, so I don't -- I don't know what it

1  said before.  I don't know what it said before.

2  Q.     Over a year before you filed this complaint,

3  Mr. Manookian, on behalf of Cummings Manookian, had

4  withdrawn the firm from that representation, correct?

5  A.     I'm sorry.  Ask me that again.

6  Q.     Over a year before you filed this complaint,

7  Mr. Manookian had sent that letter withdrawing

8  Cummings Manookian from representing the Fitzgeralds,

9  correct?

10  A.     I don't know if he sent that letter, but there

11  is -- I've seen the letter.

12  Q.     And at the time you filed this case, you knew

13  about that letter, did you not?

14  A.     Yes.

15  Q.     So at the time you filed this case, you were

16  aware that Mr. Manookian had written a December 2018

17  letter withdrawing Cummings Manookian from

18  representing the Fitzgeralds?

19  A.     I knew there was a letter and I knew when it

20  was dated, but I don't know anything beyond that.

21  Q.     When you referred to the engagement agreement

22  in Paragraphs 57 to 61 of the complaint, which are the

23  tortious interference paragraphs, you're referring to

24  what we looked at earlier today as Exhibit 1, correct?

25  A.     I'm sorry.  Ask me that again.

1 Q.      When you use the term "the engagement

2 agreement" with the Fitzgerald plaintiffs, you're

3 referring to what we looked at earlier in this

4 deposition, Exhibit 1?

5 A.      Correct, the engagement letter with the

6 Fitzgeralds, yes.

7 Q.      But you don't mention the December letter in

8 this complaint anywhere, do you?

9 A.      No.

10 Q.      Does Ms. Hagh represent any clients through

11 Hagh Law, in your view, or has all of Hagh Law's work

12 been done on behalf of Cummings Manookian?

13 A.      I think we have alternative theories on that.

14 Are you -- and you're talking about the Fitzgeralds or

15 the -- or the Shoemaker case?  Is that what you're --

16 Q.      I just mean in general.  Generally speaking,

17 is 100 percent of Hagh Law's work on behalf of

18 Cummings Manookian?

19 A.      I would say no.

20 Q.      And how do you know --

21 A.      And I don't know that because -- I guess I'll

22 say I don't know that because I don't know what other

23 cases she's had or worked on.

24 Q.      And how do you determine what work by Hagh Law

25 is on behalf of Cummings Manookian and what is on

1  behalf of Hagh Law?

2  A.      I think that's what we're in the process

3  of determining.  You know, there's -- there are

4  engagement letters for both of those cases with

5  Cummings Manookian.  And at some point Afsoon Hagh

6  did form a PLLC -- I think it's been administratively

7  dissolved now -- and in some pleading -- and at some

8  point started using "Hagh Law" on her signature lines

9  and emails.  But sometime prior to that, maybe after

10 that, it was just Afsoon Hagh with the Cummings

11 Manookian address and information.

12 Q.      So in your mind when Ms. Hagh uses "Hagh Law"

13 on a pleading, that's on behalf of Hagh Law?

14 A.      Yes.

15 Q.      And then when she is silent about her

16 affiliation, you believe that there she's working on

17 behalf of Cummings Manookian?

18 A.      It could be, yes.

19 Q.      It could be?

20 A.      Yes, in those cases.

21 Q.      When you say "those cases," what do you mean?

22 A.      Fitzgerald case and the Shoemaker case is the

23 only cases I know about.

24 Q.      So if Ms. Hagh went back and forth between

25 using no affiliation and then using Hagh Law and then

```
 1  using no affiliation again, in your view she was
 2  wearing different hats at that time?
 3  A.      It's very confusing.  Yes.
 4  Q.      But yes, that's your view?
 5  A.      Yes.
 6              MR. SPRAGENS:  Let's take another quick
 7  break and hopefully we won't need to be here all day.
 8              (Recess observed.)
 9  BY MR. SPRAGENS:
10  Q.      Ms. Burton, in Paragraph 23 of your complaint,
11  there's a list of cases.  Do you remember that list?
12  A.      Correct.
13  Q.      Are you still seeking fees in all of these
14  cases on behalf of Cummings Manookian?
15  A.      I think I've received -- I've received funds
16  -- besides Fitzgerald and Shoemaker, I've received
17  funds, I think, in five of those cases through
18  Mr. Cummings.  There's a couple that did not produce
19  anything, and there are three -- I don't remember
20  which three, but there are three that I'm checking on
21  now to see if there are going to be any fees out of
22  that case.
23  Q.      Do you need a copy of this list?
24  A.      Sure.
25  Q.      There's the complaint, Paragraph 23.  Can you
```

1    identify which cases Cummings Manookian is owed money

2    in from the defendants?

3    A.     The Fitzgerald case and the Shoemaker case.

4    And there are three other cases, but I couldn't tell

5    you, without looking at my Form-1 that I keep in the

6    bankruptcy case, what other three that I haven't

7    received money in or that I haven't marked that

8    there's no money to be pursued in those cases.  I

9    do think in Manookian versus Pennsylvania Higher

10   Education, et al., I've marked that one off of my

11   list.

12   Q.     There were no money damages in that case to

13   begin with, were there?

14   A.     I don't remember.  This was on the list of

15   cases that were being pursued in the receivership.

16   I think this list was provided by Mr. Cummings and

17   Mr. Manookian.  I think there were other cases, maybe,

18   in that receivership that were Hammervold cases, but

19   obviously none of those -- or -- I won't say none of

20   those, but the ones that were strictly Hammervold

21   cases were not included in that list.

22   Q.     Well, this is a list that Mr. Young gave you,

23   correct?

24   A.     That's correct.  And that -- Mr. Cummings, I

25   believe, also had a list of that, of those cases.

```
 1   Q.       Did you do any independent investigation,
 2   other than accepting the list from Mr. Young, to
 3   determine what cases Cummings Manookian was owed a fee
 4   in?
 5   A.       No, other than looking at the bankruptcy
 6   petition and questioning Mr. Manookian at the meeting
 7   of creditors.
 8   Q.       Did you ask Mr. Manookian about these cases in
 9   Paragraph 23 at that hearing?
10   A.       No.  I didn't specifically have the -- I don't
11   think I had the list at that time.
12   Q.       But Mr. Young had that list, right?
13   A.       Correct.
14   Q.       And you had already talked to Mr. Young at
15   that time?
16   A.       At the time that the complaint was filed, when
17   I employed him.
18   Q.       And you had also --
19   A.       But I knew that he had been collecting cases.
20   Q.       In the Manookian v. Pennsylvania Higher
21   Education case, what do you believe that Cummings
22   Manookian was owed in that case?
23   A.       I think now I don't -- there wasn't anything
24   owed in that case.  It was on -- it was on the list
25   that I received.
```

```
1   Q.      And this is the list from Mr. Young?

2   A.      Correct.

3   Q.      But that Manookian case should not be on that

4   list anymore?

5   A.      I'd have to look at my form, at my Form-1 and

6   what my notes say about that, but it's possible that

7   that -- there was no recovery in that case, or it

8   wasn't worth pursuing any longer or -- I mean, I just

9   don't recall.

10  Q.      Did you do any investigation to determine

11  whether Cummings Manookian was entitled to a fee in

12  these cases?

13  A.      Not any independent investigation.

14  Q.      You just relied on Mr. Young?

15  A.      Right.  And Mr. Cummings.

16  Q.      So it's not your testimony that Mr. Cummings

17  identified all of these cases?

18  A.      No.  No.

19  Q.      And you cannot remember which three cases,

20  other than Shoemaker and Fitzgerald, you're continuing

21  to seek fees in?

22  A.      I do not.

23  Q.      Is that something that you could tell us after

24  this deposition?

25  A.      Yes.
```

```
 1   Q.      And will Mr. Young have that information when
 2   we take his deposition?
 3   A.      I don't think so.  I think I'll have to follow
 4   up with Mr. Cummings.
 5   Q.      To determine which three cases you're still
 6   seeking fees in?
 7   A.      Right.  Right.  I think those are cases that
 8   he is handling to which Cummings Manookian is entitled
 9   to some portion of the fees or expenses.
10   Q.      Was Mr. Cummings involved in that Manookian v.
11   Pennsylvania Higher Education case?
12   A.      I do not know.
13   Q.      When did you realize that that Manookian v.
14   Pennsylvania Higher Education case should not be
15   included in the list of cases that the trustee is
16   seeking to recover in?
17   A.      I don't know without -- I don't know.
18   Q.      What do you know about the Bailey v. HCA case?
19   A.      Not anything, other than it's a case -- and
20   I don't even know if I received money in that case
21   without looking at my Form-1.  But to answer you
22   generally, and if you want to go through each one of
23   them -- I mean, obviously the majority of those, my
24   understanding is that they're medical malpractice or
25   personal injury cases.  I know Lattimore, Black,
```

```
 1   Morgan & Cain is an accounting firm.  But these were
 2   the list of existing cases that Cummings Manookian had
 3   an interest in.
 4            And that's what you do as a trustee.  You
 5   investigate the assets, and sometimes you pursue
 6   certain assets, sometimes you don't pursue them,
 7   whether because there's not anything there or it's not
 8   financially worth it.
 9   Q.       But these are cases that Mr. Young asserted
10   Cummings Manookian had an interest in when he was the
11   receiver; is that correct?
12   A.       This was -- I believe this was his -- you'd
13   have to ask Mr. Young about that, but they were the
14   cases in which I think the receiver was investigating.
15   They include cases where attorney liens had been
16   filed.
17   Q.       Do you know what Cummings -- what was Cummings
18   Manookian's entitlement to fees in the Wheeler Bonding
19   Company case?
20   A.       I do not know.
21   Q.       All right.  Let me hand you Exhibit 3, which
22   are your interrogatory responses in this case.
23   A.       Yes, sir.
24   Q.       Can you turn to the last page and verify that
25   that's your signature.  Sorry.  It's not quite the
```

1   last page.

2   A.      Page 10.  Yes, that is my signature.

3   Q.      And did you provide the information that was

4   used to respond to these interrogatories?

5   A.      I did.  I discussed these with my attorney.

6   Q.      Well, I don't want to know any attorney-client

7   communications, but if you look at Interrogatory

8   Number 3, it asks you to identify any matter in which

9   you allege Cummings Manookian is entitled to an

10  attorney's fee, cost or monies of any kind.  And you

11  responded with an objection and then by reproducing

12  that same list that appears in the complaint; is that

13  correct?

14  A.      Correct.

15  Q.      But it's now your position that Cummings

16  Manookian is not entitled to a fee in all of these

17  cases; is that right?

18  A.      At the time that the complaint was filed,

19  there was reason to believe that Cummings Manookian

20  was.

21  Q.      What was that reason?

22  A.      They were being pursued by the receiver in the

23  receivership.

24  Q.      So the sole basis for this information in your

25  interrogatory response is that when Mr. Young was

1 serving as receiver, he asserted an entitlement to

2 fees on behalf of Cummings Manookian in these cases?

3 A.      Correct.  And we went over those, and I have a

4 spreadsheet that talks about what the cases were about

5 and who the attorneys were.

6 Q.      So is it --

7 A.      And it may be, I think, on my Form-1 -- when

8 Mr. Manookian is saying that one of these cases was

9 a Hammervold case, I believe now that the Form-1 that

10 contains this list says there's no value to that.

11       And there may even be a note that says that

12 was a Hammervold case, but I'm not sure about that.

13 Or there may be ones that were on the receiver's list

14 that we didn't put into the complaint because Cummings

15 Manookian wasn't involved.

16       But to the best of my information at the time

17 that the complaint was filed, these were the causes of

18 action that it was believed that Cummings Manookian

19 could have an interest in.

20 Q.      But at the time that you responded to this

21 interrogatory, you knew that it didn't have an

22 interest in Wheeler Bonding Company v. Parts, didn't

23 you?

24 A.      Again, I'll just have to look at my Form-1 to

25 see.

```
 1   Q.       Fair to say that in responding to this
 2   interrogatory, you just copied and pasted the same
 3   list that's been put into the complaint?
 4   A.       I won't say that.  I know we talked about
 5   these.
 6   Q.       You would agree with me it's the same font in
 7   the complaint and in your interrogatory responses,
 8   which is not a Times New Roman font like the rest of
 9   the material?
10   A.       I don't know.  It looks a little smaller and
11   darker, but it's the same list.  That is the same
12   list.
13   Q.       And, in fact, it was copied and pasted
14   probably from a spreadsheet, right?
15   A.       I don't know.
16   Q.       Did you do it?
17   A.       I didn't prepare the responses.  We talked
18   about it.  The responses were prepared, and I reviewed
19   it and asked questions and made changes.
20   Q.       When you say that there was a case that was a
21   Hammervold case, you're referring to Mr. Hammervold
22   who had his own law firm; is that right?
23   A.       That's correct.  I believe that.
24   Q.       And that was Hammervold, PLC, I believe?
25   A.       I think that -- I don't know.  Hammervold Law,
```

1   Hammervold, PLC.  I'm not sure.

2   Q.      And you don't allege that Hammervold, PLC, was

3   a continuation of Cummings Manookian or an alterego of

4   Cummings Manookian, do you?

5   A.      No.

6   Q.      And why not?

7   A.      I don't believe he was ever an employee or

8   member of Cummings Manookian.  I think they worked on

9   cases together.

10  Q.      And you agree with me that Afsoon Hagh was not

11  an employee of Cummings Manookian either?

12  A.      I don't know that.

13  Q.      What percentage of the fees are you seeking in

14  the cases in which you're seeking fees on behalf of

15  Cummings Manookian?

16  A.      In the Fitzgerald case, 100 percent of the

17  fees.  In the Shoemaker case, you know, based on the

18  recent discovery, I don't know that -- I don't think

19  it's 100 percent in the Shoemaker case because there

20  were other engagement letters in that -- in that case.

21  I guess we'll formulate or decide that when discovery

22  is complete.

23  Q.      So what are you referring to that makes the

24  Shoemaker case different from the Fitzgerald case?

25  A.      There's only -- only Cummings Manookian has a

1  engagement letter in the Cummings Manookian -- in the
2  Fitzgerald case.
3  Q.      And only Cummings Manookian has a withdrawal
4  letter in the Fitzgerald case, too, correct?
5  A.      A withdrawal letter?  I think that's -- there
6  is -- I've seen the letter, yes.  Yes.
7  Q.      What do you need to do to determine what
8  percentage of the Shoemaker fee that Cummings
9  Manookian is entitled to?
10 A.      Well, there could be a number of ways, I
11 guess.  There could be a simple -- simple -- well, I
12 don't think it would be simple, but a computation of
13 the number of months that the case was with Cummings
14 Manookian before another attorney took that case.
15         I think it will depend a lot on the
16 depositions and what Mr. Manookian and Ms. Hagh's
17 testimony is, and possibly John Edwards, about their
18 engagement and what they have to support -- well, they
19 do have engagement letters.
20 Q.      So you're going to be relying on the testimony
21 of Mr. Manookian, Ms. Hagh, and possibly John Edwards
22 to determine what percentage of the fee Cummings
23 Manookian is entitled to in the Shoemaker case?
24 A.      And I would have to consult with my attorney,
25 but the counsel for the defense in that case.

```
 1   Q.      What role did they play in deciding allocating
 2   a fee among plaintiffs' firms?
 3   A.      Well, we may want to ask them about who --
 4   just like we did with Meisner, you know, who were the
 5   communications with, who was working on the case.
 6   Q.      As between Mr. Edwards and Ms. Hagh?
 7   A.      And Brian Cummings.  Mr. Manookian, maybe.  I
 8   think he worked on that case at some point.
 9   Q.      The fees that you're entitled to or that
10   you're asserting an entitlement to, those are monies
11   that the client has recovered, correct?
12   A.      Ask me that again.  I think that's a real
13   simple answer, but --
14   Q.      Yeah, that's right.  It's just as simple as it
15   can be.
16   A.      Yeah.  A contingent fee.
17   Q.      Right.  But that money that you're seeking
18   to recover from Cummings Manookian, from a legal
19   standpoint, it's the client's money that they have
20   signed an agreement with their attorneys to pay?
21   A.      Right.  Right.
22   Q.      Do you have any written contracts between
23   Cummings Manookian and any of the defendants in this
24   case?
25   A.      I'm sorry.  Ask me that again.
```

1  Q.      Do you have any written contracts between

2  Cummings Manookian and Manookian, PLLC, Hagh Law or

3  Afsoon Hagh?

4  A.      No.

5  Q.      And the contracts on which you base Cummings

6  Manookian's entitlement to fees are contracts between

7  Cummings Manookian and the clients; is that right?

8  A.      Correct.

9  Q.      And the clients can agree to pay other

10  attorneys as well, if they so choose?

11  A.      Yes.

12  Q.      Let me show you a letter dated April 19, 2017.

13          MR. SPRAGENS:  Let's mark the

14  interrogatories Exhibit 3.

15          And we'll mark as Exhibit 4 the April 19,

16  2017, letter.

17          (Marked Exhibit No. 3.)

18          (Marked Exhibit No. 4.)

19  BY MR. SPRAGENS:

20  Q.      Do you see that?

21  A.      Yes.

22  Q.      And that is an attorney-client agreement

23  between Cummings Manookian and Mr. Goodwin and

24  Mr. Keefer; is that correct?

25  A.      Yes.

```
 1   Q.      And that agreement is signed by Brian
 2   Cummings; is that correct?
 3   A.      Yes, on behalf of Cummings Manookian.
 4   Q.      So at the time that this agreement was signed,
 5   Mr. Cummings had the authority to bind Cummings
 6   Manookian, correct?
 7   A.      Yes.
 8   Q.      And much like the representation agreement we
 9   looked at earlier, this is a representation agreement
10   between clients and the law firm of Cummings
11   Manookian, correct?
12   A.      Yes.
13   Q.      Do you know which matter this representation
14   agreement relates to?
15   A.      Shoemaker versus Vanderbilt.
16   Q.      Do you know the amount -- do you know if
17   there's been a settlement reached in that case?
18   A.      Yes, there has been a settlement.
19   Q.      Do you know the amount of that settlement?
20   A.      I do not.
21   Q.      Under the Client and Scope of Representation
22   section on Page 1, the second paragraph says, "All
23   work on this matter by Cummings Manookian, our firm,
24   will be done by Brian Cummings or Brian Manookian."
25          Did I read that correctly?
```

```
 1   A.      Yes.

 2   Q.      And that is part of the agreement between

 3   Cummings Manookian and Mr. Goodwin and Mr. Keefer?

 4   A.      Yes.

 5   Q.      There's no mention of Afsoon Hagh in that

 6   paragraph, is there?

 7   A.      No.

 8   Q.      And if Afsoon Hagh did work on behalf of

 9   Cummings Manookian, that would have violated that

10   agreement, correct?

11   A.      If she was an associate or an employee of the

12   firm and worked on it, I don't know if that would be

13   seen as a violation.  I guess that's a legal

14   conclusion.

15   Q.      Well, you agree with me that it says, "All

16   work on this matter by our firm, Cummings Manookian,

17   will be done by Brian Cummings or Brian Manookian,"

18   correct?

19   A.      Yes.

20   Q.      So if she did work on the matter, that would

21   be inconsistent with that representation, correct?

22   A.      Not that I know how all firms work, but

23   normally the engagement letter will list the primary

24   attorneys that are going to be responsible for the

25   case.  But, I mean, it says what it says.  I don't
```

```
 1  know what that -- beyond that.
 2  Q.      And what it says is that all the work on the
 3  case will be done by Brian Cummings or Brian
 4  Manookian, correct?
 5  A.      Yes.
 6  Q.      Did there come a time that Cummings Manookian
 7  withdrew from representing Mr. Keefer and Mr. Goodwin?
 8  A.      I think there is some motion for withdrawal in
 9  that case maybe by Mr. Manookian.  I think I've seen
10  something on that recently.
11  Q.      And Mr. Cummings withdrew previously, correct?
12  A.      Yes, yes.  That's correct.
13  Q.      And Mr. Manookian also withdrew?
14  A.      I think that's correct.
15  Q.      And Cummings Manookian itself withdrew from
16  representing them, correct?
17  A.      I don't remember what the withdrawal on that
18  case said.
19  Q.      But if there was no attorney with an active
20  law license, Cummings Manookian could not, as a matter
21  of law, continue to represent these clients, correct?
22  A.      I would say that that's correct.  I think
23  there were engagement letters with other lawyers that
24  did not include the Cummings Manookian lawyers.
25  Q.      Are you aware of any other written contract
```

1  between Cummings Manookian and Mr. Goodwin and

2  Mr. Keefer?

3  A.      Cummings Manookian and -- no.

4  Q.      And is this April 2017 letter the basis for

5  your claim that Cummings Manookian is entitled to fees

6  in the Fitzgerald case -- excuse me -- Shoemaker case?

7  A.      Yes.

8  Q.      And that's the sole basis for the entitlement

9  fees?

10  A.      Yes.  Unless there's some equitable right to

11  fees.

12  Q.      But with respect to the claims that you've

13  made in this case, they all spring from this April

14  2017 agreement?

15  A.      Correct.  Yes, sir.

16  Q.      Okay.  So this letter sets forth Cummings

17  Manookian's entitlement to funds from the client; is

18  that correct?

19  A.      From the client, if they receive a settlement,

20  judgment or an award.

21  Q.      That's right.  So this is an agreement wherein

22  the law firm agrees to perform services for the client

23  and the client agrees to pay the law firm a portion of

24  the funds that get recovered; is that right?

25  A.      Correct.  Correct.

1   Q.      And those are the only two parties to this

2  agreement; it's Cummings Manookian and -- I suppose

3  three parties -- Mr. Goodwin and Mr. Keefer, correct?

4   A.      Yes.

5   Q.      Looking at Page 3 of this letter, do you see

6  the last section where it says, "Mediation and binding

7  arbitration of any attorney-client disputes"?

8   A.      Yes.

9   Q.      And do you agree with me that the paragraph

10  under that heading states that "In order to resolve

11  any dispute under this agreement, you must first go to

12  mediation for a good-faith attempt at resolving the

13  dispute"?

14   A.      I see that paragraph, yes.

15   Q.      And then "If mediation does not resolve the

16  dispute, any ongoing disputed issues must be submitted

17  for final disposition by an agreed-to arbitrator for

18  binding arbitration."  Is that correct?

19   A.      Correct.

20   Q.      And so the last sentence says, "Consequently,

21  neither the client nor the attorneys in this

22  attorney-client relationship can file litigation over

23  or about any alleged or real dispute within the

24  attorney-client relationship and the forum for any

25  such dispute must first be a good-faith mediation and

```
 1   then binding arbitration."

 2         Did I read that correctly?

 3   A.    Yes.

 4   Q.    Have you, on behalf of Cummings Manookian,

 5   attempted to engage in a good-faith mediation about

 6   this contract?

 7   A.    A mediation, no.

 8   Q.    And have you, on behalf of Cummings Manookian,

 9   submitted any dispute arising from this contract to an

10   arbitrator?

11   A.    No.

12   Q.    Why haven't you done that?

13   A.    Well, I don't think we're in a dispute with

14   Mr. Keefer about the -- what fees Cummings Manookian

15   are entitled to.

16   Q.    The nature of your claims in this case is that

17   Mr. Keefer should be paying Cummings Manookian funds

18   rather than paying another entity funds, correct?

19   A.    Funds have already been paid.  Well, no.  Let

20   me think about that.  I'm listening to Mr. Manookian

21   over here.  I know that -- yeah, that's right.  The

22   funds have been paid.  They have been paid.

23   Q.    But you are seeking, on behalf of Cummings

24   Manookian, to -- you're attempting to lay claim to

25   some of Mr. Keefer's money, correct?
```

1     A.     Some of the attorney fee portion of the

2     settlement, yes.

3     Q.     And that attorney's fee portion of the

4     settlement is determined by this contract, correct?

5     A.     Correct.

6     Q.     And under the terms of this contract, any

7     dispute arising from the contract has to be taken to

8     mediation and then arbitration, correct?

9     A.     I still think this has to do with a dispute

10     between the client and the attorney. And this dispute

11     is between attorney firms, law firms.

12     Q.     Have you ever made any demand on Mr. Keefer?

13     A.     No.

14     Q.     Why haven't you done that?

15     A.     Well, the settlement in this was only

16     recently, I understand, and the monies had already

17     been paid by the time I knew anything about that. I

18     think they had already been paid to Mr. Edwards, I

19     believe.

20     Q.     What about in the Fitzgerald case? Have you

21     made any demand on Mr. Fitzgerald for a portion of the

22     fee?

23     A.     No.

24     Q.     And if Mr. Fitzgerald directed that a portion

25     of the fee be paid to Cummings Manookian, would that

(615) 933-6786
www.harpethcourtreporters.com
Case 3:20-ap-90002   Doc 335-6   Filed 11/17/25   Entered 11/17/25 21:30:43   Desc
Exhibit J. Burton Depo. Tr.   Page 89 of 147

1  resolve your dispute in the Fitzgerald case?

2  A.      I guess it would depend on what portion of the

3  fees he directed to be paid to Cummings Manookian.

4  Q.      But you would agree with me that neither

5  Mr. Fitzgerald nor Mr. Keefer have approved any

6  payment to Cummings Manookian, would you not?

7  A.      I have -- I don't know.  I have seen -- I

8  haven't seen any distribution signed by Mr. Keefer for

9  the Shoemaker case.  I know Cummings Manookian wasn't

10 paid any money.  On the Fitzgerald case, I believe the

11 funds were -- Mr. Manookian instructed Mr. Meisner to

12 pay those funds to Hagh Law and that the order should

13 state that.

14        But I have seen a -- what I would call a

15 distribution statement signed by Mr. -- I don't know

16 if it was just -- I guess both the Fitzgeralds -- I'm

17 not sure -- I can't remember -- authorizing that the

18 funds be paid to Hagh Law.  But I think that may have

19 been after the funds had already been distributed.

20 But I'm still looking at all of that.

21 Q.      In any event, that was after the December 2018

22 withdrawal letter that we looked at earlier today,

23 correct?

24 A.      Yes.

25 Q.      You've asserted that Cummings Manookian is

1  entitled to 100 percent of the fee in the Fitzgerald

2  case; is that right?

3  A.     Yes.

4  Q.     And so you allege that all of the legal work

5  that was done in that case was done by Cummings

6  Manookian?

7  A.     Yes.

8  Q.     And then with respect to the Shoemaker case,

9  what work did Cummings Manookian do on the Shoemaker

10 case?

11 A.     I don't know specifically what work they did.

12 I know the complaint was filed by Brian Cummings and

13 Afsoon Hagh -- Afsoon Hagh for Cummings Manookian.

14 Q.     And is that the pleading we talked about

15 earlier where we agreed that Mr. Cummings drafted that

16 complaint?

17 A.     I don't think we agreed he drafted that

18 complaint.  He signed the complaint.

19 Q.     Do you know who drafted the complaint?

20 A.     I do not.

21 Q.     Will you be asking Ms. Hagh if she drafted the

22 complaint?

23 A.     I assume so.

24 Q.     Have you asked Mr. Cummings about that?

25 A.     No.  I assume he'll be asked that in his

```
 1   deposition.
 2   Q.      And before you filed this adversary
 3   proceeding, did you contact Mr. Cummings to find out
 4   who had done what work in that case?
 5   A.      No.
 6   Q.      Why not?
 7   A.      Well, we were under a time crunch, for one
 8   thing, but I -- I don't think there was any -- I
 9   assumed there was not any dispute with Mr. Cummings
10   about whether Cummings Manookian was entitled to any
11   fees in the Shoemaker case.
12   Q.      But if you wanted to figure out how much of
13   the fee in Shoemaker Cummings Mankookian was entitled
14   to, wouldn't you want to talk to the attorney who did
15   work on behalf of Cummings Manookian?
16   A.      Well, once the adversary proceeding was filed,
17   then I'm relying on working with my attorney, and I
18   don't know if I can say anymore about that.
19   Q.      But to your knowledge, Mr. Young has not
20   called Mr. Cummings to try to find out what percentage
21   of the fee Cummings Manookian should be entitled to in
22   Shoemaker?
23   A.      I believe that Mr. Cummings is working off --
24   and I may be wrong about this -- is working off the
25   original Cummings Manookian engagement letter.  And we
```

1  had an agreement with Mr. Cummings that any cases that
 2  he worked on, we would decide the fee.
 3       The percentage fees would be decided according
 4  to the agreement that the members had.  At Cummings
 5  Manookian, there was a formula for what the fees would
 6  be, and that's the way the fees were determined that
 7  I've received from Mr. Cummings in the bankruptcy
 8  case.
 9  Q.    And have you used that formula in the
10  Fitzgerald case?
11  A.    No.
12  Q.    Why haven't you done that?
13  A.    I don't think that Mr. Cummings -- that's a
14  good question.  I don't think Mr. Cummings claims any
15  fees in the Fitzgerald case.  I'm not aware that he
16  does.
17  Q.    What about in the Shoemaker case?
18  A.    Yes, he does.
19  Q.    And did you use that formula in the Shoemaker
20  case?
21  A.    Use the formula how?  I haven't made a full
22  decision on how much Cummings Manookian should be
23  entitled to in the Shoemaker case, but, you know, it
24  would -- it just depends.
25  Q.    And what is going to determine how much you

1  claim Cummings Manookian is entitled to in the

2  Shoemaker case?

3  A.      After we complete discovery and I discuss it

4  with my attorney, then I'll make a decision.

5  Q.      And is it based on the number of hours that

6  were done -- put into the case by attorneys at the

7  various firms?

8  A.      No.  I think it would be part of a contingency

9  based on the original -- on the Cummings Manookian

10  engagement letter and how long Cummings Manookian was

11  attorney for the plaintiffs in the case before another

12  attorney firm took over representation.

13  Q.      So in your view it's based on the length of

14  time that Cummings Manookian was representing them

15  before another firm came in to represent them?

16  A.      Based on the -- based on the engagement letter

17  and my understanding of how that works.

18  Q.      Does it impact your view of how much Cummings

19  Manookian is entitled to whether no work was done over

20  a period of time?  Meaning, isn't it more than just

21  how long they represent them but also what work is

22  done during that representation?

23  A.      I think -- well, I know that that is if you're

24  seeking equitable right to a fee, then I believe it's

25  the value of the services, but I think it does -- the

1  number of hours figure into that somehow.

2  Q.     Do you have personal experience with

3  contingency fee litigation?

4  A.     Not where I've represented.  I'm trying to

5  think.  No.  I mean, obviously I have bankruptcy

6  cases where debtors have causes of action, and they've

7  already employed attorneys or I employ those attorneys

8  or employ new attorneys to represent the estate on the

9  same contingency fee basis.

10  Q.     With respect to this April 2017 engagement

11  letter with Mr. Goodwin and Mr. Keefer, this has the

12  same termination of professional relationship language

13  in it that the Fitzgerald engagement letter has,

14  correct?

15  A.     What date did you say?  April -- you said

16  April 17th?

17  Q.     I'm looking at the April 2017 letter that's in

18  front of you.

19  A.     Oh, April of 2017.  April 19, 2017.  Yes.

20  Q.     Yes.  And at the bottom of Page 2 and top

21  of Page 3, you'll agree that this has the same

22  termination of professional relationship clause that

23  the Fitzgerald agreement has?

24  A.     Yes.

25  Q.     And that's the one where it informs the client

1  that if the client fires them, the attorneys may be
2  able to seek some portion of the attorney's fee, and
3  then it says if we withdraw, we will seek our costs,
4  we will recover our costs, correct?
5  A.      It just says -- it's silent on that, but it
6  does say it doesn't relieve you of the responsibility
7  to pay costs.
8  Q.      Right.  And it doesn't say anything about fees
9  there.
10  A.      No.
11  Q.      But your position on behalf of Cummings
12  Manookian is that even though these clauses are silent
13  about fees, that Cummings Manookian has the right to
14  take fees from its clients, even though it didn't say
15  anything about that in the contract?
16  A.      I think it may depend on the situation.  And
17  even in Shoemaker, I don't think we know all of the --
18  all of the workings of that, as to what the client --
19  why the client chose to enter into a engagement letter
20  with Manookian, PLLC, and then with John Edwards.
21  Q.      Well, you understand, ma'am, that one of the
22  reasons for the requirement of a written engagement
23  letter in a contingency fee case is a concern that
24  lawyers may take advantage of clients who are not
25  sophisticated and so they need to memorialize the

1  agreement in writing and spell everything out and have

2  it signed by the client, correct?

3  A.      Correct.

4  Q.      And the position you're taking in this case,

5  on behalf of a law firm, is that even though there's

6  no reference to attorney's fees in the Shoemaker or

7  Fitzgerald engagement agreement, that a law firm is

8  entitled to take attorney's fees out of a settlement,

9  correct?

10  A.      I'm sorry.  Ask me that question again.

11  Q.      The position that you're taking in this case,

12  on behalf of a law firm, is that even though the

13  engagement letter is silent about the ability to

14  collect attorney's fees from a client in the event of

15  a withdrawal, that the law firm is entitled to take

16  those fees out of the client's settlement.  That's

17  your position?

18  A.      There may be a dispute that arises about that,

19  but I think depending on the situation of why they

20  withdrew -- you know, say if there was some misconduct

21  on the part of the client or that sort of thing, but I

22  think it would just depend on why there was a

23  withdrawal.

24  Q.      But, I mean, the position you're taking in

25  this case is that after a withdrawal, you're asserting

1  that Cummings Manookian has the ability to claim

2  attorney's fees in these two cases, correct?

3  A.      I think for the time that they represented --

4  or because they had an engagement letter and they

5  represented the plaintiff, I think they would have a

6  right to attorney fees -- a portion of the attorney

7  fees.

8  Q.      Even though they didn't put that language in

9  the engagement agreement, correct?

10  A.      (Pause.)

11  Q.      I'm sorry.  Correct?

12  A.      I'm sorry.  I got distracted by Mr. Manookian

13  so I forgot what your question was.

14  Q.      My question is:  You're taking the position in

15  this case that even though the engagement agreement

16  between Cummings Manookian and the clients in

17  Fitzgerald and Shoemaker does not specify, in contrast

18  to the prior paragraph, that the firm may collect

19  attorney's fees in the event it withdraws, the

20  position you're taking is that it is entitled to do

21  that, right?

22  A.      I think it could, depending on the situation.

23  Q.      Have you done anything to look into whether

24  the position you're taking in this case is consistent

25  with the rules of professional conduct governing

```
 1   lawyers?

 2   A.      No.

 3   Q.      Are you going to do that?

 4   A.      I will.

 5   Q.      So you will commit to retaining an expert to

 6   see if the position you're taking in this case is an

 7   ethical position for a lawyer to take?

 8   A.      If that's what I need to do, I will do that.

 9   Q.      Do you think that's what you need to do?

10   A.      I don't know without consulting with my

11   attorney.

12              MR. GABBERT:  Is that Exhibit 4?  Did we

13   list that Exhibit 4?

14              MR. SPRAGENS:  Yes, that's Exhibit 4.

15   BY MR. SPRAGENS:

16   Q.      With respect to the Shoemaker settlement --

17   and we can set aside that exhibit for now -- were you

18   involved in the settlement negotiations that ended the

19   Shoemaker case?

20   A.      No.

21   Q.      Was Cummings Manookian involved in that

22   conversation at all?

23   A.      I do not think so, no.

24   Q.      So it's fair to say that Cummings Manookian

25   did not secure the settlement in the Shoemaker case,
```

```
 1   is it not?

 2   A.      Well, I think that depends on -- they weren't

 3   involved when there was the settlement, but I would

 4   think that from the beginning to the ending of the

 5   case, everybody's working toward some result, whether

 6   it's a settlement or a trial.

 7   Q.      There came a time where Cummings Manookian no

 8   longer had any attorneys and didn't participate in any

 9   settlement discussion, correct?

10   A.      I think that's correct.

11   Q.      And then Mr. Edwards got involved in the case?

12   A.      Correct.

13   Q.      And do you know what the highest offer in the

14   Shoemaker case was while Cummings Manookian was

15   involved in the case?

16   A.      I do not.

17   Q.      Have you asked Mr. Cummings about that?

18   A.      No.

19   Q.      Do you know if Mr. Young has done that?

20   A.      I don't know.

21   Q.      Well, is knowing what the highest offer that

22   was on the table when Cummings Manookian was involved

23   in the case, is that relevant to your decision about

24   what portion of the fee in Shoemaker Cummings

25   Manookian is entitled to?
```

```
 1   A.       I haven't evaluated that yet, so I don't know.

 2   Q.       Are you going to try to find out that

 3   information?

 4   A.       Yes.  We've still got depositions, other

 5   depositions to take.

 6   Q.       So you'll be asking what the best offer that

 7   was on the table when Cummings Manookian was involved

 8   in the Shoemaker case was?

 9   A.       If that's relevant to deciding what fee that

10   Cummings Manookian is entitled to.

11   Q.       And do you think that that's relevant as the

12   trustee for Cummings Manookian?

13                MR. YOUNG:  Objection to the extent it

14   calls for a legal conclusion.

15                THE WITNESS:  I don't know.

16   BY MR. SPRAGENS:

17   Q.       You're a lawyer, right?

18   A.       That's correct.

19                MR. SPRAGENS:  Let's just take a

20   five-minute break, if you don't mind.  I might be

21   nearing the end here.

22                (Recess observed.)

23   BY MR. SPRAGENS:

24   Q.       Ms. Burton, I wanted to talk a little bit

25   about the Shoemaker case with you.  Do you recall
```

1  whether Mr. Cummings signed that complaint on behalf
2  of Cummings Law or Cummings Manookian?
3  A.     The Shoemaker complaint?
4  Q.     Uh-huh.
5  A.     I think it was -- the Shoemaker complaint, I
6  think, was -- he signed on behalf of Cummings Law or
7  whatever his other law firm was.
8  Q.     It was after he had left Cummings Manookian?
9  A.     Correct.
10  Q.     And the work he did at Cummings Law was not on
11  behalf of Cummings Manookian, correct?
12  A.     Correct.  Correct.
13  Q.     There's no alterego or continuation theory
14  with respect to what Mr. Cummings was doing at
15  Cummings Law, correct?
16  A.     No.
17  Q.     And then your basis for asserting that
18  Ms. Hagh was acting on behalf of Cummings Manookian is
19  that on the complaint it does not list -- or it lists
20  her as associate with Cummings Manookian; is that
21  correct?
22  A.     It lists her and Cummings Manookian, being at
23  Cummings Manookian, or however you would say that.
24  Q.     Well, when you say "being at Cummings
25  Manookian," do you mean that it said Cummings

1  Manookian under her name or --

2  A.    I believe that's right.  I believe that's

3  correct.

4  Q.    Do you know if Cummings Manookian paid the

5  filing fee in that case?

6  A.    I think they paid the -- I think the filing

7  fee was paid.

8  Q.    By Cummings Manookian?

9  A.    I don't -- I don't know who paid the filing

10  fee.

11  Q.    Do you know if Cummings Manookian advanced any

12  costs in that case?

13  A.    In which case?

14  Q.    In the Shoemaker case.

15  A.    I do not know.  No, I don't know.

16  Q.    Would you agree with me that the costs in that

17  case were over $100,000?

18  A.    That's what I was told.

19  Q.    By whom?

20  A.    Mr. Young through -- there was $100,000

21  that was paid, I think, to Afsoon Hagh out of the

22  settlement to pay expenses.  We were informed of that

23  by Mr. Gabbert, and we asked for evidence of what was

24  paid.

25  Q.    And Cummings Manookian did not advance any of

1 those $100,000, did they?

2 A.       I don't know.  But it didn't receive any

3 reimbursement of any fees.

4 Q.       And you're not claiming any on its behalf, are

5 you?

6 A.       I don't know.  I don't think we have records

7 to see what -- we don't have bank records for Cummings

8 Manookian to know.

9 Q.       As far as you know, sitting here today, the

10 over $100,000 that was paid was paid by Hagh Law out

11 of a Hagh Law bank account?

12 A.       I don't know that.  I just know that there

13 were $100,000 worth of expenses that we were informed

14 -- that 100,000 of the proceeds that Mr. Gabbert was

15 holding was going to be paid to Afsoon Hagh to pay

16 expenses in Shoemaker.

17 Q.       And did some portion of the expenses in that

18 case go to Brian Cummings?

19 A.       I don't know.  I don't know.

20 Q.       You have control over Cummings Manookian's

21 accounts right now; is that right?

22 A.       I have control over the Cummings Manookian

23 bankruptcy bank account.

24 Q.       You did not authorize any advanced costs in

25 the Shoemaker case on behalf of Cummings Manookian,

1 did you?

2 A.      No.

3 Q.      And you're not -- therefore, you're not

4 seeking recovery of any costs that you've authorized,

5 correct?

6 A.      That the bankruptcy estate made, no.

7 Q.      And the rest of the costs, to your knowledge,

8 were advanced either by Hagh Law or Cummings Law; is

9 that correct?

10 A.      I don't know.  I don't know, like, at the

11 beginning of the case who advanced what, what costs.

12 Q.      In your time as the trustee for Cummings

13 Manookian, did you offer to pay any expenses in the

14 Shoemaker case?

15 A.      No.

16 Q.      Why didn't you do that?

17 A.      Well, I think there was a dispute about

18 whether Cummings Manookian was entitled to -- I mean,

19 from the very beginning, Mr. Manookian has taken the

20 position that Cummings Manookian isn't entitled to any

21 fees.  But we weren't requested -- the bankruptcy

22 estate didn't receive any requests to advance any

23 expenses.

24 Q.      But fair to say that since you've been the

25 trustee for Cummings Manookian, you have not -- the

```
 1   firm has not participated in the Shoemaker case during
 2   that time period, has it?
 3   A.      The bankruptcy estate?
 4   Q.      Yes.
 5   A.      Correct.
 6   Q.      And Cummings Manookian hasn't done anything in
 7   the Shoemaker case since the time you've been the
 8   trustee of the bankruptcy estate?
 9   A.      Correct.
10   Q.      What was the last act that Cummings Manookian
11   did in the Shoemaker case?
12   A.      I don't know.
13   Q.      Do you know any work that Cummings Manookian
14   did in the Shoemaker case?
15   A.      I know that the -- obviously, the -- of
16   course, I'm assuming from the engagement letter to the
17   filing of the complaint, that there was work done on
18   that by Cummings Manookian.  Cummings Manookian, based
19   on the signature on that complaint, was involved in
20   the complaint.
21           Beyond that, I know we've gotten, recently,
22   some discovery and I'm still going through that.  But
23   other than that, I don't know anything.  I don't think
24   I know anything specifically.
25   Q.      On what date was the Shoemaker case filed, as
```

1    best you recall?

2    A.      I think it was in -- is it 2018?  It was after

3    Mr. Manookian was suspended the first time, I believe,

4    so it was after that date.  I can't remember if that

5    was '18 or '19.  But yeah.

6    Q.      Maybe I can help you jog your memory a little.

7    Do you recall that he sent that withdrawal letter

8    December of 2018?  And so I'll suggest to you that I

9    think that case was filed February 2019.

10   A.      That's correct.

11   Q.      At that time, there were no members of

12   Cummings Manookian that had an active license to

13   practice law, correct?

14   A.      Correct.

15   Q.      Because Mr. Manookian, at that point, was the

16   only member of Cummings Manookian, and he did not have

17   an active law license?

18   A.      Correct.

19   Q.      Do you recall whether the Court ordered an

20   amended complaint be filed in the Shoemaker case?

21   A.      I don't know.

22   Q.      So you don't know if the operative complaint

23   in the case was the same one that you're describing

24   that Mr. Cummings and Ms. Hagh filed?

25   A.      I do not know.

1  Q.    You would agree that at the time the Shoemaker

2  case was settled, it was settled based on the then

3  operative complaint, not a prior complaint, right?

4  A.    I would say so, yes, unless those two were

5  taken together.  I don't know.  But I would say the

6  amended complaint.

7  Q.    So the case that was settled was the case that

8  was filed in the amended complaint?

9  A.    I don't know.

10  Q.    But you would agree that whatever the

11  operative complaint was, that was the case that was

12  settled, correct?

13  A.    I don't know what all was included in that

14  amended complaint, if it added or dropped or -- I

15  don't know -- restated.  It may say in there --

16  sometimes they say we adopt and restate.  I just don't

17  know.  I don't think I've seen that.

18  Q.    Have you read all of the pleadings in the

19  Shoemaker case?

20  A.    No, I have not.

21  Q.    Have you read any of the pleadings in the

22  Shoemaker case?

23  A.    Yes.

24  Q.    Which ones?

25  A.    I believe I've read the complaint in the

1  Shoemaker case.

2  Q.      And was that the initial complaint that you've

3  been talking about earlier that Mr. Cummings and

4  Ms. Hagh filed?

5  A.      I don't recall whether it said amended or not.

6  I'd have to go back and look.

7  Q.      And it had Mr. Cummings' signature on it,

8  right?

9  A.      It did.

10 Q.      Have you read anything other than that

11 complaint in the Shoemaker case?

12 A.      I don't think so.

13 Q.      Do you know how many depositions were taken in

14 that case?

15 A.      I do not.

16 Q.      Have you read any of the deposition

17 transcripts in that case?

18 A.      I have not.  I don't know that we've been

19 provided with any of those.

20 Q.      Have you gone on to CaseLink to look at the

21 file for that case?

22 A.      No.

23 Q.      Do you know how many pleadings there -- or how

24 many entries there are in the docket?

25 A.      No.

1   Q.     Any reason that you haven't tried to educate

2   yourself about the Shoemaker case?

3   A.     No.

4   Q.     It's fair to say that you, on behalf of

5   Cummings Manookian, were not actively participating in

6   the Shoemaker case?

7   A.     Correct.

8   Q.     And you don't know what, if any, work Cummings

9   Manookian did on that case at the beginning, do you?

10   A.     No.

11   Q.     You know that they signed up the client and

12   then, at some point, Mr. Cummings and Ms. Hagh filed a

13   complaint?

14   A.     Correct.

15   Q.     And that's the substance and extent of your

16   knowledge on the Shoemaker case?

17   A.     Yes, unless there were other pleadings that

18   Ms. Hagh signed that had the Cummings Manookian

19   information on it, but I don't recall if there were

20   any.

21   Q.     Is it possible that the only pleadings that

22   you would be reading in that case are the ones that

23   Ms. Hagh filed that you allege supports your theory of

24   the case?

25   A.     Ask me -- I'm sorry. Ask me that question

1 | again.

2 | Q.      Is it possible that the only pleadings that
3 | you have been reading in Shoemaker are the ones that
4 | in your view or Mr. Young's view support your alterego
5 | or continuation liability theory in this case?

6 | A.      I don't know what Mr. Young thinks about that,
7 | but, you know, for me it was a case in which Cummings
8 | Manookian had a engagement letter and worked on for
9 | some period of time and -- before another firm had
10 | an engagement letter.  And based on that, it's my
11 | understanding that Cummings Manookian has a right to a
12 | fee in that case.

13 | Q.      But the work that you did -- the work that
14 | you're aware of in that case is strictly signing up
15 | the client in terms of what Cummings Manookian did,
16 | correct?

17 | A.      I don't know what all is included.  I'm the
18 | bankruptcy trustee.  But I don't know.

19 | Q.      You know that they signed up the client and
20 | then time passed, and you're assuming that they did
21 | some work during that time period on the case?

22 | A.      I would think they had to before the complaint
23 | was filed.

24 | Q.      But you don't know that Cummings Manookian
25 | drafted the complaint, do you?

```
1   A.      Drafted the complaint?  No.

2   Q.      Right.  And you do agree that at the time the

3   case settled, Cummings Manookian was no longer

4   representing the client in that Shoemaker case?

5               MR. YOUNG:  Objection.  Asked and

6   answered.

7               THE WITNESS:  I believe that's correct,

8   because I think it was settled after the bankruptcy

9   petition was filed.

10  BY MR. SPRAGENS:

11  Q.      And as you sit here today, you're not prepared

12  to testify what portion of the Shoemaker fee Cummings

13  Manookian is entitled to?

14  A.      No.

15  Q.      And are you seeking to recover some funds from

16  Manookian, PLLC, with respect to the Shoemaker fee?

17  A.      I don't know that they've -- I don't know that

18  they've received any of the settlement proceeds in the

19  -- it's my understanding that Mr. -- I'm sorry.  Back

20  up.

21          I don't know that Manookian, PLLC, has

22  received any funds from the settlement of that case.

23  It's my understanding that after John Edwards was

24  paid some amount, the funds were being held in

25  Mr. Gabbert's trust account.  But I think it's still
```

1  up in the air about whether or not Manookian, PLLC,

2  claims a portion of that for attorney fees in that

3  case.

4  Q.     And as it stands right now, that fee is still

5  -- it's still the client's money; isn't that the case?

6  A.     I don't know how that is considered.  It's

7  been -- it's paid.  The clients don't have it.  The

8  attorneys -- Mr. Gabbert has the fees.  And the

9  attorneys are -- you know, Mr. Cummings is claiming

10  the interest in those fees.  So I think it's a matter

11  between the attorneys now.

12  Q.     And you agree that with respect to the

13  Shoemaker case, Hagh Law is entitled to some portion

14  of that fee?

15  A.     I think that's correct.  Well, I know that

16  there is a Manookian, PLLC, engagement letter that in

17  that first paragraph, it says that you're represented

18  by Manookian, PLLC.  But in the paragraph that usually

19  says, within that firm, who's working on the cases, it

20  says Brian Manookian and Afsoon Hagh, and I think it

21  mentions both of the law firm names.

22  Q.     So it says Hagh Law in that --

23  A.     In that letter.  Somewhere in that letter it

24  does.  And in the contingency -- yeah, the contingency

25  part in that letter it mentions Cummings Law, Brian

1    Cummings.

2    Q.      So based on that letter with the
3    representation about Hagh Law in it, do you agree that
4    Hagh Law is entitled to some portion of the Shoemaker
5    fee?

6    A.      I don't know, but I would say -- well, yes.
7    Yes.  I was going to say I don't know, but I know Hagh
8    Law claims an interest in those -- those fees, and I
9    don't know whether it can be argued that she did or
10   didn't have an engagement letter, but she is -- her
11   firm is mentioned in that letter.

12   Q.      And do you recall that there was another
13   engagement letter in that case, the one that
14   Mr. Edwards signed along with Ms. Hagh?

15   A.      Yes.  And Mr. Manookian also signed that, but
16   I think it's a waiver or something.

17   Q.      So that letter governs the distribution of the
18   attorney's fee in that case, correct?

19   A.      That's the question, isn't it?  But yes,
20   that's another engagement letter.

21   Q.      And you don't disagree that Afsoon Hagh and
22   Hagh Law did perform substantial work on the Shoemaker
23   case?

24   A.      I don't know about substantial work, but they
25   were lawyers in the firm -- in that firm.

```
1   Q.      If you went on CaseLink and looked through the
2   docket and you saw a bunch of pleadings by Ms. Hagh
3   and were aware of court appearances by Ms. Hagh, would
4   that satisfy you that Ms. Hagh and Hagh Law did
5   substantial work in that case?
6   A.      I think that and her deposition, what she says
7   in her deposition.
8   Q.      With respect to the Fitzgerald case, do you
9   agree that Afsoon Hagh personally performed
10  substantial work on that case?
11  A.      I don't -- I don't know.
12  Q.      But you are aware that she sent letters and
13  signed pleadings and did work on that case, aren't
14  you?
15  A.      I have signed pleadings.  I don't know that I
16  have letters.
17  Q.      Do you know whether Ms. Hagh drafted and
18  argued the motion for summary judgment in that case?
19  A.      My recollection is there is a motion for
20  summary judgment in that case that was filed by Afsoon
21  Hagh but with Cummings Manookian.
22  Q.      Okay.  And do you know, regardless of the
23  entity -- I'm not really concerned about that at this
24  moment.  Do you know whether she went and argued that
25  motion in court?
```

```
1    A.      I do not know.
2    Q.      Do you have any reason to dispute that she
3    personally invested a lot of time and energy working
4    on the Fitzgerald matter?
5    A.      I don't know.
6    Q.      But if she testifies that she did, you'll --
7    you'll believe that?
8    A.      Yes, unless -- yes.
9    Q.      But you're asserting 100 percent fee
10   entitlement by Cummings Manookian in that case,
11   correct?
12   A.      Correct.
13   Q.      So are you going to pay Ms. Hagh for the time
14   she spent working, you allege, on behalf of Cummings
15   Manookian?
16   A.      I haven't thought about that.
17   Q.      I mean, somehow she's got to get paid for the
18   work she did, right?
19   A.      I guess she would have to file a claim in the
20   bankruptcy court.
21   Q.      As the employee, in your view, of the debtor?
22   A.      Possibly.  I just haven't thought about that.
23   Q.      And under your reading of the situation, the
24   only way that Ms. Hagh gets paid for the work she did
25   is if she files a claim as an employee of Cummings
```

1    Manookian to get paid; is that right?

2    A.      Well, if the fee belongs to Cummings

3    Manookian.  I guess it just depends on what her

4    compensation was when she was employed by Cummings

5    Manookian.

6    Q.      And do you know whether she was ever

7    compensated by Cummings Manookian?

8    A.      Mr. Manookian said she was not, that she was

9    not.

10   Q.      So your view of the situation is that Ms. Hagh

11   did a lot of free work, legal work, for Cummings

12   Manookian and never got paid and you're going to keep

13   not paying her?

14   A.      I don't know that.  I don't know if she did

15   free work.

16   Q.      Isn't it possible that she just ran her own

17   law firm and it was called Hagh Law and she is

18   entitled to part of that fee?

19   A.      It could be.

20            MR. SPRAGENS:  All right.  I don't have

21   anything further right now.  I don't know if

22   Mr. Gabbert has any questions.

23                    E X A M I N A T I O N

24   BY MR. GABBERT:

25   Q.      Do you have any evidence whatsoever that --

```
 1   and I'm going to talk about Ms. Hagh.  And when I
 2   refer to Ms. Hagh, I'm talking about Hagh, and Hagh
 3   Law.  Okay?
 4   A.      Okay.
 5   Q.      Do you have any evidence whatsoever that Hagh
 6   or Hagh Law took any furniture, property of any kind
 7   whatsoever, from the debtor?
 8   A.      No.
 9   Q.      Do you have any evidence that she was ever a
10   member of the debtor?
11   A.      No.
12   Q.      Do you have evidence that she performed work
13   on behalf of the debtor after Mr. Manookian's
14   suspension?
15   A.      In --
16   Q.      On behalf of the debtor, I'm talking about.
17   A.      She was listed as the attorney in the
18   complaint, the Shoemaker complaint that was filed.
19   Q.      As part of Cummings Manookian or her
20   separately?
21   A.      Part of Cummings Manookian.  And then in the
22   Fitzgerald case -- I have to get that back in my head
23   about when Mr. Manookian was suspended.  October of --
24           MR. MANOOKIAN:  I'll just put on the
25   record, I wrote the letter to the Fitzgeralds.  My
```

```
 1    recollection is I waited until the very last day.

 2    The Tennessee Supreme Court -- I was temporarily

 3    suspended.  They then stayed the suspension for some

 4    period of time and then lifted the stay.  And so by

 5    December 7th of 2018, I was effectively suspended from

 6    the practice of law.

 7              THE WITNESS:  After December of '18,

 8    there was the pleading that was filed that said

 9    Mr. Manookian was withdrawing from the case but Afsoon

10    Hagh would continue representing the plaintiffs.

11              I believe there was -- there may have

12    been some communication with Ronette McCarthy during

13    the pendency of the Fitzgerald case, and then we

14    already talked about -- and I think there may have

15    been other pleadings in the Fitzgerald case that

16    either stated Cummings Manookian or Afsoon Hagh with

17    the Cummings Manookian address, telephone, all of

18    that.  And then we talked about the filing of the

19    Shoemaker complaint, that she was listed as an

20    attorney with the --

21    BY MR. GABBERT:

22    Q.      But she wasn't a signatory on that?

23    A.      Pardon me?

24    Q.      But she wasn't a signatory on that?

25    A.      I don't think so.  I think Cummings Manookian
```

1 -- I mean -- I'm sorry -- Brian Cummings signed that

2 pleading.

3 Q. After the filing of bankruptcy, Cummings

4 Manookian had nothing -- no involvement whatsoever in

5 any of those cases, right?

6 A. Correct.

7 Q. Okay. And you have no evidence of what

8 Cummings Manookian did prior to the filing of

9 bankruptcy in these cases?

10 A. The pleadings that I've seen and the emails

11 and document preparation. But personally, do I know?

12 No.

13 Q. Okay. So you don't know -- I mean, you're

14 just talking about these documents you're talking

15 about, right?

16 A. Right.

17 Q. Okay. The work that was done on these cases

18 prior to the bankruptcy, do you have evidence of what

19 work she did prior to that and what her relationship

20 was, whatsoever, with the firm, the debtor?

21 A. I think we have some through discovery, what

22 we've received in discovery.

23 Q. Okay. But nothing separate from that?

24 A. No.

25 Q. Do you have any evidence whatsoever that she

```
 1   basically has ever used the offices on that address
 2   other than as a mailing address?
 3   A.      No.
 4   Q.      Okay.
 5   A.      I think there can be a reasonable inference or
 6   an assumption, but I think Mr. --
 7   Q.      That's all you have?  That's all you have?
 8   A.      Yes, sir.  Yes, sir.
 9   Q.      You are assuming that she used it?
10   A.      Yes.
11   Q.      Do you consider Cummings, LLC, to be in any
12   way related to the debtor, other than the fact that he
13   was a member of both?
14   A.      No.
15   Q.      Do you have any claim whatsoever that Hagh Law
16   is in any way associated with the debtor?
17   A.      Unless under the theory that it was just a
18   continuation of the debtor.  But Hagh Law was a
19   separate LLC.  It was formed.
20   Q.      What do you mean by "continuation of the
21   debtor"?
22   A.      The successor liability where the -- Brian
23   Manookian and Afsoon Hagh, and I think you're just
24   asking me about her, basically continued doing the
25   same work for the same clients at the same.
```

```
 1    Q.      Everybody practices law, right?

 2    A.      Pardon me?

 3    Q.      Everybody practices law, all of these people

 4    practice law?

 5    A.      Yes.

 6    Q.      So if they continue practicing law, then

 7    that's related to the debtor?

 8    A.      In some instances with that -- with those

 9    cases.

10    Q.      Do you have any evidence that she ever

11    received any payment whatsoever from the debtor?

12    A.      I do not.  We were never furnished with bank

13    records that we requested.

14    Q.      Do you have any --

15    A.      Well, I take that -- well, I don't know that

16    you would consider that from the debtor, but she did

17    receive settlement proceeds, part of the settlement

18    proceeds, attorney fee, in the Fitzgerald case.

19    Q.      Uh-huh.  And she was involved in the

20    Fitzgerald case, right?

21    A.      Yes.

22    Q.      So whatever relationship she had, if she had

23    an entitlement to it as part of the fee, she could

24    have the fee for whatever work she did, right?

25    A.      I'm sorry.  Ask me that --
```

```
 1    Q.      Whatever her percentage was, her agreement was
 2    with the debtor if she got that part of the fee?
 3    A.      I think the reason she got that part of the
 4    fee in the Fitzgerald matter was the receiver only
 5    needed a certain amount to pay the creditor for which
 6    he had been appointed receiver, so anything in excess
 7    of that, at that time, was -- there wasn't a claim for
 8    Cummings Manookian.
 9    Q.      And that receiver is in the room today, right?
10    A.      Yes.
11    Q.      Okay.
12            MR. YOUNG:  I don't think I have anything
13    else right now.
14            MR. SPRAGENS:  I just have a couple of
15    quick follow-ups.
16                E X A M I N A T I O N
17    BY MR. SPRAGENS:
18    Q.      Ms. Burton, what damages did Cummings
19    Manookian experience as a result of any defendant
20    using a phone number or email address that belonged to
21    Cummings Manookian?
22    A.      Ask me that again.
23    Q.      What damages did Cummings Manookian suffer as
24    a result of any defendant using a phone number or an
25    email address or a mailing address that, according to
```

1  your allegation at least, associated with Cummings

2  Manookian?

3  A.      Well, at some point, if they were using

4  Cummings Manookian's space, phone numbers, email

5  addresses, if they weren't paying the bills or

6  compensating for the use of those, but I do not know a

7  dollar amount.

8  Q.      And that's all, if they were using the space,

9  for example, and they were not authorized to?

10  A.      Or even if they were -- they had permission to

11  if Cummings Manookian was paying.  And I don't think

12  they actually paid the lease payments.  I think they

13  paid the mortgage.  They paid the mortgage payments.

14  Q.      Cummings Manookian paid the mortgage payments

15  on behalf of 45 MSW Partners?

16  A.      I think Mr. Manookian testified that in

17  lieu of paying the rent to the landlord, who was

18  Mr. Manookian and Mr. Cummings in different positions,

19  and then them paying the mortgage, they made payments

20  directly to the mortgage company.  That's my

21  recollection.

22  Q.      So as you sit here today, you can't identify

23  any damages that Cummings Manookian actually

24  experienced as a result of the use of the address,

25  email address, phone number?

1    A.    No, unless that's somehow related to the
2    attorney fees that they should have been entitled to
3    that they didn't get paid.  But just the use of the --
4    you know, of the space, I don't know.  I don't know
5    the amount of any damages.
6    Q.    And with respect to the Shoemaker case,
7    Cummings Manookian didn't have any lawyers on staff at
8    the time that case was filed, did it?
9    A.    I believe it did because the case listed --
10   the complaint listed Afsoon Hagh being at Cummings
11   Manookian.
12   Q.    So you believe she was an employee of Cummings
13   Manookian at the time this was filed?
14   A.    She was at Cummings Manookian in some
15   capacity.
16   Q.    And your basis for that is that she used that
17   address?
18   A.    And her name was on the complaint.
19   Q.    You've mentioned, by the way, a few times
20   the initial creditors meeting in this case when
21   Mr. Manookian spoke.
22   A.    Yes.
23   Q.    Do you have a transcript of that meeting?
24   A.    I don't have a transcript, but there is a --
25   they record those, and the U.S. trustees maintain the

1 recording.

2 Q.    And when was the last time you listened to the

3 recording of that meeting?

4 A.    Long enough that my Dropbox has -- because

5 I wanted to go back and listen to it again in

6 preparation for this, and it's already expired, so I

7 would have to request it again.

8 Q.    Would that be back when the complaint was

9 filed?  Is that when you think you listened to it

10 last?

11 A.    I don't know that I would have listened to

12 it -- I don't know when I last listened to it, because

13 that was pretty close -- the complaint was filed

14 pretty close in time to the meeting of creditors.  So

15 I don't know that I would have gone back and listened

16 to that in preparation for the complaint.

17 Q.    Do you have a recollection of actually

18 listening to it sometime other than when you heard it

19 in person?

20 A.    Yes.

21 Q.    But you don't know when that is?

22 A.    I don't.  I don't.

23 Q.    The Shoemaker case went on for a couple of

24 years after it was filed, correct?

25 A.    Correct.

1  Q.      And throughout that time, even you would
2  concede that Ms. Hagh was signing pleadings using
3  "Hagh Law."
4  A.      I believe that's correct.  We just recently
5  received the discovery.  But yes, I think that's
6  correct.
7  Q.      But you didn't hire any lawyers to work for
8  Cummings Manookian in that case, did you?
9  A.      No.
10  Q.      Any reason why not?
11  A.      Because there were already -- I think Cummings
12  Manookian was out of that case by the time that the
13  bankruptcy petition was filed, and it couldn't, any
14  longer, operate.
15  Q.      Why couldn't it operate?
16  A.      It wasn't an operating Chapter 7 and wasn't
17  filed that way.  And Mr. Manookian says that it was
18  not operating at the date, petition date.
19  Q.      And without a lawyer as a member, it couldn't
20  even be a PLLC in good standing, could it?
21  A.      I don't know.
22  Q.      Have you read the statute about professional
23  limited liability corporations, companies?
24  A.      Not recently, no.
25  Q.      All right.  But Cummings Manookian couldn't

1  participate in the Shoemaker case because it didn't

2  have any lawyers after those first couple of filings

3  that you contend were --

4  A.    If it didn't have any lawyers, then obviously

5  it wasn't participating.

6  Q.    When was the last time that you or Mr. Young,

7  to your knowledge, spoke to Brian Cummings about the

8  matters that have to do with this case?

9  A.    It's been a while since I have talked to

10  Mr. Cummings, because it's back when we -- I'm trying

11  to think how long I received any money.  But it's been

12  a while since I've talked to Mr. Cummings.

13  Q.    Do you know if Mr. Young has talked to him

14  since you have?

15  A.    I think he has.

16  Q.    Do you know when that was?

17  A.    No.

18  Q.    Was it in the last three months, do you think?

19  A.    I think they have talked, because there's a --

20  you know, a dispute about what Mr. Cummings is

21  claiming out of the Shoemaker fees.

22  Q.    As trustee for Cummings Manookian, what's your

23  position on what Mr. Cummings and his firm are

24  entitled to in the Shoemaker case?

25  A.    I don't know at this point.

1  Q.     Will it be an equivalent amount to what you

2  say Cummings Manookian is entitled to, or will it be

3  more or less?

4  A.     Well, he had left -- he had withdrawn and left

5  Cummings Manookian, and the complaint -- he filed --

6  was involved in the filing of the complaint.  I guess

7  it depends on if we look at that percentage, you know,

8  that there was an agreement of how the percentage was

9  claimed, and I guess up until he withdrew.  He

10  withdrew from that case.

11  Q.     And you go by the passage of time when you try

12  to figure out how much the various firms are entitled

13  to?

14  A.     I think that's what the member agreement --

15  that was the formula or however you would -- the

16  process for if one partner withdrew and, depending on

17  who took the case, when there was a recovery in that

18  case, how the fee would be split among those lawyers.

19  Q.     Do you have a copy of the operating agreement?

20  A.     I think we do because we filed a motion in the

21  bankruptcy case asking as the cases that Mr. Cummings

22  was working on -- as those were being settled, we were

23  using that formula, and we asked the Court to approve,

24  so we didn't have to go in each time, just approve how

25  the attorney fees that were awarded, how they would be

```
1    split between Cummings Manookian and Cummings Law.
2    Q.       If that agreement wasn't filed on the docket
3    and you haven't produced it to us yet, would you
4    produce it to us?
5    A.       Yes.  I think -- yes.
6              MR. SPRAGENS:  That's all I have right
7    now.  Thank you very much for your time.
8              MR. GABBERT:  I'm fine.
9              FURTHER DEPONENT SAITH NOT.
10             (Proceedings concluded at 2:20 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, Sabrina L. Schneider, Notary Public and

 4    Licensed Court Reporter, do hereby certify that I

 5    recorded to the best of my skill and ability by

 6    machine shorthand all the proceedings in the foregoing

 7    transcript, and that said transcript is a true,

 8    accurate, and complete transcript to the best of my

 9    ability.

10              I further certify that I am not an attorney

11    or counsel of any of the parties, nor a relative or

12    employee of any attorney or counsel connected with the

13    action, nor financially interested in the action.

14

15              SIGNED this 4th day of May, 2022

16

17

18              *Sabrina Schneider*
                Sabrina L. Schneider, LCR
19              Notary Public, State of Tennessee
                My Commission Expires: 5/9/2022
20
      Tennessee LCR No. 455
21    Expires: 6/30/2022

22

23

24

25
```

```
 1                    E R R A T A

 2
         I, JEANNE ANN BURTON, TRUSTEE, having read the
 3   foregoing deposition, Pages 1 through 129, taken April
     20, 2022, do hereby certify said testimony is a true
 4   and accurate transcript, with the following changes
     (if any):
 5
     PAGE LINE      SHOULD HAVE BEEN
 6
 7   ____ ____      _____

 8   ____ ____      _____

 9   ____ ____      _____

10   ____ ____      _____

11   ____ ____      _____

12   ____ ____      _____

13   ____ ____      _____

14   ____ ____      _____

15   ____ ____      _____

16   ____ ____      _____

17   ____ ____      _____

18   ____ ____      _____

19
                    _____
20                  JEANNE ANN BURTON, TRUSTEE

21

22

23

24   _____
     Notary Public
25   My Commission Expires:_____
```





(615) 933-6786
www.harpethcourtreporters.com



(615) 933-6786
www.harpethcourtreporters.com



(615) 933-6786
www.harpethcourtreporters.com



(615) 933-6786
www.harpethcourtreporters.com



Case 3:20-ap-90002   Doc 335-6   Filed 11/17/25   Entered 11/17/25 21:30:43   Desc
Exhibit J. Burton Depo. Tr.   Page 138 of 147



(615) 933-6786
www.harpethcourtreporters.com



Case 3:20-ap-90002   Doc 335-6   Filed 11/17/25   Entered 11/17/25 21:30:43   Desc
Exhibit J. Burton Depo. Tr.   Page 140 of 147



(615) 933-6786
www.harpethcourtreporters.com



(615) 933-6786
www.harpethcourtreporters.com



(615) 933-6786
www.harpethcourtreporters.com



Case 3:20-ap-90002   Doc 335-6   Filed 11/17/25   Entered 11/17/25 21:30:43   Desc
Exhibit J. Burton Depo. Tr.   Page 144 of 147



(615) 933-6786
www.harpethcourtreporters.com

(615) 933-6786
www.harpethcourtreporters.com

(615) 933-6786
www.harpethcourtreporters.com