# EXHIBIT 9



HARPETH
COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

Case 3:20-ap-90002　　Doc 335-9　　Filed 11/17/25　　Entered 11/17/25 21:30:43　　Desc
Exhibit M. Fitzgerald Depo. Tr.　　Page 1 of 13

```
         IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE MIDDLE DISTRICT OF TENNESSEE
                   NASHVILLE DIVISION

IN RE:                            )
                                  )
CUMMINGS MANOOKIAN, PLLC,         ) Case No. 3:19-bk-07235
                                  ) Chapter 7
         Debtor.                  ) Judge Walker
                                  )
JEANNE ANN BURTON,                )
TRUSTEE,                          )
                                  )
         Plaintiff,               )
vs.                               )
                                  )
HAGH LAW, PLLC; AFSOON            )
HAGH; MANOOKIAN, PLLC; and        )
FIRST-CITIZENS BANK &             )
TRUST COMPANY,                    )
                                  )
         Defendants.              ) Adv. Proc. No.
_____   ) 320-ap-90002
```

**CONFIDENTIAL AND
SUBJECT TO A PROTECTIVE ORDER**

Videoconference Deposition of:

MARTY FITZGERALD

Taken on behalf of the Plaintiff

August 14, 2025

Commencing at 10:00 a.m.

---

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Florence Kulbaba, RPR, LCR

1 APPEARANCES (Via Zoom):
2 For the Plaintiff:
3  PHILLIP G. YOUNG, JR.
   Thompson Burton PLLC
4  One Franklin Park
   6100 Tower Circle
5  Suite 200
   Franklin, Tennessee  37067
6  (615) 465-6008
   phillip@thompsonburton.com
7
8 For the Defendants:
9  JOHN T. SPRAGENS
   Spragens Law, PLC
10 915 Representative John Lewis Way South
   Suite 100
11 Nashville, Tennessee 37203
   (615) 983-8900
12 john@spragenslaw.com

1            I N D E X
2         INDEX OF EXAMINATIONS
3                                              Page
4  Examination by Mr. Young                       5
   Examination by Mr. Spragens                   24
5
6          INDEX OF EXHIBITS
7                                              Page
8  No. 1:  U.S. Bankruptcy Court Subpoena To
           Marty Fitzgerald                     10
9
   No. 2:  U.S. Bankruptcy Subpoena To Testify
10         At A Deposition To Marty Fitzgerald  12
11 No. 3:  5/23/18 Brian Manookian Letter to
           Marty and Melissa Fitzgerald         14
12
13 No. 4:  12/7/18 Brian Manookian Letter to
           Marty and Melissa Fitzgerald         17
14
15 No. 5:  10/05/18 Brian Manookian Letter to
           Marty and Melissa Fitzgerald         21
16
17 No. 6:  03/29/19 Afsoon Hagh Letter to
           Marty and Melissa Fitzgerald         23

1       The videoconference deposition of MARTY
2  FITZGERALD was taken by counsel for the Plaintiff,
3  pursuant to notice, via Zoom, on August 14, 2025 for
4  all purposes under the Tennessee Rules of Civil
5  Procedure.
6       The formalities as to notice, caption,
7  certificate, et cetera, are waived.  All objections,
8  except as to the form of the questions, are reserved to
9  the hearing.
10      It is agreed that Florence Kulbaba, being a
11 licensed court reporter for the State of Tennessee, may
12 swear the witness, and that the reading and signing of
13 the completed deposition by the witness are waived.

16                      *  *  *

1            MARTY FITZGERALD
2  was called as a witness, and after having been first
3  duly sworn, testified as follows:
4       MR. YOUNG:  Just at the outset of this
5  deposition, I want to go on the record and say that
6  Mr. Spragens and I have agreed to mark this deposition
7  transcript as confidential and subject to the
8  protective order in this case.  So I just wanted to go
9  ahead and get that on the record.
10         E X A M I N A T I O N
11 BY MR. YOUNG:
12 Q.    Mr. Fitzgerald, will you please state your
13 current address?
14 A.    8158 Golf Club Road, Mt. Pleasant, Tennessee,
15 38474.
16 Q.    My name's Phillip Young and I represent Jeanne
17 Burton, the Chapter 7 bankruptcy trustee for the
18 bankruptcy estate of Cummings Manookian, PLC.
19      Just so that you have a little context for
20 this matter today, Cummings Manookian filed a voluntary
21 bankruptcy.  After that, the court appointed Ms. Burton
22 to serve as the trustee in this case.  And so it's her
23 duty, as appointed by the court, to try to collect as
24 much money for the creditors of Cummings Manookian as
25 possible.  And, obviously, with a law firm, attorneys'

```
 1  fees from Cummings Manookian cases are a big part of
 2  the money that she might be able to collect.
 3          I also want to say at the outset that I
 4  apologize for having to depose you in this matter.  I
 5  imagine that this dredges up some painful memories, and
 6  so I'm going to try my best to get through this very
 7  quickly.  But your testimony is important because what
 8  you were told by Mr. Manookian and Ms. Hagh during the
 9  course of their representation of you and Ms.
10  Fitzgerald has become a bit of an issue in this case.
11  So it's necessary for me to take your deposition.
12          MR. SPRAGENS:  Object to the form.  And
13  just wanted to let Mr. Fitzgerald know that from time
14  to time I may be objecting.  So if you could give me
15  time to object before Mr. Young asks his -- before you
16  respond to Mr. Young's question, I would appreciate
17  that.  Thank you.
18          THE WITNESS:  Sure.
19  BY MR. PHILLIPS:
20  Q.      Mr. Fitzgerald, have you ever given a
21  deposition before?
22  A.      I have.
23  Q.      In what cases?
24  A.      The death of my daughter.
25  Q.      Is that the only time?
```

Page 7

```
 1  A.      Yes.
 2  Q.      Was that deposition in person, or by zoom?
 3  A.      It was in person.
 4  Q.      I'm going to go through some just general
 5  rules, and Mr. Spragens has covered one of them already
 6  with you, but I just want to go over some very quick
 7  ground rules.
 8          I'll ask that you answer my questions audibly
 9  with a yes or a no, not just with a head shake, or an
10  uh-huh or an huh-uh, because that's very difficult for
11  the court reporter to pick up.
12          I'm going to ask that you answer all the
13  questions I ask, even if another attorney objects, like
14  just happened, unless the attorney specifically tells
15  you not to answer.  If that happens, we will resolve
16  the dispute before moving on.
17          If you need to take a break, even though I
18  think this is going to be very brief, just let me know.
19  As long as we're not in the middle of a question, I'll
20  be happy to take a break.
21          Where are you physically located today,
22  Mr. Fitzgerald?
23  A.      I am in Northport, Alabama.
24  Q.      Is anyone else in the room with you?
25  A.      No, sir.
```

Page 8

```
 1  Q.      How many screens are powered on in the room
 2  that you're in?
 3  A.      One.
 4  Q.      Do you have any paper with you today?
 5  A.      Only the notice that I received, the subpoena.
 6  Q.      So you don't have any notes, whether pulled up
 7  on paper, or on a screen?
 8  A.      That is correct.
 9  Q.      Do you have any communication apps open on
10  your computer, like texting, or instant messaging, or
11  things like that?
12  A.      No.
13  Q.      Have you talked to anyone about this
14  deposition in advance of today?
15  A.      This has been going on for seven years.  So,
16  yes, I have spoken with Afsoon Hagh and John Spragens
17  multiple times, as I've received subpoenas over the
18  years.
19  Q.      Mr. Spragens is not your counsel, correct?
20  A.      That is correct.
21  Q.      When did you last talk to Ms. Hagh about this
22  deposition?
23  A.      This specific deposition, I believe -- I don't
24  believe I have spoken to Ms. Hagh.  I believe I spoke
25  to her in probably May of this year, because I believe
```

Page 9

```
 1  I received something a week, or two, prior to the
 2  anniversary of my daughter's death and it was extremely
 3  distressful and impactful to me.  And I called her to
 4  understand what I needed to do, and expressed my
 5  displeasure and discomfort.  And that's the last time
 6  I've spoken with her.
 7  Q.      And what did she tell you about what you
 8  needed to do?
 9  A.      She said she would take care of it.  And I
10  don't know what she did after that.
11  Q.      When was the last time you talked to
12  Mr. Spragens about this matter?
13  A.      Shortly before the call.
14  Q.      Okay.  And what did he say to you in that
15  call?
16  A.      He apologized for me having to go through
17  this.  He told me to answer briefly and truthfully.
18  Q.      Did he ask you to testify in any particular
19  way?
20  A.      No.
21  Q.      Did he show you any documents?
22  A.      No.  It was a phone call.
23  Q.      When's the last time you talked to Brian
24  Manookian?
25  A.      It's been several years.  I couldn't tell you.
```

Page 10

1 Q. You mentioned this -- well, no. Strike that.
2       Do you recall being served with a subpoena for
3 the production of documents back in December of 2021?
4 A. I've been served with several subpoenas over
5 the last seven years. So I -- I don't -- I can't tell
6 you I recall that one, specifically, but I can tell you
7 that each time I have received them it has been
8 emotionally distressful for me and brought up a lot of
9 anger and pain for me.
10       So I know -- I don't know dates. Most of the
11 time I basically went into a rage and called Afsoon or
12 John, and it caused me a lot of distress.
13       (Brief pause to screen share documents.)
14 BY MR. YOUNG:
15 Q. Mr. Fitzgerald, I'm going to show you what I'm
16 going to ask be marked as Exhibit 1.
17       (Marked Exhibit Number 1.)
18 BY MR. YOUNG:
19 Q. This was the document that I was referring to
20 earlier. Have you ever seen this subpoena before?
21 A. I'm sure I have. I couldn't -- I couldn't
22 tell you exactly when or where, but like I said before,
23 I've been served with several of these and have
24 objected to every one of them.
25 Q. I'm going to -- and I'll represent to you, you

Page 11

1 can see here about a third of the way down, this is a
2 subpoena for the production of documents. And do you
3 see where it says, See Attached Description?
4 A. Yes.
5 Q. Okay. I'm going to scroll down to that
6 description. Do you see this attachment?
7 A. I do.
8 Q. Have you ever seen this before?
9 A. Like I said, I'm sure I have.
10 Q. Back in 2021, did you look for these documents
11 in your files?
12 A. No. I objected to having to go through the
13 e-mails from the hardest time in my life, and I refused
14 to do it.
15 Q. So you've never provided documents?
16 A. No.
17 Q. If I represent to you that I was given
18 documents by Mr. Spragens that he said came from you,
19 would that surprise you?
20 A. I don't know. Not necessarily.
21 Q. But just to be clear, your testimony is you've
22 never provided these documents to anyone, correct?
23       MR. SPRAGENS: Object to the form. I
24 think we're trying to imply something here that is not
25 the case. But, anyway, go ahead, you can answer.

Page 12

1       THE WITNESS: I don't -- I have not gone
2 through those e-mails from that time in my life, no.
3 That doesn't mean that Mr. Spragens didn't have access
4 in some way, shape or form. And, obviously, in an
5 e-mail communication, that's a two-way communication.
6 BY MR. YOUNG:
7 Q. But you've never provided any documents to
8 Mr. Spragens, Mr. Manookian, or Ms. Hagh in response to
9 this?
10 A. Not that I recall, no.
11       MR. SPRAGENS: I object to the form. You
12 can answer.
13 BY MR. YOUNG:
14 Q. Now I'm going to show you another exhibit.
15 I'd ask that this be marked as Exhibit 2.
16       (Marked Exhibit Number 2.)
17 BY MR. YOUNG:
18 Q. Mr. Fitzgerald, have you seen this subpoena?
19 A. I -- like I said before, I've seen several of
20 these over the last seven years. So, yes, this is the
21 one that I have here.
22 Q. That's why you're here today, correct?
23 A. Yes.
24 Q. And, again, I want to scroll down to the
25 attachment, and I'll represent to you that this is the

Page 13

1 same attachment that we just looked at. And just, for
2 the record, I want to make sure that I understand, you
3 did not look for any of these documents on this
4 attachment today?
5 A. I did not.
6 Q. I think we all know that Cummings Manookian,
7 PLC represented you and Melissa Fitzgerald in a lawsuit
8 related to the death of your daughter, correct?
9 A. I don't know the answer to that. All I know
10 is Brian Manookian came to my house and he represented
11 me. At some point he couldn't represent me, and then
12 Afsoon represented. That's -- that's my recollection.
13 I don't really know anything about Cummings Manookian.
14 Q. You don't know anything about the law firm,
15 Cummings Manookian?
16 A. No, sir.
17 Q. Did you interview any different law firms
18 before you hired Mr. Manookian?
19 A. I did not.
20 Q. Other than Brian Manookian, who you've just
21 described as coming to your house, did you meet with
22 any other lawyers from Cummings Manookian before
23 engaging him to represent you?
24 A. I did not know there were any other lawyers
25 there. Brian reached out to me, if I remember

Page 14

1 correctly.
2 Q.     Do you know whether you ultimately retained
3 the law firm of Cummings Manookian?
4 A.     No.  My dealings were with Brian, and Brian
5 only, until at some point he couldn't represent me and
6 then Afsoon represented me.
7 Q.     I want to show you a document that's been
8 marked as -- or that I'll ask to be marked as
9 Exhibit 3.
10         (Marked Exhibit Number 3.)
11 BY MR. YOUNG:
12 Q.     And you'll see this says Legal Representation
13 and Engagement.  Do you see that?
14 A.     I do.
15 Q.     And do you see at the top it's from the law
16 firm of Cummings Manookian?
17 A.     I see that.
18 Q.     And then I'm going to scroll down and ask you
19 whether that's your signature at the bottom?
20 A.     It is.
21 Q.     Do you remember ever seeing this document
22 before?
23 A.     If I signed it, I'm sure I saw it.
24 Q.     Do you recognize the signature of Melissa
25 Fitzgerald?

Page 15

1 A.     I do.
2 Q.     Do you recall whether you read this before
3 signing it?
4 A.     I don't recall.  I'm sure it was explained to
5 me if I didn't read it.
6 Q.     Did you understand that Cummings Manookian was
7 representing you on a contingency fee arrangement?
8 A.     I don't know what that means.
9 Q.     I'll represent to you that a contingency fee
10 arrangement means that a law firm only receives
11 compensation from a portion of anything that you
12 recover from the lawsuit.  Is that how you understood
13 the arrangement to be?
14 A.     Yes.
15 Q.     You mentioned this earlier, so let me go over
16 this.  At any point during the lawsuit were you
17 informed that Mr. Manookian had been suspended from the
18 practice of law?
19 A.     I was, yes.
20 Q.     Were you notified by telephone, e-mail or
21 letter?
22 A.     I do not recall.
23 Q.     What do you recall about that communication?
24 A.     All I recall is that I believe Brian was being
25 sued for something, he was countersuing, and that his

Page 16

1 license was in suspension during that time.  I don't
2 know any specifics around it.  All I knew is that at
3 that point he couldn't represent me anymore.
4 Q.     Did Mr. Manookian or anyone at Cummings
5 Manookian ever tell you that he could not represent
6 you?
7 A.     Yeah -- I mean, yeah, when he -- yes, when he
8 -- when his license was suspended, my understanding was
9 that without a license he couldn't represent me.
10 Q.    Did Mr. Manookian or anyone else at Cummings
11 Manookian ever tell you that Cummings Manookian would
12 continue representing you, despite Mr. Manookian's
13 suspension?
14 A.    No.  Like I said, I only ever dealt with Brian
15 until, until I met Afsoon, and I only met Afsoon when
16 Brian was suspended.
17 Q.    And tell me about how you met Afsoon; what
18 were you told when Afsoon entered the case?
19 A.    I was told that she was very capable, she was
20 very smart, she was very -- a practiced lawyer, and
21 that she would, she would do a good job.  And she did.
22 Q.    Did Mr. Manookian or anyone else at Cummings
23 Manookian ever tell you that Cummings Manookian was
24 withdrawing as your law firm?
25 A.    I don't -- I do not recall.

Page 17

1 Q.    Did Mr. Manookian or anyone at Cummings
2 Manookian ever tell you that you needed to find a new
3 law firm to represent you?
4 A.    No.
5 Q.    Did you ever interview any new lawyers, other
6 than Ms. Hagh?
7 A.    No.
8 Q.    How did you go about getting in contact with
9 Ms. Hagh?
10 A.    She's Brian's wife.  He introduced us.
11 Q.    I'm going to show you what I'll ask be marked
12 as Exhibit 4.
13         (Marked Exhibit Number 4.)
14 BY MR. YOUNG:
15 Q.    You'll see this is a letter dated December 7,
16 2018; do you see that?
17 A.    I do.
18 Q.    And it's entitled Withdrawal by Brian
19 Manookian and Cummings Manookian, do you see that?
20 A.    Yeah.
21 Q.    I'll ask you to just take a look through that
22 letter, briefly, and ask whether you recall having
23 received this letter before?
24 A.    Yes, I -- yes.
25 Q.    You received this letter?

1  A.    I believe so.
2  Q.    How did you receive it?
3  A.    I don't remember.
4  Q.    Did you ever have conversations with anyone
5  about the content of this letter?
6  A.    I'm sure Brian explained it to me, but I
7  wouldn't have had a reason to talk to anybody else
8  about it.
9  Q.    I'm going to represent to you, Mr. Fitzgerald,
10 that this was provided to me as part of a document
11 production in response to the subpoena that we looked
12 at earlier for your documents; do you have this letter
13 in your files?
14 A.    I don't know.  I probably do.  I'm assuming it
15 was e-mailed to me, but I don't know for sure.
16 Q.    It says at the top it was sent Via Certified
17 Mail; do you recall getting this via certified mail?
18 A.    No.  That was seven years ago.  I don't -- I
19 do not recall.  I had quite a few things going on at
20 that time.
21 Q.    I understand.  There's a sentence here, the
22 second sentence says:  As a result, and as we have
23 discussed, I am required to withdraw as counsel in this
24 matter.  Do you see that?
25 A.    I do.

1  Q.    Had you in fact discussed that with
2  Mr. Manookian prior to December 7th, 2018?
3  A.    I believe so.  I seem to recall that he
4  withdrew well before December, but I don't know for
5  sure.  I mean, not -- well, I say withdrew, but I
6  believe Afsoon was involved well before December, is my
7  recollection.  But I don't, I don't know for sure.
8  Q.    Did you understand that Ms. Hagh and
9  Mr. Manookian were part of the same law firm?
10 A.    No.
11 Q.    Did you think they were part of different law
12 firms?
13 A.    Yes.
14 Q.    Look at the second sentence of the second
15 paragraph, it says, he's talking about reimbursement of
16 certain advanced costs and expenses, and he says:  I
17 estimate those costs and expenses to be less than
18 $3,000.  Do you see that?
19 A.    Yes.
20 Q.    Do you know whether those costs and expenses
21 were ever paid?
22 A.    No.  I never -- I never paid that money.
23 Q.    And then I'm going to ask you to look at the
24 very last sentence here, it says:  You may provide this
25 letter to any future attorneys representing you in this

1  case as confirmation of the same.  Do you see that?
2  A.    I do.
3  Q.    Did you ever provide a copy of this letter to
4  anyone else?
5  A.    Not that I recall.
6  Q.    I think you've alluded to this, but I just
7  want to make really clear, after December 7, 2018, did
8  the person communicating with you about the lawsuit
9  change?
10 A.    Yes.  I mean, I primarily spoke with Afsoon
11 after that.
12 Q.    Did you ever speak with Brian Manookian after
13 December 7th of 2018 about your lawsuit?
14 A.    Only as a -- yeah, I mean, he was -- he
15 offered advice and, I mean, he was there for the
16 mediation in August of 2019.
17 Q.    When you called to check on the status of this
18 matter, who would you call?
19 A.    Afsoon.
20 Q.    If you e-mailed to check on the status of this
21 matter, who would you e-mail?
22 A.    Afsoon.
23 Q.    Were you ever asked to review motions or
24 pleadings of that sort?
25 A.    I don't understand the question.

1  Q.    Sure.  Let me try to rephrase that.  In the
2  course of a lawsuit it's common to file various types
3  of motions, for example, a motion for summary judgment,
4  or something of that sort.  Did you ever review any
5  legal pleadings like that?
6  A.    With regard to my daughter's case?
7  Q.    Yes.
8  A.    Is that your question?
9  Q.    Yes.
10 A.    I don't believe so.
11 Q.    Who did you authorize to accept a settlement
12 in that case?
13 A.    Who did I authorize to accept a settlement.  I
14 mean, the settlement came via mediation.  It was -- I
15 was the one that decided what the settlement was.
16 Q.    And who was present with you at that
17 mediation?
18 A.    Afsoon, and Brian, and my wife at the time.
19 My ex-wife now.
20 Q.    I want to show you another document here and
21 I'm going to ask that this be marked as Exhibit 5.
22         (Marked Exhibit Number 5.)
23 BY MR. YOUNG:
24 Q.    And you'll see this is dated October 5, 2018,
25 so this is just a couple of months before the last

Page 22

```
 1  letter we looked at.  And I'll just ask you to briefly
 2  review this letter and let me know if you've ever seen
 3  this letter before.
 4  A.      I've seen it.  That's the -- that's why --
 5  that was my recollection of Brian being -- that's why I
 6  said I thought it was before December that he was
 7  suspended, and this is obviously showing that he was at
 8  that point.
 9  Q.      But you remember receiving both of these
10  letters; both the one saying that he was suspended, and
11  the one saying that he had to withdraw?
12  A.      I believe so, yes.
13  Q.      Do you know how you received this letter?
14  A.      No, not specifically.  Again, it was seven
15  years ago.
16  Q.      Once Ms. Hagh began being your primary
17  contact, did you ever sign a new engagement letter with
18  Afsoon Hagh, or Hagh Law, PLLC?
19  A.      I believe that I did, but I couldn't tell you
20  specifically.
21  Q.      Do you recall if you were asked to sign one?
22  A.      Like I said, I believe that I did at some
23  point, but I don't --
24  Q.      I'm going to show you what I'm going to ask to
25  be marked as Exhibit 6.
```

Page 23

```
 1               (Marked Exhibit Number 6.)
 2  BY MR. YOUNG:
 3  Q.      And you see that in the top left corner that
 4  says Hagh Law?
 5  A.      I see that.
 6  Q.      It's dated March 29, 2019, and it says Legal
 7  Representation and Engagement; do you see that?
 8  A.      I do.
 9  Q.      And I'm going to scan down here to the last
10  page and show you that this is unsigned by either Ms.
11  Hagh or by the client.  Do you know if you've ever seen
12  this letter before?
13  A.      I mean, it looks familiar, but I don't -- I
14  don't know for sure.
15  Q.      So you can't say for sure that you have seen
16  it?
17  A.      I can't.  It was several years ago and there
18  was a lot going on in my life after the death of my
19  daughter, so I do not recall every piece of paper that
20  came across my desk, no.
21  Q.      Do you know if you signed?
22  A.      I don't.  I do not.
23          MR. YOUNG:  Those are the only questions
24  I've got, unless Mr. Spragens has anything.
25          MR. SPRAGENS:  Yeah, Mr. Fitzgerald, I
```

Page 24

```
 1  will not belabor it, but I just wanted to cover a few
 2  issues based on some of Mr. Young's questions.
 3                  E X A M I N A T I O N
 4  BY MR. SPRAGENS:
 5  Q.      I'm going to try to share my screen, if
 6  possible.
 7          All right.  Mr. Fitzgerald, do you see this is
 8  an August 23rd, 2019, engagement letter with Manookian
 9  PLLC?
10  A.      Yes.
11  Q.      Sorry, I'm looking at the wrong exhibit.  I
12  apologize.
13          Mr. Fitzgerald, I'm going to try to avoid
14  showing you the settlement statement in the Fitzgerald
15  case, but do you remember receiving a settlement
16  statement that broke down the settlement and was signed
17  by both you and Mrs. Fitzgerald?
18  A.      Yes.
19  Q.      And was that on Afsoon Hagh's letterhead?
20  A.      I believe that it was.
21  Q.      And that would have been dated October 6,
22  2019?
23  A.      Somewhere around there, yes.
24  Q.      Is there any doubt in your mind that once
25  Cummings Manookian ceased operations and Mr. Manookian
```

Page 25

```
 1  was suspended from the practice of law, that firm was
 2  no longer representing you in your daughter's case?
 3          MR. YOUNG:  Object to form.
 4          THE WITNESS:  There's no doubt.  Afsoon
 5  was there for every single thing.  There was no doubt
 6  in my mind that she was representing me.  She was there
 7  with me when Judge Martin provided a continuance, and
 8  explained to me the fact that he had actually done us a
 9  favor, even though I was enraged at the lawyer
10  whistling on his way out like he had just won.
11          She was there to explain to me why I had to
12  pay the bill for the hospital, when my daughter had
13  been killed by a 75-year-old man.  She was there to
14  explain to me how, when The Tennessean wrote an article
15  that completely depersonalized my daughter and her
16  death, that I could actually reach out and have some
17  resolution and allow them to write something else.
18  She was there for me as I sat across the table for a
19  three-hour deposition, sat across the table from the
20  man who had run over my daughter and killed her.
21          There was no doubt in my mind that Afsoon Hagh
22  was my lawyer.
23  Q.      And there was no doubt in your mind that she
24  had her own law firm called Hagh Law, PLLC?
25          MR. YOUNG:  Object to the form.
```

1  THE WITNESS: That is correct. No doubt
2  in my mind.
3  BY MR. SPRAGENS:
4  Q.    And after Mr. Manookian and Cummings Manookian
5  withdrew from the representation, is it fair to say
6  that you and Mr. Manookian remained friends?
7  A.    That is -- that is -- yes, that is true.
8  Q.    But he was no longer serving as your lawyer,
9  correct?
10 A.    That is correct. He offered advice, he
11 offered comfort, he offered some understanding, but he
12 did not, he was not in the court with us, he was not
13 the person that I contacted for anything, other than
14 moral support or friendship.
15 Q.    And Ms. Hagh provided all the legal
16 representation from the time of Mr. Manookian's
17 suspension, onward?
18 A.    That is correct.
19 Q.    Just one other topic. It's been a long time
20 since you first received a subpoena connected to this
21 bankruptcy proceeding; do you recall in February 2022
22 contacting me to let me know that you would try to
23 provide some documents in response to a subpoena?
24 A.    I believe I did. I remember I had called
25 Afsoon and I believe she introduced me to you. And I

1  remember being completely upset about the whole
2  situation and enraged that somebody would be trying to
3  benefit financially from the death of my daughter, when
4  they had absolutely nothing to do with helping my
5  family, or the case. And I thought it was despicable
6  that somebody would even try to do that. So I expect
7  that I did try to help in some way.
8  Q.    And let me represent to you that on
9  February 15th, 2022, you sent me an e-mail that said:
10        John, I spoke with Afsoon. Please let the
11 court know I will work with you to respond to Phillip
12 Young's subpoena. Thank you.
13        Do you recall sending that?
14 A.    I do, yes, now that you mention it.
15 Q.    And then you're aware that after that I
16 produced I believe nine pages, or something, of
17 documents that were responsive to the subpoena?
18 A.    Yes. I remember you telling me that. I do.
19 I apologize, I had forgotten about that.
20        MR. SPRAGENS: That's all right. I thank
21 you for your time today. I don't have any further
22 questions.
23        MR. YOUNG: Nothing further from me,
24 either. Thank you, Mr. Fitzgerald.
25        THE WITNESS: Yes.

1  FURTHER DEPONENT SAITH NOT.
2  (Deposition concluded at 10:36 a.m.)

1              C E R T I F I C A T E
2       I, Florence Kulbaba, Court Reporter in
3  and for the State of Tennessee at Large, do hereby
4  certify that I recorded to the best of my skill and
5  ability by machine shorthand the deposition contained
6  herein, that same was reduced to computer transcription
7  by myself, and that the foregoing is a true, accurate,
8  and complete transcript of the deposition testimony
9  heard in this cause.
10      I further certify that the witness was first
11 duly sworn by me and that I am not an attorney or
12 counsel of any of the parties, nor a relative or
13 employee of any attorney or counsel connected with the
14 action, nor financially interested in the action.
15      This 18th day of August, 2025.

*Florence Kulbaba*
Florence Kulbaba, LCR #070





(615) 933-6786
www.harpethcourtreporters.com



(615) 933-6786
www.harpethcourtreporters.com

(615) 933-6786
www.harpethcourtreporters.com