# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | Case No, 3:19-bk-07235 |
| | Chapter 7 |
| CUMMINGS MANOOKIAN, PLLC | Judge Walker |
| Debtor. | Adv. Proc. No. 3:20-ap-90002 |
| JEANNE ANN BURTON, TRUSTEE | |
| Plaintiff, | |
| v. | |
| HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC, | |
| Defendants. | |

## DEFENDANTS AFSOON HAGH, HAGH LAW, PLLC, AND MANOOKIAN PLLC'S JOINT REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Afsoon Hagh, Hagh Law, PLLC, and Manookian PLLC ("Defendants") submit this Joint Reply to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

## I.    INTRODUCTION

Defendants' Motion for Summary Judgment invited the Trustee to do one simple thing: identify a real, pre-petition property interest of Cummings Manookian, PLLC ("CM") in the Fitzgerald or Shoemaker fees, and point to actual record evidence that Defendants ever received or now hold that property. She has not done so. Instead, her opposition and responses to

Defendants' Statement of Undisputed Material Facts confirm the opposite – that CM's own engagement agreements eliminated any fee upon withdrawal, that CM actually withdrew and expressly disclaimed any Fitzgerald fee in December 2018; that CM had no licensed lawyers or employees practicing law by early 2019; and that neither Hagh Law, PLLC, Afsoon Hagh, nor Manookian PLLC ever received or owed "property of CM."

As a result, the Fitzgerald claim fails at the threshold. The Trustee admits that the Fitzgerald Engagement Agreement grants CM a potential fee only if the client discharges the firm. Conversely, if CM withdraws, CM is limited to reimbursement of advanced costs – and CM advanced none.

The Trustee also admits the authenticity and contents of the December 7, 2018 withdrawal letter, in which CM, through its sole member, not only withdrew from the Fitzgerald representation but "specifically disclaimed" any right to a fee. Against those documents and admissions, the Trustee offers no competing evidence — only out-of-context "I don't remember" deposition snippets and an improvised theory that Ms. Hagh's later work at a different law firm somehow kept CM in the case. But neither of those is a factual dispute capable of surviving summary judgment; they are just legal commentary interspersed with increasingly outlandish attempts to rewrite CM's contracts and undo CM's own waiver.

The Trustee's Shoemaker theory is even weaker. It is not pled in the Complaint at all, and under settled Sixth Circuit law, the Trustee cannot debut a new quantum meruit claim against successor counsel in summary judgment briefing. But even if the Court entertained it, the Shoemaker Engagement Agreement mirrors Fitzgerald. CM may claim a portion of any fee only if the client terminates the firm. If CM withdraws, CM is entitled only to advanced expenses. It

is undisputed that CM withdrew from the case prior to its filing, and, moreover, had no lawyers during the entire multi-year course of its litigation.

Stripped of rhetoric, the Trustee's opposition never gets past the foundational requirements of § 541, § 542, and Tennessee law. There is no debtor–creditor relationship between CM and these Defendants, no "interest of the debtor in property" in the Fitzgerald or Shoemaker fees as of the petition date, and no "property of another" over which Defendants exercised dominion.

Without a cognizable estate property interest, Count 7 (declaratory judgment) collapses, and the derivative claims for conversion, fraudulent transfer, tortious interference, alter ego/successor liability, and turnover follow. Because the Trustee has admitted away the few facts that could have mattered and has failed to create a genuine issue as to any material one, the Court should grant Defendants' Motion for Summary Judgment in full and dismiss all claims with prejudice.

## II. THE TRUSTEE'S RESPONSES TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACT DO NOT CREATE GENUINE DISPUTES OF MATERIAL FACT.

The Trustee's Response to Defendants' Statement of Undisputed Material Facts confirms, rather than undermines, that there is no triable factual dispute. In paragraph after paragraph she (1) expressly admits dispositive facts, (2) labels facts "disputed" but offers only commentary or legal argument, or (3) incorporates "for the same reasons as ¶ __" boilerplate without supplying conflicting record evidence.

Under Fed. R. Civ. P. 56 and Bankr. M.D. Tenn. LBR 7056-1(b)–(c), those responses do not create genuine issues of material fact; they result in Defendants' facts being deemed admitted. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264–65 (Tenn. 2015).

### A. The Trustee's references to Rule 36 do not change her express admissions.

For numerous paragraphs, the Trustee prefaces her response with "No automatic admission is merited under Fed. R. Civ. P. 36(a)(3)," but then immediately concedes "this paragraph's facts are undisputed." For example:

- As to Defs.' SUMF ¶ 14, she responds: "No automatic admission is merited … That said, this paragraph's facts are undisputed," and agrees that Exhibit 2 "is a genuine copy of the attorney-client agreement between Cummings Manookian and Marty Fitzgerald and Melisa Fitzgerald." (Trustee's Resp. to Defs.' SUMF ¶ 14.)

- As to Defs.' SUMF ¶ 25, she repeats the same formulation and concedes that Exhibit 3 is "the Fitzgerald Withdrawal Letter … dated December 7, 2018." (Id. ¶ 25.)

Under LBR 7056-1(b), what matters at summary judgment is that the non-movant either admits or properly controverts each fact with record citations. Having elected to say "this paragraph's facts are undisputed" for key paragraphs concerning the engagement letters and withdrawal letter, the Trustee has admitted them for Rule 56 purposes, regardless of any collateral Rule 36 argument.

## B. "Disputed for the same reasons as ¶ __" and "I don't remember" testimony are insufficient under LBR 7056-1 and are deemed undisputed.

The Trustee also repeatedly responds "Disputed for the same reasons stated in response to paragraph 62" (or "62, 67, and 69") without tying those reasons to new record citations for the paragraph at issue. *See, e.g.*, Trustee's Resp. ¶¶ 63, 68, 70, 73.

LBR 7056-1(b) requires that each response "demonstrate[] that the fact is disputed . . . supported by specific citation to the record." Boilerplate incorporation by reference is not a substitute. Under Fed. R. Civ. P. 56(e)(2), where a fact is not properly controverted with record citations, the Court may "consider the fact undisputed for purposes of the motion."

The same is true of her effort to "dispute" Defs.' SUMF ¶¶ 26–27 (that the Fitzgerald Withdrawal Letter was sent to and received by the Fitzgeralds) with nothing more than witnesses' inability to recall the mailing method or whether they received certified mail. (Trustee's Resp. ¶¶

26–27, citing Manookian Dep. 73:12–13; Melissa Fitzgerald Dep. 17:5–10.) None of that contradicts the existence of the December 7, 2018 letter, its authenticity, or its content withdrawing and disclaiming fees—which she expressly admits in ¶ 25. "I don't remember" testimony does not create a genuine dispute in the face of a contemporaneous written document and uncontroverted declaration testimony. See *Rye*, 477 S.W.3d at 264–65.

## III. THE TRUSTEE'S ADMISSIONS IN RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS CONFIRM THE FACTUAL FRAMEWORK PRESENTED BY DEFENDANTS.

Before the Court ever reaches the Trustee's shifting theories, her own responses to Defendants' Statement of Undisputed Material Facts ("SUMF") lock in the controlling factual landscape. Under Fed. R. Civ. P. 56 and LBR 7056-1, those admissions are binding for purposes of this motion and establish what is, and is not, genuinely in dispute. See *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264–65 (Tenn. 2015).

### A. CM's structure and business

The Trustee admits CM was a Tennessee professional limited liability company whose business was contingent-fee medical-malpractice and similar personal-injury cases, with Brian Cummings and Brian Manookian as its only members. She further admits that CM used a standard form engagement agreement with separate, bargained-for provisions addressing:

- what happens if the **client terminates** CM (potential fee interest in a later recovery); and
- what happens if **CM withdraws** (no fee, only reimbursable costs). *Defs.' SUMF ¶¶ 5–9; Trustee's Resp. ¶¶ 5–9 (Undisputed).*

Those concessions are critical: they confirm that any fee "property" must arise, if at all, from CM's own engagement terms with its clients—not from amorphous notions of "cases," corporate existence, or the latest whack-a-mole theory offered by the Plaintiff.

**B.    Engagement letters and the Fitzgerald withdrawal letter**

As to the Fitzgerald fee, the Trustee repeatedly tries to avoid consequences of obvious admissions, but she squarely admits the authenticity and binding nature of the key documents.  She concedes that:

- Exhibit 2 to Defendants' MSJ is a genuine copy of the Fitzgerald Engagement Agreement, drafted by CM, and is "the attorney-client agreement between Cummings Manookian and Marty Fitzgerald and Melisa Fitzgerald." *Defs.' SUMF ¶¶ 13–14; Trustee's Resp. ¶¶ 13–14 ("this paragraph's facts are undisputed").*

- The Fitzgerald Engagement Agreement provides that if the Fitzgeralds **terminate CM**, CM "will be entitled to some portion of any recovered attorney's fee," but if **CM withdraws**, CM is entitled only to **advanced expenses**. *Defs.' SUMF ¶¶ 21–22; Trustee's Resp. ¶¶ 21–22 (Undisputed).*

- The Fitzgerald Engagement Agreement "does not provide for, or require, the payment of an attorney's fee to Cummings Manookian in the event Cummings Manookian withdraws from representing the Fitzgeralds." *Defs.' SUMF ¶ 23; Trustee's Resp. ¶ 23 (Undisputed).*

Likewise, she concedes that Exhibit 3 is a genuine December 7, 2018 "Fitzgerald Withdrawal Letter" on CM letterhead, signed by Brian Manookian. *Defs.' SUMF ¶ 25; Trustee's Resp. ¶ 25 ("No automatic admission is merited … That said, this paragraph's facts are undisputed.").*

The Trustee purports take issue about mailing method and client recollection in response to ¶¶ 26–27, but never offers any actual, countervailing evidence that the letter is not what it purports to be or that CM did not, in fact, withdraw and disclaim any fee. *See* Trustee's Resp. ¶¶ 26–27 (citing only "don't remember" testimony).

**C.    CM's lack of licensed attorneys after early 2019**

The Trustee further admits that, by early 2019, CM was no longer a functioning law practice staffed by licensed lawyers:

- CM's members' law licenses were suspended or inactive after late 2018/early 2019.

- As of January 1, 2019, CM "had no members or partners with an active license to practice law." *Defs.' SUMF ¶¶ 10–12, 46; Trustee's Resp. ¶¶ 10–12, 46 (Undisputed); see also Burton Dep. 20:16–21:1, 25:17–25 (agreeing that CM had no actively licensed member-lawyers).*

She tries to hedge by asserting that it is "disputed" whether CM still had "employees," because she "considers" Afsoon Hagh to have been acting as a CM employee or agent in continuing some cases. *See* Trustee's Resp. ¶¶ 50–57. But she identifies **no:** employment agreement between CM and Hagh; W-2s, 1099s, payroll records, or tax filings from CM for Hagh after 2018, or CM corporate records authorizing continued operations through her. As such, those are legal characterizations, not competing facts. Under *Rye*, such conclusory assertions do not generate a genuine dispute. 477 S.W.3d at 265. Moreover, the Trustee never once addresses the sworn deposition testimony of both Brian Manookian and Brian Cummings that Afsoon Hagh was never an employee of Cummings Manookian.

## D. The Trustee admits CM did not own client causes of action or files

The Trustee also concedes that CM did **not** own the underlying client claims or files in any of its contingency cases:

- "In the cases in which Cummings Manookian represented clients, Cummings Manookian did not own the client file or the cause of action." *Defs.' SUMF ¶ 58; Trustee's Resp. ¶ 58 (Undisputed; citing Manookian Decl. ¶ 55; Burton Dep. 34:10–13).*

That single admission – although obvious and legally and ethically mandated – undercuts the better portion of the Trustee's theory in this case. It forecloses any argument that "the Fitzgerald case," "the Shoemaker case," or the clients' "choses in action" were themselves CM property that could have been "transferred" to Hagh Law or Manookian PLLC for fraudulent-transfer, successor-liability, or conversion purposes. Whatever interest CM had was limited to what its engagement contracts gave it—and, as shown above, those contracts take any fee away when CM withdraws.

### E. Transfers and "property of CM"

Finally, the Trustee's responses confirm that no CM property was ever transferred to these Defendants. She admits that CM never owned real property at 45 Music Square West; never transferred any property of any kind to Manookian PLLC; and that Manookian PLLC never "received any property of any kind belonging to" CM and "does not and has never owed a debt that is property of Cummings Manookian." *Defs.' SUMF ¶¶ 59–61, 64–65; Trustee's Resp. ¶¶ 59–61, 64–65 (all "Undisputed").*

As to the Hagh Parties, she admits that they "do not and have never owed a debt that is property of Cummings Manookian." *Defs.' SUMF ¶ 72; Trustee's Resp. ¶ 72 (Undisputed; Hagh Decl. ¶ 7).* Critically, the Trustee does **not** cite any document or testimony showing that the Fitzgerald or Shoemaker fee was CM's property at any point, as opposed to a fee awarded to counsel of record under the existing contingent-fee arrangements and court orders.

In short, the Trustee's own SUMF responses: lock in CM's structure and engagement terms; acknowledge CM's lack of licensed lawyers and ownership of client causes; and admit that no CM property or debt obligation was ever held by Defendants. Those admissions establish the core factual framework for this motion, and they are fully consistent with—and reinforce—the legal arguments in the sections that follow.

## IV. THE FITZGERALD ENGAGEMENT AGREEMENT BARS ANY FEE TO CUMMINGS MANOOKIAN ONCE IT WITHDREW

### A. The Fitzgerald Engagement Agreement Is Unambiguous and Forecloses Any Attorney's Fee if CM Withdraws

Under settled Tennessee law, the interpretation of an unambiguous written contract is a question of law for the Court. Courts "ascertain and give effect to the contracting parties' intentions" by giving the language its "usual, natural, and ordinary meaning," and where the

language is clear and unambiguous, "its literal meaning controls the outcome of contract disputes," with no resort to extrinsic evidence or judicial rewriting. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889–90 (Tenn. 2002). More recently, the Tennessee Supreme Court reiterated that the "written words are the lodestar of contract interpretation" and courts may not disregard or revise the text under the guise of construing it. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694–95 (Tenn. 2019).

Here, there is no genuine dispute about what the Fitzgerald Engagement Agreement says or whom it binds. Defendants' Statement of Undisputed Material Facts ("Defs.' SUMF") establishes — and the Trustee expressly concedes — that:

- On May 23, 2018, Cummings Manookian ("CM") entered into a written attorney-client engagement agreement with Marty and Melissa Fitzgerald (the "Fitzgerald Engagement Agreement"). (Defs.' SUMF ¶¶ 13–16; Tr.'s Resp. to Defs.' SUMF ¶¶ 14–16.)
- The Fitzgerald Engagement Agreement was drafted by CM, is a binding contract between CM and the Fitzgeralds, and is the only written agreement governing CM's representation of the Fitzgeralds. (Defs.' SUMF ¶¶ 17–19; Tr.'s Resp. ¶¶ 17–19 ("this paragraph's facts are undisputed").)
- Exhibit 2 is a genuine copy of that engagement agreement. (Defs.' SUMF ¶ 14; Tr.'s Resp. ¶ 14 ("this paragraph's facts are undisputed").)

Most importantly, the Trustee affirmatively admits the operative fee provisions:

- Paragraph 20 of Defs.' SUMF states that the Fitzgerald Engagement Agreement provides that **if the Fitzgeralds terminate CM**, then CM "will be entitled to some portion of any recovered attorney's fee." The Trustee's response: "Undisputed." (Defs.' SUMF ¶ 20; Tr.'s Resp. ¶ 20.)
- Paragraph 21 states that **if CM withdraws from representing the Fitzgeralds**, CM "will be entitled to advanced expenses." The Trustee's response: "Undisputed." (Defs.' SUMF ¶ 21; Tr.'s Resp. ¶ 21.)
- Paragraph 22 states that the Fitzgerald Engagement Agreement "does not provide for, or require, the payment of an attorney's fee to [CM] in the event [CM] withdraws from representing the Fitzgeralds." Again, the Trustee's response: "Undisputed." (Defs.' SUMF ¶ 22; Tr.'s Resp. ¶ 22.)

To the Trustee's credit, those admissions track the plain text of the contract. By its own terms, the contract creates **a fee right only in the discharge** and **no fee right whatsoever in the withdrawal scenario**, where the client's sole contractual obligation is to reimburse advanced costs. There is no language — anywhere — reserving to CM a contingent fee interest if CM chooses to withdraw, and the Trustee has identified no such language. To the contrary, she has admitted the opposite in her responses to Defs.' SUMF ¶¶ 20–22.

Under Tennessee contract law, that is the end of the matter. Courts must give effect to the contract actually written, not to *post-hoc* litigation preferences. *Planters Gin* holds that where contract language is clear and unambiguous, "the literal meaning controls," and courts may not look beyond the four corners of the agreement or "reimpose obligations that the parties, for whatever reason, elect to omit." *Individual Healthcare Specialists* likewise rejects any approach that would "disregard the written text and instead derive the parties' intent from extrinsic evidence" when the text is plain.

In a recent bankruptcy decision applying Tennessee law, this very Court explained the principle in simple, contract-law terms: "No mention of late fees means no late fees." *In re Equipment Finders, Inc.*, 2019 WL 4917891, at *4 (Bankr. M.D. Tenn. Oct. 11, 2019) (Hon. Charles Walker holding that "[u]nder Tennessee law, the Plan's silence on the assessment of late fees does not give rise to an ambiguity in the Plan subject to interpretation. The plain language within the four corners of the Plan control: no provision provides for the assessment of late fees.").

The same rule applied by Judge Walker in *In re Equipment Finders* applies here: no mention of a fee upon withdrawal means no fee upon withdrawal. The parties — sophisticated lawyers drafting their own fee agreement — chose to:

1. Expressly grant CM a fee claim **only** if the Fitzgeralds terminated the firm before recovery; and

2. Expressly limit CM's rights upon its own "withdrawal" to reimbursement of "advanced costs," with no reference to any continuing fee interest.

The Trustee does not identify any ambiguity in these provisions and, indeed, repeatedly concedes that the underlying facts about the contract's terms are "undisputed." (Tr.'s Resp. to Defs.' SUMF ¶¶ 14, 17–22.) Nor can the Trustee salvage her Fitzgerald theory by recasting these unambiguous provisions through argument. The engagement letter uses ordinary language — "discharge" and "withdraw" — that is fully consistent with Tennessee law distinguishing client-driven termination from lawyer-driven withdrawal. *See* Tenn. Sup. Ct. R. 8, RPC 1.16 (governing withdrawal of counsel). A reasonable reader cannot interpret a clause that expressly limits CM's rights upon "withdrawal" to "advanced costs" as secretly preserving a multi-million-dollar contingent fee interest in the event of withdrawal. Under *Planters Gin* and its progeny, and as recognized by this Court in *In re Equipment Finders,* the Court is not free to insert such a right into the contract under the guise of interpretation.

Accordingly, based on (1) the Fitzgerald Engagement Agreement's unambiguous text, (2) the Trustee's admissions that the contract is binding and that ¶¶ 20–22 of Defs.' SUMF are "undisputed," and (3) Tennessee's plain-meaning rule, there is no genuine issue of material fact about CM's contractual rights in the Fitzgerald matter: once CM withdrew, its only contractual entitlement was reimbursement of advanced costs, not any portion of a fee. As a matter of law, CM had no contingent fee interest in the later Fitzgerald recovery that could have become "property of the estate" or been transferred, converted, or turned over by Defendants.

**B.    The December 7, 2018 Fitzgerald withdrawal letter is undisputed and dispositively waives any CM interest in a Fitzgerald fee.**

The Trustee's effort to manufacture a factual dispute about the December 7, 2018 Fitzgerald withdrawal letter fails on the face of the record and under basic summary-judgment law. The material facts about that letter are either (1) conclusively established by uncontroverted evidence, or (2) expressly admitted in the Trustee's own responses to Defendants' Statement of Undisputed Material Facts.

The handful of paragraphs she labels "disputed" cite no contrary evidence that CM retained any fee interest; at most they point to witnesses' inability to remember the mechanics of how a seven-year-old letter was delivered. That is not enough to create a genuine issue of material fact under Rule 56. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986) (non-movant must come forward with "significant probative evidence"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (summary judgment required where non-movant fails to make a sufficient showing on an essential element).

**1. The existence, contents, and legal effect of the December 7 letter are not genuinely disputed.**

The withdrawal letter itself is Exhibit 3 to Defendants' Motion for Summary Judgment. It is on the Debtor's letterhead, addressed to Marty and Melissa Fitzgerald at their Franklin, Tennessee address, and dated December 7, 2018. It explains that Brian Manookian's license has been suspended and that he is "required to withdraw as counsel" and that CM is likewise "required to withdraw" from the Fitzgerald case. It further states that under the engagement agreement CM is entitled only to reimbursement of certain costs, and that "because Cummings Manookian is withdrawing from this matter, it will not be entitled to any portion of an attorney's fee and specifically disclaims the same under the terms of our prior engagement agreement. The Trustee affirmatively admits those basic facts. (Trustee's Resp. to Defs.' SUMF ¶¶ 25, 28–29, 32 (stating

Case 3:20-ap-90002   Doc 363   Filed 12/01/25   Entered 12/01/25 23:07:57   Desc Main
Document   Page 12 of 33

that paragraphs describing Exhibit 3's date, authorship, withdrawal language, and fee disclaimer are "undisputed").)

Likewise, the Manookian Declaration confirms the letter and is unrebutted by the Trustee. As of December 7, 2018, Mr. Manookian was the sole member of CM and was authorized to speak to the Fitzgeralds on CM's behalf regarding their representation. (Manookian Decl. ¶¶ 24–25 (Ex. 7).) He attests that Exhibit 3 *is* the December 7, 2018 "Fitzgerald Withdrawal Letter," that he sent it to Marty and Melissa Fitzgerald, that they received it, and that the letter (a) states that he and CM were withdrawing, (b) requests that the Fitzgeralds obtain new counsel, and (c) records that CM in fact withdrew before any Fitzgerald settlement. *Id.* ¶¶ 26–32.

The Trustee does not offer any competing document, testimony, or expert opinion suggesting that Exhibit 3 is inauthentic, that it says anything different from what it says on its face, or that Mr. Manookian lacked corporate authority to bind CM when he signed it. Nor could she: by her own admission, Exhibit 3 "speaks for itself," and the facts set out in paragraphs 25, 28, 29, and 32 of Defendants' SUMF "are undisputed." Trustee's Resp. to Defs.' SUMF ¶¶ 25, 28–29, 32. Having conceded those points, the Trustee cannot now avoid the legal consequences of what the letter unambiguously does: it records CM's withdrawal and *expressly waives* any interest in any Fitzgerald fee.

Under Tennessee law, a waiver is "the voluntary relinquishment or abandonment of a known right or privilege," and may be effected expressly by clear written language. *See Collins v. Summers Hardware & Supply Co.*, 88 S.W.3d 192, 201–02 (Tenn. Ct. App. 2002). The December 7 letter is exactly that kind of express waiver: CM, through its sole member, stated in writing that *because it was withdrawing from the Fitzgerald case* it "will not be entitled to any portion of an

attorney's fee and specifically disclaims the same under the terms of our prior engagement agreement." Fitzgerald Withdrawal Letter (Ex. 3); Manookian Decl. ¶¶ 24–32.

And this is a point bearing emphasis: no client signature or additional formality is required for CM to waive its own contract rights; a party may relinquish a right unilaterally, and the Trustee cites no authority to the contrary.

Thus, fully eleven months before the petition date, the Debtor had already (1) chosen the contractual path in which it has *no* fee interest—withdrawal rather than termination by the client—and (2) expressly, in writing, disclaimed any fee in Fitzgerald. Under 11 U.S.C. § 541, the estate acquires only whatever interests the debtor held as of the commencement of the case; the Trustee "stands in the shoes of the debtor" and "may only assert the claims which the debtor could have asserted at the commencement of the bankruptcy case." *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853–54 (6th Cir. 2002). A trustee cannot revive a contractual right the debtor has already extinguished by valid waiver.

### 2. The Trustee's attempt to "dispute" mailing and receipt is not supported by contrary evidence and cannot defeat summary judgment.

Against this straightforward record, the Trustee attempts to label as "disputed" the facts that the withdrawal letter was sent and received and that CM withdrew before any Fitzgerald recovery. (Trustee's Resp. to Defs.' SUMF ¶¶ 26–27, 30–31.) But her responses do not identify *any* evidence that Exhibit 3 was not sent, not received, or that CM in fact continued to represent the Fitzgeralds. Instead, she:

- repeats a generic Rule 36 objection to "automatic admissions," and
- relies on selectively snipped excerpts of deposition testimony in which the Fitzgeralds could not remember, seven years later, exactly how the letter was delivered or what documents they had in their personal files in 2019.

That is not a genuine factual dispute; it is not even the "mere scintilla" and speculative doubt that *Anderson* and *Celotex* hold insufficient as a matter of law. *See Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–52; *Cain v. Irvin*, 286 F. App'x 920, 923 (6th Cir. 2008) (non-movant must present more than "a mere scintilla of evidence"; there must be evidence on which a jury could reasonably find for that party).

Indeed, the actual Fitzgerald testimony (not misleadingly truncated snippets) confirms, rather than undermines, Defendants' showing. In his August 14, 2025 deposition, Marty Fitzgerald testified that he had seen the December 7, 2018 letter; that it matched his recollection of Mr. Manookian's suspension and withdrawal; and that he had received it seven years prior to Mr. Fitzgerald's 2025 deposition.

That testimony is entirely consistent with the Manookian Declaration (¶¶ 26–28) and with the letter itself. But more importantly, the Trustee points to no deposition testimony in which either Marty or Melissa Fitzgerald *denies* receiving the letter, contradicts the letter's contents, or claims that CM continued to represent them after December 2018. To the contrary, Marty testified that after Mr. Manookian's suspension there was "no doubt" in his mind that Afsoon Hagh was his lawyer and that she had her own firm, Hagh Law, PLLC. (M. Fitzgerald Dep. 22:20–24.) That testimony is, again, perfectly consistent with CM's withdrawal and Hagh Law's succession—and inconsistent with the Trustee's theory that CM somehow secretly remained counsel and retained a contingent-fee stake despite having expressly disclaimed it.

Unsurprisingly, the Trustee's Response to Defendants' SUMF never grapples with this testimony. Instead, for paragraphs 26, 27, 30, and 31 she simply cross-references earlier legal objections and asserts, in conclusory fashion, that "the facts in this paragraph are disputed." (Trustee's Resp. to Defs.' SUMF ¶¶ 26–27, 30–31.) Rule 56, however, requires more: once the

movant supports its motion with evidence, the non-movant "may not rest upon the mere allegations or denials" but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c)(1), (e); *see Byrd v. Hall*, 847 S.W.2d 208, 211–15 (Tenn. 1993) (non-moving party must "set forth specific facts" and cannot rely on general allegations). Simply stamping "disputed" next to a paragraph, without identifying any concrete evidence that contradicts the movant's proof, does not create a triable issue. Under the Local Rules of this Bankruptcy Court, those unsupported "denials" are now treated as binding admissions.

### 3. Because the letter is binding and undisputed, it defeats the Trustee's Fitzgerald theory as a matter of law.

Once the undisputed record is viewed as Rule 56 requires, the legal consequences follow inexorably:

- CM's Fitzgerald engagement agreement gives it no contingent-fee interest if it withdraws; at most it may seek reimbursement of costs. (Fitzgerald Engagement Agreement (Ex. 2); Manookian Decl. ¶¶ 8–10, 21–23; Trustee's Resp. to Defs.' SUMF ¶¶ 13–14.)

- On December 7, 2018, CM—through its sole member—did in fact withdraw from the Fitzgerald case and expressly waived any claim to a fee, "specifically disclaim[ing]" any such right under the engagement agreement. (Fitzgerald Withdrawal Letter (Ex. 3); Manookian Decl. ¶¶ 24–32; Trustee's Resp. to Defs.' SUMF ¶¶ 25, 28–29, 32.)

- The Fitzgeralds understood that CM and Mr. Manookian were out of the case, and that Afsoon Hagh and Hagh Law were their lawyers going forward. (M. Fitzgerald Dep. 22:20–24; *see also id*. 16:4–9, 17:11–24, 19:8–13 (describing transition to Ms. Hagh).)

- By the time CM filed bankruptcy in late 2019, any contractual or equitable interest it might have had in a future Fitzgerald fee had already been extinguished by its own withdrawal and express written waiver. (Manookian Decl. ¶¶ 24–32.)

Under § 541 and *In re Cannon*, the Trustee cannot acquire a greater interest in the Fitzgerald fee than CM itself possessed at the petition date—and CM possessed none. The December 7 withdrawal/disclaimer letter is therefore not only real and binding; it is dispositive of the Trustee's Fitzgerald-based claims as a matter of law.

**V.** **THE TRUSTEE'S NEWLY DEVISED "HAGH AS DEBTOR'S EMPLOYEE/AGENT" THEORY DOES NOT CREATE A GENUINE ISSUE OF MATERIAL FACT AND IS UNSUPPORTED BY LAW.**

The Trustee's latest attempt to avoid summary judgment is to invent, for the first time in her Response to Defendants' Statement of Undisputed Material Facts, a new theory that Debtor somehow still had an "employee" after January 1, 2019—namely, Afsoon Hagh—who was "acting on Debtor's behalf in continuing to litigate its cases."

That assertion is not tied to any concrete record evidence; to the contrary, it is expressly contradicted by the testimony of CM's only two partners, Brian Cummings and Brian Manookian, who both swore under oath that Afsoon Hagh was never an employee of CM. And it is phrased expressly as a conditional conclusion ("to the extent that Defendant Afsoon Hagh is considered [an employee]") supported only by citation to the Trustee's own responses to Manookian PLLC's second RFAs, not to objective documents, payroll records, contracts, or testimony establishing an actual employment or agency relationship.

That is exactly the sort of "conclusory allegation[]" and "speculation" that both Tennessee and federal courts hold cannot defeat summary judgment. *See, e.g.*, *Rye v. Women's Care Ctr. Of Memphis, MPLLC*, 477 S.W.3d 235, 265 (Tenn. 2015) (nonmovant may not rest on "mere allegations or denials" but must, by Rule 56 means, "set forth specific facts" showing a genuine issue for trial); *Byrd v. Hall*, 847 S.W.2d 208, 215–16 (Tenn. 1993) (same). The Sixth Circuit is in accord: "conclusory allegations, speculation, and unsubstantiated assertions are not evidence" and do not create a genuine dispute of material fact. *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 579 (6th Cir. 2016) (quotation omitted). Merely declaring that Ms. Hagh should be "considered" an employee of Debtor does not substitute for admissible evidence that she in fact was one, particularly where Defendants have presented serial record evidence that she was not.

**A.**     **The Trustee's own responses admit Debtor had no licensed members and identify no actual employees.**

The Trustee concedes—and does not genuinely dispute—that as of January 1, 2019 "Debtor had no members or partners with an active license to practice law."  That admission is drawn from her own discovery responses.  Yet, in the very next breath, she declares that it is "disputed that [Debtor] had no employees to the extent that Defendant Afsoon Hagh is considered one acting on Debtor's behalf in continuing to litigate its cases," again citing only to her own RFA response.

On its face, that "dispute" is not evidentiary; it is hypothetical and circular. The Trustee does not cite:

- any employment agreement between Debtor and Ms. Hagh;
- any payroll records, W-2s, 1099s, tax documents, or benefits records showing Debtor paid her a wage or salary;
- any Debtor corporate minutes or resolutions hiring her as an employee post-January 1, 2019; or
- any deposition testimony from Ms. Hagh, Mr. Manookian, Mr. Cummings, the Trustee, or any client witness actually stating that Ms. Hagh was employed by Debtor during the period in question.

The only "support" offered for this new classification is the Trustee's own interpretive gloss on the work Ms. Hagh performed in the Fitzgerald and Shoemaker matters—work which the Trustee herself elsewhere characterizes as being done on behalf of Hagh Law and Manookian PLLC, Debtor's alleged "successors" and "alter egos," not as Debtor's internal staff.  Under *Rye* and Tennessee Rule 56.06, the burden shifted to the Trustee to "set forth specific facts showing that there is a genuine issue for trial" as to Ms. Hagh.  She has not done so.

**B.     Labeling Ms. Hagh an "employee/agent" conflicts with the Trustee's own successor-liability narrative and is legally empty.**

The Trustee's theory is also internally inconsistent.  In the main body of her Reply, she insists that Hagh Law and Manookian PLLC are Debtor's alter egos and "successors," which "continued [Debtor's] business under a new name" by handling the same Fitzgerald and Shoemaker cases, with the same address, phone number, email, and engagement letter."  She emphasizes that Hagh Law had no staff and that Ms. Hagh was its sole member, who could not recall filing any new case separate from Debtor's matters.

That successor-liability/alter-ego narrative necessarily portrays Hagh Law and Manookian PLLC as *separate* entities that allegedly absorbed Debtor's business and liabilities. What the Trustee cannot coherently do is simultaneously characterize (1) Hagh Law as Debtor's "successor" and alter ego, on the one hand; and (2) Ms. Hagh as Debtor's *employee*, acting inside Debtor's corporate structure, on the other. Those are entirely different legal constructs with different consequences.  If, as the Trustee asserts, Hagh Law and Manookian PLLC "continued [Debtor's] business" as successors, then by definition Debtor ceased operating through its own employees. The work Ms. Hagh and Mr. Manookian did after their new PLLCs were formed was work for those entities, not for Debtor.

In any event, Tennessee law makes clear that whether someone is an "employee" or an independent contractor or agent is a fact-intensive inquiry turning on multiple factors, including the right to control the work, the right to terminate, the method of payment, provision of tools and office space, and ability to work for others.  In the face of sworn record evidence presented by Defendants that Ms. Hagh was never an employee, the Trustee offers no evidence—much less undisputed evidence—on any of those factors as to Ms. Hagh and Debtor after January 1, 2019. She identifies no contract where Debtor reserved a right to control Ms. Hagh's work, no Debtor

payroll, and no Debtor tax treatment of her as an employee. Without such proof, the bare assertion that she should be "considered" an employee is legally meaningless.

## C. Relying on PLC statutes and the operating agreement does not create a factual dispute.

The Trustee's Response also newly relies on Tennessee's PLC statute, Tenn. Code Ann. § 48-249-1106(a), and Debtor's operating agreement to suggest that Debtor *could have* continued to operate through Ms. Hagh as a non-member lawyer even after all members' licenses were suspended or withdrawn. But that speculative argument, even taken at face value, is purely legal and hypothetical. It says nothing about whether Debtor *actually did* employ Ms. Hagh or whether the Fitzgerald and Shoemaker fees were in fact treated, in the real world, as Debtor's property during the relevant time period.

The statute merely permits a PLC to provide services through "individuals licensed or otherwise authorized" to render them; it does not deem every such individual an "employee," and it certainly does not transform every outside lawyer who touches a file into an internal employee. Whether Debtor invoked that option, entered into an employment arrangement, and actually paid Ms. Hagh as an employee are factual questions — and the Trustee has supplied no evidence answering them in the affirmative while the Defendants have provided conclusive evidence to the contrary.

Thus, the Trustee's PLC/operating-agreement theory is, at most, a legal argument about what Debtor hypothetically *could* have done. It is not "record evidence" of what Debtor *did* do. Legal arguments, untethered to concrete facts, do not create a genuine dispute of material *fact* under Rule 56. *Rye*, 477 S.W.3d at 265; *Tyson*, 836 F.3d at 579.

**D.      The Trustee's conditional "disputes" are precisely what Rule 56 forbids.**

Finally, the Trustee's handling of Defendants' SUMF elsewhere confirms that she is not actually joining issue on the facts; she is merely preserving argumentative positions.  Over and over, she responds "Undisputed except to the extent this implies that no evidence exists. Otherwise, disputed," without adding any new documents, deposition testimony, or concrete facts. (*See, e.g.,* Trustee's Responses to paragraphs 74–77 and 80, where she admits she personally has no evidence that the Hagh Parties ever used the 45 Music Square West space or furnishings and cannot identify any damages flowing from any alleged use, but nonetheless vaguely "disputes" the implications for the same reasons previously stated.).

That is exactly what Tennessee courts have rejected: a nonmovant may not defeat summary judgment by sprinkling the word "disputed" over undisputed facts and reserving theoretical possibilities. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts" and instead must "set forth specific facts showing that there is a genuine issue for trial." *Rye*, 477 S.W.3d at 265 (quoting *Matsushita* and Tenn. R. Civ. P. 56.06). The Trustee has not done so here.

Because the Trustee's "Hagh as Debtor's employee/agent" theory is a late-breaking, unsupported label that conflicts with her own successor-liability narrative and rests on no concrete facts, it does not create a genuine dispute of material fact. The Court should reject it and treat Defendants' statements concerning Debtor's lack of employees and the separateness of the Hagh Parties as undisputed for purposes of summary judgment.

**VI.      THE TRUSTEE CANNOT SALVAGE A NEW, UNPLED SHOEMAKER-FEE THEORY AT THE SUMMARY-JUDGMENT STAGE.**

The Trustee's latest briefing makes clear that she is now trying to assert a new Shoemaker fee theory — a quantum-meruit/co-counsel claim to a portion of the Shoemaker contingency fee

— directly against these Defendants. She grounds that theory in the Shoemaker contingency-fee engagement, her new contention that "Debtor's attorney … signed the Shoemaker complaint," and an asserted right to "at least a dispute as to how much Debtor is owed under quantum meruit." None of that appears in her Complaint.

The only place Shoemaker appears in the pleading is as one line in a chart listing the "CM Cases" for which the state-court receiver filed an attorneys' lien: "Shoemaker v. Vanderbilt Medical, Davidson Circuit." The Complaint never alleges that CM (much less these Defendants) is contractually or equitably entitled to any portion of the Shoemaker fee, never pleads any facts about the Shoemaker engagement terms, the beginning or end of CM's relationship with Shoemaker, what work CM supposedly did, or any specific Shoemaker-related damage figure.

Instead, the Trustee relies on a single, generalized paragraph that alleges Debtor "has a legal and/or equitable interest in the attorneys' fees generated by each of the CM Cases, listed herein," Compl. ¶ 79, and a boilerplate request in the declaratory-judgment count that the Court "determine the extent of [Debtor's] portion of the fees and expenses generated by each of the CM cases." Compl. ¶ 80. As her own Reply concedes, the only claims that are specifically pled as to a particular case are the Fitzgerald-specific tortious-interference and turnover counts. There is no Shoemaker-specific claim, no Shoemaker-specific count, and no allegation that these Defendants — as successor counsel — owe CM any portion of the Shoemaker fee under any theory.

That is precisely why Defendants pointed out that the Shoemaker case did not even settle until 2021, after this adversary proceeding was filed in January 2020, and the Trustee never amended to add Shoemaker-specific allegations or claims, nor did she ever disclose a Shoemaker damage computation. Rather than seek leave to amend under Rule 15, the Trustee instead attempts — five years into the case — to transform a generic declaratory-judgment paragraph about "CM

Cases" into a fully-formed, Shoemaker-specific quantum-meruit/co-counsel claim against successor counsel. That is not how federal pleading works.

The Sixth Circuit's rule on this point is crystal clear. It is "well-settled that a plaintiff may not expand its claims to assert new theories in response to summary judgment or on appeal." *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). At the summary-judgment stage, "the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Allowing a plaintiff to do otherwise "would subject defendants to unfair surprise." *Id.*; see also *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013) (re-affirming that a plaintiff "may not expand its claims to assert new theories in response to summary judgment" and must instead amend if it wishes to add such a theory).

District courts within the Sixth Circuit—including this District—apply the same rule: a plaintiff "may not expand its claims to assert new theories in response to summary judgment," and any new theory unearthed in discovery must be brought, if at all, by amendment, not by argument in summary-judgment briefing. But that is exactly what the Trustee is attempting here. Her Reply for the first time characterizes the Shoemaker theory as a quantum-meruit claim based on alleged "work [of] Debtor's attorney that signed the Shoemaker complaint," and on that basis asserts that "Debtor owns at least a portion of the Shoemaker fees." Those are new legal theories and targets — a co-counsel fee claim against successor counsel — that were never pled in the Complaint.

Nor does the Trustee's reliance on the generic "CM Cases" definition cure this defect. A bare allegation that Debtor has some undifferentiated "legal and/or equitable interest in the attorneys' fees generated by each of the CM Cases" does not give Defendants fair notice that they are being sued on a Shoemaker-specific quantum-meruit theory, much less that successor counsel

— rather than the client — are alleged to owe Shoemaker fees to the estate. *See Bridgeport*, 508 F.3d at 400 (plaintiff could not rely on generalized allegations to spring a new theory at summary judgment).

The Trustee's own summary-judgment papers confirm the problem. In her Response to Defendants' Statement of Undisputed Material Facts, she never identifies a single Complaint paragraph that pleads a Shoemaker-specific claim against these Defendants. Instead, she tries to generate "disputes" by arguing about who "made an appearance" in the Shoemaker case via a signature block, or by pointing to the existence of a Shoemaker engagement letter — none of which transforms the generic declaratory language into a properly pled Shoemaker co-counsel fee claim. The Response to Defendants' SUMF cannot amend the Complaint, and argument about an engagement letter is no substitute for a pleaded claim.

In short, what is missing from the Complaint is exactly what the Trustee now wants to litigate: a specific claim that CM (or the Trustee) is entitled, under quantum meruit or otherwise, to a share of the Shoemaker contingency fee from these Defendants as successor counsel. Under binding Sixth Circuit precedent, that new Shoemaker-fee theory cannot be raised for the first time in response to summary judgment, and it cannot create a genuine issue of material fact where none was pled. The Shoemaker theory is therefore procedurally barred and cannot defeat Defendants' Motion.

## VII. EVEN IF A SHOEMAKER CLAIM WERE PROPERLY BEFORE THE COURT, THE SHOEMAKER ENGAGEMENT AGREEMENT FORECLOSES ANY POST-WITHDRAWAL FEE – AND THOSE DISPOSITIVE TERMS ARE UNDISPUTED.

Even if the Court were to indulge the Trustee's newly-minted Shoemaker fee theory, it fails on the merits for the same reason as the Fitzgerald fee. The Shoemaker Engagement Agreement is a written, admitted contract that (1) gives Cummings Manookian ("CM") a potential fee only if

the *client* terminates CM, (2) limits CM to advanced expenses only if CM itself withdraws, and (3) is undisputedly the only written agreement between CM and the Shoemaker Estate. The Trustee has admitted all the key contract facts necessary to apply that language. The record establishes, and the Trustee admits, that:

- CM entered into a written attorney–client agreement with Brett Keefer on April 19, 2017, regarding the Shoemaker matter, attached as Exhibit 1 to Defendants' MSJ (the "Shoemaker Engagement Agreement"). *Defs.' SUMF ¶¶ 36, 39; Trustee's Resp. to Defs.' SUMF ¶¶ 36, 39; Manookian Decl. ¶¶ 36–40; Ex. 1, Shoemaker Engagement Agreement.*

- The Shoemaker Engagement Agreement is "the only written agreement between Cummings Manookian and Brett Keefer or any representative of the Shoemaker Estate." *Defs.' SUMF ¶ 39; Trustee's Resp. to Defs.' SUMF ¶ 39.*

- The agreement states that if **Keefer terminates CM** as his lawyers, CM "will be entitled to some portion of any recovered attorney's fee." *Defs.' SUMF ¶ 40; Trustee's Resp. to Defs.' SUMF ¶ 40; Manookian Decl. ¶ 41; Ex. 1, Shoemaker Engagement Agreement.*

- The agreement further states that if **CM withdraws** from representing Keefer, CM "will be entitled to advanced expenses." *Defs.' SUMF ¶ 41; Trustee's Resp. to Defs.' SUMF ¶ 41; Manookian Decl. ¶ 42; Ex. 1.*

- The Trustee admits that "Cummings Manookian did not pay any costs or advance any expenses associated with any lawsuit filed on behalf of Brett Keefer or the Shoemaker Estate." *Defs.' SUMF ¶ 42; Trustee's Resp. to Defs.' SUMF ¶ 42; Manookian Decl. ¶ 43; Manookian PLLC Second RFAs No. 17.*

- The Trustee also admits that the Shoemaker Engagement Agreement "does not provide for, or require, the payment of an attorney's fee to Cummings Manookian in the event Cummings Manookian withdraws from representing Brett Keefer." *Defs.' SUMF ¶ 43; Trustee's Resp. to Defs.' SUMF ¶ 43; Manookian Decl. ¶ 44; Ex. 1.*

Taken together, those admissions establish the same simple contractual framework that existed for the Fitzgerald engagement. If the client terminates CM, then CM may receive some portion of any recovered fee. If CM withdraws, then CM is entitled only to reimbursement of advanced expenses, and the contract "does not provide for, or require, the payment of an attorney's fee" in that circumstance.

On the face of this admitted contract, there is no scenario in which CM both (a) withdraws, and (b) retains any contractual right to a Shoemaker fee. In that scenario, CM bargains for, and

receives, at most reimbursement of its advanced expenses—which here are undisputedly zero.

Defendants' motion does not rest solely on the text of the Shoemaker Engagement Agreement; it is supported by uncontroverted evidence that CM *withdrew* from representing Keefer before any Shoemaker settlement or fee existed. Defendants' SUMF establishes that:

- "Cummings Manookian withdrew from representing Brett Keefer." *Defs.' SUMF ¶ 44; Manookian Decl. ¶ 45; Manookian PLLC Second RFAs No. 13; Burton Dep. 84:6–14.*

- "Cummings Manookian withdrew from representing Brett Keefer prior to receiving a settlement for Mr. Keefer or the Shoemaker Estate." *Defs.' SUMF ¶ 45; Manookian Decl. ¶ 46; Manookian PLLC Second RFAs No. 15.*

- As of January 1, 2019, CM "had no members or partners with active licenses to practice law." *Defs.' SUMF ¶ 46; Trustee's Resp. to Defs.' SUMF ¶ 46 (facts undisputed); Manookian Decl. ¶ 47; Manookian PLLC Second RFAs No. 21; Burton Dep. 20:16–21:1, 25:17–25.*

In response, the Trustee does **not** point to any document or testimony affirmatively showing that CM continued to serve as counsel of record through settlement. Instead, she characterizes ¶¶ 44–45 as "disputed" because (a) *Burton* testified she did not remember whether the entity "Cummings Manookian, PLLC" itself sent a withdrawal letter, and (b) Brian Cummings testified he did not know whether the firm ever sent such a letter. *Trustee's Resp. to Defs.' SUMF ¶¶ 44–45 (citing Burton Dep. 84:6–18; Cummings Dep. 56:21–25, 115:9).*

That is not a factual contradiction; it is a lack of recollection. Under Tennessee summary-judgment standards, a non-movant cannot create a genuine dispute of material fact simply by saying "I don't remember" in the face of sworn declarations and deemed-admitted RFAs establishing withdrawal. *Rye*, 477 S.W.3d at 264–65 (non-movant must "set forth specific facts" by Rule 56 means; speculation and conclusory denials do not suffice). The broader Shoemaker record confirms the reality:

- The Debtor had no partners, members, or employees actively practicing law by January 1, 2019. *Defs.' SUMF ¶¶ 46-47; Trustee's Resp. to Defs.' SUMF ¶¶ 46-47.*

- The Shoemaker case was filed in February 2019 and "ultimately settled in 2021." *Defs.' SUMF ¶¶ 48, 55; Trustee's Resp. to Defs.' SUMF ¶¶ 48, 55; Hagh Decl. ¶ 2.*

- No attorney did any work "for or on behalf of Cummings Manookian" in the Shoemaker v. VUMC case, No. 19C358, and CM "was not involved in negotiating the settlement in the Shoemaker matter." *Defs.' SUMF ¶¶ 54, 56; Manookian PLLC Second RFAs Nos. 53, 57; Burton Dep. 98:16–23; Trustee's Resp. to Defs.' SUMF ¶¶ 54, 56 (disputing only on argumentative grounds that Hagh was "still working on Debtor's behalf").*

In other words, by the time the Shoemaker fee came into existence in 2019, the case was being handled and resolved by successor firms and attorneys—not by CM, which had no active lawyers as of January 1, 2019. *Defs.' SUMF ¶ 46; Trustee's Resp. ¶ 46.* The Trustee's only "dispute" is semantic: she questions whether one can say the *entity* "withdrew" where her witnesses simply do not recall the paperwork. That sort of equivocation does not create a genuine issue of material fact under Rule 56.

In sum, the actual (non-speculative, non-hypothetical) contractual posture is fatal to every statutory and tort theory the Trustee asserts with respect to Shoemaker:

- **Turnover (11 U.S.C. § 542(b))** requires "a debt that is property of the estate" owed by the defendant. Once CM's own contract denies it any fee if it withdraws, and CM advances no expenses, there is no "debt" owed to CM by anyone in connection with the Shoemaker recovery.

- **Fraudulent transfer (11 U.S.C. § 548; Tenn. Code Ann. §§ 66-3-305, -306)** requires a "transfer of an interest of the debtor in property" or an "asset of the debtor." Where CM's contract extinguishes any post-withdrawal fee right and there are no recoverable expenses, the Shoemaker fee was never "an interest of the debtor in property" as against these Defendants.

- **Conversion** requires that Defendants exercise dominion over property belonging to the "true owner." Because, by the terms of CM's own engagement letter, CM had no right to any fee after it withdrew and no costs to recoup, CM cannot be the "true owner" of any part of the Shoemaker contingency fee.

In short, even if the Shoemaker theory had been properly pled (it was not), the Shoemaker Engagement Agreement itself forecloses any post-withdrawal fee, and the Trustee has admitted the critical provisions. On the undisputed contractual record, there is no Shoemaker fee interest that ever became "property of the estate" as against these Defendants. That is not a factual dispute; it is a dispositive legal consequence of the Trustee's own admissions, and it provides an independent ground to grant summary judgment on any Shoemaker-based claim.

## VIII. EVEN IF SOME FEE RIGHT SURVIVED, TENNESSEE LAW MAKES THE *CLIENTS*, NOT THESE DEFENDANTS, THE PROPER COUNTERPARTY — AND THE TRUSTEE'S "SUE THE LAWYERS INSTEAD" THEORY IS PURE, UNSUPPORTED LEGAL THEORY, NOT A DISPUTED FACT.

The Trustee's final move is to concede that her Fitzgerald and Shoemaker theories are not grounded in any contract or debt running from these Defendants to CM, and instead to argue that Tennessee quantum meruit law allows her to skip the clients entirely and proceed directly against successor counsel. But Tennessee law does not allow a plaintiff to use quantum meruit or unjust enrichment to override a valid, on-point contract. Where a valid, enforceable agreement addresses the subject of compensation, courts will not imply a quasi-contractual obligation to pay something different. *Whitehaven*, 973 S.W.2d at 596 (quantum meruit available only when "no valid contractual agreement exists between the parties or such contract has become unenforceable"); *Metro. Gov't*, 195 S.W.3d at 32–33. Yet that is exactly what the Trustee asks this Court to do: ignore the actual Engagement Agreements and award CM a share of a post-withdrawal contingency fee it expressly did **not** bargain for.

That is the new theory in Section I.A.3 of Trustee's summary judgment response, where she insists that "when defendants divert Debtor's attorney's fees, Debtor can sue them, leaving the client out of the litigation," and that Defendants are "triply wrong" to say fee disputes are between attorney and client.

But that is not a factual dispute; it is a totally unsupported legal theory that (1) misreads the Trustee's sole cited authority in *Johnson* and *Glassman*, (2) ignores Tennessee's basic attorney–client quantum meruit framework, and (3) still does not supply the missing element of this case: an actual *estate property interest* or *debt* owed by these Defendants to CM. It further fails to eliminate the key problem that such a cause of action was *never pled in the Complaint*.

## A.    The Trustee concedes the only engagement letters run between CM and its *clients*, not CM and Defendants.

On the basic relational structure among the clients, Debtor, and Defendants, there is no dispute:

- The Trustee admits that CM "entered into engagement agreements with its clients that laid out the duties and rights of both parties to the contract."

- She admits that the "Fitzgeralds only ever signed one contingency-fee engagement letter—Debtor's" and that "contractually, Debtor's engagement letter stands alone, entitling it alone to the Fitzgerald fees."

- She likewise admits that there is a Shoemaker engagement letter between CM and the Shoemaker plaintiffs, promising CM a one-third contingency fee.

At the same time, the Trustee never identifies any fee-sharing agreement between CM and Hagh Law; co-counsel agreement between CM and Manookian PLLC; or assignment of CM's fees from clients to these Defendants. Indeed, her own filings confirm that no such agreements exist.

## B.    Tennessee's quantum meruit framework runs against the client; *Johnson* and *Glassman* do not say otherwise.

Defendants' MSJ pointed out the settled Tennessee rule that, when a contingent-fee relationship ends before recovery, prior counsel's remedy — if any — is against the *client*, in contract or quantum meruit. The Trustee does not challenge that proposition with any Tennessee Supreme Court or Court of Appeals case. Instead, she asserts that Defendants "over generalize" and claims that *Johnson* and *Glassman* permit firm-vs-firm quantum meruit suits "leaving the client out of the litigation." That characterization is wrong for at least two reasons:

- **Johnson** involved law firms who actually *stood in a co-counsel relationship*—they jointly represented the same client, with an understanding that both would share in the eventual contingent fee. It did *not* create a free-floating cause of action allowing any earlier firm to sue any later firm that received a fee from a former client in the absence of a co-counsel/fee-sharing arrangement.

- **Glassman** is similar: it addresses fee-sharing and quantum meruit between firms with a demonstrable relationship and a shared expectation of sharing the fee.

By contrast, here the Trustee concedes there was *no* co-counsel or fee-sharing agreement between CM and any Defendant. *Johnson* and *Glassman*, as described in the Trustee's own Reply, simply confirm that when two firms *both actually stand in line to the same fee* (because of co-counsel or fee-sharing), quantum meruit can be used to divide that fee between them. They do *not* convert successor counsel in Tennessee into a de facto debtor to any prior lawyer who ever touched the file, absent agreement.

## C.     The Trustee's "no standing to sue the client once paid" point is a policy argument, not a fact, and it is wrong.

The Trustee asserts that "once the client has paid, the complaining firm has zero standing to sue that client" and that "the injury came by the one firm taking the funds, not by the client." That is not a factual assertion at all; it is a policy argument about how she believes fee litigation *should* work.

Nothing in *Johnson* or *Glassman* supports the notion that a client who has paid an agreed contingent fee is forever insulated from claims by prior counsel who allege they were contractually or equitably entitled to a portion of that fee.   To the contrary, Tennessee's quantum meruit framework presupposes that the client — who contracted for legal services and received the benefit — is the one against whom the discharged or withdrawing lawyer seeks compensation.   The Trustee cites no authority holding that, after settlement, the only available target is whoever ultimately received the fee, regardless of contract or privity.

Again, this is not a "dispute" about what happened in Fitzgerald or Shoemaker; it is an attempt to invent an additional remedy against successor counsel that Tennessee courts have never recognized. That kind of legal improvisation is precisely what Rule 56 is designed to filter out.

**D.    Without privity or co-counsel facts, the Trustee still has no estate property interest or "debt" running from Defendants.**

In sum, all of the Trustee's statutory and tort theories require that she show *some* cognizable property interest or debt as between CM and these Defendants:

- Turnover (§ 542(b)) requires "an entity that owes a debt that is property of the estate."
- Bankruptcy and TUFTA fraudulent transfer claims require a "transfer of an interest of the debtor in property" or an "asset of the debtor."
- Conversion requires that Defendants exercised dominion over property belonging to the "true owner."

Her own admissions and citations show the only fee engagement letters here are between CM and clients. Again, there is no contract, assignment, or co-counsel agreement between CM and any Defendant, and there never was. Even crediting every factual assertion in the Trustee's Reply, the estate never acquires, as against these Defendants, anything more than what CM itself had: a contingent-fee contract with the clients that CM later extinguished by withdrawal and express fee waiver. There is still no debtor–creditor relationship between CM and Defendants, and no Tennessee authority creating one by operation of law.

## IX.    CONCLUSION

For all of the Trustee's rhetoric, this case still turns on basics the record will not bend: CM's own engagement agreements, CM's own written withdrawal and fee waiver, the undisputed fact that CM had no licensed lawyers actually practicing law by early 2019, and the Trustee's express admissions that neither the Hagh Parties nor Manookian PLLC ever received or owed "property of CM." On that framework, there is no pre-petition § 541 property interest in the

Fitzgerald or Shoemaker fees, no "debt that is property of the estate" for turnover, and no "property of another" to support conversion or fraudulent transfer. What remains are only unpled theories, legal characterizations, and speculation—none of which can create a genuine dispute of material fact under Rule 56.

Because the Trustee has failed to identify any cognizable estate property interest in the Fitzgerald or Shoemaker fees, and because her responses to Defendants' SUMF admit away the few facts that could have mattered, Defendants are entitled to judgment as a matter of law.

Defendants respectfully request that the Court: (1) grant Defendants' Motion for Summary Judgment in its entirety; (2) enter judgment in favor of Defendants on all counts of the Complaint; (3) deny the Trustee's request for declaratory and turnover relief as to the Fitzgerald and Shoemaker fees; and (4) direct that any funds presently held in the Court's registry in connection with the Fitzgerald settlement be released to the persons or entities lawfully entitled to them under existing non-bankruptcy rights and orders.

Date:   December 1, 2025                    Respectfully submitted,


                                           */s/ John Spragens*
                                           John Spragens (TN Bar No. 31445)
                                           Spragens Law PLC
                                           915 Rep. John Lewis Way S, Suite 100
                                           Nashville, TN 37203
                                           T: (615) 983-8900
                                           F: (615) 682-8533
                                           john@spragenslaw.com

                                           *Attorney for Manookian PLLC, Afsoon*
                                           *Hagh and Hagh Law PLLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed December 1, 2025 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

*/s/ John Spragens*