## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE:<br><br>**CUMMINGS MANOOKIAN, PLLC**<br><br>    Debtor.<br><br>**JEANNE ANN BURTON, TRUSTEE**<br><br>    Plaintiff,<br><br>v.<br><br>**HAGH LAW, PLLC; AFSOON HAGH;**<br>**and MANOOKIAN PLLC,**<br><br>    Defendants. | **Case No, 3:19-bk-07235**<br>**Chapter 7**<br>**Judge Walker**<br><br>**Adv. Proc. No. 3:20-ap-90002** |

## DEFENDANTS AFSOON HAGH, HAGH LAW, PLLC,
## AND MANOOKIAN PLLC'S JOINT TRIAL BRIEF

Defendants Afsoon Hagh, Hagh Law, PLLC, and Manookian PLLC submit this Joint Trial Brief for the Court's consideration in advance of the trial of this matter.

### I.     INTRODUCTION

This trial will proceed on a record that is no longer in dispute in any meaningful way. After more than five years of discovery, multiple rounds of summary judgment briefing, and two sets of Requests for Admission, the Trustee still cannot do the one thing her case requires: identify a cognizable, pre-petition property interest of Cummings Manookian, PLLC ("CM") in either the

Fitzgerald or Shoemaker fees, and point to evidence that these Defendants ever received or now hold that property.

The controlling documents and the Trustee's own admissions point the other direction. CM's engagement agreements—drafted by CM—provide that any contingent fee right in the Fitzgerald and Shoemaker matters depends on the clients terminating CM, not on CM withdrawing. When CM withdraws, its recovery is contractually limited to reimbursement of advanced expenses.

In Fitzgerald, CM not only chose the withdrawal option, it sent a December 7, 2018 withdrawal letter expressly advising the clients that CM "will not be entitled to any portion of an attorney's fee and specifically disclaims the same" under the prior engagement agreement. The Trustee has conclusively admitted in response to Requests for Admission: the authenticity of that letter, that the letter expressly waives any compensation for CM, that the letter was actually sent, and that Brian Manookian spoke for CM when he disclaimed any fee.

The Shoemaker theory is even more attenuated. CM withdrew pre-suit before any lawsuit was filed, never again communicated with the clients throughout the years of litigation, advanced no costs, and had no role in the case's litigation or settlement. Indeed, the Complaint in this case does not even plead any Shoemaker-specific entitlement to fees against these Defendants, and the Trustee has never amended to add such a claim or disclosed any Shoemaker damages computation.

Separate and apart from the clear prohibition on any recovery by CM imposed by the very fee contracts it drafted, the Trustee's responses to Defendants' Statement of Undisputed Material Facts and to RFAs close the door on any property-transfer or turnover theory. She admits that neither Hagh Law, PLLC, Afsoon Hagh, nor Manookian PLLC ever received a payment from CM, ever took or used CM's property (including any contents of 45 Music Square West), or ever owed

CM a debt. Under Fed. R. Civ. P. 56 and LBR 7056-1, those responses fix the factual landscape for trial.

On that landscape, this is not a case about tracing estate property into Defendants' hands or unwinding an actual transfer of CM assets. It is a case about a defunct law firm that voluntarily relinquished its own fee rights, ceased to have any licensed attorneys, and never transferred its property to the separate PLLCs and lawyer now before the Court.

As Defendants' summary judgment papers already explained, the record is not ambiguous on these points: CM had no cognizable property interest in the Fitzgerald or Shoemaker fees; any claim CM might have had would run, if at all, against its former clients; there is no "transfer of an interest of the debtor in property" to support fraudulent transfer; there is no "property of the estate" in Defendants' possession to support turnover; there is no underlying contract or tort right to sustain conversion or tortious-interference theories; and there is no factual basis for successor or alter-ego liability.

Against that backdrop, the issues for trial are narrow and legal:

1.    Whether, as of the petition date, CM held any enforceable legal or equitable interest in the Fitzgerald or Shoemaker fees under its own engagement agreements and Tennessee law on contingent fees and withdrawal;

2.    Whether any CM property – fees, client interests, or tangible assets – was ever transferred to, held by, or owed by these Defendants so as to satisfy the threshold "property of the debtor" element for conversion, fraudulent transfer, or turnover; and

3.    Whether, in light of the RFAs and admitted facts, the Trustee can satisfy the elements

of her successor-liability, alter-ego, and tortious-interference theories, or prove any non-

speculative damages even if she could establish liability.

As the sections that follow show, the answer to each question is no. The binding

admissions and undisputed record foreclose essential elements of every cause of action, and

judgment should be entered in favor of Defendants on all counts.

## II.    PROCEDURAL BACKGROUND AND CLAIMS AT ISSUE

### A.    Parties and Posture

This adversary proceeding arises in the Chapter 7 case of Cummings Manookian, PLLC

("CM" or "Debtor").  Jeanne Ann Burton, as Chapter 7 Trustee, is the plaintiff.  The defendants

are Afsoon Hagh, Hagh Law, PLLC, and Manookian PLLC (collectively, the "Defendants").

CM was a short-lived plaintiffs' firm that worked on contingent-fee engagement

agreements.  Those agreements expressly limited CM's rights if it *withdrew* from a case: upon

withdrawal, CM could seek reimbursement of advanced costs, but had no contractual right to any

attorney's fee. *See Defs.' SUMF ¶¶ 5–9, 21–23; Trustee's Resp. ¶¶ 5–9, 21–23*

By January 1, 2019 CM had ceased operating as a law practice. It had no actively licensed

member-attorneys, no employees, and no payroll. Defs.' SUMF ¶¶ 17–25, 46–47; Trustee's Resp.

¶¶ 17–25, 46–47; Burton Dep. 20:16–21:1, 25:17–25.  The Fitzgerald and Shoemaker recoveries

at issue were obtained thereafter by separate counsel at separate law firms.

Despite that reality, the Trustee seeks to treat these Defendants as if they were CM's

debtors or successors, asking the Court to reallocate fees earned by operating, licensed firms back

to a dissolved, non-practicing entity that (a) withdrew from the cases and (b) in Fitzgerald,

*expressly waived any fee*. See Fitzgerald Withdrawal Letter (Ex. 3); Defs.' SUMF ¶¶ 24–25, 28–29, 32; Trustee's Resp. ¶¶ 25, 28–29, 32.

**B.      The Trustee's Claims – And Why They Fail Factually and Conceptually**

The operative pleading is the Trustee's original Complaint. It has never been amended to add Shoemaker-specific claims against successor counsel following the resolution of that case or to conform to the developed record.   Stripped of rhetoric, the Trustee's theories are as follows:

### 1.      Declaratory Judgment (Fitzgerald and "CM Cases")

The Trustee asks for a declaration that the estate "owns" the Fitzgerald (and, vaguely, other) contingent fees because CM once represented those clients.  In her summary-judgment papers she goes so far as to claim that the entire $1.35 million Fitzgerald fee "belongs solely to Debtor." Trustee's MSJ at 1–2.

That position disregards CM's own contract and conduct. The Fitzgerald Engagement Agreement gives CM *no* right or claim to a fee where it chooses to withdraw.  Defs.' SUMF ¶¶ 21–23; Trustee's Resp. ¶¶ 21–23.   And Cummings Manookian undisputedly withdrew.  Following the departure of Brian Cummings from the firm and the suspension of Brian Manookian's law license, CM sent a December 7, 2018 letter to Marty and Melissa Fitzgerald withdrawing its representation and "explicitly disclaim[ing] the right to any fee." Defs.' SUMF ¶¶ 24–25, 28–29, 32; Trustee's Resp. ¶¶ 25, 28–29, 32. The Trustee's declaratory claim depends on ignoring both the contract and the waiver.

### 2.      Conversion

The Trustee asserts that Defendants "converted" property of CM by retaining settlement proceeds and fees.  But she identifies no specific "property of CM" ever held by Defendants – no CM trust funds, no CM receivables, and no assigned fee rights.  Her own admissions are that the

only relevant written contracts are between CM and its *clients*, and that there is no fee-sharing or co-counsel agreement with Defendants in Fitzgerald or Shoemaker. *See* Defs.' Reply at 8–12; Manookian Decl. ¶¶ 36–46; Shoemaker Engagement Agreement (Ex. 1).

Without a defined, existing CM property interest, a conversion claim is conceptually empty. The Trustee is attempting to convert *someone else's earnings* into "property of CM" by labeling them "converted."

### 3. Fraudulent Transfer (TUFTA / Bankruptcy Code)

The Complaint recites TUFTA and bankruptcy avoidance buzzwords, alleging that CM assets were fraudulently transferred "to or for the benefit of" Defendants. Compl. ¶¶ 44–52. But the Trustee has now *admitted* that Defendants never received or held CM property. Defs.' SUMF ¶¶ 48, 55, 59–61, 64–65; Trustee's Resp. ¶¶ 48, 55, 59–61, 64–65. As a result: no asset, no transfer, no TUFTA or § 548 case. These claims are a classic example of pleading the statute, then hoping discovery will conjure a transfer that never occurred. The summary judgment record confirms that it did not.

### 4. Tortious Interference with the Fitzgerald Contract

The Trustee accuses Defendants of "coercing" the Fitzgeralds not to remit a fee to CM under its contingent-fee contract. That theory runs headlong into CM's own voluntary withdrawal and written waiver. Defs.' SUMF ¶¶ 24–25, 28–29, 32; Trustee's Resp. ¶¶ 25, 28–29, 32. By the time successor counsel obtained the recovery, CM had (i) ceased practicing law, (ii) withdrawn from the case, (iii) told the client it was not seeking a fee, and (iv) directed the client to find new counsel.

The Trustee thus asks the Court to find "interference" with a contract that CM itself abandoned and disavowed.

5.      **Successor Liability / Alter Ego**

The Complaint gestures at "successor" and "alter ego" labels to impute CM's debts to Hagh Law and Manookian PLLC. But Tennessee law requires, at minimum, a transfer of assets or operations or complete domination plus misuse of the corporate form. Defs.' MSJ at 48–54.

Here, the Trustee identifies no transfer of CM assets to Defendants, no assumption of CM liabilities, and no evidence that Defendants used any entity as a sham to avoid CM obligations. Defs.' SUMF ¶¶ 44–47, 48, 55; Trustee's Resp. ¶¶ 44–47, 48, 55. The "successor" and "alter-ego" counts are labels in search of facts.

6.      **Turnover (11 U.S.C. § 542)**

The turnover count assumes away the central issue by asserting that Defendants hold "property of the estate" that must be surrendered. But turnover is a remedy, not a way to create property rights *ex nihilo*. Because the estate has no enforceable interest in the Fitzgerald or Shoemaker fees and Defendants never received CM property, there is nothing for § 542 to reach. See Defs.' MSJ at 54–57.

In short, each cause of action presupposes a CM property interest or debt running against these Defendants. The Trustee has never identified such an interest in the pleadings and has disclaimed it in the record.

**C.      The Summary Judgment Record and Binding Admissions**

This case will not go to trial on a blank slate. The Trustee has already made a series of binding factual admissions—both in response to Requests for Admission and in her responses to Defendants' Statement of Undisputed Material Facts—that sharply constrain what she can argue and prove.

1.      **Requests for Admission: What the Trustee Has Already Irrevocably Conceded**

Case 3:20-ap-90002    Doc 365    Filed 12/02/25    Entered 12/02/25 19:23:46    Desc Main
Document      Page 7 of 25

Under Rule 36, matters admitted in response to Requests for Admission are "conclusively established" unless the Court permits withdrawal. The Trustee has never moved to withdraw or amend the admissions that matter here. As a result, several key categories of fact are now fixed.

First, the Trustee admits the existence, authenticity, and operative terms of CM's engagement agreements and withdrawal letters. She concedes that CM entered into written contingent-fee agreements with its clients; that those agreements distinguish between client termination and firm withdrawal; that they provide only for a possible fee if the client terminates the firm; and that they do not provide for, or require, payment of any attorney's fee to CM when CM withdraws. She further admits that the Shoemaker and Fitzgerald agreements attached to Defendants' summary-judgment papers are genuine copies of those contracts and accurately reflect their fee provisions. S*he also admits that CM sent the December 7, 2018 Fitzgerald withdrawal letter and that it expressly disclaims any right to a fee.*

Second, the Trustee admits that CM had ceased functioning as a law practice before the challenged fees were earned. She concedes that, as of January 1, 2019, CM had no members or partners with an active license to practice law, no employees, and no payroll. As to Shoemaker, she admits that CM did not pay any costs, did no work in the filed malpractice case, never again had contact with the clients once the case was instituted, and had no lawyers practicing when the case was litigated and settled.

Third, the Trustee admits the non-existence of any transfer or possession of CM property by these Defendants. In response to RFAs and Defendants' SUMF, she acknowledges that neither Manookian PLLC nor the Hagh Parties ever received or held property belonging to CM, that no CM assets were transferred to them, and that they do not and have never owed a debt that is property of the estate. Her own deposition testimony confirms that she cannot identify any

payment from CM to these Defendants, any specific item of furniture or equipment that she knows belonged to CM and was taken by them, or any quantifiable harm arising from their alleged "use" of CM property.

Those are not incidental details. They go directly to the existence of any fee rights, the viability of any property-based theory, and the factual predicates for successor liability, alter ego, fraudulent transfer, conversion, and turnover. As Rule 36 makes clear, the Trustee is bound by these admissions; she may not treat them as suggestions and argue the opposite at trial.

### 2.     Responses to Defendants' SUMF and Deemed Admissions

The Trustee's handling of Defendants' Statement of Undisputed Material Facts has the same practical effect. Under the Bankruptcy Court's local summary-judgment rule, a nonmovant must respond to each numbered fact with a citation to contrary record evidence; unsupported "disputes" are disregarded, and properly supported facts are deemed admitted for purposes of Rule 56.

Here, for many of Defendants' most important factual statements, the Trustee either expressly agrees that "this paragraph's facts are undisputed" or purports to "dispute" them with nothing more than argument, commentary, or references to witnesses who simply do not remember events from years ago. For example, she affirms the authenticity and content of the Fitzgerald and Shoemaker engagement agreements and of the Fitzgerald withdrawal letter, even while insisting – without citation – that no "automatic admission" should result (whatever that means). She admits the lack of active CM lawyers after early 2019, the absence of CM costs in Shoemaker, and the timeline under which the Fitzgerald and Shoemaker recoveries were obtained by successor counsel. Where she claims to "dispute" those points, she does so by referencing "I don't recall"

testimony or generic objections, not by pointing to any contradictory testimony or countervailing record evidence.

Under Rule 56 and the local rule, those are not genuine disputes; they are binding admissions masquerading as argument. The result is a set of core facts that the Court must treat as established, including: the controlling contract language on fees; CM's own pre-petition fee waiver in Fitzgerald; CM's non-operating status at all relevant times; CM's lack of costs and work in the filed Shoemaker case; and the absence of any transfer or possession of CM property by Defendants.

### 3. How the Court Should Use These Admissions at Trial

Taken together, the RFAs and summary-judgment admissions sharply narrow what remains to be decided. They are not evidentiary "suggestions" that the Trustee may revisit or ignore at trial; they are binding concessions that define the factual landscape.

On that fixed foundation, the Trustee cannot create the factual predicates her causes of action require. She cannot prove an estate property interest in Fitzgerald or Shoemaker fees when she has already admitted contracts that give CM no fee upon withdrawal and a written waiver of any fee in Fitzgerald. She cannot prove a fraudulent transfer or conversion when she has already admitted that no CM property was ever transferred to, or held by, these Defendants. She cannot establish successor liability or alter ego when she concedes there was no transfer of CM assets and offers no evidence of misuse of the corporate form. And she cannot salvage a tortious-interference claim by contradicting the withdrawal and waiver she has acknowledged in discovery.

The trial, in other words, should not be a free-ranging inquiry into hypothetical scenarios the Trustee now wishes were true. It must necessarily be conducted on the facts she has already admitted: CM wrote the contracts that defeat its fee theories, CM made the decision to withdraw

and waive any fee in Fitzgerald, CM did no work and advanced no costs in Shoemaker, CM never transferred assets to these Defendants, and has no evidence that they ever held CM property or owed CM a debt. Once the Court treats those matters as established, as the Rules require, there is no evidentiary path left for the Trustee to carry her burden on any count.

**D. Narrow Questions Remaining for the Court**

On this record, the questions the Court must resolve on the pending summary-judgment motions—and, if necessary, at trial—are narrow and largely legal:

1. Whether a dissolved, non-operating firm that withdrew from a case and expressly waived any fee can nonetheless claim a contractual or equitable interest in successor counsel's contingent fee.

2. Whether fraudulent transfer or turnover theories can proceed where the Trustee has admitted there was never any transfer or possession of CM property by these Defendants.

3. Whether bare "successor" and "alter-ego" labels, unsupported by any asset transfer or misuse of the corporate form, can impose CM's liabilities on separate firms under Tennessee law.

4. Whether a party that repudiated its own fee right can plausibly accuse successor counsel of "interfering" with that right.

The balance of this Trial Brief addresses those questions in order and explains why, under the governing law and the Trustee's own admissions, each must be resolved in Defendants' favor.

## III. LEGAL STANDARD

**A. Property of the Estate – 11 U.S.C. § 541**

Section 541(a) defines "property of the estate" as the "legal or equitable interests of the debtor in property as of the commencement of the case." The statute does not enlarge those interests; it simply gathers into the estate whatever rights the debtor actually held under non-bankruptcy law on the petition date. The Trustee "stands in the shoes" of the debtor and "can rise no higher than the debtor's rights" as of that date. *See, e.g., Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853–54 (6th Cir. 2002).

Accordingly, if CM had no enforceable right to the Fitzgerald or Shoemaker fees as of the petition date, then the estate has no § 541 interest in those fees. A speculative hope that a dissolved, non-operating firm might someday persuade a court to award it part of successor counsel's fee is not a "legal or equitable interest" in property; it is simply wishful thinking, and § 541 does not transform wishful thinking into an estate asset.

In the contingent-fee context, the debtor's property interest is defined by state law: the engagement agreement and any cognizable quantum-meruit claim against the client. If the governing contract gives the firm no fee upon withdrawal, and the firm has expressly disclaimed any fee in writing, there is nothing for § 541 to capture.

**B.      Tennessee Law on Contingent Fees, Withdrawal, and Fee Waivers**

Under Tennessee law, attorney-fee rights are creatures of contract between lawyer and client, reinforced (not displaced) by statute. See Tenn. Code Ann. §§ 23-2-102, -103 (governing contingent-fee arrangements and attorney liens). The starting point is always the engagement agreement.

Tennessee law and CM's own agreements draw a sharp distinction between two scenarios:

1. **Client terminates the firm.** If the client discharges the firm without cause, the firm may have a claim to a fee interest, typically measured in quantum meruit, and that claim runs against the client.

2. **Firm withdraws.** If the firm chooses to withdraw, its rights are limited to what the contract preserves. CM's standard agreements, including Fitzgerald and Shoemaker, limit the firm upon withdrawal to reimbursement of advanced costs, if any, and say nothing about any further fee.

Tennessee law does not allow a former firm to reach into another firm's negotiated contingent fee. The Trustee's effort to treat Defendants' earned fees as if they were "CM fees" ignores this basic framework.

Moreover, an express contractual waiver or disclaimer of fees is fully enforceable and extinguishes any claim under the agreement. When a firm both (a) lacks any contractual fee right upon withdrawal, and (b) affirmatively disclaims any fee in writing, there is no plausible basis for a later fee claim under Tennessee law—let alone a bankruptcy "property of the estate" theory built on top of it.

## C. Elements of the Relevant Causes of Action

Because the Trustee's Complaint is sprawling but thin, it is critical to keep the governing elements clear and to measure her proof against them. The following standards control:

### 1. Declaratory Judgment

Under the Declaratory Judgment Act, a plaintiff must show an actual, justiciable controversy regarding existing legal rights or property interests; the court may then, in its discretion, declare those rights. A declaratory-judgment claim cannot conjure a property interest that does not exist under substantive law; it merely declares what those rights already are. If CM

Case 3:20-ap-90002   Doc 365   Filed 12/02/25   Entered 12/02/25 19:23:46   Desc Main
Document      Page 13 of 25

had no fee right and no property interest as of the petition date, there is nothing meaningful for the Court to declare in the Trustee's favor.

### 2. Conversion

To prevail on conversion, a plaintiff must establish: (1) the plaintiff's ownership or immediate right to possession of specific property; (2) the defendant's intentional exercise of dominion over that property; and (3) deprivation of the plaintiff's use and enjoyment of it. *See Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 797 (M.D. Tenn. 2000) (conversion is "the appropriation of another's property to one's own use and benefit, by the exercise of dominion over it, in defiance of the true owner's rights").

Thus, without a defined CM property interest in identifiable funds, there is nothing to "convert." Bare assertions that Defendants received their own earned fees do not satisfy the threshold element of ownership or right to possession.

### 3. Fraudulent Transfer (TUFTA and Bankruptcy Code)

The Tennessee Uniform Fraudulent Transfer Act, Tenn. Code Ann. §§ 66-3-305, -306, permits avoidance only of a "transfer made or obligation incurred by a debtor" involving an "asset" of that debtor, and then only if the debtor (a) acted with actual intent to hinder, delay, or defraud a creditor, or (b) did not receive reasonably equivalent value while insolvent or rendered insolvent. Bankruptcy fraudulent-transfer provisions operate on the same premise: a transfer of "an interest of the debtor in property."

Each theory therefore requires, at step one, a *transfer of a CM asset*. If there is no CM asset in play—and no transfer by CM—these counts never get out of the gate. Re-labeling Defendants' own fee income as a "transfer" of CM property does not satisfy TUFTA or the Bankruptcy Code.

### 4.  Tortious Interference with Contract

Under Tennessee law, tortious interference with contract requires: (1) a valid contract; (2) the defendant's knowledge of the contract; (3) the defendant's intent to induce a breach or otherwise interfere; (4) the use of improper motive or improper means; and (5) resulting damages. *See Na-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 335 F. Supp. 3d 1002, 1019–20 (M.D. Tenn. 2018).

Where the contracting party itself has withdrawn and expressly disclaimed any contractual right (as CM did in Fitzgerald), there is no valid, existing contractual expectancy to interfere with. The Trustee's theory reduces to claiming interference with a right CM voluntarily abandoned.

### 5.  Successor Liability

Tennessee follows the general rule that a corporation or PLLC that purchases the assets of another is not liable for the seller's debts, subject to narrow exceptions. One such exception is "mere continuation" successor liability, which courts apply only when the plaintiff proves, at a minimum, that:

- o   the predecessor transferred its assets to the successor;

- o   the successor paid less than adequate consideration;

- o   the successor continues the predecessor's business;

- o   the entities share at least one common officer who was instrumental in the transfer; and

- o   the predecessor is left incapable of paying its creditors.

*See, e.g., Mapco Exp., Inc. v. Interstate Entertainment, Inc.*, No. 3:08-cv1235, 2011 WL 12556959, at *17 (M.D. Tenn. Aug. 11, 2011); *Rxar Co., LLC v. Rheumatology Assocs., P.A.*, No. 3:14-C-0789, 2017 U.S. Dist. LEXIS 64354 (M.D. Tenn. 2017).

These standards demand proof of an actual asset transfer and concrete continuity. Vague allegations that firms share a principal, an address, or a practice area are not enough, and they cannot substitute for evidence of a transfer of CM assets—which the Trustee has never identified.

### 6.    Alter Ego / Veil Piercing

Tennessee veil-piercing and alter-ego law is likewise narrow and element-heavy. Under *Continental Bankers Life Ins. Co. v. Bank of Alamo*, 578 S.W.2d 625 (Tenn. 1979), as reaffirmed in *Youree v. Recovery House of East Tennessee, LLC*, M2021-01504-SC-R11-CV (Tenn. Jan. 22, 2025), a plaintiff must show:

- o   that the defendant exercised complete dominion and control over the entity;

- o   that such control was used to commit a fraud or wrong, to violate a statutory or other duty, or to commit a dishonest or unjust act; and

- o   that this misuse of control proximately caused the plaintiff's injury.

Tennessee courts emphasize that mere common ownership, shared office space, overlapping personnel, or ordinary corporate formalities are not enough. There must be a misuse of the entity to commit a specific wrong that caused the alleged harm. The Trustee's attempt to treat Defendants as a kind of reverse "collective alter ego" of CM ignores these requirements and collapses them into guilt by association.

## IV.    ARGUMENT

### A.    The Estate Has No Property Interest in Fitzgerald or Shoemaker Fees

The Trustee's theory begins and ends with the premise that CM somehow "owned" the Fitzgerald and Shoemaker fees as of the petition date. The undisputed record shows the opposite.

CM's own engagement agreements – drafted by CM and admitted by the Trustee to govern both Fitzgerald and Shoemaker – distinguish sharply between client termination and firm

withdrawal. If the *client* terminates CM, the agreement contemplates a possible fee interest. If *CM* withdraws, the agreement is explicit: CM's only surviving right is reimbursement of advanced costs, if any; it has no entitlement to an attorney's fee. The Trustee has admitted both the authenticity of these agreements and the accuracy of Defendants' description of their fee provisions, including the absence of any fee right upon withdrawal.

In Fitzgerald, CM did more than merely trigger the "withdrawal" side of its own contract. On December 7, 2018, CM – through its sole member – sent a letter to the Fitzgeralds formally withdrawing from the representation and expressly disclaiming any right to a fee in that case. The Trustee admits that Exhibit 3 is a genuine copy of that letter; she admits Mr. Manookian sent it; and she admits that it expressly disclaims precisely what she now seeks to be awarded.

By the time of the bankruptcy petition, CM thus had (1) a contract that affords no fee upon withdrawal and (2) a written, unambiguous prepetition waiver of any fee in Fitzgerald. Under § 541, the Trustee cannot manufacture an estate property interest that CM had already bargained away and expressly relinquished.

Shoemaker is even more remote. The only written agreement is CM's 2017 engagement with Keefer and the Shoemaker estate, and the Trustee concedes that this contract uses the same termination and withdrawal structure as Fitzgerald. She further admits that CM withdrew before any malpractice lawsuit was filed, that CM advanced no costs in the filed Shoemaker litigation, that CM performed no work in the filed case, and that by the time any fee could be earned CM had no licensed attorneys, employees, or payroll.

Critically, the Complaint does not even plead any Shoemaker-specific contract claim, quantum meruit theory, or fee-sharing arrangement involving these Defendants; Shoemaker appears only as a line item on a list of "CM Cases" and in generic declaratory allegations. On this

record, there is simply no coherent way to describe any portion of the Shoemaker fee as "CM's property" as of the petition date.

Once the contracts, the withdrawal, and the waiver are acknowledged, the legal consequence is straightforward. Section 541 brings into the estate only the legal or equitable interests the debtor actually held at the commencement of the case. CM had no enforceable contractual or quantum meruit claim to Fitzgerald or Shoemaker fees as of that date. Without an underlying property interest, the Trustee's declaratory-judgment claim has nothing to declare; the conversion claim has nothing to convert; the fraudulent-transfer claims lack any "interest of the debtor in property" to transfer; and the turnover count has nothing to turn over. All fee-based theories rest on a property right that, on this record, never existed.

## B.    No Transfer or Possession of Estate Property by Defendants

Even if the Trustee could salvage some abstract property interest in fees (she cannot), her property-based claims still fail because she has no evidence that any CM asset was ever transferred to, or held by, these Defendants. Her own admissions close that door.

Through Requests for Admission, Defendants' SUMF, and sworn declarations, the record establishes – without contradiction – that neither Manookian PLLC, nor Afsoon Hagh, nor Hagh Law PLLC ever received a transfer of CM property. There is no evidence of CM funds moving into Defendants' accounts, no assignment of CM receivables, no transfer of client files or work product as "assets," and no conveyance of furniture, equipment, or intellectual property. Manookian's declaration states that Manookian PLLC has never received, possessed, or used property belonging to CM and owes no debt that is property of CM; Hagh's declaration says the same as to herself and her firm. The Trustee offers nothing to the contrary.

Indeed, the Trustee's own testimony underscores these points. In her deposition, she conceded that she cannot identify a single payment from CM to the Hagh Parties, cannot identify a single piece of office furniture or equipment that she knows belonged to CM that was used by Defendants, does not know who owned the contents of the Music Square West office, and cannot articulate any damages CM supposedly suffered from Defendants' alleged "use" of that space. These are not minor gaps; they are admissions that the factual predicate for any transfer-or-possession theory is missing.

Against that record, the fraudulent-transfer claims cannot get off the ground. Both TUFTA and the Bankruptcy Code require a transfer of an asset of the debtor; the Trustee has identified none. The conversion claim fails because she cannot show that Defendants ever exercised dominion over specific CM property. And the § 542 turnover count fails because there is no matured "debt that is property of the estate" and no identifiable estate property in Defendants' hands. The Trustee's rhetoric about "taking everything" collapses when forced to engage with the actual evidence, which shows that Defendants never acquired CM's assets in the first place.

## C.      No Basis for Successor Liability or Alter Ego

In an effort to avoid the absence of any direct debtor–creditor relationship, the Trustee resorts to broad-brush "successor" and "alter-ego" labels, suggesting that Hagh, Hagh Law, and Manookian PLLC should simply be treated as stand-ins for CM. Tennessee law squarely rejects that kind of guilt by association.

Successor-liability doctrine in Tennessee starts from the rule that a company acquiring another's assets does not assume the seller's debts, subject to narrow exceptions. The "mere continuation" exception, which the Trustee implicitly invokes, requires proof of an actual transfer of assets for less than adequate consideration, coupled with continuity of business and management

and the predecessor's resulting inability to pay its creditors. Here, the Trustee cannot satisfy the first requirement. She has admitted that CM never transferred assets to Hagh Law or Manookian PLLC.

Cummings Manookian's law practice did not migrate to a new vehicle; it collapsed. There was no Cummings and there was no Manookian. By January 1, 2019, CM had no active lawyers, no employees, and no payroll.

Hagh Law is a separate PLLC of which Ms. Hagh is the sole member, and Hagh herself was never an owner, member, or employee of CM. Shared office space for a period of time, or the fact that successor counsel once sat in the same building and used similar letterhead, is not a transfer of assets and does not create successor liability.

The alter-ego theory fares no better. Tennessee veil-piercing requires proof that a defendant exercised complete domination and control over an entity, used that control to commit a fraud or other wrong, and caused the plaintiff's injury through that misuse. The Trustee points to none of this. Her alter-ego "evidence" consists of overlapping addresses and some filings in Fitzgerald that used CM's address or signature block while Hagh was doing the work. None of that speaks to misuse of the corporate form to defraud creditors or evade obligations, and none of it shows that any Defendant used any entity as a shell to divert CM assets or defeat CM's creditors. At most, the Trustee has shown professional and personal connections; Tennessee law requires far more before disregarding entity separateness.

Accordingly, even if CM had a cognizable fee interest (it did not), there is no doctrinal mechanism to impose CM's hypothetical liabilities or obligations on these Defendants. The successor-liability and alter-ego counts are labels in search of facts, and they cannot carry the Trustee's case any further than her property theories do.

**D.      No Independent Tort or Contract Theory (Tortious Interference)**

Recognizing that her property-based claims are weak, the Trustee also gestures at tortious interference. That theory collapses as soon as the controlling contracts and undisputed facts are brought back into view.

The only relevant written contracts are CM's engagement agreements with its clients. There is no contract of any kind between CM and these Defendants – no co-counsel agreement, no fee-sharing arrangement, no assignment of fees. Under those client engagements, CM had the right to withdraw and did so. In Fitzgerald, it went further and expressly disclaimed any fee. Whatever contractual expectancy CM once had, it chose to relinquish.

A tortious-interference claim under Tennessee law requires, among other elements, a valid contractual expectancy, intentional and improper interference by the defendant, and resulting damages. The Trustee cannot plausibly argue that Defendants interfered with a fee right that CM both lacked under its own contract and voluntarily waived in writing. There is no evidence that Defendants induced the Fitzgeralds (or anyone else) to breach an obligation to CM. Nor is there evidence of "improper means" or "improper motive" in the sense Tennessee law requires—no threats, misrepresentation, or independently wrongful conduct.

The only causal story supported by the record is that CM's own withdrawal and waiver eliminated any potential fee interest long before Defendants earned their fees. It is difficult to interfere with a right that no longer exists. In short, the tortious-interference claim is an attempt to recast CM's voluntary strategic and ethical choices as someone else's tort. The elements simply do not fit. That claim fails independently of the Trustee's property and successor-liability theories and cannot salvage the Complaint.

**E.      Independent Failure of Proof on Damages**

Finally, even if the Trustee could somehow survive on liability (she cannot), her claims would still fail for lack of admissible proof of damages. <u>After years of discovery, she has no coherent damages case.</u>

The Trustee has never supplied a Rule 26 computation of damages for any count directed at these Defendants. She has not identified any methodology for allocating fees between firms or valuing a hypothetical quantum-meruit interest CM might have had. She has never asserted a number of hours CM worked on any given case; what it did; or how it contributed.

She has not disclosed an expert to opine on fee allocation, the value of any alleged "use" of Music Square West, or any other category of loss. Her deposition testimony confirms that she cannot articulate, in concrete terms, what dollar amounts she believes the estate is owed or how those numbers would be calculated.

The Trustee's failure to provide *any* damages accounting is not an oversight; it is a consequence of her completely contrived claims. Given the prepetition waiver in Fitzgerald, the absence of any work or cost advancement by CM in Shoemaker, and the lack of any transfer or possession of CM property, any attempt to quantify damages would be speculative in the extreme. There is no non-speculative way to assign a dollar value to a fee right that did not exist, to an asset that was never transferred, or to the "use" of furniture that may never have belonged to CM. Under familiar principles, including *Celotex's* burden-shifting framework, a plaintiff's failure to make a showing on an essential element—such as damages—requires judgment as a matter of law.

Thus, even if a liability theory could be cobbled together in the abstract, the Trustee has no evidentiary path to a money judgment. That independent failure of proof reinforces what the property, transfer, successor-liability, and tort analyses already demonstrate: every route the Trustee has pleaded leads to the same place—judgment for Defendants on all counts.

## VI.    CONCLUSION

This case has always turned on a narrow, threshold question: did CM have any cognizable property interest, as of the petition date, in the Fitzgerald or Shoemaker fees or in any other asset held by these Defendants?  Once the contracts, the withdrawal and waiver, CM's collapse as a functioning law firm, and the Trustee's own admissions are placed in view, the answer is no. Everything else in the Complaint depends on pretending that answer is yes.

On the actual law set out above and the admitted facts summarized in Sections II, IV, and VI, the Trustee cannot establish any of the elements her sprawling pleadings require.  CM's own engagement agreements, which the Trustee has authenticated and conceded, do not give CM a fee upon withdrawal.  In Fitzgerald, CM went further and expressly waived any fee in writing months before the petition.   In Shoemaker, CM withdrew before the malpractice suit was filed, advanced no costs, did no work in the filed action, and had no licensed attorneys by the time any fee could arise. Under § 541 and Tennessee law, there is simply no "estate property" in those fees to begin with.

The same record forecloses the Trustee's effort to repurpose ordinary fee income earned by operating successor counsel into "CM assets" for purposes of conversion, fraudulent transfer, or turnover.  She has admitted that CM never transferred assets to these Defendants, that they never received or held CM property, and that they do not owe a debt that is property of the estate. Without a debtor asset and without a transfer or possession, the fraudulent-transfer counts, conversion theories, and § 542 turnover demand all fail at the starting line.

Nor can the Trustee salvage her case by recasting Defendants as "successors" or "alter egos" of CM or by accusing them of tortious interference.  Successor liability in Tennessee requires an actual transfer of assets and a continuation of the predecessor's business; alter-ego liability

requires misuse of the entity form to commit a wrong that causes the claimed injury. The Trustee has proven, and can prove, neither. She points to no asset transfer, no assumption of CM liabilities, and no misuse of any entity to divert CM assets or evade CM's creditors. And her tortious-interference theory depends on treating CM's own withdrawal and written waiver as if they were someone else's "improper means." The facts and the governing law cannot be made to fit that story.

Layered on top of these substantive defects is a basic failure of proof. After years of discovery, the Trustee has no non-speculative damages case. She has not disclosed a usable damages computation, identified a methodology for allocating fees or valuing any hypothetical quantum-meruit claim, or offered a way to quantify alleged "use" of CM property. Under familiar standards, that failure alone would warrant judgment on any count seeking monetary relief.

Finally, the Trustee is not free at trial to sidestep the limitations created by her own discovery responses. Her admissions in response to Requests for Admission and Defendants' Statement of Undisputed Material Facts conclusively establish the core predicates that defeat her claims: the content of CM's engagement agreements and the Fitzgerald withdrawal letter; CM's non-operating status when the fees were earned; the absence of CM work or costs in Shoemaker; and the non-existence of any transfer or possession of CM assets by these Defendants. On that fixed foundation, there is no evidentiary path for the Trustee to carry her burdens on property, liability, or damages.

Whether in ruling on the pending summary-judgment motions or, if necessary, after trial on the existing record, the result should be the same. The Trustee has not identified an estate asset in Defendants' hands, has not established the elements of any of her theories, and has not proven any recoverable damages.

For all of these reasons, Defendants respectfully request that the Court enter judgment in their favor on all counts and dismiss the Complaint, and this adversary proceeding, with prejudice, together with such further relief as the Court deems just and proper.

Date:   December 2, 2025

                                        Respectfully submitted,


                                        /s/ John Spragens
                                        John Spragens (TN Bar No. 31445)
                                        Spragens Law PLC
                                        915 Rep. John Lewis Way S., Suite 100
                                        Nashville, TN 37203
                                        T: (615) 983-8900
                                        F: (615) 682-8533
                                        john@spragenslaw.com

                                        *Attorney for Manookian PLLC, Afsoon Hagh and Hagh Law PLLC*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed December 2, 2025 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.


                                        /s/ John Spragens